GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625-0112
*Attorney for Defendant Trooper Jose Rivera*

By:  Kai Marshall-Otto
     Deputy Attorney General
     (609) 376-2948
     Kai.Marshall-Otto@law.njoag.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF TRENTON

---

| | |
|---|---|
| Joel Martinez, | : |
| Plaintiff, | :    No. 15-cv-2932-BRM-TJB |
| v. | : **CERTIFICATION OF KAI W. MARSHALL-OTTO IN SUPPORT OF DEFENDANT RIVERA'S MOTION FOR SUMMARY JUDGMENT** |
| COLONEL JOSEPH R. FUENTES, et al., | : |
| Defendants. | : |

---

I, Kai W. Marshall-Otto, of full age, hereby certify:

1.   I am employed by the State of New Jersey, Department of Law and Public Safety, as a Deputy Attorney General.

2.   I work in the State Police, Employment, and Corrections Section of the Division of Law, which provides legal representation to the New Jersey State Police and its employees.

3.   I submit this certification in support of Trooper Rivera's Motion for Summary Judgment.

4.   Attached hereto as Exhibit A are excerpts from the April 26, 2018 deposition of Joel Martinez.

5.      Attached hereto as <u>Exhibit B</u> are excerpts, and exhibits, from the April 10, 2018 deposition of Jose Rivera.

6.      Attached hereto as <u>Exhibit C</u> are excerpts from the April 19, 2018 deposition of Blake Eldridge.

7.      Attached hereto as <u>Exhibit D</u> are excerpts from the April 19, 2018 deposition of Chase Atlee.

8.      Attached hereto as <u>Exhibit E</u> are excerpts from the April 26, 2018 deposition of Vicky Martinez.

9.      Attached hereto as <u>Exhibit F</u> are excerpts from the April 10, 2018 deposition of Sgt. Thomas Murtha.

10. Attached hereto as <u>Exhibit G</u> is a true and correct copy of documents produced in this action as NJSP MARTINEZ 278-279.

I hereby certify that the foregoing statements are true. I am aware that, if any of the foregoing statements are willfully false, I am subject to punishment.


By:  <u>s/ Kai W. Marshall-Otto</u>
                Kai W. Marshall-Otto
                Deputy Attorney General

DATED: April 12, 2019

2

# EXHIBIT A

Joel Martinez                                                    April 26, 2018

Page 1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
                 Civil Action No. 15-2932 (BRM)(TJB)
- - - - - - - - - - - - - - - -
JOEL MARTINEZ                               CONFIDENTIAL
          Plaintiff
            vs.                      ORAL DEPOSITION OF:
                                         JOEL MARTINEZ
COLONEL JOSEPH R. RUENTES,
SUPERINTENDENT, LT. COLONEL
PATRICK CALLAHAN, DEPUTY
SUPERINTENDENT OF OPERATIONS;
MAJOR KEVIN DUNN, DEPUTY
BRANCH COMMANDER, FIELD
OPERATIONS SECTION; JOHN
DOE 1, TROOP C COMMANDER;
JOHN DOE 2, SUPERVISOR,
TROOPER I JOSE G. RIVERA
(#6010), ACTING MAJOR MARK
WONDRACK, OFFICE OF
PROFESSIONAL STANDARDS;
CAPTAIN SCOTT EBNER, BUREAU
CHIEF, INTAKE AND ADJUDICATION
BUREAU, OFFICE OF PROFESSIONAL
STANDARDS, AND DSG ISMAEL
E. VARGAS,
          Defendants.
- - - - - - - - - - - - - - - -


               *     *     *     *


             THURSDAY, APRIL 26, 2017


               *     *     *     *



             MASTROIANNI & FORMAROLI, INC.
         Certified Court Reporting & Videoconferencing
                 251 South White Horse Pike
                 Audubon, New Jersey 08106
                    856-546-1100

Joel Martinez                                                                April 26, 2018

Page 18

1    A.    To this date.
2    Q.    To this date.
3          So it would have been in 2010 that you
4    began?
5    A.    Correct.  April 26th.
6    Q.    April 26th, of 2010.
7          And what position did you hold when you
8    first started at BlackRock?
9    A.    Investment management associate focused
10   on our offshore product range and dealing with our
11   offshore international financial advisors at Merrill
12   Lynch who are our clients.
13   Q.    And you no longer hold that position,
14   right?
15   A.    My role is no longer investment
16   management associate.  I'm a relationship manager
17   now.
18   Q.    And that's a promotion, right?
19   A.    It is.
20   Q.    How many promotions subsequent to the
21   initial position you held in 2010 have you had?
22   A.    One major promotion.
23   Q.    Any minor promotions?
24   A.    Change in title.  I went from
25   investment management associate to offshore product

Page 19

1    specialist.
2    Q.    In what year?
3    A.    This was, let's call it 2013, 2014.
4    Q.    And then subsequent to that, when was
5    the major promotion?
6    A.    Around the same time.  It was -- that
7    was a title promotion that went from investment
8    management associate to vice president.  So as an
9    offshore product specialist, I was still considered
10   an investment management associate.
11   Q.    Did you receive a promotion around
12   2015, by any chance, or would that have been in that
13   range?
14   A.    Yeah, it was around 2015 where I was
15   given the vice president, to my recollection, title.
16   Q.    2015 was the vice president title.
17         And have you received any promotions
18   subsequent to that?
19   A.    I have not.  But at the beginning of
20   this year, my group that was focused exclusively on
21   the Merrill Lynch channel, merged into the wider
22   wires, as we call it now, so I'm no longer referred
23   to as an offshore product specialist, but as a
24   relationship manager.
25   Q.    Understood.

Page 20

1         MR. LOUGHRY:  Just interrupt for one
2    moment.  Can we go off the record?
3         (Off-the-record discussion)
4         MR. MARSHALL-OTTO:  Back on the record.
5    BY MR. MARSHALL-OTTO:
6    Q.    So at this time I want to dig in a
7    little bit to the substance of the underlying
8    lawsuit.
9         Were you present on the grounds of the
10   Lawrenceville School on April 26 of 2013?
11   A.    I was.
12   Q.    And about what time did you arrive
13   there on that date?
14   A.    It was most definitely afternoon,
15   between 1 and 3:30.
16   Q.    And what was the reason for your
17   presence on the school grounds that day?
18   A.    I was going to catch a flight at
19   Philadelphia Airport to SanDiego where I was going to
20   pick up my mother who was elderly and fly her back
21   with me back to Philadelphia so she could stay with
22   me in Princeton.  So I went to the home, my home with
23   Vicky, to pick up my luggage which I needed an extra
24   piece to pack my things.
25   Q.    At this time, if you can remind me,

Page 21

1    were you still technically married to Vicky?
2    A.    I was.
3    Q.    But you no longer are, is that right?
4    A.    I no longer am.
5    Q.    On that date, did Vicky, your wife at
6    the time, know that you were coming to the house?
7    A.    No, she did not.
8    Q.    She did not.
9         Did your children know that you were
10   coming to the house?
11   A.    They did not.
12   Q.    Were either your children or Vicky
13   present there?
14   A.    They were not.
15   Q.    Was it common at that point in time for
16   you to come to the house unannounced?
17   A.    Vicky preferred that it would be
18   announced, but she had no problem with me coming over
19   unannounced to visit the kids which I did often.
20   Q.    Understood.
21         So would it be accurate to say that in
22   the context of where your relationship was with
23   Vicky, she would have preferred notice, but she
24   understood that in your role as a father you were
25   welcome there anytime essentially?

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Joel Martinez                                                          April 26, 2018

---

Page 26

1    there. I was just trying to avoid an overlap where
2    they could cross paths.
3         Q.     Can you tell me a little bit more about
4    the confrontation with Trooper Rivera?
5              Is it accurate to say that you
6    initiated that confrontation?
7         A.    It is accurate.
8         Q.     And you made the choice to approach him
9    at the baseball field, is that correct?
10        A.     From a distance because there was a
11   fence that was separating us from a fairly wide
12   distance. So to approach from a distance, correct.
13        Q.     So describe for me the approach that
14   you made from your car that you parked in front of
15   Trooper Rivera's car to where you began verbally
16   communicating to him, let's say?
17        A.     Well, to describe the events, I would
18   say that as I started to walk towards the dugout and
19   I was on the outside of the dugout on the outside of
20   the field, I noticed at a distance that Trooper
21   Rivera was addressing some of the students in the
22   dugout, some of the student athletes. And from a
23   distance I saw that he could see me and I saw him get
24   on his cell phone. And oddly, Coach Eldridge
25   approached me, generally just to make small talk

---

Page 27

1    which I thought was a bit strange. We were always
2    polite to each other and friendly, but we had a very
3    short period of small talk. And after that small
4    talk, I continued to walk towards the dugout.
5         Q.     And had you made any kind of verbal
6    communications toward Trooper Rivera by that point or
7    did that come after?
8         A.     No, the first verbal communication came
9    when I arrived at the dugout. Again, I was on the
10   outside of the fence and he was at a fairly large
11   distance. That was the first interaction between
12   both of us, I initiated it. And I asked him what are
13   you doing here.
14        Q.     How loudly?
15        A.     Loud enough for him to hear me because,
16   again, we were at a distance and we were outdoors.
17        Q.     Loud enough for everyone else around
18   the baseball field to hear?
19        A.     Yes.
20        Q.     And can you tell me what came next as
21   far as what you verbalized to him?
22        A.     Sure. I asked him a very direct and
23   firm question, what are you doing here? And his
24   response to me was in a very evasive and dismissive
25   manner, I don't know what you're talking about. And

---

Page 28

1    I was disappointed that that was his answer because
2    he was most definitely aware of all of the incidents
3    that had transpired in the past between he and my
4    wife and him and my family and between both of us.
5    So I was very direct again and I answered, well, what
6    I'm talking about is you coming here to campus to
7    hurt families. I'm talking about you coming here to
8    campus to hurt children. I'm talking about you
9    coming here to campus after having hurt your wife of
10   20 years who was recovering from throat cancer.
11             And he became very quiet. He became
12   very quiet.
13        Q.     Did you say anything else?
14        A.     No. At that point Trooper Rivera
15   started walking towards me and he escorted me away
16   from the dugout, away from the student athletes, away
17   from the coaches. And we silently walked away
18   together towards the backstop of the diamond, away
19   from the field of vision of everyone else.
20             That was when I saw my then spouse,
21   Vicky Martinez, arriving in her vehicle and getting
22   out of her vehicle and approaching us. And we were
23   both, the trooper and I, in silence.
24        Q.     And we'll get to that.
25             When you were expressing yourself to

---

Page 29

1    Trooper Rivera on the baseball field, can you give me
2    an estimate, rough estimate, as to how many student
3    athletes were around the field, on or around?
4         A.     Maybe 15, 16 student athletes.
5         Q.     So --
6         A.     And the coaches.
7         Q.     So you testified earlier that one of
8    the reasons, if not the main reason, for your
9    approaching Trooper Rivera was that you felt it was
10   inappropriate for him to be there considering the
11   exposure to your children that might occur and the
12   impact that might have.
13             Did you consider when you began to
14   verbalize your feelings toward him the impact that
15   might have on the children, the students who were on
16   the field at that time?
17        A.     No, because again, it was a verbal
18   communication between the trooper and I because we
19   were at a distance I spoke loud enough for him to
20   hear and firmly. So I'm not sure how that would
21   impact the students, disrupt them.
22        Q.     Do you not think that a loud verbal
23   communication regarding infidelity could negatively
24   impact a student?
25        A.     I'm sure it could definitely disrupt

---

Pages 26 to 29

Joel Martinez                                                    April 26, 2018

Page 30

1    the practice.  I'm sure it was out of place.  I'm
2    sure that between 15 and 20 student athletes, the
3    last thing that they're expecting is a dialogue
4    between two adults that have nothing to do with
5    baseball would be out of place.
6        Q.    And, in fact, that dialogue was being
7    directed, or monologue initially, was being directed
8    at their coach?
9        A.    I didn't know he was the coach.
10       Q.    You didn't?  When did you become aware
11   that he was the coach?
12       A.    Later.  I knew that he was associated
13   with the school.  I know that he had played baseball
14   as a youth for the school, and I know that he had
15   access to the field house and the baseball equipment
16   in the field house including the batting cages, and a
17   relationship with the Associate Dean of Athletics, I
18   believe Michael Goldberg.  And that's what I knew.
19       Q.    Why did you think he had access to all
20   these various areas where baseball equipment was
21   stored and to individuals within the athletic
22   department if not for a coaching position?
23       A.    Because I've never seen him coach
24   students.  In that baseball diamond it was always --
25   I'm sorry, in that batting cage within the field

Page 31

1    house, it was always him and Alejandra his son.
2        Q.    His son.  Oh, okay.
3              And you used the word associated with
4    the school or the program, is that right?
5        A.    Um-hum.
6        Q.    So you knew him to have an association.
7              But nevertheless, you testified that
8    you didn't think he should be on school grounds, is
9    that right?
10             MR. LOUGHRY:  Objection.
11             THE WITNESS:  No.
12             MR. LOUGHRY:  Objection just to form.
13   He can answer.
14   BY MR. MARSHALL-OTTO:
15       Q.    Correct me.
16       A.    Sure.
17             You're making it seem that it's -- that
18   he's not supposed to be there legally or as a private
19   citizen he had no right to be on campus.  And I never
20   made that assertion.  I've always said that it was
21   inappropriate for him to be there.  He had every
22   single legal right to be there.  Like I said earlier,
23   I graduated from Berkley, I received my masters from
24   Princeton, I'm a pretty smart guy.  Of course I
25   understand his legal rights.  I would never make that

Page 32

1    claim.
2        Q.    Well, and I understand what you're
3    saying, but I'm not really talking about legal rights
4    either.
5              What I'm talking about are his moral
6    rights, I guess.  In spite of the fact that he had
7    had an affair, and I understand with your wife, there
8    was that difficulty.  As someone who was an alumnus
9    of the school and who had a relationship with the
10   athletics department, how is it inappropriate or was
11   it inappropriate for him to be on the school grounds?
12             MR. LOUGHRY:  I object to the form.
13             Go ahead.  You can answer.
14             THE WITNESS:  In no way was it
15   inappropriate for Trooper Rivera to be there on the
16   baseball diamond with the students.  What was
17   inappropriate was the probability of him running into
18   my children who might be playing outside during a
19   period that was close to after school and my children
20   seeing him and reopening up wounds.  I wanted to get
21   that across to him hoping that I could appeal to his
22   sensibilities and maybe have him think about that and
23   leave the baseball field.  But in no way did I ever
24   challenge his -- or think that it was inappropriate
25   for him to be there.

Page 33

1    BY MR. MARSHALL-OTTO:
2        Q.    Understood.  Thank you.
3              Let's move on to what happened after
4    you and Trooper Rivera left the field and went
5    towards your cars.
6        A.    Um-hum.
7        Q.    How did it happen that the two of you
8    left the baseball field?
9        A.    When I got to the point of my series of
10   questions, those three questions that I described
11   earlier, the last one being about his wife who was
12   recovering from throat cancer who he was unfaithful
13   to, I noticed that he became a little bit concerned
14   and started to walk over towards me and said come on,
15   walk with me.  This was coming from a man in a
16   uniform.  And, again, I'm a pretty bright guy, I'm
17   not dumb.  I completely complied.  And as we were
18   walking away, I said nothing else to him until Vicky
19   arrived on the scene.
20       Q.    So from the baseball field to the cars,
21   essentially was it just a quiet walk?
22       A.    Correct.
23       Q.    Nothing was spoken?
24       A.    Nothing was spoken.
25       Q.    By either of you?

Pages 30 to 33

Joel Martinez                                                April 26, 2018

Page 34

1   A.   By either of us.
2   Q.   Okay.
3   A.   There was something spoken between
4   myself and Vicky as Vicky approached us when she
5   arrived on the scene --
6   Q.   Between yourself and Vicky?
7   A.   -- as we were walking back towards the
8   backstop and away from the dugout.
9   Q.   And can you tell me what was said
10  between the two of you?
11  A.   Yes. Vicky, as she was walking towards
12  us, I said -- I started speaking to her in Spanish.
13  I said is this what you left us for? Is this what
14  you hurt our marriage for? Was this what was worth
15  it? And her reply to me was what are you doing here.
16  You're not supposed to be here.
17       And I was disappointed with that being
18  her first words. And I said in disbelief, given all
19  the pain that Trooper Rivera had caused our children,
20  what am I supposed to be doing here? I live here. I
21  live here. And I turned to Trooper Rivera and I said
22  he's not supposed to be here. And Trooper Rivera
23  looked at me, chest out, and he said I have every
24  right to be here, I'm an alumnus of this school,
25  which my understanding was that he never graduated.

