# EXHIBIT A

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 2 of 11 PageID: 357

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2             CIVIL ACTION NO. 3:15-cv-02932-BRM-TJB

 3
     JOEL MARTINEZ,
 4
                    Plaintiff,
 5
              vs.
 6
     COLONEL JOSEPH R. FUENTES, SUPERINTENDENT;
 7   LT. COLONEL PATRICK CALLAHAN, DEPUTY
     SUPERINTENDENT OF OPERATIONS; MAJOR KEVIN
 8   DUNN, DEPUTY BRANCH COMMANDER, FIELD
     OPERATIONS SECTION; JOHN DOE 1, TROOP C
 9   COMMANDER; JOHN DOE 2, SUPERVISOR; TROOPER I
     JOSE G. RIVERA (#6010); ACTING MAJOR MARK
10   WONDRACK, OFFICE OF PROFESSIONAL STANDARDS;
     CAPTAIN SCOTT EBNER, BUREAU CHIEF, INTAKE
11   AND ADJUDICATION BUREAU, OFFICE OF
     ADJUDICATION BUREAU, OFFICE OF PROFESSIONAL
12   STANDARDS, and DSG ISMAEL E. VARGAS,

13                  Defendants.

14                    ------------

15             THURSDAY, APRIL 19, 2018
                      ------------
16

17        Oral sworn deposition of BENJAMIN C. ATLEE,
     taken at the Lawrenceville Prep School, 2500 Main
18   Street, Hogate Hall, Lawrenceville, New Jersey,
     before Carolyn J. McCalla, Certified Court Reporter,
19   on the above date, commencing at 11:07 a.m., there
     being present:
20

21                    - - - - -

22                    TATE & TATE
                 Certified Court Reporters
23               520 Stokes Road - Suite C-1
                 Medford, New Jersey 08055
24            (856) 983-8484 - (800) 636-8283

25
```

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 3 of 11 PageID: 358

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
|---|---|---|
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

## Page 2

APPEARANCES CONTINUED:

LOUGHRY & LINDSAY, LLC
330 Market Street
Camden, New Jersey 18102
BY: JUSTIN T. LOUGHRY, ESQUIRE
Attorneys for Plaintiff

ATTORNEY GENERAL OF NEW JERSEY
25 Market Street, PO Box 116
Trenton, New Jersey 08648
BY: KAI MARSHALL-OTTO, ESQUIRE
Attorneys for Defendants Colonel
Joseph Fuentes, et al.

WINDELS, MARX, LANE & MITTENDORF, LLP
120 Albany Street Plaza
New Brunswick, New Jersey 08901
BY: WILLIAM C. CAGNEY, ESQUIRE
Attorneys for the witness

## Page 3

INDEX

| WITNESS | EXAMINING ATTORNEY | PAGE |
|---|---|---|
| BENJAMIN C. ATLEE | | |
| | Examination By Mr. Marshall-Otto | 4 |
| | Examination By Mr. Loughry | 19 |
| | Examination By Mr. Marshall-Otto | 35 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| | No exhibits were marked | |

## Page 4

BENJAMIN C. ATLEE, having been first duly sworn, testified as follows:

EXAMINATION BY MR. MARSHALL-OTTO:

Q. Mr. Atlee, my name is Kai Marshall-Otto. I am a Deputy Attorney General with the Office of the Attorney General. I represent defendant Trooper Jose Rivera with respect to a civil lawsuit brought against him by one Joel Martinez.

This is the matter captioned Martinez V Fuentes, et al., proceeding in the United States District Court for the District of New Jersey.

We're here today at the Lawrenceville School in Lawrenceville, New Jersey to depose you, Mr. Champ Atlee.

Mr. Atlee, do you understand that you are under oath?

A. I do.

Q. Have you had your deposition taken before?

A. No.

Q. I'm going to go over some rules that we're going to try and adhere to over the course of this deposition. I'm going to ask you a series of questions today regarding the events underlying this lawsuit that took place in April of 2013, the 26th of April 2013.

## Page 5

Please make sure you answer each question to the best of your recollection. However, if you don't remember an answer to a question, you can simply state that you don't remember. I will try to avoid asking you questions that require you to speculate or guess. That being said, if I do and you feel comfortable, you may respond unless, of course, your attorney offers an objection and instructs you not to answer.

Please make sure you speak all of your answers because the court reporter can't record a nod of your head or a shake, so verbal answers.

Please wait for me to finish speaking before you start answering. That makes the court reporter's job a little bit easier and ensures an accurate record of this deposition and I will try and extend you the same courtesy.