Page 35

1   So I replied, I said no, you're not, you're a fraud,
2   you're a failure. I know that you didn't graduate.
3   I know that you didn't make it here academically.
4   And I saw Trooper Rivera stunned. He said absolutely
5   nothing to me. And me realizing that it was getting
6   late and for me to have to hit the road to pick up my
7   mom to fly out of Philadelphia Airport, I started
8   walking towards my car because I was right next to my
9   car. I was on my way out. And as I was walking
10  towards the car, I hear "that's it" in a very strong
11  angry tone. And the trooper proceeded to arrest me
12  right on the hood of my car as I was leaving the
13  scene. And he put the handcuffs on me very tight.
14  It was very painful. It was very traumatic. And I
15  was shocked that this was happening.
16  Q.   So when he arrested you, you were
17  walking away?
18  A.   Correct.
19  Q.   So did he approach you from a distance
20  or could you not see because --
21  A.   I could not see him as I was walking
22  towards my car. I did not see him approach me.
23  Q.   So all you know is that you were
24  walking away one moment and the next moment you were
25  being placed against the hood, essentially?

Page 36

1   A.   Correct.
2   Q.   And the cuffs were being placed around
3   your wrists?
4   A.   Correct.
5   Q.   So I want to ask you, with respect to
6   the arrest and the entire date April 26, 2013, did
7   Trooper Rivera assault or cause you physical injury?
8   A.   Other than --
9   Q.   Or any injury, in fact?
10  A.   Other than placing the handcuffs
11  excessively tight on me leaving marks, no.
12  Q.   Okay.
13  A.   We were at a distance, there was no
14  room for that.
15       (Exhibit is Martinez 1, photographs,
16  marked for identification)
17  BY MR. MARSHALL-OTTO:
18  Q.   So, Mr. Martinez, you're now looking at
19  what's been marked as Martinez 1. And for the
20  record, these documents are Bates labeled P-36
21  through P-40.
22       And what we're looking at is five color
23  photographs.
24       Can you describe what these are for me?
25  A.   Yes. These are the markings left from

Page 37

1   the handcuffs that Trooper Rivera placed on me which
2   I had in anguish and out loud asked him to loosen,
3   they were too strong and they were hurting me. And
4   he scoffed that they're not supposed to feel good.
5   And when I was released from the detention center and
6   given my phone back, I took pictures in the holding
7   cell of these markings. And when I returned home, in
8   the bathroom I took some more shots of the markings
9   left by the handcuffs.
10  Q.   So it would be correct to characterize
11  what we're looking at here are the injuries caused by
12  the handcuffs, is that correct?
13  A.   That's correct.
14  Q.   And specifically it would be the
15  redness that we're looking at that reflects those
16  injuries, correct?
17  A.   After the time I had spent in the
18  holding cell and after I was released and returned my
19  phone, yes. These were not as soon as I arrived in
20  the holding cell and moments after the handcuffs were
21  taken off. This was a while after the handcuffs were
22  taken off.
23  Q.   About how many hours? Your best
24  estimate.
25  A.   Less than two.

Joel Martinez                                                    April 26, 2018

Page 38

1    Q.    Less than two.
2          Were the marks worse immediately after
3    the cuffs were taken off?
4    A.    Yes, they were.
5    Q.    So they resolved quickly?
6    A.    They were not -- I mean they were more
7    noticeable as soon as the cuffs were taken off.  This
8    is less than two hours later when I was released.
9    Q.    Do you, today, bear any signs of those
10   cuff marks?
11   A.    I do not.
12   Q.    And how long did it take for that to
13   completely resolve?
14   A.    I do not recall.  Days perhaps.
15   Q.    Days perhaps.
16         Did you see a doctor about it?
17   A.    I did not.
18   Q.    You did not.
19         How long did you feel pain from it, if
20   at all?
21   A.    By the next day I did not feel any
22   pain.
23   Q.    Did you take any Advil or Tylenol or
24   anything?
25   A.    Perhaps.

Page 39

1    Q.    Do you recall if it helped?
2    A.    I do not recall.
3          (Exhibit Martinez 2, Responses and
4    Objections of Plaintiff Joel Martinez to defendants'
5    Notice to Produce Documents, is marked for
6    identification)
7    BY MR. MARSHALL-OTTO:
8    Q.    Mr. Martinez, I've handed you what has
9    been marked as Martinez 2 which is entitled:
10   Responses and Objections of Plaintiff Joel Martinez
11   to Defendants' Notice to Produce Documents.
12         I'm just going to ask you very quickly
13   with as much time as you need to flip through this
14   document and take a look at these responses and
15   objections.
16         Do you recall, and answer this question
17   when you're ready, do you recall having taken a look
18   at these?
19         MR. LOUGHRY:  Taken a look at them
20   when?
21   BY MR. MARSHALL-OTTO:
22   Q.    At the time they were propounded on
23   your counsel, did he ask you to take a look at these
24   when --
25         MR. LOUGHRY:  Now I object on the terms

Page 40

1    of work product and attorney-client privilege.  I can
2    see that my signature appears on the last page.
3          MR. MARSHALL-OTTO:  Your signature does
4    appear there, yes.
5          MR. LOUGHRY:  But I don't think any
6    dialogue between Mr. Martinez and counsel is -- I
7    don't think that's fairly discoverable.
8          MR. MARSHALL-OTTO:  No, I think you're
9    right.
10         MR. LOUGHRY:  The interrogatories are
11   something different.
12         MR. MARSHALL-OTTO:  Yes.
13         MR. LOUGHRY:  They have to be verified.
14   BY MR. MARSHALL-OTTO:
15   Q.    What I'm trying to get at, and I'll try
16   to do it in a more artful way, is your efforts at
17   producing or locating the documents that are sought
18   through these document requests.  So if you could
19   take a quick look through these requests and tell me
20   whether you engaged in efforts to retrieve any of the
21   documents in these categories?
22   A.    I made ever effort to retrieve the
23   documents that Justin and his paralegal, Pat?
24         MR. LOUGHRY:  Patricia Good.
25         THE WITNESS:  Patricia, had requested

Page 41

1    of me.  I have been very responsive and thorough in
2    retrieving that information.
3    BY MR. MARSHALL-OTTO:
4    Q.    Fine.  You can put that aside.  Thank
5    you.
6          (Exhibit Martinez 3, Responses and
7    Objections to Interrogatories, is marked for
8    identification)
9    BY MR. MARSHALL-OTTO:
10   Q.    Mr. Martinez, I've handed you what has
11   been marked as Martinez 3 which is entitled:
12   Responses and Objections to Interrogatories.
13         Would you take a look through this
14   document and let me know when you're done?
15   A.    Sure.
16   Q.    Specifically when you've arrived at the
17   last page.
18   A.    I have arrived at the last page.
19   Q.    Is that your signature that appears on
20   the last page?
21   A.    Yes, it is.
22   Q.    And did you review these interrogatory
23   responses before you signed?
24   A.    Yes, I did.  These, I believe, were
25   mailed to me.

EXHIBIT  B

Jose G. Rivera                                         April 10, 2018

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

JOEL MARTINEZ,                    CIVIL ACTION NO.
                                  15-2932 (BRM-TJB)
          Plaintiff,
                                  CONFIDENTIAL
     vs.
                                  ORAL DEPOSITION OF:
COLONEL JOSEPH R. FUENTES,            JOSE G. RIVERA
et al,

          Defendants.

_____

ORIGINAL

               *   *   *   *   *
          Tuesday, April 10, 2018
               *   *   *   *   *


          Transcript in the above matter taken at
the offices of Richard J. Hughes Justice Complex,
Office of the Attorney General, 25 Market Street,
Trenton, New Jersey, commencing at 11:00 a.m.
A P P E A R A N C E S:
     GURBIR S. GREWAL
     ATTORNEY GENERAL OF NEW JERSEY
     BY:   KAI W. MARSHALL-OTTO
     DISTRICT ATTORNEY GENERAL
     DIVISION OF LAW
     CORRECTIONS AND STATE POLICE SECTION
     RICHARD J. HUGHES JUSTICE COMPLEX
     25 MARKET STREET
     TRENTON, NEW JERSEY 08625
     (609) 633-8687
     E-MAIL:  kai.marshall-otto@lawnjaol.com
     ATTORNEY FOR THE DEFENDANT/JOSE G. RIVERA


          MASTROIANNI & FORMAROLI, INC.
     Certified Court Reporting and Videoconferencing
          251 South White Horse Pike
          Audubon, New Jersey 08106
               (856) 546-1100

Jose G. Rivera                                                    April 10, 2018

---

Page 10

1    am not, I don't know about your lawyer, but I'm not
2    trying to make this into an endurance test or
3    anything like that.  We don't want to make anybody
4    physically uncomfortable.
5           Do you have any questions of me before
6    we start?
7        A.    Not at all.
8        Q.    How old are you?
9        A.    I'm forty-nine.
10       Q.    And your date of birth?
11       A.    5/21/1968.
12       Q.    And are you single or married at this
13   point?
14       A.    I am married.
15       Q.    Any children?
16       A.    Two.
17       Q.    How old are they?
18       A.    Seventeen and fifteen.
19       Q.    Okay.  Now, are you assigned to a
20   particular station at this point?
21       A.    Not at this time.  I am actually on
22   medical leave.
23       Q.    How long have you been on medical leave?
24       A.    It's been three years now.
25       Q.    Going back to 2015?

---

Page 12

1        Q.    Can we agree, and I think I have the
2    date right, that the date of the incident we are here
3    to talk about today was the 26th of April --
4        A.    Yeah, I was on full duty, absolutely
5    without a doubt.
6        Q.    And earlier in 2013 you were on medical
7    leave?
8        A.    Correct.
9        Q.    Do you remember what day you came back
10   on full duty?
11       A.    No, I wouldn't be able to tell you that
12   off the top of my head.
13       Q.    Was it in April, that same month?
14       A.    No.
15       Q.    This was before?
16       A.    That was before.  Because I was on --
17   when I came on, back to full duty, I was in the
18   station on limited duty.  So. . . And the periods,
19   you'd have to contact medical, find out what that was
20   about, roundabout the dates.
21       Q.    Now, on April 26, 2013, were you what
22   was called patrol trooper?
23       A.    Road trooper, correct.
24       Q.    And now, did you have a certain patrol
25   loop that you were responsible for patrolling on

---

Page 11

1        A.    Correct.
2        Q.    There's some mention in the records I
3    reviewed from your personnel file of you being on
4    medical leave perhaps in the year 2013?
5        A.    Correct.
6        Q.    What was the time period of that medical
7    leave?
8        A.    That medical leave, 2013, '12 into '13.
9        Q.    Can you remember the months?
10       A.    Month?  March, '12, March of 2012, and
11   then into '13.
12       Q.    How far into '13?
13       A.    The full year, and then I was on and off
14   medical leave due to what I was, you know, medically
15   diagnosed with.
16       Q.    Now, was this a physical or a
17   psychological condition?  I don't need to know all
18   the details.
19       A.    Physical.
20       Q.    But you were working on April the 26th,
21   20 --
22       A.    That's correct.  That was the period
23   where I was on and off where I was coming on limited
24   duty, then I was going full duty, and then I
25   eventually was -- I was let out on a medical leave.

---

Page 13

1    April the 26th, 2013?
2        A.    That's correct, yes, I did.
3        Q.    Was this loop having to do with Route 95
4    and 295?
5        A.    295 and the whole interstate.  Correct.
6    Basically that was the area I was covering at the
7    time, but we, you know, we covered the whole
8    interstate from 95 down to the shore, if it all
9    happened to require us to head that far east.
10       Q.    Let's see.  You weren't the only road
11   trooper --
12       A.    No.
13       Q.    Let me finish my question.
14       A.    I am sorry.
15       Q.    You weren't the only road trooper on the
16   road that day, were you, in your area?
17       A.    No, I was not.
18       Q.    What barracks were you out of?
19       A.    Hamilton Station.
20       Q.    Over on Negron Road?
21       A.    Negron Boulevard, correct.
22       Q.    If you can remember what's roughly the
23   geographic area that the troopers in that station
24   patrol?
25       A.    Well, the station, how would you call

---

Jose G. Rivera                                                    April 10, 2018

---

Page 34

1  this, because they may call that the primary,
2  meaning, that's my stop, my job.  If I assisted, that
3  would mean that was someone else's job.
4      Q.    Okay.  All right.  Well, look at the
5  top, the second page, 14:52 p.m., I guess that would
6  be 2:52 in the afternoon?
7      A.    Correct.
8      Q.    You have a motor vehicle stop with
9  capital P in parentheses right before that entry
10 again.
11     A.    Uh-hum.
12     Q.    Again, that appears to be a stop that
13 you made?
14     A.    Counsel, that is something that is new
15 to me.  We wouldn't typically look at our patrol
16 charts as detailed as you are indicating here.  So if
17 that's an issue, counsel, the P being whether it's
18 primary being that it's my job as opposed to someone
19 else's job, another trooper, another job and I am
20 assisting, that probably needs further looking into.
21         MR. MARSHALL-OTTO:  Let's go off the
22 record.
23         (Off-the-record discussion.)
24         MR. MARSHALL-OTTO:  Let's go back on the
25 record.

---

Page 35

1  BY MR. LOUGHRY:
2      Q.    Looking down, 15:24 the word "arrived"
3  appears.  That would be 3:24 in the afternoon, and
4  it's a patrol loop?
5      A.    Patrol loop, yeah.
6      Q.    Does that mean you returned to your
7  patrol loop?
8      A.    Patrol loop, it's just in the area, in
9  the area of 295.  Specifically it's on like a roll,
10 you're rolling, you're patrolling your roam.  So
11 that's in the area I was in at the time.
12     Q.    Okay.  Now, the next time entry is
13 16:05?
14     A.    Correct.
15     Q.    And it says arrived and there's a
16 trespass complaint.
17     A.    Uh-hum.
18     Q.    And your note here says one Hispanic
19 male, at 1 H M under Lawrenceville School varsity
20 baseball field ref trespass.
21     A.    Right.
22     Q.    Is that indicating that you arrived
23 there at 16:05 or is that when you actually made the
24 arrest?
25     A.    That's when I made the arrest.  That's

---

Page 36

1  when I went over the air and notified them that I had
2  a Hispanic male under arrest.
3      Q.    We can confirm that, I guess, Rivera 1,
4  16:05, Rivera 1 being the CAD Abstract, is when you
5  actually called in the arrest?
6      A.    Correct.
7      Q.    So you actually arrived at that scene
8  maybe 30 minutes before?
9      A.    Correct, uh-hum.
10     Q.    Is there any entry on your entry
11 activity log for arriving at that scene?
12     A.    It's patrolling.  You're not putting
13 yourself out.  It's sort of like, I was on foot, and
14 you see a New York City cop on beat walking the
15 streets, you don't stop, you know, on the corner, and
16 you say, I'm at this location for the next two
17 minutes, and I am going to take two steps east to the
18 next block.  So basically what I am saying is that
19 you're in the area.  And as what anyone would notice
20 when you see officers, well, just state highway
21 patrols or troopers on the road, they are one minute
22 in one area, and in another minute, they can be in
23 another.
24     Q.    All right.  But you did get out of your
25 car?