Are you currently on any medications or drugs or anything that might prevent you from answering questions truthfully and to the best of your ability today?

A. No, I'm not.

Q. And any other physical or mental ailment you are suffering from that might impact your memory?

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 4 of 11 PageID: 359

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 6

1  A.  No.
2  Q.  Did you review any materials or documents
3  or have any conversations in preparation for your
4  deposition today other than with your attorney?
5  A.  No.
6  Q.  I'm just going to go into a very brief bit
7  of background.
8       For the record, what is your full name?
9  A.  For the record, my full name is Benjamin
10 Champneys Atlee.
11 Q.  And is it correct that you are commonly
12 called Champ Atlee?
13 A.  Yes, just as the dominion of my second
14 name.
15 Q.  And your date of birth please?
16 A.  ▮▮▮▮▮▮▮▮.
17 Q.  And where do you presently reside?
18 A.  ▮▮▮▮▮▮▮▮ in Lawrenceville.
19 Q.  Is that on the campus or off?
20 A.  No, it's not, no. I moved off campus in
21 2006.
22 Q.  In 2006. Prior to that you lived on
23 campus?
24 A.  Yes. Actually I lived quite near the
25 baseball field.

### Page 7

1  Q.  Oh, did you. How long had you lived there
2  before you moved off campus?
3  A.  A decade anyway.
4  Q.  So, just for clarity of the record, in
5  April of 2013, you were living off campus, correct?
6  A.  I was living off campus.
7  Q.  In Lawrenceville Township?
8  A.  Yes.
9  Q.  Can you tell me a little bit about your
10 educational background?
11 A.  Yes. So I graduated from Lawrenceville
12 School and attended Claremont, then Claremont Men's
13 College for two years. I dropped out of college to
14 sign a baseball correct with the Minnesota Twins. I
15 was out of school for a year and then I finished at
16 Franklin & Marshall College in Lancaster,
17 Pennsylvania. I did graduate work at both Florida
18 State and at Penn State Millersville.
19 Q.  And so do you hold a graduate degree?
20 A.  Yes. I hold a Master's degree from Penn
21 State Millersville.
22 Q.  And you hold an undergraduate degree from
23 Franklin & Marshall?
24 A.  Correct.
25 Q.  So, you played professional baseball; is

### Page 8

1  that correct?
2  A.  For about an hour.
3  Q.  That's a lot more than most people can say.
4       MR. CAGNEY:  I can say that too.
5  Q.  And are you currently employed by the
6  Lawrenceville School?
7  A.  I am.
8  Q.  How long have you been an employee here?
9  A.  Since the fall of 1969.
10 Q.  That's impressive.
11      Subsequent to getting your Master's degree,
12 is this the only place where you have held
13 employment?
14 A.  I worked for two years at Peddie in
15 Hightstown in 1967 and 1968.
16 Q.  In what position -- or strike that.
17      What positions have you held while employed
18 at the Lawrenceville School to the extent that you
19 can name them?
20 A.  Let's see. So --
21 Q.  We can start with the most recent and,
22 sorry to interrupt. We can start with the most
23 recent and when it starts to fade you can just tell
24 me.
25 A.  Probably easier to go the other way.

### Page 9

1  Q.  Okay.
2  A.  So, I was appointed as the house master of
3  the Woodhull House. So I was pointed as the house
4  master at Woodhull House and an instructor in the
5  English department. I ultimately became the
6  director of day students at Lawrenceville. I was
7  also the chairman of the English department for I
8  believe six years. In 19, relative to this event,
9  in 1977 I became the varsity baseball coach and I
10 continued in that role until the spring of 2015.
11 Q.  Are you involved in the baseball practice
12 in any respect at this point?
13 A.  Well, I'm formally retired, but I was asked
14 by the athletic director to at least converse with a
15 new coach to just make him comfortable with the way
16 the Lawrenceville does business I suppose.
17 Q.  But as of today, are you receiving
18 paychecks from the Lawrenceville School?
19 A.  I'm certainly receiving paychecks from the
20 Lawrenceville School. I'm not receiving paychecks
21 as the varsity baseball coach.
22 Q.  And what is your capacity now then?
23 A.  So, at this point I'm an instructor in the
24 English department. I guess I should add that I'm
25 an academic adviser to five seniors as well.

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 5 of 11 PageID: 360

| | | |
|---|---|---|
| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 10

1  Q. Just for clarity of the record, you were
2  the varsity baseball coach in April of 2013; is that
3  correct?
4  A. Yes, I was, yes.
5  Q. So, now I'm going to get into a little bit
6  more meat as to the events underlying this lawsuit.