---

Page 37

1      A.    I did get out of my car, correct,
2  uh-hum.
3      Q.    Let's go to that for a minute.  You went
4  to the Lawrenceville School?
5      A.    Correct.
6      Q.    You parked near the baseball field?
7      A.    Correct.
8      Q.    And you got out of your car?
9      A.    Correct.
10     Q.    Now, at that point you weren't
11 investigating any kind of complaint, were you?
12     A.    Correct.
13     Q.    You weren't responding to any kind of
14 complaint?
15     A.    Correct.
16     Q.    You were interested in checking out the
17 baseball field?
18     A.    At the time, I was a volunteer baseball
19 coach at the Lawrenceville School which the State
20 Police is well aware of.  So on that day, I stopped
21 by to see my boys practice.
22     Q.    Did you have anybody's permission to do
23 that?
24     A.    My permission?  No.  As a patrol
25 trooper, we have the liberty of doing what would be

---

Pages 34 to 37

Jose G. Rivera                                                    April 10, 2018

## Page 38

1   community service, stopping just like we would stop
2   at grocery stores and supermarkets, just to say hello
3   and give a presence of who we are.  This particular
4   day, I actually stopped by and see how my boys were
5   doing for practice.
6       Q.   Was this a break?  Did you have a break
7   that you did this on?
8       A.   Break?  While on patrol.  Not
9   necessarily, it's not a specific break.
10      Q.   Do you get a lunch break?
11      A.   Yeah.
12      Q.   This wasn't your lunch break?
13      A.   It wasn't my lunch break, correct.
14      Q.   Do you get any other break, formal
15  breaks, under your contract?
16      A.   Lunch break?  Coffee break.  We can,
17  even on patrol, we're on 24/7.  I mean, let's say,
18  for the 24/7 being that when we're off, we are still
19  on.  And to clarify this, you know, if we're on
20  patrol and we want to stop at the Wawa, we want to
21  stop at the supermarket and grab something to eat,
22  there's no policy, no procedure that you have to say,
23  oh, I'm going to step out and get a cup of coffee, we
24  can turn on our radios, which we, you know, carry on
25  our person.

## Page 39

1       Q.   Did you receive some kind of a verbal
2   admonition or some counseling from one of your
3   supervisors for your appearance that day at that
4   location?
5       A.   My appearance there?
6       Q.   Yes.
7       A.   Oh, well, they were surprised, they were
8   surprised, yeah.  So I was, I was reprimanded,
9   correct.
10      Q.   What was -- who communicated that
11  reprimand to you?
12      A.   My staff sergeant.
13      Q.   Who was that?
14      A.   Thomas Murtha.
15      Q.   How did he do that?
16      A.   Well, he basically wrote it up.  In the
17  beginning, it was told to me nothing would actually
18  come of it, and then I guess it was brought up to
19  higher rank, and they looked at it a little further,
20  but it was disposed of, unsubstantiated.  Because as
21  troopers do, we patrol, we're doing our job, and that
22  day I was doing my job.  I was just off the road in
23  an area that I am, you know, permitted to be in.
24  Though it was not on the highway, per se, but, like I
25  said, in the beginning, the exits and basically the

## Page 40

1   State of New Jersey is our jurisdiction.
2            Does that answer your question, counsel?
3       Q.   I am thinking about your answer.
4       A.   Okay.
5       Q.   I have the right to do that.
6       A.   Because the question of why I was there
7   has been brought up, and like I said, it's been
8   looked into and disposed of by my superiors.
9            MR. LOUGHRY:  All right.  Let's have
10  this marked.
11           (Exhibit Rivera 3, New Jersey State
12  Police Performance Evaluation, CONFIDENTIAL,
13  NJSP MARTINEZ 211 through 224, is marked for
14  identification.)
15  BY MR. LOUGHRY:
16      Q.   I'll show you what was marked as Rivera
17  3 for identification.  You're familiar with New
18  Jersey State Police Performance Evaluation forms, are
19  you?
20      A.   Yes, sir.
21      Q.   This is a periodic review by your
22  supervisors of your performance?
23      A.   That's correct.
24      Q.   And you probably saw a copy of this one
25  before, haven't you?

## Page 41

1       A.   I've seen -- well, every quarterly or I
2   forget how many times, we are evaluated for our
3   performance, correct.
4       Q.   There's a period on the first page,
5   there's a period which relates to according to the
6   form, April 20, 2013 - July 12, 2013?
7       A.   Where do you see the dates?
8       Q.   Upper right-hand corner, right below
9   where it says New Jersey State Police.
10      A.   Oh, April 20th through July 12th,
11  correct.
12      Q.   So this covers the time period including
13  the date of April 26, 2013, right?
14      A.   Correct.
15      Q.   If you look at page 11 of 11 of 14?
16      A.   11?
17      Q.   It says it at the bottom, Page 11 of 14.
18      A.   Okay.
19      Q.   It looks like, first of all, on this
20  page, it looks like you got an unsatisfactory check
21  mark at the top?
22      A.   Yeah, yeah, yeah.
23      Q.   You generally were rated satisfactory in
24  your evaluations?
25      A.   Correct.

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                                    Professionals Serving Professionals

Jose G. Rivera                                    April 10, 2018

Page 82

1    A.    Probable cause, no.
2    Q.    Now, when this case --
3    A.    Actually, let me go back, because this
4    is at the criminal level, this is at the municipal
5    court in Lawrence.  We did have a meeting.  A
6    probable cause hearing?  I don't recall, but
7    something that maybe the prosecutor, the municipal
8    court prosecutor may have had with the judge.
9    Q.    You weren't there for it?
10   A.    No, I was not.
11   Q.    You couldn't say one way or the other?
12   A.    One way or the other, no.
13   Q.    This case was dismissed in the municipal
14   court, wasn't it?
15   A.    That's correct.  And the reason being?
16   Q.    There's no question pending.
17   A.    Okay.
18         MR. MARSHALL-OTTO:  Off the record.
19         (Off-the-record discussion.)
20         (Exhibit Rivera 10, New Jersey State
21   Police Investigation Report, NJSP MARTINEZ 040
22   and 041, CONFIDENTIAL, is marked for
23   identification. )
24   By MR. LOUGHRY:
25   Q.    So when you arrived at the field, let's

Page 83

1    go back to when you went over to the baseball field,
2    you parked your car, you went down to the field, the
3    players were in the dugout area?
4    A.    In the dugout, correct.
5    Q.    On the third base side?
6    A.    On the third base side, yes.
7    Q.    And the coaches were speaking with them?
8    A.    Correct.
9    Q.    And did you go and sit with the players?
10   A.    No.
11   Q.    Or were you more standing with the
12   coaches?
13   A.    I was outside standing by the coach.  I
14   was standing exactly next to assistant coach Blake
15   Eldridge.
16   Q.    Now, at some point you became aware of
17   Mr. Martinez being nearby, I guess on the other side
18   of the fence or something?
19   A.    Yes.
20   Q.    And he was shouting?
21   A.    Correct.
22   Q.    And you knew Mr. Martinez?
23   A.    Yes, I caught sight of him.  In fact,
24   what would be, when he came into my view was, he was,
25   what would be the equivalent of behind the backstop

Page 84

1    screaming and hollering.  Well, more than that,
2    but. . .
3    Q.    He was screaming and hollering at you?
4    A.    Yes, cursing, profanity, basically
5    saying, you know, this son of a bitch, he has no
6    business being here, and he had an affair with my
7    wife, and as he's getting closer, I turned to the
8    head coach -- well, prior to that, Blake Eldridge
9    says:  You know who that is?  And I say yeah, I know
10   who that is, that's Mr. Martinez, that's Vicky's
11   husband.  And he proceeds to walk over to the fence,
12   the fence line and makes his way closer to where we
13   were.  And actually stopped and along the side of the
14   dugout, which is, you know, cement-like wall, and
15   he's, you know, screaming and hollering, bent over,
16   and such, calling out to the players, you know:  Your
17   fucking coach, you know, had an affair with my wife.
18   He has no business being here, so forth and so on.
19   And I looked at Coach Champ Atlee, and I said:
20   Coach, I'll take care of this, you know.
21   Q.    Let me stop you there.  So is there some
22   kind of gate that lets you on to the actual surface
23   of the field?
24   A.    Correct.
25   Q.    Did he come inside the gate?

Page 85

1    A.    No.
2    Q.    So he's outside the gate?
3    A.    He's outside.
4    Q.    And he was yelling, did you say he was
5    bent over and leaned into the dugout?  Did I get that
6    right?
7    A.    Yeah.  The fence line, it butts up to
8    the dugout, he's bent over and screaming towards the
9    kids, profanity about myself and what had happened.
10   Q.    All right.  So, you had had an affair
11   with his wife?
12   A.    That's correct.
13   Q.    Apparently he knew about it?
14   A.    He was divorced by then or in the
15   proceeding.
16   Q.    How did you know that?
17   A.    I had spoken to her.
18   Q.    Vicky Martinez?
19   A.    Yes, they were in the process of getting
20   divorced.
21   Q.    Okay.  So he was using profanity using
22   the F word?
23   A.    F word, everything under the sun as far
24   as --
25   Q.    Well, let's stop there for a minute.

Pages 82 to 85

Jose G. Rivera                                           April 10, 2018

Page 86

1      A.   Yes, sir.
2      Q.   You heard the F word?
3      A.   Yes.
4      Q.   You heard it loud and clear?
5      A.   Heard it loud and clear.
6      Q.   When he was yelling at you and you were
7   out there with the coaches?
8      A.   Yes, and he's pointing at me as he's
9   speaking to the players and loud, saying, what had
10   happened.
11      Q.   And you heard that word repeatedly, the
12   F word?
13      A.   Including the F word.
14      Q.   It wasn't just the F word.  He was
15   saying certain things?
16      A.   Yes.
17      Q.   He was saying things such as I am going
18   to use that word so we have the reality here from
19   your standpoint.
20      A.   Yes, sir.
21      Q.   What the fuck are you doing here?
22      A.   Yes, sir.
23      Q.   That's something he said?
24      A.   Yes, sir.
25      Q.   And he was pointing at you?

Page 87

1      A.   Yes, sir.
2      Q.   And he said:  Do you know what the fuck
3   your coach did, something like that?
4      A.   That's correct.  Not only did he -- that
5   he had an affair with my wife?
6      Q.   Well, that was true, right?
7      A.   Correct.
8      Q.   He wasn't saying anything that was not
9   correct?
10      A.   That is correct.
11      Q.   Did he say to you that you had no,
12   quote, fucking business on campus?
13      A.   Yes.
14      Q.   All right.  And I guess you're making, I
15   don't want to use the word assumption, but you're
16   making the inference that because you could hear all
17   of this language, including the profanities, that the
18   coaches could also hear?
19      A.   Absolutely.
20      Q.   And the players could hear?
21      A.   Without a doubt.
22      Q.   And did hear it?
23      A.   Well, I have to, as far as I know, yes,
24   it was loud and clear.  He positioned himself so that
25   the kids would -- what I got from what he was doing,

Page 88

1   was sort of discredit me, you know, put me in a bad
2   light as to, you know, what can -- you know, what I
3   am doing there when, in fact, happened with his wife.
4   And so, he just went on.  And I said:  Enough.
5      Q.   So you would fairly characterize him, I
6   guess, accurately, as he was upset emotionally at
7   this point?
8      A.   No, he was out of control.
9      Q.   Out of control?
10      A.   Out of control.
11      Q.   That's even more than upset emotionally?
12      A.   Absolutely.  In fact, beyond out of
13   control.  He was out of place given the institution
14   where he placed himself.  And besides out of control,
15   disorderly.  Quite honestly, I don't know if there's
16   anything, you know, mentally wrong with him, because
17   he just went out in a rage, to come and discredit, I
18   guess, me as to what had happened years prior.
19      Q.   Well, actually we were talking about
20   Christmas of 2011, right?
21      A.   Yeah.
22      Q.   And we were talking about you having an
23   affair with Vicky Martinez through several months of
24   2012?
25      A.   Some months, yes.

Page 89

1      Q.   So it wasn't years, it was maybe 12
2   months earlier?
3      A.   Okay.
4      Q.   Is that right?
5      A.   Okay.
6      Q.   Now, he didn't have an affair with your
7   wife?
8      A.   No.
9      Q.   So you weren't angry with him for having
10   an affair with your wife?
11      A.   No.
12      Q.   Do you think a man would not be angry
13   with a fellow who had an affair with his wife?
14      A.   Oh, I mean, but his behavior --
15      Q.   I am asking you a question.  Would you
16   assume that a man might be angry --
17      A.   Oh, yeah.
18      Q.   -- about someone having an affair --
19      A.   Sure.
20      Q.   -- with his wife?
21      A.   Absolutely.  But they were no longer
22   together and the fact --
23      Q.   Wait a minute.  Were they together when
24   you had the affair?
25      A.   They were together when we had the

Pages 86 to 89

Jose G. Rivera                                                                April 10, 2018

Page 110

1   you know, I'm going to leave, get in your car and
2   drive away?
3       A.   Could I have done that?
4       Q.   Yes.
5       A.   No, well, no, I'm basically, how would I
6   say?  Failure to act.
7       Q.   All right.  I think you misunderstood my
8   question.  Nobody was stopping you from getting in
9   your car, were they?
10      A.   No.
11      Q.   Okay.  And nobody had blocked you in
12  with their car or anything like that; am I correct?
13      A.   Sure.
14      Q.   So at any point here you could have
15  said, you know what, I'm out of here, you could have
16  gotten in my car and left.
17      A.   No.
18           MR. MARSHALL-OTTO:  Objection to form.
19           MR. LOUGHRY:  Physically.  Let me just
20  clarify.
21  BY MR. LOUGHRY:
22      Q.   Physically you could have gotten in your
23  car and left?
24      A.   As a civilian.
25      Q.   I'm just asking you if you could have

Page 111

1   physically done that.
2       A.   Yes, but that takes, you're asking, I'm
3   in the -- I'm working, I'm working.  In the capacity
4   I'm --
5       Q.   I think you're answering my question.
6   You're saying professionally, you felt duty bound not
7   to do that, not to leave?
8       A.   Not to leave.
9       Q.   But there was nothing physically
10  stopping you?
11      A.   Not physically, absolutely not.
12      Q.   That was the only question I was asking,
13  Trooper.
14      A.   Okay.  All right.
15      Q.   We'll get through this a lot faster if
16  you answer the questions I ask.  I am sorry, I didn't
17  mean to chastise you.
18      A.   No.
19      Q.   At some point when you're up there at
20  the front of the car, he grabbed your arm?
21      A.   Yes.
22      Q.   With one hand or two?
23      A.   He grabbed with one hand, and that's
24  when I swept and turned him.  Because at that moment,
25  as you can imagine, he's heated, he's really upset,

Page 112

1   he's not obeying my order to leave, and so I'm
2   basically telling him, well, what are you going to
3   do.  So he sort of like grabbed my arm, and I sweep
4   his arm and turn him around and place him under
5   arrest.
6       Q.   So he placed his hand on your arm?
7       A.   Yes.
8       Q.   Did he inflict any pain?
9       A.   He did not inflict any pain.
10      Q.   Did he try to make your arm do anything
11  in particular?
12      A.   No.
13      Q.   He just put his hand on your arm?
14      A.   Correct.
15      Q.   And you swept him?
16      A.   Yes, it's a sweep as, you know, in my
17  training, it's that you, you are to be unarmed.  And
18  so I am talking to him, I know where I am, as far as,
19  you know, the situation.  I'm in uniform.  I'm, you
20  know, I am sworn to carry out the law.  At that
21  moment, I act, my initial, my immediate reaction was
22  just to grab him and put him down, not knowing what
23  he was thinking.
24      Q.   So which arm did he touch?
25      A.   This arm (Indicating).