7  Were you present on the grounds of the
8  Lawrenceville School on April 26th of 2013?
9  A. Yes, I was.
10 Q. Was there a baseball practice that day?
11 A. Yes. I was conducting a baseball practice,
12 and this occurred right at the beginning of baseball
13 practice.
14 Q. That was a varsity baseball team practice?
15 A. Right.
16 Q. About what time did that practice take
17 place?
18 A. It would have been, well, the practice
19 would have begun at 3:30. Players are asked to be
20 on the field to stretch and to throw. The actual
21 event would have occurred just about at a quarter of
22 four because I just asked the players to come in.
23 Q. But the players arrive at about 3:30?
24 A. About 3:30.
25 Q. And at some point during the course or

### Page 11

1  after the arriving of the players, did Trooper Jose
2  Rivera stop by?
3  A. Yes.
4  Q. And about what time, to the best of your
5  recollection, did he stop by?
6  A. It would have been between 3:30 and quarter
7  of four.
8  Q. So, were the players stretching when he
9  showed up?
10 A. To the best of my recollection they were.
11 People, the coaches were just arriving to the field.
12 Q. And were some in the dugout?
13 A. Coaches?
14 Q. Individuals, be they coaches or players.
15 A. Well, let's see, so the coaches were just
16 arriving and I was getting ready to tell them what I
17 wanted them to do in the first section of the
18 practice. Typically at quarter of four I would call
19 the players in, I would discuss with them what we
20 were going to do. If it was the day after a game,
21 sometimes we would review essentially what went
22 wrong in the previous game and talk about that.
23 Q. So, when Trooper Rivera arrived, do you
24 recall where he went? Did he go by a dugout by
25 chance?

### Page 12

1  A. Well, yeah, he spoke to me and then he was
2  off to my left as I began to talk to the players.
3  Q. And do you recall whether this was by the
4  first base or the third base dugout?
5  A. Well, all this, all this occurred nearby
6  the third base dugout. First of all, it would be
7  the home dugout. The players normally stretched and
8  threw along the left field line to stay away from
9  the infield. So it was natural that we would use
10 the third base dugout.
11 Q. And do you recall when Trooper Rivera came
12 by and was -- was he presumably engaging you in
13 conversation?
14 A. My recollection is that we spoke briefly.
15 Q. And do you recall what about?
16 A. Again, my best recollection would be that
17 he was trying to find out what the time of our next
18 game might be so that he could figure out whether or
19 not he could attend. If he wasn't on duty then he
20 was usually in uniform and he was instructing the
21 outfielders. So I'm guessing that he stopped by to
22 find out about the next game because that's, if he
23 was on duty, that's the sort of conversation we
24 would have.
25 Q. So, as I understand it, what you are saying

### Page 13

1  is that he was trying to determine whether he would
2  be on duty during the next practice?
3  A. Right.
4  Q. And were he not on duty, he would attend in
5  a baseball uniform?
6  A. Right.
7  Q. Rather than a trooper uniform?
8  A. Rather than a trooper uniform.
9  Q. And as a coach, was Trooper Rivera a coach
10 of some sort?
11 A. Yes, a volunteer coach.
12 Q. And as a coach, was he permitted or
13 expected to be on school grounds to attend
14 practices?
15 A. Yes.
16 Q. After Trooper Rivera arrived at the
17 practice, did Mr. Martinez at some point approach
18 the practice?
19 A. Yes.
20 Q. When I say Mr. Martinez, I mean Mr. Joel
21 Martinez.
22 A. Yes.
23 Q. How long after Trooper Rivera arrived did
24 Mr. Martinez arrive on the scene?
25 A. I'm guessing -- well, let me answer this

4 (Pages 10 to 13)

| | | |
|---|---|---|
| (856) 983-8484 | Tate & Tate, Inc. | (800) 636-8283 |
| | 520 Stokes Road, Suite C-1, Medford, NJ 08055 | |

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 6 of 11 PageID: 361

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 14

1  way. I'm sure that I had spoken briefly with Mr.
2  Martinez. I began to speak to the team when I heard
3  a loud voice off to my left.
4  Q.    Okay.
5  A.    So, in terms of the timeframe, it was in I
6  would guess sort of a five minute timeframe and
7  almost immediately as I was beginning to speak to
8  the team.
9  Q.    And prior to when you heard that voice, did
10 you have any awareness of Mr. Martinez's presence?
11 A.    No.
12 Q.    So, that was your first?
13 A.    Yes.
14 Q.    Will you describe for me, this is a rather
15 open-ended question, what you observed from the time
16 you heard that voice.