Page 113

1       Q.   Your left arm?
2       A.   He reached from the right.
3       Q.   The record is not going to reflect
4   unless I say this, that he put his hand on your left
5   arm?
6       A.   Right, which would be his right arm onto
7   my left.
8       Q.   Okay.  And you immediately swept him?
9       A.   Yes, I swept, you know, it's sort of,
10  you know, be the equivalent of having his arm, you
11  know, go under and turning him around and placing him
12  under arrest.
13      Q.   In your training is it a violation of
14  the law for a citizen to touch you?
15      A.   Is it a violation of the law?
16      Q.   Of the law for a citizen to touch you?
17      A.   If you feel threatened, yes.
18      Q.   Mr. Martinez hadn't threatened you with
19  any harm at that point, had he?
20      A.   Not towards me -- well, his presence and
21  the fact that he failed to abide by my order, your
22  tendency is to sort of worry and heighten your safety
23  for your own protection.
24      Q.   I am asking a different question.  He
25  had not uttered any words, saying, I am going to hurt

04/26/2013  19:16    6095040115           HAMILTON STATION              PAGE  02/02

**COMPLAINT-SUMMONS**

1187  S  2013

**THE STATE OF NEW JERSEY**
**vs.**
JOEL MARTINEZ

LAWRENCE TWP MUNICIPAL COURT
2211 LAWRENCE RD
LAWRENCE          NJ  08648
(609) 844-7159 COUNTY OF: MERCER

ADDRESS:
LAWRENCEVILLE        NJ  08648-0052

POLICE CASE #: C060130299

DEFENDANT INFORMATION
SEX: M  EYE COLOR: BROWN    DOB:
DRIVER'S LIC. #:                    DL STATE: NJ
SOCIAL SECURITY #:
TELEPHONE #:                        SBI #:

COMPLAINANT NAME: TPR  J  RIVERA JR
NEW JERSEY STATE POLICE

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named defendant on or about 04-26-2013 in LAWRENCE TWP                MERCER          County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, PURPOSELY OFFEND THE SENSIBILITIES OF ANOTHER BY ADDRESSING UNREASONABLY LOUD AND OFFENSIVELY COARSE OR ABUSIVE LANGUAGE TO ANOTHER PERSON PRESENT IN A PUBLIC PLACE, SPECIFICALLY BY CONTINUOUSLY BERATING AND SHOUTING PROFANITIES AT TPR. RIVERA #6010 IN THE PRESENCE OF A HIGH SCHOOL BASEBALL TEAM, IN VIOLATION OF N.J.S. 2C:33-2B (PETTY DISORDERLY OFFENSE)

WITHIN THE JURISDICTION OF THIS COURT, WITH PURPOSE TO HARASS ANOTHER, SUBJECT ANOTHER TO OFFENSIVE TOUCHING, SPECIFICALLY BY PLACING HIS HANDS ON TPR. RIVERA #6010 WHILE ATTEMPTING TO REMOVE THE SUBJECT FROM THE PROPERTY (LAWRENCEVILLE SCHOOL). IN VIOLATION OF N.J.S. 2C:33-4B (PETTY DISORDERLY PERSON OFFENSE)

In violation of:

| | 1) 2C:33-2B | 2) 2C:33-4B | 3) |
|---|---|---|---|
| Original Charge | | | |
| Amended Charge | | | |

**CERTIFICATION:**
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Signed: TPR J RIVERA JR                Date: 04-26-2013

The complaining witness is a law enforcement officer and a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons.

**SUMMONS:**
YOU ARE HEREBY SUMMONED to appear before this court to answer this complaint. If you fail to appear on the date and at the time stated below, a warrant may be issued for your arrest.

DATE TO APPEAR: 04-30-2013  TIME: 8:30am
                        TPR J RIVERA JR          04-26-2013
                        Signature of Person Issuing Summons    Date

☐ Domestic Violence -- Confidential  ☐ Related Traffic Tickets or Other Complaints  ☐ Serious Personal Injury/ Death Involved

Special conditions of release:
☐ No phone, mail or other personal contact w/victim
☐ No possession firearms/weapons
☐ Other (specify):

NJSP MARTINEZ 047

EXHIBIT
Rivera 9
4/10/18 TDS

COMPLAINT-SUMMONS

THE STATE OF NEW JERSEY
VS.
JOEL MARTINEZ

LAWRENCE TWP MUNICIPAL COURT
2211 LAWRENCE RD
LAWRENCE          NJ  08648
(609) 844-7159 COUNTY OF: MERCER

ADDRESS: ▮▮▮▮▮▮▮

LAWRENCEVILLE      NJ 08648-0052

| # of CHARGES | CO-DEFTS | POLICE CASE # |
|---|---|---|
| 2 | | C060130299 |

COMPLAINANT TPR   J RIVERA JR
NAME:      NEW JERSEY STATE POLICE

DEFENDANT INFORMATION
SEX: M  EYE COLOR: BROWN      DOB: ▮▮▮▮▮
DRIVER'S LIC. # ▮▮▮▮▮▮▮▮▮▮      DL STATE: NJ
SOCIAL SECURITY # ▮▮▮▮▮▮▮      SBI #:
TELEPHONE #:

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named
defendant on or about 04-26-2013 in LAWRENCE TWP                    MERCER   County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, PURPOSELY OFFEND THE SENSIBILITIES OF
ANOTHER BY ADDRESSING UNREASONABLY LOUD AND OFFENSIVELY COARSE OR ABUSIVE
LANGUAGE TO ANOTHER PERSON PRESENT IN A PUBLIC PLACE, SPECIFICALLY BY
CONTINUOUSLY BERATING AND SHOUTING PROFANITIES AT TPR. RIVERA #6010 IN THE
PRESENCE OF A HIGH SCHOOL BASEBALL TEAM. IN VIOLATION OF N.J.S. 2C:33-2B (PETTY
DISORDERLY OFFENSE)

WITHIN THE JURISDICTION OF THIS COURT, WITH PURPOSE TO HARASS ANOTHER, SUBJECT
ANOTHER TO OFFENSIVE TOUCHING, SPECIFICALLY BY PLACING HIS HANDS ON TPR. RIVERA
#6010 WHILE ATTEMPTING TO REMOVE THE SUBJECT FROM THE PROPERTY (LAWRENCEVILLE
SCHOOL). IN VIOLATION OF N.J.S. 2C:33-4B (PETTY DISORDERLY PERSON OFFENSE)

in violation of:

| Original Charge | 1) 2C:33-2B | 2) 2C:33-4B | 3) |
|---|---|---|---|
| Amended Charge | | | |

CERTIFICATION:
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false,
I am subject to punishment.
                              TPR J RIVERA JR                    Date: 05-16-2013
Signed:                                                                4.26.13

The complaining witness is a law enforcement officer and a judicial probable cause determination is not required prior to the
issuance of this Complaint-Summons.

SUMMONS
YOU ARE HEREBY SUMMONED to appear before this court to answer this complaint. If you fail to appear on the date and at the time
stated below, a warrant may be issued for your arrest.

DATE TO APPEAR: 05-20-2013 TIME: 5:30pm

                              TPR J RIVERA JR                    4.26.13
                              Signature of Person Issuing Summons         Date

☐ Domestic Violence – Confidential        ☐ Related Traffic Tickets        ☐ Serious Personal Injury/ Death
                                            or Other Complaints                Involved

Special conditions of release:
☐  No phone, mail or other personal contact w/victim
☐  No possession firearms/weapons
☐  Other (specify):

CONFIDENTIAL

SP-310 (Rev. 1/91) (S.O.P., D7)                                    Page 2 of 3    01/07/2014

# New Jersey State Police Investigation Report          C060-2013-00299

## ...olen/Recovered Property & Values

| | |
|---|---|
| Currency Amount: | $0.00 |
| Jewelry Amount: | $0.00 |
| Fur Amount: | $0.00 |
| Clothing Amount: | $0.00 |
| Motor Vehicle Amount: | $0.00 |
| Miscellaneous Amount: | $0.00 |
| Total Amount Stolen: | $0.00 |
| Total Amount Recovered: | $0.00 |

## Evidence, Alarm, and Report Status

| | | | |
|---|---|---|---|
| Chemical Lab Number: | Evidence: No | Arrest Report Pending: | No |
| Ballistics Lab Number: | NJSP - S&TS: No | Prop./Veh. Report Pending: | No |
| Alarm Number/Year: | Retained: No | Alarm Pending: | No |
| Alcohol Involved: No | Returned: No | Evidence Pending: | No |
| Other Drugs Involved: No | Destroyed: No | Bias Incident: | No |
| VCCB Information and | Co-Op: No | Domestic Violence: | No |
| Phone Number Provided | | | |
| (1-800-242-0804): Not Applicable | | | |

**Technicians Involved**
  *N/A*

**Assisting Troopers**
  *N/A*

**Other Supporting Agencies**
  *N/A*

**Related Cases**
  *N/A*

**MV Summons/Warnings & Statutes**
  *N/A*

**Suspects/Summoned**
  *N/A*

**Persons Arrested**

| JOEL MARTINEZ | | | | | | |
|---|---|---|---|---|---|---|
| Address: | ▮▮▮▮▮ LAWRENCEVILLE, NJ | | | | | |
| S.S.N.: | D.O.B | Age 40 | Sex Male | Race 1A | Criminal Complaint Warrant/Summons No. S2013000387 | |

EXHIBIT
PENGAD 800-631-6989
Rivera 10
4/10/18  TS

**Narrative**

4/26/2013 Friday

On this date while on patrol on U.S. Highway 95, Lawrence Twp., the undersigned conducted a property/community policing check of The Lawrenceville School, Lawrenceville NJ, specifically the Varsity Baseball Field which is adjacent to the Interstate.  It should be noted that the undersigned is a volunteer assistant baseball coach at the school.  During my check, the undersigned was approached by the defendant, Mr. Joel Martinez, who was

SP-310 (Rev. 1/91) (S.O.P. D7)                                                      Page 3 of 3    01/07/2014

## New Jersey State Police Investigation Report          C060-2013-00299

behaving disorderly, specifically by shouting, "What the fuck are you doing
here". Mr. Martinez became belligerent and aggressive as he finger pointed at
the undersigned.

As Mr. Martinez walked towards the field, he got louder and continued to shout
profanities towards the undersigned claiming that I had no "fucking" business
on campus. Mr. Martinez had complete disregard towards the juveniles-baseball
players and staff present. He continued to berate the undersigned and claimed
that I should leave the school grounds immediately. I ordered the subject to
lower his voice, explained to him that he was out of line, and suggested that
he leave.

Mr. Martinez was escorted back towards his car approximately 75 yards from the
entrance onto the baseball field nearest the team's dugout. Mr. Martinez was
continuously reminded to lower his voice and calm down but he only got louder
and louder and claimed that I was to "fucking leave him alone" and that I had
no business being on campus. "You have no fucking authority on this campus",
he stated. Mr. Martinez decided to continue berating the undersigned shouting
absurd profanities despite the numerous attempts to calm him down by his wife,
icky Martinez, whom arrived on scene. She went as far as asking him what he
was doing and that he should listen to the undersigned. Mrs. Martinez
appeared to be nervous and concerned as Mr. Martinez was not listening to the
undersigned. Mr. Martinez eventually grabbed the undersigned's arm at which
time he was immediately placed under arrest for harassment and disorderly
person. Search of his person was negative for any weapons and/or contraband.
Mr. Martinez was placed in my Troop car#577 and transported back to Hamilton
Station for processing. Mr. Martinez was charged accordingly and released
with a court date of 04/30/2013 @8:30a, Lawrence Municipal Court.

Case Closed.

| Report Date: 05/07/2013 | 1st. Approval: | 2nd. Approval: |
|---|---|---|
| TPR. I J G RIVERA | Date: 05/08/2013 | Date: 05/22/2013 |
| #6010 | TPR. II D M GREEN | DSG K T KOENIG |
| Signature: | #6354 | #5725 |
| | Signature: | Signature: |

EXHIBIT C

Page 1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2              CIVIL ACTION NO. 3:15-cv-02932-BRM-TJB

3

   JOEL MARTINEZ,
4
               Plaintiff,
5
          vs.
6

   COLONEL JOSEPH R. FUENTES, SUPERINTENDENT;
7  LT. COLONEL PATRICK CALLAHAN, DEPUTY
   SUPERINTENDENT OF OPERATIONS; MAJOR KEVIN
8  DUNN, DEPUTY BRANCH COMMANDER, FIELD
   OPERATIONS SECTION; JOHN DOE 1, TROOP C
9  COMMANDER; JOHN DOE 2, SUPERVISOR; TROOPER I
   JOSE G. RIVERA (#6010); ACTING MAJOR MARK
10 WONDRACK, OFFICE OF PROFESSIONAL STANDARDS;
   CAPTAIN SCOTT EBNER, BUREAU CHIEF, INTAKE
11 AND ADJUDICATION BUREAU, OFFICE OF
   ADJUDICATION BUREAU, OFFICE OF PROFESSIONAL
12 STANDARDS, and DSG ISMAEL E. VARGAS,
13             Defendants.
14
                   ------------
15             THURSDAY, APRIL 19, 2018
                   ------------
16

17        Oral sworn deposition of BLAKE ELDRIDGE,
   taken at the Lawrenceville Prep School, 2500 Main
18 Street, Hogate Hall, Lawrenceville, New Jersey,
   before Carolyn J. McCalla, Certified Court Reporter,
19 on the above date, commencing at 12:00 p.m., there
   being present:
20

21                 - - - - - -
22

                   TATE & TATE
23             Certified Court Reporters
               520 Stokes Road - Suite C-1
24             Medford, New Jersey 08055
               (856) 983-8484 - (800) 636-8283
25

## Page 10

1    Q.   About what time did you arrive at the
2 baseball field that day?
3    **A.   I do not recall exactly.**
4    Q.   Rough estimate of when the practice
5 started, that might help.
6    **A.   Practices typically start 3:45.**
7    Q.   And would you have arrived sometime shortly
8 before then?
9    **A.   I arrived actually after the beginning of**
10 **practice.**
11    Q.   Sometime after the beginning of practice,
12 any idea whether they were still on the field or in
13 the dugout at that point?  When I say they, I mean
14 the players.
15    **A.   Players were in the dugout.**
16    Q.   Subsequent to your arrival at the practice,
17 or perhaps before, did Trooper Jose Rivera come onto
18 the scene of the practice?
19    **A.   He was there when I arrived.**
20    Q.   He was there when you arrived, okay.  Did
21 you have any conversation with him?
22    **A.   No, sir.**
23    Q.   And were you aware at the time that Trooper
24 Rivera was a volunteer coach?
25    **A.   Yes.**

## Page 11

1    Q.   As a volunteer coach with the varsity
2 baseball team, was he expected or permitted to
3 attend practices of the varsity baseball team?
4    **A.   Yes.**
5    Q.   After you arrived at the practice, did a
6 Mr. Joel Martinez arrive on the field at some point
7 or in the vicinity of the field?
8    **A.   Yes.**
9    Q.   Am I correct, when I phrase that question,
10 I'm assuming he arrived after you did; is that
11 right?
12    **A.   No.**
13    Q.   So, he was already present when you arrived
14 at the practice?
15    **A.   No.**
16    Q.   Help me discover where my confusion is
17 coming from.  When you arrived at the practice, to
18 the best of your recollection, was Mr. Martinez
19 present or in the vicinity of the baseball field?
20    **A.   Yes.  Should I elaborate.**
21       MR. CAGNEY: He will figure it out.
22    Q.   Were you aware of his presence at that
23 time?
24    **A.   When I arrived, yes.**
25    Q.   When you arrived.  When did you become

## Page 12

1 aware of his presence?
2    **A.   At the time I arrived.**
3    Q.   At the time you arrived.  Where was he
4 situated?
5    **A.   Arriving at the same time.**
6    Q.   Okay, did you pull in together?
7    **A.   I was walking.**
8    Q.   And he pulled in in his car?
9    **A.   Uh-huh, yes.**
10    Q.   Did you then walk in from the parking area
11 with him?
12    **A.   Not with.**
13    Q.   But close to, in proximity to?
14    **A.   Yes, sir.**
15    Q.   And did he at some point in his approach to
16 the field begin to make verbal, loud verbal remarks?
17    **A.   Yes.**
18    Q.   Can you explain to me, describe for me what
19 unfolded as he and you walked toward the baseball
20 field, what you saw and heard to the best of your
21 recollection?
22    **A.   So Mr. Martinez pulled in, exited his car**
23 **and asked me a question, asked me if I knew who that**
24 **was on the field and I answered that question and**
25 **then he started to approach the field and then**

## Page 13

1 directed a question to the field at that time?
2    Q.   What was that question?
3    **A.   I believe it was "Who do you think you**
4 **are."**
5    Q.   And what happened next?
6    **A.   Mr. Martinez was outpacing me on his way to**
7 **the field, and so I took the other gate to enter the**
8 **field and Mr. Martinez continued to address**
9 **questions, that same question toward the field.**
10    Q.   The question "Who do you think you are,"
11 how many times did he repeat that question?
12    **A.   I believe, I recall three times.**
13    Q.   What tone of voice was he speaking in?
14    **A.   A loud interrogative.**
15    Q.   Interrogative, was it an agitated tone?
16    **A.   It was amplified.**
17    Q.   What happened next after he repeated this
18 question a number of times?
19    **A.   I was at that point just actually most of**
20 **the way across the field.  I saw Trooper Rivera was**
21 **holding a baseball bat.  He put the bat to the side**
22 **and turned his attention to Mr. Martinez.  And at**
23 **that point there was another question asked and**
24 **Trooper Rivera responded to that question by asking**
25 **who Mr. Martinez was.**