17 A.    Yeah, I heard the voice. I caught what the
18 speaker was saying. He said relatively, he said
19 pretty loudly in what I took to be an irony, "I
20 guess it's okay to break up a man's family." And he
21 repeated that at least once. It became clear to me
22 that he was directing the conversation at
23 Mr. Rivera.
24 Q.    And what did you observe unfold after that?
25 A.    I was struck by Mr. Rivera's restraint. He

### Page 15

1  said at least twice, "You need to stop this. You
2  need to leave" or "This is inappropriate. You need
3  to leave."
4        They were, they were on either side of the
5  fence. Mr. Rivera was on the field. Mr. Martinez
6  was standing between the bleachers and the end of
7  the dugout. Within a few moments, Mr. Rivera
8  stepped through the gate in the fence and escorted
9  Mr. Martinez away.
10 Q.    How long would you say the verbal exchange
11 occurred from when you first heard Mr. Martinez's
12 voice to when Mr. Rivera began to escort Mr.
13 Martinez off that area of the baseball field?
14 A.    So, my best recollection would be that I
15 started to talk to the team. I heard the voice. I
16 looked up. It became clear, pretty quickly, that
17 the conversation was addressed to Mr. Rivera, that
18 it wasn't addressed to me or to a player. I don't
19 recall whether Mr. Rivera immediately responded to
20 it, but pretty quickly, as I'm trying to recollect
21 this, Mr. Martinez said something further and
22 Mr. Rivera warned him that it was inappropriate,
23 that he wasn't, that he shouldn't do this, that he
24 needed to leave.
25       Mr. Martinez was angry enough that he did

### Page 16

1  not, you know, he did not respond to that. I
2  believe at that point he said again something to the
3  effect that "I guess it's all right for you to break
4  up a man's family."
5        Then I would say pretty quickly within
6  probably 15 or 20 seconds Mr. Rivera walked through
7  the gate and escorted him away.
8  Q.    Okay.
9  A.    That's my recollection.
10 Q.    And did you hear anyone, and by that I mean
11 either Trooper Rivera or Mr. Martinez use any
12 profane or extreme language?
13 A.    No, I didn't. It was a fairly contained
14 conversation in that respect, given the way it
15 started. No, I didn't hear any profanity from
16 either man.
17 Q.    So, you say it was contained considering
18 the way it started.
19 A.    Yeah.
20 Q.    Is it fair to say that it started with Mr.
21 Martinez yelling?
22 A.    Yes.
23 Q.    And that Trooper Rivera controlled the
24 situation? Was that your perception?
25 A.    That was my perception and, you know, at

### Page 17

1  the time I was reassured that Trooper Rivera was
2  restrained, but clear in what he was telling Mr.
3  Martinez to do. I was relieved that Mr. Martinez's
4  conversation was directed at an individual as
5  opposed to being -- because when I first heard it, I
6  wasn't sure, and I also need to note I didn't know
7  who, I didn't know who was speaking at that point.
8  I didn't know Mr. Martinez. So, yeah.
9  Q.    When you observed a man's identity that you
10 did not know --
11 A.    I did not know.
12 Q.    -- walking toward the baseball field and
13 screaming, did you feel concerned for the safety of
14 yourself and the students?
15 A.    Yes, to a point. I would say probably my
16 most effective response to that would be that as the
17 confrontation was unfolding, because I was looking
18 at the players, I could see two or three kids who
19 seemed alarmed by what they were hearing. They
20 actually couldn't see because the dugout is
21 enclosed, but they could hear what was going on.
22 Q.    Is it fair to say that this is the kind of
23 conduct that the Lawrenceville School would prefer
24 their students not to be exposed to?
25       MR. LOUGHRY: Objection to form. You

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 7 of 11 PageID: 362

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| --- | --- | --- |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 18

1  can answer.
2  Q.   You can answer.
3  A.   Yes, obviously.
4  Q.   In your opinion, who was the initial
5  aggressor in this situation between Mr. Martinez and
6  Trooper Rivera?
7       MR. LOUGHRY: Objection to form.
8  Q.   You can answer.
9  A.   **Simply on the base of Mr. Martinez being**
10 **the first to speak and to speak loudly, he was**
11 **precipitating the event.**
12 Q.   And based on what you observed, based on
13 what you observed, did it appear that Trooper Rivera
14 took appropriate action to diffuse the situation?
15 A.   **Yes, I thought so then and I believe I said**
16 **as much to Officer Vargas when he spoke with me that**
17 **I was relieved that the confrontation came to an end**
18 **pretty quickly.**
19 Q.   And did you observe -- are you aware --
20 strike that.
21      Are you aware that Trooper Rivera
22 subsequently placed Mr. Martinez under arrest?