Page 14

1  Q.    When you say another question was asked of
2  Trooper Rivera, what question was that?
3  **A.    "Who do you think you are to break up a**
4  **family."**
5  Q.    And how did Trooper Rivera respond?
6  **A.    What appeared to be an attempt to what I**
7  **would say now looking back would be deescalate the**
8  **situation by dropping the bat and holding out a hand**
9  **and asking for Mr. Martinez to ask his questions**
10 **again.**
11 Q.    When Mr. Martinez asked that question an
12 additional time and Trooper Rivera put the bat down,
13 how close in proximity were the two individuals at
14 that point?
15 **A.    Probably 15, 20 feet apart.**
16 Q.    At one point did they become closer in
17 proximity?
18 **A.    Later, yes.**
19 Q.    And how much later?
20 **A.    Maybe a minute.**
21 Q.    I'm going to get back to that, but can you
22 tell me what happened in that minute in the interim?
23 **A.    Mr. Martinez continued to ask a number of**
24 **questions and Trooper Rivera began to encourage him**
25 **to continue the conversation, to calm down and to**

Page 15

1  **continue the conversation away from the ball field.**
2  Q.    When Trooper Rivera and Mr. Martinez came
3  into proximity with one another, how did that
4  happen?  What I mean by that is who approached who
5  or did they approach each other?
6  **A.    They did not approach each other.**
7  **Mr. Rivera was moving forward through the gate and**
8  **Mr. Martinez was backing up in acknowledgment of,**
9  **and they began to move towards the parking lot.**
10 Q.    So, at that time Trooper Rivera was
11 instructing him to move away?
12 **A.    Uh-huh, yes.**
13 Q.    Did you observe, and I mean this with
14 respect to your auditory senses, any further
15 language being used by Mr. Martinez either
16 explicitly profane language or otherwise aggressive
17 language?
18 **A.    From that point forward, no.**
19 Q.    So, you did not hear anything further after
20 Trooper Rivera, in essence, escorted Mr. Martinez
21 away?
22 **A.    Correct.**
23 Q.    With respect to what you did hear prior to
24 that, did you hear any profane language?
25 **A.    Well, could you clarify what you mean by**

Page 16

1  profane?
2  Q.    Yes, I can.  By that I mean language that
3  parents don't law their kids to use, words like
4  "Fuck, shit, asshole," things like that?
5  **A.    No, those words were not used.**
6  Q.    So, the language that was used, would you
7  characterize it as aggressive?
8  **A.    Yes, I would characterize it as aggressive**
9  **in terms of the formulation.**
10 Q.    So it's not necessarily the language he
11 used, it was how he used it; is that right?
12 **A.    Correct, correct.**
13 Q.    Did it appear that Trooper Rivera responded
14 with any type of similarly emotionally charged
15 language or otherwise emotionally charged response
16 or did he remain calm?
17 **A.    He appeared to remain calm.**
18 Q.    Did you perceive, did you perceive that
19 Trooper Rivera was attempting to diffuse the
20 situation?
21 **A.    At the moment where students were ready --**
22 **were present, I observed Trooper Rivera trying to**
23 **take the situation away from the students.**
24 Q.    Between Mr. Martinez and Trooper Rivera,
25 who would you say was the aggressor with respect to

Page 17

1  this incident?
2        **MR. LOUGHRY:**  Objection as to form.
3  Go ahead.
4  Q.    You can answer the question.
5        **MR. CAGNEY:**  You can answer.
6  **A.    I would say that Mr. Martinez was the**
7  **initiator.**
8  Q.    When you say initiator, do you mean to
9  imply that Trooper Rivera continued it or do you
10 mean to simply, or is it because you are not maybe
11 comfortable with using the word aggressor?
12 **A.    I'm not comfortable with using the term**
13 **aggressor.**
14 Q.    So, we could describe him as the aggressor?
15 **A.    I would not do that necessarily, but one**
16 **could, but I would not.**
17 Q.    That's what I mean, when I use the word
18 comfortable with, I mean do you feel comfortable
19 describing him as the aggressor, not using that
20 word?
21        **MR. CAGNEY:**  I'm sorry, I guess it's
22 an objection.  I don't understand the question.
23 Q.    So, I asked the question whether you
24 considered Mr. Martinez to be the aggressor
25 essentially is what I asked, and you characterized

Page 18

1   him as the initiator.  So, my follow-up question to
2   that was whether you used the initiator rather than
3   the language I used which was aggressor, because you
4   think it would be unfair to characterize him as
5   aggressor and initiator is a more appropriate, is
6   more appropriate verbiage to use or whether you used
7   the word initiator to suggest that while Mr.
8   Martinez initiated the situation, Trooper Rivera
9   continued or perpetuated it.  Does that distinction
10  make sense?
11  A.      It does, yes.  I would say the former.  I
12  don't have any information about who or why or if
13  any conversation continued.
14  Q.      I don't have much more.  Give me one
15  moment.
16          Subsequent to the events that you observed,
17  did you learn that Trooper Rivera had placed Mr.
18  Martinez under arrest or did you observe the arrest?
19  A.      Yes to both of those.
20  Q.      You did observe the arrest.  Is that
21  because you -- strike that.
22          Can you explain to me how you came to
23  observe the arrest?
24  A.      After Mr. Martinez and Trooper Rivera moved
25  to the parking lot, we, the head coach and I

Page 19

1   attempted to continue the business of the baseball
2   practice, and after a few moments we heard a raised
3   voice, and in looking over at that point I observed
4   Trooper Rivera placing Mr. Martinez under arrest.
5   Q.      But you were still on the field, right?
6   A.      Correct.
7   Q.      With respect to what you observed, did you
8   observe Trooper Rivera attack, assault or otherwise
9   cause bodily injury to Mr. Martinez?
10  A.      I did not.
11  Q.      Did you observe Mr. Martinez initiate any
12  type of physical contact with Trooper Rivera?
13  A.      I did not.
14  Q.      That's all I have for the moment.  Justin?
15  EXAMINATION BY MR. LOUGHRY:
16  Q.      Mr. Eldridge, my name is Justin Loughry.  I
17  represent Mr. Martinez in this matter.  We
18  introduced ourselves you to me, me to you, just
19  prior to, just before the deposition began.  Do you
20  remember that?
21  A.      Yes, sir.
22  Q.      You and I have not met before that moment,
23  have we?
24  A.      No, sir, not to my knowledge.
25  Q.      We have had no communication or

Page 20

1   conversation that you are aware of; is that correct?
2   A.      That's correct.
3   Q.      This is not the first time though that you
4   have answered questions about this incident, is it?
5   A.      No, it is not.
6   Q.      You sat with a New Jersey state trooper
7   named Vargas and gave an interview?
8   A.      Yes, sir.
9   Q.      Was that here on campus?
10  A.      Yes, sir.
11  Q.      And I want to put that aside for a moment.
12  You appear to be aware that Mr. Martinez was placed
13  in formal police custody that afternoon when you
14  observed his arrest; is that right?
15  A.      Yes, sir.
16  Q.      Did you become aware later on that he was
17  charged with a criminal offense?
18  A.      Yes, sir.
19  Q.      Did you ever receive any kind of a notice
20  or a subpoena from any court, and I'm not talking
21  about a subpoena bringing you to this deposition
22  here today, I'm talking about for a court appearance
23  to bring you to court to give testimony in a matter,
24  criminal charge against Mr. Martinez?
25  A.      I'm sorry, could you ask that question

Page 21

1   again?
2   Q.      Of course I will.
3           Did you ever receive any subpoena or court
4   notice commanding you to come to a court to give
5   testimony in a criminal case against Mr. Martinez?
6   A.      No, sir.
7   Q.      You know there is, I don't know, let me
8   know ask you, do you know there is a municipal court
9   here in this township, Lawrenceville?
10  A.      Yes, sir.
11  Q.      You probably have heard about one or
12  another students over the years perhaps having some
13  brush with that?
14  A.      Yes, sir.
15  Q.      I want to be specific about this.  You
16  received no notice and no subpoena from any
17  municipal court in Lawrenceville or anybody
18  associated with the municipal court to come to court
19  to give testimony against Mr. Martinez; am I
20  correct?
21  A.      Yes, sir.
22  Q.      Did you have any conversation with any
23  attorney about potentially coming to be a witness at
24  such a case in municipal court against Mr. Martinez?
25  A.      No, sir.

6 (Pages 18 to 21)

EXHIBIT  D

USDC, District of NJ                     Martinez v. Fuentes, et al.                          Thursday
No. 3:15-cv-02932-BRM-TJB          Deposition of Benjamin C. Atlee                    April 19, 2018

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
2                    CIVIL ACTION NO. 3:15-cv-02932-BRM-TJB

3

   JOEL MARTINEZ,
4
                     Plaintiff,
5
            vs.
6
   COLONEL JOSEPH R. FUENTES, SUPERINTENDENT;
7  LT. COLONEL PATRICK CALLAHAN, DEPUTY
   SUPERINTENDENT OF OPERATIONS; MAJOR KEVIN
8  DUNN, DEPUTY BRANCH COMMANDER, FIELD
   OPERATIONS SECTION; JOHN DOE 1, TROOP C
9  COMMANDER; JOHN DOE 2, SUPERVISOR; TROOPER I
   JOSE G. RIVERA (#6010); ACTING MAJOR MARK
10 WONDRACK, OFFICE OF PROFESSIONAL STANDARDS;
   CAPTAIN SCOTT EBNER, BUREAU CHIEF, INTAKE
11 AND ADJUDICATION BUREAU, OFFICE OF
   ADJUDICATION BUREAU, OFFICE OF PROFESSIONAL
12 STANDARDS, and DSG ISMAEL E. VARGAS,

13                   Defendants.

14
                     ------------
15                   THURSDAY, APRIL 19, 2018
                     ------------
16

17         Oral sworn deposition of BENJAMIN C. ATLEE,
   taken at the Lawrenceville Prep School, 2500 Main
18 Street, Hogate Hall, Lawrenceville, New Jersey,
   before Carolyn J. McCalla, Certified Court Reporter,
19 on the above date, commencing at 11:07 a.m., there
   being present:

20

21                   - - - - - -

22                   TATE & TATE
                 Certified Court Reporters
23             520 Stokes Road - Suite C-1
                 Medford, New Jersey 08055
24             (856) 983-8484 - (800) 636-8283

25

USDC, District of NJ
No. 3:15-cv-02932-BRM-TJB

Martinez v. Fuentes, et al.
Deposition of Benjamin C. Atlee

Thursday
April 19, 2018

---

## Page 10

1    Q.    Just for clarity of the record, you were
2  the varsity baseball coach in April of 2013; is that
3  correct?
4    A.    Yes, I was, yes.
5    Q.    So, now I'm going to get into a little bit
6  more meat as to the events underlying this lawsuit.
7          Were you present on the grounds of the
8  Lawrenceville School on April 26th of 2013?
9    A.    Yes, I was.
10   Q.    Was there a baseball practice that day?
11   A.    Yes.  I was conducting a baseball practice,
12  and this occurred right at the beginning of baseball
13  practice.
14   Q.    That was a varsity baseball team practice?
15   A.    Right.
16   Q.    About what time did that practice take
17  place?
18   A.    It would have been, well, the practice
19  would have begun at 3:30.  Players are asked to be
20  on the field to stretch and to throw.  The actual
21  event would have occurred just about at a quarter of
22  four because I just asked the players to come in.
23   Q.    But the players arrive at about 3:30?
24   A.    About 3:30.
25   Q.    And at some point during the course or

---

## Page 11

1  after the arriving of the players, did Trooper Jose
2  Rivera stop by?
3    A.    Yes.
4    Q.    And about what time, to the best of your
5  recollection, did he stop by?
6    A.    It would have been between 3:30 and quarter
7  of four.
8    Q.    So, were the players stretching when he
9  showed up?
10   A.    To the best of my recollection they were.
11  People, the coaches were just arriving to the field.
12   Q.    And were some in the dugout?
13   A.    Coaches?
14   Q.    Individuals, be they coaches or players.
15   A.    Well, let's see, so the coaches were just
16  arriving and I was getting ready to tell them what I
17  wanted them to do in the first section of the
18  practice.  Typically at quarter of four I would call
19  the players in, I would discuss with them what we
20  were going to do.  If it was the day after a game,
21  sometimes we would review essentially what went
22  wrong in the previous game and talk about that.
23   Q.    So, when Trooper Rivera arrived, do you
24  recall where he went?  Did he go by a dugout by
25  chance?

---

## Page 12

1    A.    Well, yeah, he spoke to me and then he was
2  off to my left as I began to talk to the players.
3    Q.    And do you recall whether this was by the
4  first base or the third base dugout?
5    A.    Well, all this, all this occurred nearby
6  the third base dugout.  First of all, it would be
7  the home dugout.  The players normally stretched and
8  threw along the left field line to stay away from
9  the infield.  So it was natural that we would use
10  the third base dugout.
11   Q.    And do you recall when Trooper Rivera came
12  by and was -- was he presumably engaging you in
13  conversation?
14   A.    My recollection is that we spoke briefly.
15   Q.    And do you recall what about?
16   A.    Again, my best recollection would be that
17  he was trying to find out what the time of our next
18  game might be so that he could figure out whether or
19  not he could attend.  If he wasn't on duty then he
20  was usually in uniform and he was instructing the
21  outfielders.  So I'm guessing that he stopped by to
22  find out about the next game because that's, if he
23  was on duty, that's the sort of conversation we
24  would have.
25   Q.    So, as I understand it, what you are saying

---

## Page 13

1  is that he was trying to determine whether he would
2  be on duty during the next practice?
3    A.    Right.
4    Q.    And were he not on duty, he would attend in
5  a baseball uniform?
6    A.    Right.
7    Q.    Rather than a trooper uniform?
8    A.    Rather than a trooper uniform.
9    Q.    And as a coach, was Trooper Rivera a coach
10  of some sort?
11   A.    Yes, a volunteer coach.
12   Q.    And as a coach, was he permitted or
13  expected to be on school grounds to attend
14  practices?
15   A.    Yes.
16   Q.    After Trooper Rivera arrived at the
17  practice, did Mr. Martinez at some point approach
18  the practice?
19   A.    Yes.
20   Q.    When I say Mr. Martinez, I mean Mr. Joel
21  Martinez.
22   A.    Yes.
23   Q.    How long after Trooper Rivera arrived did
24  Mr. Martinez arrive on the scene?
25   A.    I'm guessing -- well, let me answer this

---

4 (Pages 10 to 13)

USDC, District of NJ
No. 3:15-cv-02932-BRM-TJB

Martinez v. Fuentes, et al.
Deposition of Benjamin C. Atlee

Thursday
April 19, 2018

Page 14

1　way.  I'm sure that I had spoken briefly with Mr.
2　Martinez.  I began to speak to the team when I heard
3　a loud voice off to my left.
4　Q.　Okay.
5　A.　So, in terms of the timeframe, it was in I
6　would guess sort of a five minute timeframe and
7　almost immediately as I was beginning to speak to
8　the team.
9　Q.　And prior to when you heard that voice, did
10　you have any awareness of Mr. Martinez's presence?
11　A.　No.
12　Q.　So, that was your first?
13　A.　Yes.
14　Q.　Will you describe for me, this is a rather
15　open-ended question, what you observed from the time
16　you heard that voice.
17　A.　Yeah, I heard the voice.  I caught what the
18　speaker was saying.  He said relatively, he said
19　pretty loudly in what I took to be an irony, "I
20　guess it's okay to break up a man's family."  And he
21　repeated that at least once.  It became clear to me
22　that he was directing the conversation at
23　Mr. Rivera.
24　Q.　And what did you observe unfold after that?
25　A.　I was struck by Mr. Rivera's restraint.  He