23 A.   **I'm aware that it happened.  I didn't see**
24 **it.**
25 Q.   You did not see it?

### Page 19

1  A.   **No.  Again, I didn't know who he was.  I**
2  **saw what I have described and then that was as much**
3  **as I observed.**
4  Q.   So, is it accurate to say that once Trooper
5  Rivera escorted Mr. Martinez away from the field,
6  you remained on the field with the players?
7  A.   **Yes.  I had business to do.  So I went back**
8  **to my work.**
9  Q.   So, you continued to conduct the practice?
10 A.   **Yes.**
11 Q.   Now, with respect to what you did observe,
12 did you at any time observe Trooper Rivera attack,
13 assault or otherwise physically do harm to Mr.
14 Martinez?
15 A.   **I didn't see that.**
16 Q.   That's all I have for the moment.  Justin?
17      MR. LOUGHRY: Thank you.
18 **EXAMINATION BY MR. LOUGHRY:**
19 Q.   It's Mr. Atlee, am I saying that right?
20 A.   **That's correct.**
21 Q.   Mr. Atlee, we introduced each other this
22 morning to each other before the deposition, just
23 before the deposition began; is that right?
24 A.   **Uh-huh.**
25 Q.   You are nodding yes?

### Page 20

1  A.   **Yes.**
2  Q.   You and I have not met each other before,
3  have we?
4  A.   **No.**
5  Q.   And we haven't spoken before, have we?
6  A.   **No.**
7  Q.   It sounds like you have had about 95
8  percent of your career, your work life here at the
9  Lawrenceville School?
10 A.   **That's correct.**
11 Q.   I'm not very good at math.  You are in the
12 English department, maybe you are not either, but I
13 was approximating, fair enough?
14 A.   **I think that's fair.**
15 Q.   You held a number of positions of
16 responsibilities here besides teaching; is that
17 right?
18 A.   **That's true, yes.**
19 Q.   So, of them have been more or less
20 administrative type of positions?
21 A.   **Yes.  I would say the mid level**
22 **administration.**
23 Q.   So, you have been given some
24 responsibilities --
25 A.   **Yes.**

### Page 21

1  Q.   -- by the school beyond simply instructing
2  a class?
3  A.   **Yes.**
4  Q.   Is it fair to say you feel a very strong
5  sense of loyalty to this school?
6  A.   **I think that probably can be overdone.  The**
7  **school gave me an opportunity to do what I care**
8  **about.**
9  Q.   That has to have made you feel good over
10 the years?
11 A.   **Oh, absolutely.**
12 Q.   And you have a great affection for this
13 school, fair enough?
14 A.   **Yes.  I would be careful about that because**
15 **we're talking about a professional relationship.**
16 **I'm not nostalgic about the school.**
17 Q.   But you do have a sense that there is sort
18 of a code of conduct and honor here at the school?
19 A.   **Yes, I would agree.**
20 Q.   There is a way that things are supposed to
21 be done here?
22 A.   **Yes.**
23 Q.   Is that right?
24 A.   **Yes.**
25 Q.   One of the things about that code of

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 8 of 11 PageID: 363

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 22

1  conduct would be that staff, faculty, should be
2  careful not to air their personal grievances or
3  their personal conflicts in front of students, fair
4  enough?
5  A.   I think that's fair as a general assumption
6  probably across the profession.
7  Q.   Certainly as part of a culture here at
8  Lawrenceville, right?
9  A.   I probably would put it a little
10 differently. I think it's part of the culture in
11 teaching generally.
12 Q.   That's a culture to which you have
13 dedicated more than 40 years?
14 A.   Yes.
15 Q.   Is that right?
16 A.   That would be fair.
17 Q.   Jose Rivera, he was a baseball player in
18 his past, wasn't he?
19 A.   He was a baseball player at the
20 Lawrenceville School.
21 Q.   And he was a baseball player while you were
22 the coach of the team?
23 A.   That's true.
24 Q.   So, you coached him?
25 A.   Yes.

### Page 23

1  Q.   And so you know Jose Rivera for, well, I'm
2  going to say many years, but certainly back to his
3  high school years?
4  A.   Yes.
5  Q.   He played in the outfield?
6  A.   Very good center field.
7  Q.   And now he is a -- back in 2013 he was a
8  volunteer coach?
9  A.   Yes.
10 Q.   For the outfielders?
11 A.   Right.
12 Q.   Over the years you have developed a
13 relationship that we can say was collegial with him?
14 A.   Yes, I think that's fair.
15 Q.   Would you consider him a friend?
16 A.   Yeah, I would consider him a friend.
17 Q.   You didn't know Mr. Martinez?
18 A.   No. As I have stated, that afternoon I
19 actually had no idea who he was.