Page 15

1　said at least twice, "You need to stop this.  You
2　need to leave" or "This is inappropriate.  You need
3　to leave."
4　　　　They were, they were on either side of the
5　fence.  Mr. Rivera was on the field.  Mr. Martinez
6　was standing between the bleachers and the end of
7　the dugout.  Within a few moments, Mr. Rivera
8　stepped through the gate in the fence and escorted
9　Mr. Martinez away.
10　Q.　How long would you say the verbal exchange
11　occurred from when you first heard Mr. Martinez's
12　voice to when Mr. Rivera began to escort Mr.
13　Martinez off that area of the baseball field?
14　A.　So, my best recollection would be that I
15　started to talk to the team.  I heard the voice.  I
16　looked up.  It became clear, pretty quickly, that
17　the conversation was addressed to Mr. Rivera, that
18　it wasn't addressed to me or to a player.  I don't
19　recall whether Mr. Rivera immediately responded to
20　it, but pretty quickly, as I'm trying to recollect
21　this, Mr. Martinez said something further and
22　Mr. Rivera warned him that it was inappropriate,
23　that he wasn't, that he shouldn't do this, that he
24　needed to leave.
25　　　　Mr. Martinez was angry enough that he did

Page 16

1　not, you know, he did not respond to that.  I
2　believe at that point he said again something to the
3　effect that "I guess it's all right for you to break
4　up a man's family."
5　　　　Then I would say pretty quickly within
6　probably 15 or 20 seconds Mr. Rivera walked through
7　the gate and escorted him away.
8　Q.　Okay.
9　A.　That's my recollection.
10　Q.　And did you hear anyone, and by that I mean
11　either Trooper Rivera or Mr. Martinez use any
12　profane or extreme language?
13　A.　No, I didn't.  It was a fairly contained
14　conversation in that respect, given the way it
15　started.  No, I didn't hear any profanity from
16　either man.
17　Q.　So, you say it was contained considering
18　the way it started.
19　A.　Yeah.
20　Q.　Is it fair to say that it started with Mr.
21　Martinez yelling?
22　A.　Yes.
23　Q.　And that Trooper Rivera controlled the
24　situation?  Was that your perception?
25　A.　That was my perception and, you know, at

Page 17

1　the time I was reassured that Trooper Rivera was
2　restrained, but clear in what he was telling Mr.
3　Martinez to do.  I was relieved that Mr. Martinez's
4　conversation was directed at an individual as
5　opposed to being -- because when I first heard it, I
6　wasn't sure, and I also need to note I didn't know
7　who, I didn't know who was speaking at that point.
8　I didn't know Mr. Martinez.  So, yeah.
9　Q.　When you observed a man's identity that you
10　did not know --
11　A.　I did not know.
12　Q.　-- walking toward the baseball field and
13　screaming, did you feel concerned for the safety of
14　yourself and the students?
15　A.　Yes, to a point.  I would say probably my
16　most effective response to that would be that as the
17　confrontation was unfolding, because I was looking
18　at the players, I could see two or three kids who
19　seemed alarmed by what they were hearing.  They
20　actually couldn't see because the dugout is
21　enclosed, but they could hear what was going on.
22　Q.　Is it fair to say that this is the kind of
23　conduct that the Lawrenceville School would prefer
24　their students not to be exposed to?
25　　　　MR. LOUGHRY:  Objection to form.  You

5 (Pages 14 to 17)

USDC, District of NJ                Martinez v. Fuentes, et al.                Thursday
No. 3:15-cv-02932-BRM-TJB     Deposition of Benjamin C. Atlee              April 19, 2018

---

Page 18

1   can answer.
2   Q.      You can answer.
3   A.      Yes, obviously.
4   Q.      In your opinion, who was the initial
5   aggressor in this situation between Mr. Martinez and
6   Trooper Rivera?
7            MR. LOUGHRY: Objection to form.
8   Q.      You can answer.
9   A.      Simply on the base of Mr. Martinez being
10  the first to speak and to speak loudly, he was
11  precipitating the event.
12  Q.      And based on what you observed, based on
13  what you observed, did it appear that Trooper Rivera
14  took appropriate action to diffuse the situation?
15  A.      Yes, I thought so then and I believe I said
16  as much to Officer Vargas when he spoke with me that
17  I was relieved that the confrontation came to an end
18  pretty quickly.
19  Q.      And did you observe -- are you aware --
20  strike that.
21          Are you aware that Trooper Rivera
22  subsequently placed Mr. Martinez under arrest?
23  A.      I'm aware that it happened.  I didn't see
24  it.
25  Q.      You did not see it?

---

Page 19

1   A.      No.  Again, I didn't know who he was.  I
2   saw what I have described and then that was as much
3   as I observed.
4   Q.      So, is it accurate to say that once Trooper
5   Rivera escorted Mr. Martinez away from the field,
6   you remained on the field with the players?
7   A.      Yes.  I had business to do.  So I went back
8   to my work.
9   Q.      So, you continued to conduct the practice?
10  A.      Yes.
11  Q.      Now, with respect to what you did observe,
12  did you at any time observe Trooper Rivera attack,
13  assault or otherwise physically do harm to Mr.
14  Martinez?
15  A.      I didn't see that.
16  Q.      That's all I have for the moment.  Justin?
17          MR. LOUGHRY: Thank you.
18  EXAMINATION BY MR. LOUGHRY:
19  Q.      It's Mr. Atlee, am I saying that right?
20  A.      That's correct.
21  Q.      Mr. Atlee, we introduced each other this
22  morning to each other before the deposition, just
23  before the deposition began; is that right?
24  A.      Uh-huh.
25  Q.      You are nodding yes?

---

Page 20

1   A.      Yes.
2   Q.      You and I have not met each other before,
3   have we?
4   A.      No.
5   Q.      And we haven't spoken before, have we?
6   A.      No.
7   Q.      It sounds like you have had about 95
8   percent of your career, your work life here at the
9   Lawrenceville School?
10  A.      That's correct.
11  Q.      I'm not very good at math.  You are in the
12  English department, maybe you are not either, but I
13  was approximating, fair enough?
14  A.      I think that's fair.
15  Q.      You held a number of positions of
16  responsibilities here besides teaching; is that
17  right?
18  A.      That's true, yes.
19  Q.      So, of them have been more or less
20  administrative type of positions?
21  A.      Yes.  I would say the mid level
22  administration.
23  Q.      So, you have been given some
24  responsibilities --
25  A.      Yes.

---

Page 21

1   Q.      -- by the school beyond simply instructing
2   a class?
3   A.      Yes.
4   Q.      Is it fair to say you feel a very strong
5   sense of loyalty to this school?
6   A.      I think that probably can be overdone.  The
7   school gave me an opportunity to do what I care
8   about.
9   Q.      That has to have made you feel good over
10  the years?
11  A.      Oh, absolutely.
12  Q.      And you have a great affection for this
13  school, fair enough?
14  A.      Yes.  I would be careful about that because
15  we're talking about a professional relationship.
16  I'm not nostalgic about the school.
17  Q.      But you do have a sense that there is sort
18  of a code of conduct and honor here at the school?
19  A.      Yes, I would agree.
20  Q.      There is a way that things are supposed to
21  be done here?
22  A.      Yes.
23  Q.      Is that right?
24  A.      Yes.
25  Q.      One of the things about that code of

---

6 (Pages 18 to 21)

# EXHIBIT E

Page 1

```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF NEW JERSEY
             Civil Action No. 15-2932 (BRM)(TJB)
- - - - - - - - - - - - - - -
JOEL MARTINEZ                          CONFIDENTIAL
          Plaintiff
       vs.                          ORAL DEPOSITION OF:
                                     VICKY MARTINEZ
COLONEL JOSEPH R. RUENTES,
SUPERINTENDENT, LT. COLONEL
PATRICK CALLAHAN, DEPUTY
SUPERINTENDENT OF OPERATIONS;
MAJOR KEVIN DUNN, DEPUTY
BRANCH COMMANDER, FIELD
OPERATIONS SECTION; JOHN
DOE 1, TROOP C COMMANDER;
JOHN DOE 2, SUPERVISOR,
TROOPER I JOSE G. RIVERA
(#6010), ACTING MAJOR MARK
WONDRACK, OFFICE OF
PROFESSIONAL STANDARDS;
CAPTAIN SCOTT EBNER, BUREAU
CHIEF, INTAKE AND ADJUDICATION
BUREAU, OFFICE OF PROFESSIONAL
STANDARDS, AND DSG ISMAEL
E. VARGAS,
          Defendants.
- - - - - - - - - - - - - - -


                 *     *     *     *


              THURSDAY, APRIL 26, 2017


                 *     *     *     *



             MASTROIANNI & FORMAROLI, INC.
       Certified Court Reporting & Videoconferencing
                251 South White Horse Pike
                Audubon, New Jersey 08106
                    856-546-1100
```

Vicky Martinez                                                    April 26, 2018

## Page 18

1    also, to be honest, kind of the Latin man dynamic,
2    that was just -- I think I was super emotional and
3    embarrassed and I had all kinds of complicated
4    feelings.  I'm not sure I would have if it had been
5    somebody who was not a Latino man.  Like if it were a
6    white woman, I think it would be very different, we
7    could be just kind of more cold about things and
8    straightforward.  But I do get that he was trying to
9    connect with me because he wanted me to feel
10   comfortable, but I didn't necessarily feel
11   comfortable.  I don't know if it's what a woman feels
12   about, you know, like why are you so nosey and why do
13   you care, and why do you -- you know, so it was just
14   weird.  It was a weird vibe.
15        Q.    All right.  I understand.  And I'm
16   going to just ask you a couple of questions.
17        A.    Sure.
18        Q.    It's not my purpose here --
19        A.    And I went on.  So I'm sorry.
20        Q.    It's not my purpose to ask you a lot of
21   leading questions here today.
22        A.    Okay.
23        Q.    That's really more for
24   cross-examination, but it might be easier to just get
25   the background facts, if I do that.  You might feel

## Page 19

1    more comfortable, you can tell me if I'm wrong.
2        A.    Okay.
3        Q.    So is it correct that just for purposes
4    of setting the context here that in December of 2011
5    you were married to Joel Martinez, is that right?
6        A.    Yes.
7        Q.    But you had an affair, an intimate
8    relationship, with this Trooper Jose Rivera around
9    that time, December, 2011, is that right?
10        A.    Yes.
11        Q.    And that was something that -- and not
12   to belabor the obvious, but it was something that you
13   did, I'll say, in secret or covertly?  That is, you
14   didn't tell your husband before the affair that you
15   were going to do that, it's something that happened
16   and he found out afterwards, is that right?
17        A.    That's right.
18        Q.    And in fairly short order, there was a
19   point where Mr. Martinez apparently found out about
20   this?
21        A.    Yes.
22        Q.    And after that, in fairly short order,
23   you and Mr. Rivera changed the nature of your
24   relationship, you stopped having a physically
25   intimate relationship, is that fair to say?

## Page 20

1        A.    No.
2        Q.    All right.  So the relationship went on
3    for some months after that?
4        A.    I wouldn't -- it was not physical, it
5    was more -- I mean obviously he had become a friend
6    before anything, and so I think it's hard to
7    understand if you're on the outside and don't really
8    understand the friendship and intimacy and connection
9    and trust that you might have with another person,
10   but, you know, if things didn't explode and then I
11   was left to deal with everything by myself, he's a
12   really wonderful man and cared and wanted to make
13   sure that I was going to be okay.  And certainly
14   being that I was very confused, scared, had a lot of
15   very intense emotions and with no real time to handle
16   a lot of my emotions because I had three much smaller
17   kids at the time.
18        Q.    How old were your kids?
19        A.    In '10 and '11, my youngest was four,
20   right?  Yeah, she was four and six and seven.  So
21   they were little.
22        Q.    You hands your hands full?
23        A.    Yeah.  So how do you actually have time
24   to deal with -- I mean I still don't, but it's
25   different, of course.  It was a very intense time in

## Page 21

1    life for both of us.  And so, you know, I don't think
2    that anybody, not Joel, not Jose, not you guys
3    sitting here today have the time to listen to me to
4    maybe come to a place where you might understand why
5    it would not have been okay for me to be absolutely
6    alone with nobody to talk to because nobody would
7    have understood.  So it was scarey.  And I harmed one
8    man, I was dishonest, I harmed him.
9        Q.    You're talking about your husband?
10        A.    Yeah.  And so there was absolutely
11   going to be a lot of pain, a lot of anger and
12   disappointment.  And I mean life was flipped
13   completely upside down.  And I know why -- I know
14   what I did to cause that.  And at the same time when
15   you're, you know, going through life and you learn
16   things through connections with other people, through
17   some maturity -- I mean I met my husband at the time
18   when I was 20 years old, right?  I met him when I was
19   20.
20        Q.    You're talking about Joel?
21        A.    Yeah.  Yeah.  And so I think that I
22   changed quite a great deal from when I met him to
23   when this incident happened.  And obviously our
24   marriage was not in a very good place, that maybe has
25   no bearing on what's happening today or what I need

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Vicky Martinez                                             April 26, 2018

Page 26

1    be there, she knows we're there.
2         She and I had had a few conversations
3    over the phone about my relationship with her husband
4    and after our conversation that night at Houlihan's,
5    we both went our separate ways.  And before I could
6    get home, he called me to say don't go home because
7    she is not at our home, so she must be at your home.
8         And so I didn't know what to do.  I
9    parked in the parking lot of a little kind of
10   medicine business complex on my way home to see if
11   she would get home so I could have some kind of
12   confirmation.  And sure enough, she got home and the
13   three of us had a conversation, you know, over the
14   phone.
15        And I would hope you would understand
16   how I was so -- I was so hesitant to drive home.  At
17   this point it's two in the morning and what I know is
18   that she told my husband about our relationship
19   and --
20   Q.    You found that out, that she had told
21   Joel?
22   A.    Yeah, because she got home.
23   Q.    Okay.
24   A.    And I don't like to call our
25   relationship an affair.  I know what it was.  I know

Page 27

1    what an affair is, but it was not just that, it was
2    so much beyond the physical.
3         And I think the reason that we could
4    talk about it, first of all I meant as in the three
5    of us, is because it was not just physical.  So it
6    actually mattered more in my mind.
7         Okay?
8         So I didn't go home that night because
9    I was scared.  And I don't remember who suggested it,
10   I know I was happy to just stay in the parking lot
11   and I felt like a zombie at that point and I didn't
12   know what I would do.  I don't know who suggested
13   that we meet, but he didn't want me to be alone
14   because I was scared.  So we met up again and talked
15   some more.  And he knew I was scared.  And he just
16   wanted to comfort me.  Only I could step back into my
17   home and deal with the situation, obviously.
18   Q.    You certainly answered my question and
19   perhaps more.
20        All right.  So let's fast-forward to
21   April of 2013, the month that Mr. Martinez was
22   arrested.
23   A.    Um-hum.
24   Q.    I have the day, I think, as April 26 of
25   2013.

Page 28

1         Now, at that point, Joel Martinez, he
2    was not still living with you, was he?
3    A.    He was not.
4    Q.    Had he moved out a couple months
5    before, something like that?
6    A.    Gosh, if I recall correctly, it may
7    have been like six weeks before.  I feel like it was
8    between one and three months, but maybe closer to
9    two.  And I feel like it was March, but I could be
10   wrong.
11   Q.    And at that point, as of that, you
12   know, date toward the end of April, you hadn't
13   actually spoken to Trooper Rivera in a number of
14   weeks, is that right?
15   A.    Yes.  I don't remember if it was weeks
16   or months.
17   Q.    Now, on that day, though, you were on
18   campus that afternoon, weren't you?
19   A.    Yes.
20   Q.    And at some point did you see your
21   husband or your husband's car in the area of the
22   baseball field?
23   A.    Yes.
24   Q.    And how was it that -- your house is
25   over there, is part of your work over that way, as

Page 29

1    well?
2    A.    Part of my work?  Varsity softball is
3    my work.
4    Q.    The softball field is near the baseball
5    field?
6    A.    The baseball field is -- I would say
7    it's on a cul-de-sac in front of my house and the
8    varsity softball field is in my backyard.
9    Q.    Okay.
10   A.    So I was driving at around 3:30-ish as
11   I would do everyday to go change for practice.  And I
12   only need five minutes.  So I usually still beat the
13   girls there by ten minutes.  And it was a very
14   different day, as you can imagine, seeing his white
15   Acura and a trooper car parked not too far away from
16   each other.
17   Q.    And that's what you saw when you got
18   to --
19   A.    That what I saw.  And it had been -- I
20   can't even do the math, but it had been more than a
21   year, probably not quite 18 months since.  So my
22   husband at the time, it was the first time he had
23   been in the same physical vicinity as Jose.
24   Q.    For a very long time?
25   A.    A very long time.  Since before he knew

Pages 26 to 29

# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JOEL MARTINEZ,                          CIVIL ACTION NO.
                                        15-2932 (BRM-TJB)

          Plaintiff,
                                             CONFIDENTIAL
     vs.                                ORAL DEPOSITION OF:

COLONEL JOSEPH R. FUENTES,              THOMAS R. MURTHA
et al,

          Defendants.