20 Q.   I think that you responded to Mr. Kai
21 Marshall-Otto's question about not having seen any
22 arrest that day; is that correct?
23 A.   That's correct. That is correct.
24 Q.   But you must have become aware after the
25 fact that there had been an arrest, didn't you?

### Page 24

1  A.   I did become aware of that, yes.
2  Q.   How did you become aware of that, if you
3  remember?
4  A.   I guess I would say this much. I think by
5  the end of the afternoon that Mr. Eldridge, and
6  conceivably Mr. Goldenberg, although Mike had other
7  duties as a trainer, so I'm not sure that he was
8  there.
9  Q.   When you say Mike, you mean Mike
10 Goldenberg?
11 A.   Mike Goldenberg.
12 Q.   Go ahead.
13 A.   So my recollection is by the end of the
14 afternoon I knew more about who was who. I didn't
15 realize that Mr. Martinez was actually a faculty
16 husband. But I believe I knew that by the end of
17 the afternoon because I was really kind of at sea as
18 to what I was looking at.
19 Q.   Somewhere along the line in that process of
20 coming to some knowledge about it, you came to an
21 understanding that he has been arrested?
22 A.   Yes. Yes, I did become aware that he had
23 been arrested.
24 Q.   Did you ever receive any notice yourself of
25 any pending court proceedings against Mr. Martinez?

### Page 25

1  A.   No.
2  Q.   So, let me just be clear about it. So you
3  never received any subpoena or notice from a court
4  asking you to come to court to appear as a witness;
5  is that correct?
6  A.   Well, aside from the subpoena I received
7  prior to this deposition.
8  Q.   Right, you received a subpoena which
9  required your appearance to give testimony at a
10 deposition in this particular case that Mr. Kai
11 Marshall-Otto and I are present for today, correct?
12 A.   Correct.
13 Q.   I'm going to talk now, for example, about a
14 municipal court proceeding. Lawrenceville Township
15 has a municipal court, you know that?
16 A.   Yes.
17 Q.   You didn't receive any notice or subpoena
18 to come to the Lawrenceville Municipal Court to give
19 testimony, did you?
20 A.   No, certainly not to my -- certainly not to
21 my recollection, and certainly if somebody had asked
22 me to come testify in municipal court I would have
23 responded and done it.
24 Q.   Fair to say that you are the kind of person
25 who if you got a court notice you would take that

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 9 of 11 PageID: 364

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| --- | --- | --- |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

**Page 26**

1  with utmost seriousness?
2  A.   Yes, I would take it seriously.
3  Q.   You made a reference to having an interview
4  or conference with a Trooper Vargas of the New
5  Jersey State Police?
6  A.   Yes.
7  Q.   You attended a session where he asked you
8  questions about this incident?
9  A.   **Yes. As a matter of fact, it happened in**
10 **my classroom.**
11 Q.   Apart from coming to that or being involved
12 in that event, Vargas asking you questions and you
13 giving him answers, did anyone from, anyone else
14 from the state police call to interview you about
15 what you had seen and heard?
16 A.   **No, not to my recollection. Somebody, and**
17 **I'm trying to remember how it would have happened,**
18 **somebody indicated to me that Mr. Vargas would be**
19 **coming to interview me. I don't recall what the**
20 **mechanics were, but I was ready to receive him.**
21 Q.   I only have a few more questions.
22       It sounded to me, and tell me if I'm
23 correct, that after Mr. -- after Trooper Rivera went
24 through the gate to the outside of the fence to
25 speak with Mr. Martinez, it was a fairly short

**Page 27**

1  moment, so to speak, before they began walking away
2  together up towards the car?
3  A.   Yes.
4  Q.   And at that point as they walked up away
5  from the field -- first of all, you have already
6  told us you weren't hearing any profanity; is that
7  correct?
8  A.   Correct.
9  Q.   But at that point were you hearing what
10 they were saying to one another or were they simply
11 walking up?
12 A.   **No, I was not hearing what they were**
13 **saying. In relative terms they were leaving fairly**
14 **quietly.**
15 Q.   So, what I want to ask you because we're
16 not out there at the field, I want to talk about the
17 spot where that gate is and then the walk up to the
18 cars for just a moment. So if you can focus your
19 attention on that.
20 A.   Uh-huh.
21 Q.   The gate is near the end of the third base
22 dugout?
23 A.   **Yes. The gate was just inside the third**
24 **base dugout towards the backstop.**
25 Q.   So, if two people were talking at that

**Page 28**

1  point right outside that gate, and you -- let me
2  strike that and go back.