ORIGINAL

                    *   *   *   *   *
               Tuesday, April 10, 2018
                    *   *   *   *   *

          Transcript in the above matter taken at
the offices of Richard J. Hughes Justice Complex,
Office of the Attorney General, 25 Market Street,
Trenton, New Jersey, commencing at 11:00 a.m.
A P P E A R A N C E S:
     GURBIR S. GREWAL
     ATTORNEY GENERAL OF NEW JERSEY
     BY:  MICHAEL VOMACKA
     DISTRICT ATTORNEY GENERAL
     DIVISION OF LAW
     CORRECTIONS AND STATE POLICE SECTION
     RICHARD J. HUGHES JUSTICE COMPLEX
     25 MARKET STREET
     TRENTON, NEW JERSEY 08625
     (609) 633-8687
     E-MAIL:  Michael.Vomacka@lps.state.nj.us
     ATTORNEY FOR THE DEFENDANT/THOMAS R. MURTHA


            MASTROIANNI & FORMAROLI, INC.
     Certified Court Reporting and Videoconferencing
            251 South White Horse Pike
            Audubon, New Jersey 08106
                (856) 546-1100

Thomas R. Murtha                                April 10, 2018

Page 10

1    have him transferred?
2        A.   No.
3        Q.   Did someone come to you and say in
4    essence, in words and substance, you need to do an
5    eval because he's being transferred?
6        A.   Our evaluation system is prescribed by
7    our standard operating procedures, and they are
8    prescribed to be done at certain intervals and
9    certain events trigger that, such as a transfer, a
10   yearly -- again, the system has now changed and has
11   been revamped.  Probationary evals were done, say, if
12   someone was promoted, they get one within one year of
13   their promotion, their probationary time.  This one
14   was done specifically upon Trooper Rivera's transfer.
15       Q.   Okay.  There's a commentary paragraph
16   here.  Did you write that verbiage?
17       A.   On what page?
18       Q.   Page 11 of 14, the one I've been talking
19   about.
20       A.   Yes, I did.
21       Q.   I have some questions about some initial
22   acronyms, whatever, here.
23       A.   Uh-hum.
24       Q.   First it says during this rating period,
25   Trooper Rivera was Verbally Counseled.  Those two

Page 11

1    words "Verbally Counseled", the first letter was
2    capitalized, is this a term of art, Verbally
3    Counseled?
4        A.   Within our internal evaluation systems,
5    we have a system called the, MAPPS, it's an acronym.
6    When you have to address something, there are ways
7    you can do that.  You can verbally counsel somebody,
8    you can review an SOP with them, you can refer a
9    matter to our Internal Affairs System, you can
10   commend somebody for their actions.  Verbal
11   counseling is, as you said, a term of art for a form
12   of intervention.
13       Q.   Is it a reprimand?
14       A.   These turn classified under
15   interventions.  Verbally counseling, you know, my
16   understanding is, you noted something and you
17   addressed it.
18       Q.   When you say noted something, you mean
19   something negative?
20       A.   If you're counseling somebody, I could
21   see how realistically it would be a negative
22   connotation.  It's just a corrective measure a
23   supervisor would take.
24       Q.   In other words, something happened that
25   you want to intervene about to correct in the future;

Page 12

1    is that what you're saying?
2        A.   You say something happened?
3        Q.   Well. . .
4        A.   Day-to-day basis, you're working, you
5    may note something.  Hey, you know, I'd like you to
6    do it this way.  Hey, that situation there, you could
7    have done it this way.  There's different levels to
8    it.  It's a -- it doesn't necessarily connote
9    negativity.  But I could see where would one infer
10   from there.
11       Q.   Do you know what SOP C-22 is?  It's
12   mentioned there?
13       A.   I would have to be, my recollection
14   would have to be refreshed by the actual SOP.  Off
15   the top of my head. . .Usually, I don't recall what
16   SOP C-22 is termed off the top of my head.
17       Q.   Let's take a look at the rest of the
18   paragraph.  Maybe we can draw some inferences.
19   There's mention in the next sentence of an incident
20   in which Trooper Rivera and I am quoting here, quote,
21   failed to document his location in the CAD.  Do you
22   see that reference?
23       A.   Yes.
24       Q.   Is that some kind of issue that you
25   might note as a supervisor?

Page 13

1        A.   Yes.
2        Q.   And what's the concern there?
3        A.   Well, the SOP, again, off the top of my
4    head, I can't recollect what it is.  Whether, I think
5    C7 is our evaluations, F19 may be patrol procedures.
6    I mean, there's all different acronyms.  C7 -- C-22
7    may be something to do with radio procedures.  Again,
8    during this time, I verbally counseled in regards to
9    whatever.  He again, without the SOP or without the
10   verbal counseling, I wouldn't be able to speak to the
11   exact verbiage.
12           MR. LOUGHRY:  I ask the reporter to note
13       in the document request, we had one before, in
14       the previous deposition, I'd like to have a
15       copy of that SOP C-22.  Obviously, there's a
16       protective order, and I'll confirm in that a
17       letter to you or. . .
18           MR. MARSHALL-OTTO:  You can include it
19       in a letter to me.  That's fine.
20           MR. LOUGHRY:  I don't believe it's
21       privileged.  All right.
22   By MR. LOUGHRY:
23       Q.   So it doesn't appear in this photograph
24   as if you are commenting in a particular arrest for
25   this individual conduct, and harassment for any

Pages 10 to 13

Thomas R. Murtha                                    April 10, 2018

Page 14

1    allegations made against Trooper Rivera, that's not
2    the subject of what you are writing about?
3        A.   No.
4        Q.   What you are writing about, Trooper
5    Rivera made an error in the basic control function.
6    What was the error?
7        A.   Excuse me?
8        Q.   What was his error?
9        A.   Again, I believe this pertains to radio
10   procedures, and again pertains to the other incident,
11   I believe at the time of the incident, his location
12   did not marry up with the CAD location, and I
13   believe, it was more like a safety thing, where, we
14   need to know where you're at.
15       Q.   This was marked as Rivera 1 at his
16   deposition.  It was identified by him as a CAD
17   Report.  And you just used the phrase, I think, CAD.
18   Is this what you are referring to?  You would refer
19   to as the CAD Report?
20       A.   Yes, it is.
21       Q.   And what is, just for the record, what
22   is the function of that CAD Abstract or CAD report?
23       A.   The CAD is a computer system, it's the
24   computer aided dispatch system.  It's a system
25   wherein, you know, anybody and everybody in the State

Page 15

1    Police that they logged into the system, you can
2    track where they are.  And when things, incidents
3    occur, or motor vehicle stops, they generate what's
4    called a CAD incident number.  So this is a record of
5    what occurred at this time at this date.
6        Q.   Now, did you have access to this, this
7    CAD report, in the process of you filling the
8    evaluation and writing the paragraph that's on page
9    -- the commentary that's on Page 11 of 14?
10       A.   I had access to all the State Police
11   systems that I would need to prepare this.
12       Q.   Did you look at the CAD Report in order
13   to write that?
14       A.   In conjunction as I wrote this, did I
15   specifically take this out?  No.  Do I have access to
16   it?  Sure, I have access to anything.
17       Q.   How did you know that he had failed to
18   report a location?
19       A.   I was the supervisor on the date.
20       Q.   You remember the events on the date?
21       A.   On that date when this occurred, he was
22   in the computer aided dispatch system for a control
23   loop.
24       Q.   What does that mean, to be in the system
25   for a control loop?  What does that mean?

Page 16

1        A.   During the day, when you come in in the
2    morning, you log onto the system, it puts a general
3    entry you're on duty.  If you were to say SOP, it
4    says, which I believe, C-22 may be something with
5    radio procedures, you're supposed to keep the patrol
6    chart updated or keep the computer updated.  A, just
7    for general supervision tracking purposes, for
8    safety, numerous different reasons.  At the time of
9    this incident previous to that, he was signed out on
10   a patrol loop of 295.  Our SOP dictates, my
11   understanding, that you update the CAD at least once
12   an hour, and then, you know, there is always
13   different verbiage in there, stuff that, things that
14   occur.  You just, you document them, or things that
15   you are doing.  And again, for various different
16   reasons, whether it's statistically to track stuff,
17   whether it's just basic safety, whether it's for just
18   general knowledge as a supervisor.  You like to know
19   where your people are.
20       Q.   And did you make a determination at some
21   point that there was some period of time where you,
22   the supervisor, you know, the station, did not know
23   where he was?
24       A.   Yes.
25       Q.   Did you learn subsequently where he had

Page 17

1    been?
2        A.   Yes.
3        Q.   Where was that?
4        A.   At the time this occurred, he was in
5    Lawrence Township at the Lawrenceville School.
6        Q.   And was that part of his patrol route?
7        A.   Trooper Rivera is a New Jersey State
8    Trooper assigned to the Hamilton Station.  We have a
9    prescribed patrol area.  295 is in that area which
10   covers Lawrence, Lawrenceville School, the Lawrence
11   off the highway.  That is in our area, yes.
12       Q.   When you say patrol loop, is that part
13   of the patrol loop?
14       A.   Again, you get into a semantic of the
15   roadway versus what is off.  It's in the vicinity of
16   where he was.  I don't know specifically where he was
17   but he was in the vicinity.
18       Q.   The dispatch call there, the first
19   contact with dispatch at what, 16:05?
20       A.   According to this, yes.
21       Q.   And that's the first time on that report
22   which treats this incident of arrest, right?
23       A.   On this report, yes.
24       Q.   And let's see.  Here's Rivera 2, another
25   document I want to ask you about.  Do you recognize

Pages 14 to 17

Thomas R. Murtha                                    April 10, 2018

Page 18

1  this document or this type of document at least?
2      A.    Sure, patrol truck.
3      Q.    Who maintains that -- does that patrol
4  chart? Does the trooper do it, or someone at
5  headquarters do it?
6      A.    The patrol chart is maintained by the
7  trooper. He's responsible for making entries and
8  updating it. How it's actually entered into the
9  computer dispatch, it's, a trooper radios out,
10  dispatcher receives it, they can put the entry in.
11  With the new computer aided dispatch in the car, you
12  can actually update your location yourself. You can
13  --
14      Q.    I'm sorry. You mean you have a key
15  board or something in your computer and you can input
16  the information?
17      A.    You can import it yourself.
18      Q.    How about in 2013, was that the case?
19      A.    Yes.
20      Q.    This one, can you tell in looking at
21  this one, whether he was importing this stuff on his
22  computer or calling it in?
23      A.    This was inputted via the dispatcher.
24      Q.    We're talking about the next document.
25      A.    The computer-aided dispatch?

Page 19

1      Q.    Yes.
2      A.    Transcribes that into a different
3  program with generates a patrol log. They are two
4  systems intertwined.
5      Q.    Right.
6      A.    If you were to add up all the CAD
7  incidents from the day, it translates into your
8  patrol chart.
9      Q.    Fair enough.
10      A.    It aggregates everything into this.
11      Q.    It looks like there's a time period, I
12  have to get my copy out because I can't look across
13  the table, somewhere between 15:24 and 16:05?
14      A.    Yes.
15      Q.    There's sort of a gap of time of about
16  39 minutes, something like that?
17      A.    Uh-hum.
18      Q.    The last entry, prior to the 16:05
19  entry, is, he's out on 295?
20      A.    15:24 he enters the patrol loop or
21  somebody, whether him or dispatch, he signed out on
22  the patrol loop of 295.
23      Q.    He signed into or out of?
24      A.    Again, it is a mater of semantics. At
25  15:24 that was entered into the CAD that he was on

Page 20

1  patrol loop 295.
2      Q.    He was on patrol at 295.
3          MR. VOMACKA:  You're asking in the
4  document?
5          MR. LOUGHRY:  Yes, in the document. I
6  don't think this is official with him in the
7  car. Doesn't know. I am looking at the
8  document.
9          THE WITNESS:  That's what was generated,
10  yes. Now, if he were to pull that, that CAD,
11  you could see if he inputted it or they
12  inputted. For me reviewing as a supervisor,
13  somehow, some way, he was on the loop of 295.
14  BY MR. LOUGHRY:
15      Q.    Well, can you put these two reports
16  together, and I want to make sure I get the exhibit
17  numbers right. Rivera 1 and Rivera 2, and looking at
18  the information on those reports, is that
19  information, the sum total of it, what leads you to
20  the commentary paragraph and the conclusion that the
21  trooper made an error in basic patrol function?
22      A.    If you are doing a patrol loop, there's
23  no patrol loop, it's -- take a look down the road,
24  take a look back, make sure no one is broken down, no
25  accidents. If you are in the vicinity of that and

Page 21

1  you stop off at the Dunkin Donuts to get a cup of
2  coffee, you wouldn't necessarily say, hey, I am at
3  Dunkin Donuts. But if he was out at the Lawrence
4  School for a patrol-related function, community
5  policing, such as target hardening, doing a critical
6  infrastructure check, I would assume he would have
7  updated his location, which he did not.
8      Q.    How about if he's out there to visit the
9  baseball field where he's a volunteer baseball coach
10  and hang out with the kids for a while in the middle
11  of his shift? How about that?
12      A.    Again, in this day and age of soft
13  targets, community policing, when you say hang out,
14  if you are doing it in a semi-official capacity, I
15  would assume that he would sign out there.
16      Q.    There should be an entry?
17      A.    As a supervisor, I would have liked to
18  have known where he was.
19      Q.    If he was just taking a break, it has
20  nothing to do with his police work, you wouldn't
21  necessarily want to know where he was? I am asking.
22      A.    You're trying to take an art and make it
23  into a science.
24      Q.    Okay.
25      A.    The freedom that the trooper has and the

Pages 18 to 21

Thomas R. Murtha                                    April 10, 2018

Page 22

1    discretion that the trooper has of where he goes and
2    when he goes absent direction, as long as he's on
3    patrol and doing somewhat of a patrol-related
4    function, I don't care if they run radar at the
5    Scudder Falls Bridge, or if they look for expired
6    inspections on 29 and 129, they have the freedom to
7    go, as long as they are within that area.  Again,
8    just for documentation purposes, for credit purposes,
9    productivity and statistical purposes, if somebody is
10   doing a property check, somebody is out in a
11   community policing detail, or if somebody is out on a
12   meal, you want to know.  However, you do make
13   allowances.  If somebody stops for a necessity, call
14   of nature, someone wants to grab a bottle of water.
15   But specifically related to this, A, I would like to
16   have known he was there, and for, B, the safety
17   aspect, and for him to get the credit, if he's doing
18   something positive for the community in somewhat of
19   an official capacity as the State Police.
20        Q.    Did you ever discuss this event with
21   Trooper Rivera after the event occurred, that is,
22   after the arrest occurred?
23        A.    Yes.
24        Q.    And when did you discuss it?
25        A.    In conjunction with him coming back to

Page 23

1    the station.  You know, when he was -- my
2    recollection, when he said he had one under arrest, I
3    looked at the computer, and he's on the patrol loop.
4    Usually there's some precipitating event, such as a
5    motor vehicle stop, a pedestrian contact, which, hey,
6    if he's out on a motor vehicle stop and he says I
7    have one under arrest, generally, A, maybe it's a CDS
8    arrest or maybe it's a DWI, maybe it's some other
9    sort of arrest.  When someone says patrol loop and
10   then they say they want an arrest, I want to know
11   what's going on.
12        Q.    Sure.
13        A.    We got back to the station.  We spoke as
14   to what occurred.
15        Q.    What did he tell you?
16        A.    He said he was out in Lawrence School,
17   your client had encountered him, there was some
18   tumultuous behavior by your client, and your client
19   grabbed him by the arm at which place he placed him
20   under arrest.
21        Q.    Did he tell you anything about the
22   person he arrested?
23        A.    Your client made it known who he was in
24   relation to Trooper Rivera.
25        Q.    I am asking whether Trooper Rivera told

Page 24

1    you about the client?
2        A.    Yes.
3        Q.    What did tell you?
4        A.    That he had a relationship with the
5    client's wife previous to this occasion, and, you
6    know, where he was and what he was doing.
7        Q.    This is the defendant's wife, the
8    arrestee's wife?
9        A.    Yes.
10       Q.    You used the word client.  He wasn't
11   your client?
12       A.    No, no.
13       Q.    Okay.  All right.  Did you review the
14   reports that Trooper Rivera wrote on this incident
15   report, I should say?
16       A.    I would have to see the report to see if
17   I did or not.
18            MR. MARSHALL-OTTO:  It's R-13.
19            MR. LOUGHRY:  I'm getting there.
20   Actually, it's R-10.
21            THE WITNESS:  R-10 is the arrest report.
22   R-10 is the Investigation Report.
23   BY MR. LOUGHRY:
24       Q.    Have you had a chance to look at it?
25       A.    I'm looking at it now.