3        At the time that Rivera and Martinez are
4  right outside that gate speaking --
5  A.   Yes.
6  Q.   -- briefly, you were in front of the
7  dugout?
8  A.   Yes.
9  Q.   So, you could see them?
10 A.   Yes.
11 Q.   But the students, the baseball players were
12 inside the dugout?
13 A.   Correct.
14 Q.   The dugout has a full back to it?
15 A.   **Yes, it has a full back to it.**
16 Q.   So, the students wouldn't be able to see,
17 they can't see around the corner, so to speak?
18 A.   Exactly.
19 Q.   But whatever conversation was transpiring
20 in the moment that Martinez and Rivera are right
21 outside that gate you are close enough to hear it?
22 A.   No. I couldn't --
23 Q.   You didn't hear it?
24 A.   **Yes, that's the answer. I didn't hear it.**
25 **They were walking away.**

**Page 29**

1  Q.   If, for example, two people in that
2  situation were yelling at each other, screaming at
3  each other, you would be able to hear it, wouldn't
4  you?
5  A.   Yes, I believe I would.
6  Q.   As they proceed up towards the cars, I want
7  to talk about the distance between that gate at the
8  end of the dugout and where the cars were parked up
9  on the street. Are we talking about something like
10 40 yards?
11 A.   **I think that would be just about right.**
12 Q.   So, as they walked up that way, again, if
13 one or both of them were screaming at each other, or
14 yelling in a very, very loud voice, you would still
15 be able to hear them, wouldn't you?
16 A.   **I think that would be true.**
17 Q.   But you weren't hearing them because they
18 were speaking quietly or maybe not speaking; is that
19 correct?
20 A.   **I have to mediate between the need to turn**
21 **my attention to the troops, I would have to mediate**
22 **between that and what was happening between the two**
23 **men moving away toward the car, but I did not hear**
24 **yelling.**
25 Q.   If there had been screaming and yelling of

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 10 of 11 PageID: 365

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| --- | --- | --- |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 30

1  tirades and profanities, and stuff like that, it
2  would have been of some concern to you, wouldn't it?
3  A.   Yes, simply because I wanted it banned.
4  Q.   Because if they were at the gate or on the
5  way up the yard, so to speak, up to the road and
6  they were screaming and yelling profanities, that's
7  something the students could hear in the dugout,
8  correct?
9  A.   Correct.
10 Q.   But that wasn't of concern to you because
11 that wasn't happening at that point; am I correct?
12 A.   That is correct.
13 Q.   I take it from your testimony that you, at
14 no point did you see either one of the men put their
15 hands on the other fellow, right? Do I have that
16 right?
17 A.   **You know, I recall it this way. Mr. Rivera**
18 **my description was escorted him away. He may have**
19 **put his hand on him to demonstrate what direction he**
20 **wanted him to move, but it was relatively quiet.**
21 Q.   So, let me just describe for the record
22 what you just did because we don't have a video
23 picture of what you just did. When you say that
24 it's possible, or he may, he may have put his hand
25 on him, you were talking about Trooper Rivera using

### Page 31

1  his right arm or his right hand stretched out from
2  his body possibly putting it on Mr. Martinez's back
3  or something like that? I want to describe the
4  gesture you just made.
5  A.   **I know you do. I would only note that I am**
6  **offering you a gesture that may have happened, but**
7  **that I, in fact -- they moved off in that direction.**
8  **It is possible in my recollection that Mr. Rivera**
9  **steered him. At the same time it went relatively**
10 **quietly.**
11 Q.   And the gesture that you are talking about,
12 just to describe for the record, is with your right
13 arm extended out from your body a bit and sort of
14 moving your right arm and hand forward gently, fair
15 enough?
16 A.   **That's what I was imagining. I can't, I**
17 **would not testify that that's specifically what**
18 **happened because I don't remember that in detail. I**
19 **do remember that they turned to go and that there**
20 **really didn't seem to be much tension or much**
21 **quarrel about it.**
22 Q.   So, you had heard Rivera say to him you
23 need to leave, you need to move out of here,
24 correct?
25 A.   **Yes, I think, my recollection is that he**

### Page 32

1  said it probably twice.
2  Q.   And that's, in fact, what from what you
3  could observe, that's what Mr. Martinez did, he
4  left?
5  A.   **That's true.**
6  Q.   Now, I just want to play you a few seconds
7  of a recording, and I'm going to ask you if you can
8  confirm that this is your voice on the recording.
9  It's just a question of authenticating something
10 that has been sent to me, that's all.