Page 25

1        Q.    Okay.
2             There's a couple places for, I guess,
3    detectives or somebody to approve here for other
4    troopers, but your name does not appear here.
5        A.    No, I did not approve this report.
6        Q.    Who is Trooper Green?
7        A.    Timothy Green, I believe, would have
8    been an acting sergeant at that time, one of my
9    patrol supervisors.
10       Q.    What about DSG Koenig?
11       A.    He was, I believe, would have been the
12   detective sergeant and assigned to Hamilton at that
13   time.
14       Q.    And is it unusual to have a couple
15   signatures of approval?
16       A.    No.
17       Q.    Did either of these folks, Green or
18   Koenig, discuss this report with you?
19       A.    I don't recall speaking with them
20   directly about this report.
21       Q.    In any of your conversations with Rivera
22   did the question come up as to whether he was going
23   to include in his report some mention of the
24   relationship as it were between Mr. Martinez and Mrs.
25   Martinez and Trooper Rivera, that being there was an

Pages 22 to 25

Thomas R. Murtha                                    April 10, 2018

## Page 26

1  adulteress affair between Rivera and Martinez?
2      A.   I don't recall speaking to Trooper
3  Rivera about the substance of the report.  The way
4  the Investigation Report goes, the trooper writes
5  them, the sergeant will approve it.  Usually a
6  criminal investigation office will do the second
7  level of approval.  And again, dates, that was
8  submitted, you know, he may have typed it up on the
9  day I wasn't working, and it had been approved on a
10  day I was not working.
11      Q.   Was it appropriate to write this report
12  in your view knowing what you know after the fact,
13  you know, was it appropriate for him to write this
14  report without making any mention of the background
15  between the relationship, Vicky Martinez, Jose
16  Rivera, and Joel Martinez?
17      A.   Appropriateness?
18      Q.   Yes.  Was it appropriate, was it
19  correct?
20      A.   He's a trooper, an incident occurred, he
21  placed somebody under arrest, he's mandated to write
22  an Investigation Report.
23      Q.   Was it appropriate without explaining
24  the reason, at least his perceived reason for the
25  purported upset and tumultuous behavior of Mr.

## Page 27

1  Martinez?
2      A.   I don't have an issue with him not
3  mentioning it.
4      Q.   Why is that?
5      A.   Is it material to his arrest?  Is it
6  material as towards your client's behavior?  You
7  know, at the end of the day, the behavior that he
8  described to me which your client acknowledged to me
9  and was written here, you know, using profanity in
10  front of juveniles, being loud and aggressive toward
11  a police officer in uniform and place his hands on
12  him, this seems wholly inappropriate to me.
13      Q.   Did you have a discussion with Mr.
14  Martinez?
15      A.   Yes, I did.
16      Q.   What did he tell you?
17      A.   In substance, both accounts of the
18  events matched up.
19      Q.   And so he told you he had used all this
20  profanity?
21      A.   I spoke to him.  In substance, yes.
22      Q.   Well --
23      A.   We didn't get into specific stuff, but
24  his somewhat tumultuous behavior in front of people,
25  you know, he would acknowledge, he did acknowledge

## Page 28

1  that, you know, it wasn't appropriate, or, yeah, I
2  was wrong, something to that.
3      Q.   I will ask you a specific question.  Did
4  he tell you that he used the F word a dozen times or
5  20 times or something like that?  Did he admit that
6  to you?
7      A.   He admitted to behavior in front of the
8  juveniles that matches Trooper Rivera's account.
9      Q.   Well, did you give him Trooper Rivera's
10  account and ask him to review?
11      A.   We spoke because your client was very
12  upset.  Your client wished to speak to somebody in
13  the supervisory capacity.  Your client did not, when
14  I spoke to him, it was my understanding of the
15  events, your client agreed, acknowledged, did not
16  dispute the events that occurred and expressed
17  remorse.
18      Q.   I asked you a specific question.  The
19  specific question was did you show Mr. Martinez the
20  written report that you have in front of you so he
21  could express agreement or disagreement with what was
22  written?
23      A.   No.
24      Q.   Oh, okay.  It didn't exist at that
25  point, did it?

## Page 29

1      A.   No.
2      Q.   So how is it that he became aware, if he
3  did become aware, of what Rivera was saying?
4      A.   From the moment he walked in the
5  station, he was yelling, he wanted to speak to
6  somebody in a supervisory capacity, and he went so
7  far as saying he wanted to speak to the Attorney
8  General.  As a shift supervisor, I saw what was going
9  on.  This is somewhat not in the, you know, usual
10  course of business, something like this is occurring.
11  Prisoners come in all the time and they are quiet,
12  whatever.  He was in an agitated state.  I spoke to
13  him, identified myself as a supervisor.  He has some
14  objections, that he's been arrested, which he said he
15  was arrested for no reason.  I said that I would
16  speak to him; however, some of the nuts and bolts of
17  processing kind of had to start and he needed to
18  allow that to occur.
19      Q.   Where did you speak to him?
20      A.   In the cells.
21      Q.   You went into the holding cells?
22      A.   Yes.
23      Q.   And you sat down with him?
24      A.   I don't know if I sat down, but I spoke
25  to him within the cells.

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Thomas R. Murtha

April 10, 2018

## Page 30

1  Q.   Did you go inside the cells with him or?
2  A.   I am sure I was in the cell room.  The
3  physical layout, whether he was behind the bars,
4  whether I was in the doorway.
5  Q.   Was he still handcuffed?
6  A.   I don't know.
7  Q.   He was upset?
8  A.   Oh, sure.
9  Q.   And he told that you this guy had an
10  affair with his wife?
11  A.   Yes.
12  Q.   Now, what I am specifically asking, did
13  you make any notes about that?
14  A.   I did a report for him and forwarded
15  that to Internal Affairs, because his objection was
16  that he had been arrested for no reason.
17  Q.   Uh-hum.
18  A.   The details of that relationship, I
19  don't know if -- I don't recall making specific note.
20  However, you know, he acknowledged a relationship,
21  Trooper Rivera acknowledged the relationship, and I
22  conveyed, you know, that to my superiors, also.
23  Q.   So did you write a report writing down
24  what it is he told you?
25  A.   No, I did not.

## Page 31

1  Q.   Did you -- you didn't write down any
2  report that attributed to any particular quotes to
3  him when he was out there on the field or talking to
4  Rivera there at scene?
5  A.   Not that I recall.
6  Q.   I mean, did he admit to you that he used
7  the F word, the fuck word, you know, 15 or 20 times?
8  A.   As a direct admission, I don't recall.
9  Q.   Okay.  And did he tell you, did he admit
10  to you that he had grabbed Trooper Rivera?
11  A.   Yes, he did.
12  Q.   How did he say that he did that?
13  A.   He grabbed him by the arm.  Or he
14  acknowledged when I conveyed the set of circumstances
15  to him, something -- he agreed with it.  He was even
16  apologetic.
17  Q.   Did you write that down?
18  A.   No.
19  Q.   You didn't make a record of that?
20  A.   No.
21  Q.   Were you ever called to attend court in
22  this case when this case came up in municipal court?
23  A.   No.
24  Q.   No one came, we need you because this
25  guy made some kind of admissions to you?

## Page 32

1  A.   No.
2  Q.   That never got communicated to you?  No?
3  A.   I was never subpoenaed as far as I am
4  aware of.
5  Q.   You knew the case was dismissed, don't
6  you?  Do you know that?
7  A.   I am aware after the fact of that, yes,
8  I was.
9  Q.   In terms of the Internal Affairs
10  investigation, were you interviewed?
11  A.   I don't believe I was.
12  Q.   Do you know the fellow Vargas?
13  A.   I know the name.  I don't know if I'm
14  personally acquainted with him.
15  Q.   Do you know that he was trying to figure
16  out what happened out there as far as at the field
17  between Rivera and Martinez?
18  A.   If you say so.  Was he the investigator
19  assigned to the case?
20  Q.   Yes.
21  A.   Okay.
22  Q.   You never had any contact with him to
23  tell him about the extremely valuable information
24  that Mr. Martinez gave you from what you're telling
25  me?

## Page 33

1  A.   I don't believe that I was interviewed.
2  I don't believe.
3  Q.   What's an SP 525?
4  A.   I believe that's the Report of Incident
5  form.
6  Q.   Your badge is 6110?
7  A.   6110, correct.
8  Q.   What's the function of that report,
9  SP 525?  What's the function of that report?
10  A.   It's report of incident form.  I guess
11  when allegation has been made or some substantial
12  breaking of a rule or law, it comes to my attention,
13  I fill it out and forward it to Internal Affairs.
14  Q.   You mean when a member of the public
15  brings an allegation against a police officer, for
16  example?
17  A.   It could be public, could be internally,
18  sure.
19  Q.   It could be another police officer
20  making an allegation against another police officer?
21  A.   Yes.
22  Q.   So you report the substance of the
23  allegation?
24  A.   Yes.
25  Q.   Is it a function of that form to put

Pages 30 to 33

# EXHIBIT G

# COMPLAINT - SUMMONS

| COMPLAINT NUMBER | | | |
|---|---|---|---|
| 1107 | S | 2013 | 000387 |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. |

**THE STATE OF NEW JERSEY**
**VS.**
**JOEL MARTINEZ**

LAWRENCE TWP MUNICIPAL COURT
2211 LAWRENCE RD
LAWRENCE        NJ  08648
(609)844-7159 COUNTY OF: MERCER

ADDRESS: PO BOX 6052

LAWRENCEVILLE     NJ 08648-0052

| # of CHARGES 2 | CO-DEFTS | POLICE CASE #: C060130299 |
|---|---|---|

COMPLAINANT NAME: TPR  J  RIVERA JR  NEW JERSEY STATE POLICE

**DEFENDANT INFORMATION**
SEX: M  EYE COLOR: BROWN   DOB:
DRIVER'S LIC. #:                    DL STATE:  NJ
SOCIAL SECURITY #:        SBI #:
TELEPHONE #:

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named defendant on or about 04-26-2013 in LAWRENCE TWP, MERCER County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, PURPOSELY OFFEND THE SENSIBILITIES OF ANOTHER BY ADDRESSING UNREASONABLY LOUD AND OFFENSIVELY COARSE OR ABUSIVE LANGUAGE TO ANOTHER PERSON PRESENT IN A PUBLIC PLACE, SPECIFICALLY BY CONTINUOUSLY BERATING AND SHOUTING PROFANITIES AT TPR. RIVERA #6010 IN THE PRESENCE OF A HIGH SCHOOL BASEBALL TEAM. IN VIOLATION OF N.J.S. 2C:33-2B (PETTY DISORDERLY OFFENSE)

WITHIN THE JURISDICTION OF THIS COURT, WITH PURPOSE TO HARASS ANOTHER, SUBJECT ANOTHER TO OFFENSIVE TOUCHING, SPECIFICALLY BY PLACING HIS HANDS ON TPR. RIVERA #6010 WHILE ATTEMPTING TO REMOVE THE SUBJECT FROM THE PROPERTY (LAWRENCEVILLE SCHOOL). IN VIOLATION OF N.J.S. 2C:33-4B (PETTY DISORDERLY PERSON OFFENSE)

in violation of:

| Original Charge | 1) 2C:33-2B | 2) 2C:33-4B | 3) |
|---|---|---|---|
| Amended Charge | | | |

**CERTIFICATION:**
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.

Signed: TPR J RIVERA JR    Date: 05-16-2013  4.26.13

The complaining witness is a law enforcement officer and a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons.

**SUMMONS:**
YOU ARE HEREBY SUMMONED to appear before this court to answer this complaint. If you fail to appear on the date and at the time stated below, a warrant may be issued for your arrest.

DATE TO APPEAR: 05-20-2013 TIME: 5:30pm

TPR J RIVERA JR    4.26.13
Signature of Person Issuing Summons    Date

| ☐ Domestic Violence – Confidential | ☐ Related Traffic Tickets or Other Complaints | ☐ Serious Personal Injury/ Death Involved |
|---|---|---|

Special conditions of release:
☐ No phone, mail or other personal contact w/victim
☐ No possession firearms/weapons
☐ Other (specify):

**ORIGINAL**

NJSP MARTINEZ 278    Page 1 of 7    NJ/CDR1 8/1/2005

# COMPLAINT – SUMMONS (Court Action)

| COMPLAINT NUMBER | | | | STATE V. | |
|---|---|---|---|---|---|
| **1107** | **S** | **2013** | **000387** | | **JOEL MARTINEZ** |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | | |

| FTA Bail Information | Date Bail Set: | Amount Bail Set: $_____ | by:_____ | ☐ Bail Recog. Attached |
|---|---|---|---|---|

| Released on Bail | R.O.R. | Committed Default | Committed w/o Bail | Place Committed: | Date Referred to County Prosecutor: _____ |
|---|---|---|---|---|---|

| Date of First Appearance: 05-20-2013 | ☐ Advised of Rights by_____ | Defendant Desires Counsel: ☐ Yes   ☐ No |
|---|---|---|

| Prosecuting Attorney Information | | | | Defense Counsel Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Name:** | | | | **Name:** | | | | | |
| State | County | Municipal | Other | None | Retained | Public Def | Assigned | Waived | Other |
| Original Charge | 1) 2C:33-2B | | | 2) 2C:33-4B | | | 3) | | |
| Amended Charge | | | | | | | | | |
| Waiver Indt/Jury | | | | | | | | | |
| Plea/Date of Plea | Plea:      Date: | | | Plea:      Date: | | | Plea:      Date: | | |
| Adjudication (* see code) | Finding Code: D   Date: 12-2-13 | | | Finding Code:      Date: | | | Finding Code:      Date: | | |

| Jail Term | | Jail time credit | Susp. Imp | | Jail time credit | Susp. Imp | | Jail time credit | Susp. Imp |
|---|---|---|---|---|---|---|---|---|---|
| Probation Term | | | Susp. Imp | | | Susp. Imp | | | Susp. Imp |
| Cond. Discharge Term | | | | | | | | | |
| Community Service | | | | | | | | | |
| D/L Suspension Term | | | | | | | | | |

| Fines/Costs | Fines:      Costs: | Fines:      Costs: | Fines:      Costs: |
|---|---|---|---|
| VCCB/SNSF | VCCB:      SNSF: | VCCB:      SNSF: | VCCB:      SNSF: |
| DEDR/Lab Fee | DEDR:      LAB: | DEDR:      LAB: | DEDR:      LAB: |
| CD Fee/Drug Ed Fnd | CD:      DAEF: | CD:      DAEF: | CD:      DAEF: |
| DV Surch/Other Fees | DV:      Other: | DV:      Other: | DV:      Other: |
| Restitution Beneficiary:_____ | | | |

| Miscellaneous Information, Adjournments, Companion Complaints, Co-Defendants, Case Notes: | * Finding Codes |
|---|---|
| | 1 – Guilty |
| | 2 – Not Guilty |
| | 3 – Dismissed – Other |
| | 4 – Guilty but Merged |
| | 5 – Dismissed-Rule |
| | 6 – Dismissed Lack of Prosecution |
| | 7 – Dismissed – Pros Motion/Vic Req |
| | 8 – Conditional Discharge |
| | D – Dismissed- Prosecutor Discretion |
| | M – Dismissed- Mediation |
| | P – Dismissed-Plea Agreement |
| | S – Disposed at Superior |
| | W – Dismissed-False ID |

JUDGE'S SIGNATURE        DATE 12-2-13

**ORIGINAL – Court Action**

Page 2 of 7        NJ/CDR1 8/1/2005

NJSP MARTINEZ 279