11      I will not start right at the beginning
12 because my recollection is that there is a fairly
13 lengthy disposition by the state police trooper
14 before you get to speak. What I am interested in is
15 hearing a voice that has been represented to me
16 perhaps to be your voice, but I need you to confirm
17 that.
18      (At which time the following is an excerpt
19 of an interview.)
20      "...here to sort of delve into, you know
21 what you saw and ask you some questions.
22      Right.
23      So, why don't we get started with that.
24 Can you just tell me as concisely and yet sort of as
25 comprehensively as possible what you remember

### Page 33

1  happening that day?
2       Yeah. So, you know, as we determined from
3  looking at my academic calendar, it was a Friday."
4  Q.   Did you have a chance to listen to the few
5  seconds of this tape recording that I just played
6  for you on my laptop computer?
7  A.   **That's me.**
8  Q.   That's your voice?
9  A.   **Yep.**
10 Q.   I will just go a little further into the
11 tape. That's pretty much at random just to see if
12 it continues to be you.
13      I'm at the 26th minute and 56 second mark.
14 I don't know if there is anything significant there
15 but I'm looking for a sound.
16      "I could catch, oh, this is trouble."
17 Q.   Is that your voice?
18 A.   **That would appear to be my voice.**
19 Q.   I will go one more place just further down
20 the tape.
21      This is at the 54th minute and 11 second
22 mark. They kept you there for awhile I gather.
23      "It connects to my notions of human
24 behavior."
25 Q.   Again, is that your voice?

Case 3:15-cv-02932-BRM-TJB   Document 64-3   Filed 05/22/19   Page 11 of 11 PageID: 366

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Benjamin C. Atlee | April 19, 2018 |

### Page 34

1  A.   That would be my voice.
2  Q.   After you gave -- do you remember giving a
3  statement to this Vargas fellow?
4  A.   Oh, I remember giving a statement. What I
5  forgot was that there was a tape recorder on
6  although he had, it doesn't surprise me, and it
7  doesn't in my view contradict anything I have said
8  here, but he obviously was recording the
9  conversation. I mean at this juncture for all I
10 know he could have had the tape recorder right here
11 and I simply forgot about it or he, you know, he
12 said he had it with him and he simply indicated
13 quickly that he had it and in which case as far as I
14 was concerned the process was still the same one, he
15 was interviewing me about the event.
16 Q.   And you were doing your best to be truthful
17 in your answers to him?
18 A.   As I am today.
19 Q.   And I take it he didn't play the tape
20 recording for you after it was finished so that you
21 could review it?
22 A.   Well, obviously my memory about it isn't as
23 good as it ought to be. I don't recall that he did.
24 Q.   Those are all the questions I have. Thank
25 you very much.

### Page 35

1  EXAMINATION BY MR. MARSHALL-OTTO:
2  Q.   I want to clarify one small thing. Just a
3  few minutes ago you testified about a gesture of
4  Trooper Rivera that may have happened when we were
5  talking about the hand on the back, the "may have
6  happened" language is what I want to focus on. When
7  you say this gestures may have happened, are you
8  talking about a distinct recollection you have or
9  when you use that language, are you saying it's
10 simply something that you could not rule out having
11 happened?
12 A.   The second of those choices and it amounts
13 to a speculation on my part at best. I saw them
14 turn. I saw them turn to leave. I must say that, I
15 would say that neither man seemed to be, there
16 didn't seem to be any struggle about it. It didn't
17 seem to be any tension about it, but Trooper Rivera
18 was relatively close to Mr. Martinez and they moved
19 off. That's why I said to you I'm only speculating
20 about what the gestures would have been. It is not
21 a distinct recollection and I tried to make that
22 clear.
23 Q.   Okay, thank you. That's all I have.
24      MR. LOUGHRY: Thank you very much.
25 (The deposition was concluded at 11:51 a.m.)

### Page 36

1       CERTIFICATE OF OFFICER
2
3      I, (CAROLYN J. MC CALLA), a Certified Court
4 Reporter and Notary Public, do hereby certify that
5 prior to the commencement of the examination,
6      BENJAMIN C. ATLEE
7 was duly sworn by me to testify to the truth, the
8 whole truth and nothing but the truth.
9      I do further certify that the foregoing is
10 a true and accurate transcript of the stenographic
11 notes of testimony taken by me at the time place and
12 on the date hereinbefore set forth.
13     I do further certify that I am neither a
14 relative nor employee, nor attorney, nor counsel to
15 any parties to this action; and that I am neither
16 related a relative nor employee of any such attorney
17 or counsel, and that I am not financially interested
18 in this action.
19
20
21 _Carolyn McCalla_, CCR, CRR, RPR, RMR
22 CAROLYN J. MC CALLA
23 Certificate No XI-0001219