# EXHIBIT B

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 2 of 11 PageID: 368

| | | |
|---|---|---|
| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2            CIVIL ACTION NO. 3:15-cv-02932-BRM-TJB
 3
   JOEL MARTINEZ,
 4
                    Plaintiff,
 5
              vs.
 6
   COLONEL JOSEPH R. FUENTES, SUPERINTENDENT;
 7 LT. COLONEL PATRICK CALLAHAN, DEPUTY
   SUPERINTENDENT OF OPERATIONS; MAJOR KEVIN
 8 DUNN, DEPUTY BRANCH COMMANDER, FIELD
   OPERATIONS SECTION; JOHN DOE 1, TROOP C
 9 COMMANDER; JOHN DOE 2, SUPERVISOR; TROOPER I
   JOSE G. RIVERA (#6010); ACTING MAJOR MARK
10 WONDRACK, OFFICE OF PROFESSIONAL STANDARDS;
   CAPTAIN SCOTT EBNER, BUREAU CHIEF, INTAKE
11 AND ADJUDICATION BUREAU, OFFICE OF
   ADJUDICATION BUREAU, OFFICE OF PROFESSIONAL
12 STANDARDS, and DSG ISMAEL E. VARGAS,
13                  Defendants.
14                  _____
15           THURSDAY, APRIL 19, 2018
                    _____
16
17      Oral sworn deposition of BLAKE ELDRIDGE,
   taken at the Lawrenceville Prep School, 2500 Main
18 Street, Hogate Hall, Lawrenceville, New Jersey,
   before Carolyn J. McCalla, Certified Court Reporter,
19 on the above date, commencing at 12:00 p.m., there
   being present:
20
21                  - - - - -
22
                    TATE & TATE
23            Certified Court Reporters
              520 Stokes Road - Suite C-1
24            Medford, New Jersey 08055
              (856) 983-8484 - (800) 636-8283
25
```

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
|---|---|---|
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

## Page 2

APPEARANCES CONTINUED:

LOUGHRY & LINDSAY, LLC
330 Market Street
Camden, New Jersey 18102
BY: JUSTIN T. LOUGHRY, ESQUIRE
Attorneys for Plaintiff

ATTORNEY GENERAL OF NEW JERSEY
25 Market Street, PO Box 116
Trenton, New Jersey 08648
BY: KAI MARSHALL-OTTO, ESQUIRE
Attorneys for Defendants Colonel
Joseph Fuentes, et al.

WINDELS, MARX, LANE & MITTENDORF, LLP
120 Albany Street Plaza
New Brunswick, New Jersey 08901
BY: WILLIAM C. CAGNEY, ESQUIRE
Attorneys for the witness

## Page 3

INDEX

| WITNESS | EXAMINING ATTORNEY | PAGE |
|---|---|---|
| BLAKE ELDRIDGE | | |
| | Examination By Mr. Marshall-Otto | 4 |
| | Examination By Mr. Loughry | 19 |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| | No exhibits were marked | |

## Page 4

BLAKE ELDRIDGE, having been first duly sworn, testified as follows:

EXAMINATION BY MR. MARSHALL-OTTO:

Q. Hello, Mr. Eldridge. My name is Kai Marshall-Otto. I am a Deputy Attorney General with the Office of the Attorney General. I represent defendant Trooper Jose Rivera with respect to a civil lawsuit brought against him by one Joel Martinez.

For the record, this matter is captioned Martinez V Fuentes, et al., presently proceeding in the U.S. District Court, District of New Jersey.

We're here today to take your deposition, Mr. Eldridge. We are at the Lawrenceville School in Lawrenceville, New Jersey. Mr. Eldridge, do you understand that you are under oath here today?

A. Yes, sir.

Q. Have you had your deposition taken before for any reason?

A. No, sir, not that I recall -- actually I believe when I was a seventh or eighth grader about an injury on a school bus that actually just popped right into my head.

Q. So, considering that that was some time ago, I'm going to briefly go over some instructions

## Page 5

that we try to adhere to over the course of deposition such as this. It helps make the process run smoothly.

So, today I'm going to ask you a series of questions regarding the events underlying this lawsuit. It should not take long. Please make sure to answer every question that I ask to the best of your recollection. If you do not remember an answer to a question, you don't have to guess. You can simply give me your best recollection. I will try to avoid asking questions that require you to wildly speculate. That being said, if you are in the course of answering a question and you choose to speculate, that's fine. Please make sure to speak all your answers. The court reporter can't take down a nod or shake of the head. So all answers need to be verbal.

I would ask that you allow me to finish speaking before you start answering a question and I will do my best to extend the same courtesy to you and not interrupt you when you are answering a question with a follow-up question until you are done speaking.

Now, are you currently on any medications or other drugs that might impact your memory or

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 4 of 11 PageID: 370

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

Page 6

1  ability to testify truthfully?
2  A.  No, sir.
3  Q.  In the same vein, are you currently
4  suffering from any physical or mental condition that
5  might impact your memory?
6  A.  No, sir.
7  Q.  Did you review any materials or documents
8  or have any discussions with anyone in preparation
9  for your deposition today outside of any discussions
10 you may have had with your attorney which I'm not
11 interested in?
12 A.  No, sir.
13 Q.  For the record, what is your full name?
14 A.  Gregory Blake Eldridge, Jr.
15 Q.  What is your date of birth?
16 A.  [redacted]
17 Q.  Where do you presently reside?
18 A.  At the Lawrenceville School.
19 Q.  How long have you resided here?
20 A.  Approaching 14 years now.
21 Q.  14 years.
22     So in April of 2013, you resided here?
23 A.  Yes, sir.
24 Q.  And where do you -- in what part or on what
25 part of the campus do you currently reside?

Page 7

1  A.  I currently reside on one of the interior
2  campus roads, Humphreys Drive, in a single-family
3  home.
4  Q.  And did you reside there in April of 2013?
5  A.  I did not.
6  Q.  You did not. Where did you reside in April
7  of 2013?
8  A.  On Woods Drive, another interior campus
9  road.
10 Q.  These interior campus roads, are they near
11 the baseball field?
12 A.  Woods Drive is, yes.
13 Q.  Is Woods Drive the kind of cul-de-sac of
14 homes that is adjacent to the baseball field?
15 A.  Yes, sir.
16 Q.  That is where you lived in April of 2013?
17 A.  Yes, sir.
18 Q.  And that is the same cul-de-sac of houses,
19 if you will, that one Vicky Martinez lived in in
20 April of 2013; is that right?
21 A.  Yes, sir.
22 Q.  How far away from her did you live?
23 A.  In feet or in doors?
24 Q.  In doors, yes. Just rough is fine.
25 A.  Six or eight.

Page 8

1  Q.  Can you tell me a little bit about your
2  educational background?
3  A.  I am an alumni of the Lawrenceville School.
4  I attended college at the University of Chicago. I
5  have a Master's degree from Middlebury College.
6  Q.  How long have you been employed by the
7  Lawrenceville School?
8  A.  Almost 14 years now.
9  Q.  Is that the entirety of your professional
10 career?
11 A.  No, sir.
12 Q.  Where did you work before that?
13 A.  At the Hill School for two years, at the
14 Portsmouth Abbey School a year before that.
15 Q.  Where are those schools located? Maybe I
16 should know that.
17 A.  The Hill School is in Pottstown,
18 Pennsylvania and the Portsmouth Abbey School is in
19 Portsmouth, Rhode Island. And I was a paralegal in
20 a Boston firm in the year before working at the
21 Portsmouth Abbey School.
22     MR. LOUGHRY: I didn't hear the last
23 you said.
24 A.  Paralegal at a Boston firm. So that's the
25 entirety of my post college, university professional

Page 9

1  career.
2  Q.  I won't ask about ice cream parlors or
3  anything like that.
4     In April of 2013, did you hold the position
5  of assistant coach?
6  A.  For which sport?
7  Q.  The sport of baseball.
8  A.  Yes, sir. For the varsity team.
9  Q.  Can you tell me just going back to your
10 employment what positions you have held at the
11 Lawrenceville School over the past 14 years?
12 A.  I started as a teacher, house master and
13 coach which is the standard load. I also have
14 served as a level director and now I am currently
15 the Dean of Students.
16 Q.  When did you become the Dean of Students?
17 A.  I started July 1, 2014.
18 Q.  I am going to dive right into the
19 substantive factual matter behind this case. Were
20 you present on the grounds of the Lawrenceville
21 School on April 26th of 2013?
22 A.  Yes.
23 Q.  And did you conduct or assist in conducting
24 a practice with the varsity baseball team that day?
25 A.  Yes.

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 5 of 11 PageID: 371

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

### Page 10

1  Q. About what time did you arrive at the
2  baseball field that day?
3  A. I do not recall exactly.
4  Q. Rough estimate of when the practice
5  started, that might help.
6  A. Practices typically start 3:45.
7  Q. And would you have arrived sometime shortly
8  before then?
9  A. I arrived actually after the beginning of
10 practice.
11 Q. Sometime after the beginning of practice,
12 any idea whether they were still on the field or in
13 the dugout at that point? When I say they, I mean
14 the players.
15 A. Players were in the dugout.
16 Q. Subsequent to your arrival at the practice,
17 or perhaps before, did Trooper Jose Rivera come onto
18 the scene of the practice?
19 A. He was there when I arrived.
20 Q. He was there when you arrived, okay. Did
21 you have any conversation with him?
22 A. No, sir.
23 Q. And were you aware at the time that Trooper
24 Rivera was a volunteer coach?
25 A. Yes.

### Page 11

1  Q. As a volunteer coach with the varsity
2  baseball team, was he expected or permitted to
3  attend practices of the varsity baseball team?
4  A. Yes.
5  Q. After you arrived at the practice, did a
6  Mr. Joel Martinez arrive on the field at some point
7  or in the vicinity of the field?
8  A. Yes.
9  Q. Am I correct, when I phrase that question,
10 I'm assuming he arrived after you did; is that
11 right?
12 A. No.
13 Q. So, he was already present when you arrived
14 at the practice?
15 A. No.
16 Q. Help me discover where my confusion is
17 coming from. When you arrived at the practice, to
18 the best of your recollection, was Mr. Martinez
19 present or in the vicinity of the baseball field?
20 A. Yes. Should I elaborate.
21      MR. CAGNEY: He will figure it out.
22 Q. Were you aware of his presence at that
23 time?
24 A. When I arrived, yes.
25 Q. When you arrived. When did you become

### Page 12

1  aware of his presence?
2  A. At the time I arrived.
3  Q. At the time you arrived. Where was he
4  situated?
5  A. Arriving at the same time.
6  Q. Okay, did you pull in together?
7  A. I was walking.
8  Q. And he pulled in in his car?
9  A. Uh-huh, yes.
10 Q. Did you then walk in from the parking area
11 with him?
12 A. Not with.
13 Q. But close to, in proximity to?
14 A. Yes, sir.
15 Q. And did he at some point in his approach to
16 the field begin to make verbal, loud verbal remarks?
17 A. Yes.
18 Q. Can you explain to me, describe for me what
19 unfolded as he and you walked toward the baseball
20 field, what you saw and heard to the best of your
21 recollection?
22 A. So Mr. Martinez pulled in, exited his car
23 and asked me a question, asked me if I knew who that
24 was on the field and I answered that question and
25 then he started to approach the field and then

### Page 13

1  directed a question to the field at that time?
2  Q. What was that question?
3  A. I believe it was "Who do you think you
4  are."
5  Q. And what happened next?
6  A. Mr. Martinez was outpacing me on his way to
7  the field, and so I took the other gate to enter the
8  field and Mr. Martinez continued to address
9  questions, that same question toward the field.
10 Q. The question "Who do you think you are,"
11 how many times did he repeat that question?
12 A. I believe, I recall three times.
13 Q. What tone of voice was he speaking in?
14 A. A loud interrogative.
15 Q. Interrogative, was it an agitated tone?
16 A. It was amplified.
17 Q. What happened next after he repeated this
18 question a number of times?
19 A. I was at that point just actually most of
20 the way across the field. I saw Trooper Rivera was
21 holding a baseball bat. He put the bat to the side
22 and turned his attention to Mr. Martinez. And at
23 that point there was another question asked and
24 Trooper Rivera responded to that question by asking
25 who Mr. Martinez was.

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 6 of 11 PageID: 372

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

**Page 14**

1  Q.  When you say another question was asked of
2  Trooper Rivera, what question was that?
3  A.  "Who do you think you are to break up a
4  family."
5  Q.  And how did Trooper Rivera respond?
6  A.  What appeared to be an attempt to what I
7  would say now looking back would be deescalate the
8  situation by dropping the bat and holding out a hand
9  and asking for Mr. Martinez to ask his questions
10  again.
11  Q.  When Mr. Martinez asked that question an
12  additional time and Trooper Rivera put the bat down,
13  how close in proximity were the two individuals at
14  that point?
15  A.  Probably 15, 20 feet apart.
16  Q.  At one point did they become closer in
17  proximity?
18  A.  Later, yes.
19  Q.  And how much later?
20  A.  Maybe a minute.
21  Q.  I'm going to get back to that, but can you
22  tell me what happened in that minute in the interim?
23  A.  Mr. Martinez continued to ask a number of
24  questions and Trooper Rivera began to encourage him
25  to continue the conversation, to calm down and to

**Page 15**

1  continue the conversation away from the ball field.
2  Q.  When Trooper Rivera and Mr. Martinez came
3  into proximity with one another, how did that
4  happen?  What I mean by that is who approached who
5  or did they approach each other?
6  A.  They did not approach each other.
7  Mr. Rivera was moving forward through the gate and
8  Mr. Martinez was backing up in acknowledgment of,
9  and they began to move towards the parking lot.
10  Q.  So, at that time Trooper Rivera was
11  instructing him to move away?
12  A.  Uh-huh, yes.
13  Q.  Did you observe, and I mean this with
14  respect to your auditory senses, any further
15  language being used by Mr. Martinez either
16  explicitly profane language or otherwise aggressive
17  language?
18  A.  From that point forward, no.
19  Q.  So, you did not hear anything further after
20  Trooper Rivera, in essence, escorted Mr. Martinez
21  away?
22  A.  Correct.
23  Q.  With respect to what you did hear prior to
24  that, did you hear any profane language?
25  A.  Well, could you clarify what you mean by

**Page 16**

1  profane?
2  Q.  Yes, I can.  By that I mean language that
3  parents don't law their kids to use, words like
4  "Fuck, shit, asshole," things like that?
5  A.  No, those words were not used.
6  Q.  So, the language that was used, would you
7  characterize it as aggressive?
8  A.  Yes, I would characterize it as aggressive
9  in terms of the formulation.
10  Q.  So it's not necessarily the language he
11  used, it was how he used it; is that right?
12  A.  Correct, correct.
13  Q.  Did it appear that Trooper Rivera responded
14  with any type of similarly emotionally charged
15  language or otherwise emotionally charged response
16  or did he remain calm?
17  A.  He appeared to remain calm.
18  Q.  Did you perceive, did you perceive that
19  Trooper Rivera was attempting to diffuse the
20  situation?
21  A.  At the moment where students were ready --
22  were present, I observed Trooper Rivera trying to
23  take the situation away from the students.
24  Q.  Between Mr. Martinez and Trooper Rivera,
25  who would you say was the aggressor with respect to

**Page 17**

1  this incident?
2      MR. LOUGHRY:  Objection as to form.
3  Go ahead.
4  Q.  You can answer the question.
5      MR. CAGNEY:  You can answer.
6  A.  I would say that Mr. Martinez was the
7  initiator.
8  Q.  When you say initiator, do you mean to
9  imply that Trooper Rivera continued it or do you
10  mean to simply, or is it because you are not maybe
11  comfortable with using the word aggressor?
12  A.  I'm not comfortable with using the term
13  aggressor.
14  Q.  So, we could describe him as the aggressor?
15  A.  I would not do that necessarily, but one
16  could, but I would not.
17  Q.  That's what I mean, when I use the word
18  comfortable with, I mean do you feel comfortable
19  describing him as the aggressor, not using that
20  word?
21      MR. CAGNEY:  I'm sorry, I guess it's
22  an objection.  I don't understand the question.
23  Q.  So, I asked the question whether you
24  considered Mr. Martinez to be the aggressor
25  essentially is what I asked, and you characterized

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 7 of 11 PageID: 373

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

### Page 18

1  him as the initiator. So, my follow-up question to
2  that was whether you used the initiator rather than
3  the language I used which was aggressor, because you
4  think it would be unfair to characterize him as
5  aggressor and initiator is a more appropriate, is
6  more appropriate verbiage to use or whether you used
7  the word initiator to suggest that while Mr.
8  Martinez initiated the situation, Trooper Rivera
9  continued or perpetuated it. Does that distinction
10 make sense?
11 **A.     It does, yes. I would say the former. I**
12 **don't have any information about who or why or if**
13 **any conversation continued.**
14 Q.     I don't have much more. Give me one
15 moment.
16       Subsequent to the events that you observed,
17 did you learn that Trooper Rivera had placed Mr.
18 Martinez under arrest or did you observe the arrest?
19 **A.     Yes to both of those.**
20 Q.     You did observe the arrest. Is that
21 because you -- strike that.
22       Can you explain to me how you came to
23 observe the arrest?
24 **A.     After Mr. Martinez and Trooper Rivera moved**
25 **to the parking lot, we, the head coach and I**

### Page 19

1  **attempted to continue the business of the baseball**
2  **practice, and after a few moments we heard a raised**
3  **voice, and in looking over at that point I observed**
4  **Trooper Rivera placing Mr. Martinez under arrest.**
5  Q.     But you were still on the field, right?
6  **A.     Correct.**
7  Q.     With respect to what you observed, did you
8  observe Trooper Rivera attack, assault or otherwise
9  cause bodily injury to Mr. Martinez?
10 **A.     I did not.**
11 Q.     Did you observe Mr. Martinez initiate any
12 type of physical contact with Trooper Rivera?
13 **A.     I did not.**
14 Q.     That's all I have for the moment. Justin?
15 **EXAMINATION BY MR. LOUGHRY:**
16 Q.     Mr. Eldridge, my name is Justin Loughry. I
17 represent Mr. Martinez in this matter. We
18 introduced ourselves you to me, me to you, just
19 prior to, just before the deposition began. Do you
20 remember that?
21 **A.     Yes, sir.**
22 Q.     You and I have not met before that moment,
23 have we?
24 **A.     No, sir, not to my knowledge.**
25 Q.     We have had no communication or

### Page 20

1  conversation that you are aware of; is that correct?
2  **A.     That's correct.**
3  Q.     This is not the first time though that you
4  have answered questions about this incident, is it?
5  **A.     No, it is not.**
6  Q.     You sat with a New Jersey state trooper
7  named Vargas and gave an interview?
8  **A.     Yes, sir.**
9  Q.     Was that here on campus?
10 **A.     Yes, sir.**
11 Q.     And I want to put that aside for a moment.
12 You appear to be aware that Mr. Martinez was placed
13 in formal police custody that afternoon when you
14 observed his arrest; is that right?
15 **A.     Yes, sir.**
16 Q.     Did you become aware later on that he was
17 charged with a criminal offense?
18 **A.     Yes, sir.**
19 Q.     Did you ever receive any kind of a notice
20 or a subpoena from any court, and I'm not talking
21 about a subpoena bringing you to this deposition
22 here today, I'm talking about for a court appearance
23 to bring you to court to give testimony in a matter,
24 criminal charge against Mr. Martinez?
25 **A.     I'm sorry, could you ask that question**

### Page 21

1  **again?**
2  Q.     Of course I will.
3        Did you ever receive any subpoena or court
4  notice commanding you to come to a court to give
5  testimony in a criminal case against Mr. Martinez?
6  **A.     No, sir.**
7  Q.     You know there is, I don't know, let me
8  know ask you, do you know there is a municipal court
9  here in this township, Lawrenceville?
10 **A.     Yes, sir.**
11 Q.     You probably have heard about one or
12 another students over the years perhaps having some
13 brush with that?
14 **A.     Yes, sir.**
15 Q.     I want to be specific about this. You
16 received no notice and no subpoena from any
17 municipal court in Lawrenceville or anybody
18 associated with the municipal court to come to court
19 to give testimony against Mr. Martinez; am I
20 correct?
21 **A.     Yes, sir.**
22 Q.     Did you have any conversation with any
23 attorney about potentially coming to be a witness at
24 such a case in municipal court against Mr. Martinez?
25 **A.     No, sir.**

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 8 of 11 PageID: 374

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

Page 22

1  Q. A couple things I thought I heard you say,
2  but your voice trailed off a bit so I need to go
3  back. You can just tell me if I'm hearing it
4  correctly or not.
5      I want to direct your attention to a moment
6  where you were on the field, Trooper Rivera had
7  apparently just put down a baseball bat that he had
8  been holding and that after doing so Mr. Rivera
9  turned his attention to Mr. Martinez. That's where
10 I'm trying to get in the juncture of the story. Are
11 you with me?
12 A. **Yes, sir, I'm with you.**
13 Q. At that point you are on the field?
14 A. **Yes, sir.**
15 Q. So, Rivera goes over to some sort of a gate
16 over by the fence; is that right?
17 A. **Yes.**
18 Q. But he had some back and forth with Mr.
19 Martinez probably at a distance of about 15 feet,
20 something like that?
21 A. **Yes, sir.**
22 Q. I think you had told us that there had been
23 a question asked by Mr. Martinez I guess before
24 Mr. Rivera put his bat down, the question being "Who
25 do you think you are?" Did I get that right? That

Page 23

1  is Martinez is asking Rivera "Who do you think you
2  are?"
3  A. **Yes, that's what I said, yes.**
4  Q. And then I think you told us that after
5  Rivera put the bat down and turned his attention to
6  Mr. Martinez, there was another question asked and
7  that Rivera responded to that question. Did I get
8  that right?
9  A. **Yes, sir.**
10 Q. And, in other words, Mr. Martinez asked a
11 second question?
12 A. **Yes.**
13 Q. And was that second question along the
14 lines of "Who do you think you are to break up a
15 family?"
16 A. **Yes, sir.**
17 Q. And Riviera responded?
18 A. **Mr. Rivera spoke after.**
19 Q. I thought I heard you say, but maybe I'm
20 wrong, Rivera asked Martinez a question; is that
21 right?
22 A. **Yes.**
23 Q. And was that question, "Who do you think
24 you are?"
25 A. **No.**

Page 24

1  Q. Or "Who are you?"
2  A. **I think it was "Who are you?"**
3  Q. Who are you?
4  A. **Yes.**
5  Q. So, your best recollection is that Trooper
6  Rivera about 15 feet away from Mr. Martinez says
7  "Who are you;" is that right?
8  A. **Yes.**
9  Q. I wasn't sure I heard it right.
10     Did you also tell us that this is after
11 dropping the bat and so forth that Rivera said to
12 Mr. Martinez, ask me your question again.
13     Let me just do this again because the door
14 opened, the record should reflect there was a
15 distraction and the witness and I were both
16 distracted and I'm not his counsel, by the way, who
17 is completely focused?
18     So after the bat goes down and there is
19 this dialogue going on, did Rivera, did you say that
20 you heard Rivera say to Martinez "Ask me your
21 question again" or something like that?
22 A. **I do not recall saying that.**
23 Q. So, after they got closer, that is Rivera
24 walked over to where Martinez was; is that right?
25 A. **It did get closer.**

Page 25

1  Q. At this point you haven't heard any
2  profanity from anybody, fair enough?
3  A. **Not as described by the Assistant Attorney**
4  **General, no.**
5  Q. So, to be completely clear about this you
6  did not hear Mr. Martinez say, and I will apologize
7  here, "Who the fuck do you think you are? What the
8  fuck are you doing here" and "do you fucking enjoy
9  breaking up families?" You didn't hear those
10 expressions, the word fuck used by Mr. Martinez in a
11 loud voice to Mr. Rivera, am I correct?
12 A. **I don't recall that, yes.**
13 Q. So, you don't recall hearing that word
14 "fuck", am I correct?
15 A. **At this point I do not.**
16 Q. And it was in fairly short order, if I get
17 your recollection correct, that when Mr. Rivera went
18 over to where Mr. Martinez was at the gate, was it
19 at the gate or near the gate?
20 A. **At the gate.**
21 Q. Mr. Martinez was not on the field?
22 A. **Correct.**
23 Q. He was outside the field?
24 A. **Correct.**
25 Q. But they walked away together?

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 9 of 11 PageID: 375

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

### Page 26

```
 1   A.   Correct.
 2   Q.   You didn't necessarily hear what their
 3   conversation was when they walked away?
 4   A.   I did not.
 5   Q.   As they walked away, you couldn't hear
 6   anything they said to each other as they were
 7   standing at the gate, could you?
 8   A.   Yes.
 9   Q.   As they walked away, did they appear to be
10   talking?
11   A.   I did not observe them.
12   Q.   And you didn't hear them?
13   A.   I did not hear them.
14   Q.   Now, if they had been yelling at each other
15   walking away up to where the car was parked, if they
16   had actually been yelling at each, would you have
17   heard the yelling?
18   A.   I don't know.
19   Q.   Would you be close enough to hear it?
20   A.   I would.
21   Q.   Let's say you are on the baseball field,
22   how far is it from where you are standing to the
23   gate?
24   A.   25 feet from where I was standing.
25   Q.   How far is it from the gate up to where the
```

### Page 27

```
 1   cars were parked?
 2   A.   40 yards.
 3   Q.   So, as they are walking up they are
 4   starting at a distance of about 25 feet away from
 5   you and progressively getting farther away from you;
 6   is that correct?
 7   A.   Correct.
 8   Q.   But you didn't hear, at least as you recall
 9   today, you didn't hear any yelling back and forth
10   between one or the other of these two men as they
11   walked away; is that correct?
12   A.   That's correct, I did not recall.
13   Q.   Let's go to the question of you seeing
14   Mr. Martinez being arrested. Can you describe to
15   the best of your ability just what it is that you
16   saw, what physical action by Rivera?
17   A.   When I turned my attention in that
18   direction I saw Mr. Rivera standing behind Mr.
19   Martinez and Mr. Martinez was leaning forward over
20   the edge of the car.
21   Q.   His body was bent down over the hood of the
22   car?
23   A.   Yes, sir.
24   Q.   Did Rivera have his hand on him or
25   something holding him down?
```

### Page 28

```
 1   A.   Yes.
 2   Q.   Did you see whether there were handcuffs
 3   involved?
 4   A.   I did not see that at the time.
 5   Q.   I take it you didn't see how it was Mr.
 6   Martinez ended up bent down over the hood of the
 7   car? You didn't see that part of it?
 8   A.   That is correct, I did not see that.
 9   Q.   And at no point did you see Mr. Martinez
10   put his hand on Mr. Rivera, fair enough?
11   A.   That's correct.
12   Q.   Vicky Martinez was present at that point,
13   wasn't she?
14   A.   Yes.
15   Q.   And Vicky Martinez was somebody known to
16   you, wasn't she?
17   A.   Yes.
18   Q.   She was an assistant softball coach at the
19   time, wasn't she?
20   A.   I do not recall.
21   Q.   She was some kind of an admissions official
22   or associate admissions official?
23   A.   Yes.
24   Q.   So, she was on the faculty?
25   A.   Yes.
```

### Page 29

```
 1   Q.   And she was a neighbor of yours, wasn't
 2   she?
 3   A.   Yes.
 4   Q.   And your eyesight is good enough to realize
 5   that the woman you are seeing 40 yards away is, in
 6   fact, Vicky Martinez?
 7   A.   Yes.
 8   Q.   You heard Vicky Martinez say something
 9   rather loudly, didn't you?
10   A.   I believe, I don't recall exactly, but I do
11   believe that it may have been her.
12   Q.   Well, you heard a female voice, didn't you?
13   A.   I can't recall right now, but I seem to
14   remember that is the case, but I'm not fully
15   definite.
16   Q.   Do you remember what she was saying?
17   A.   No.
18   Q.   I want you to listen to a minute or so of a
19   tape recording.
20   A.   Sure.
21   Q.   It is not a tape recording of the incident,
22   by the way.
23   A.   Understood.
24        (At which time the following is an excerpt
25   of an interview.)
```

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 10 of 11 PageID: 376

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

### Page 30

1  "Okay, good morning. Today is May 7th,
2  2014 on a Wednesday and it looks like the time is
3  now 9:02 a.m. We're currently located at the
4  Lawrenceville Prep High School at 2500 Main Street
5  in Lawrenceville, New Jersey. This is the digitally
6  recorded statement of Mr. Blake Eldridge."
7  Q.  Is that your name, Blake Eldridge?
8  A.  Yes, sir.
9  Q.  Do you remember meeting with an
10  investigator from the state police?
11  A.  Yes, sir.
12  Q.  That would be Investigator Vargas?
13  A.  Yes, sir.
14  Q.  Do you recognize his voice from what you
15  just heard?
16  A.  Yes, sir.
17  Q.  Now I will see if you recognize your voice.
18  I will try to get to that.
19     "...Coach Atlee and Coach Rivera and I were
20  on the field. The boys were sitting in the dugout."
21  Q.  Did you have a moment to listen to that
22  voice I just played?
23  A.  Yes.
24  Q.  That was around the three minute and 45 to
25  50 second mark of this recording that I'm playing.

### Page 31

1  Was that your voice?
2  A.  Yes.
3  Q.  You recognize it?
4  A.  Yes.
5  Q.  I will pick one or two other places along
6  the line here, but there is one specific one I think
7  I want to ask you. If you will listen to this so if
8  you just give me a minute. I'm a little haphazard
9  with a computer and mouse pad, but I will do the
10  best I can.
11     (Discussion off the record.)
12  Q.  This portion that I will play you I believe
13  has something to do with you seeing in a distance a
14  restraint of Mr. Martinez by Mr. Rivera, but I will
15  play it for you and I will ask you about it.
16     "Did you witness the arrest?
17     What I witnessed was a restraint and then I
18  heard Miss Martinez screaming no, no, no. Why, you
19  know, why is this happening?"
20  Q.  Is that your voice?
21  A.  Yes.
22  Q.  Now, in this excerpt I played for you you
23  tell the -- it appears you tell the detective that I
24  saw a restraint. That's what you described to me
25  here today; is that right?

### Page 32

1  A.  Yes. I saw Mr. Martinez bent over with
2  Trooper Rivera standing behind him, yes.
3  Q.  And you recall hearing Vicky screaming.
4  Did you hear yourself say that?
5  A.  I did hear myself say that.
6  Q.  Do you want me to play this for you again?
7  A.  No.
8  Q.  And what you report her as saying is "No,
9  no, no, why is this happening?"
10  A.  Yes.
11  Q.  Do you remember her saying those words?
12  A.  I do now.
13  Q.  And that's, that's what you remember her
14  saying as opposed to other things?
15  A.  Correct.
16  Q.  Is there anything else you remember her
17  saying or is that because of the recollection?
18  A.  That audio did remind me. That's what I do
19  remember now.
20  Q.  Just to be fair, I will play the next 20
21  seconds to see if you say anything else about it. I
22  frankly don't remember so I will go back a little
23  bit to get that. I'm at 26 minutes and 26 second
24  mark. That's what I started at before. I will
25  start at the same place again.

### Page 33

1  "Did you witness the arrest? What I
2  witnessed was a restraint and then I heard Miss
3  Martinez screaming like, no, no, no, why? Like why
4  is this happening, and then we turned our attention
5  again and, and back to the boys, and then a little
6  while later Jose drove away.
7  Do you -- so you witnessed sort of him
8  being restrained? (Inaudible) didn't handcuff and
9  Miss Martinez obviously not happy and that's
10  perfectly understandable. Did you witness the
11  actions that immediately preceded the arrest?
12  No.
13  So would you know what --"
14  Q.  I think that covers it.
15  So you stand by your recollection that you
16  reported to this investigator that I have now played
17  for you at the 26th minute, 26 second mark and a
18  little bit maybe 30 or 40 seconds after that?
19  A.  Yes, sir.
20  Q.  Give me a moment.
21  Oh, yes, there was one other thing I wanted
22  to try to clear up. You spoke about the two
23  gentlemen, Mr. Martinez and Mr. Rivera, moving
24  toward or to the parking lot. Is that actually a
25  parking lot there or is it a roadway where the cars

Case 3:15-cv-02932-BRM-TJB   Document 64-4   Filed 05/22/19   Page 11 of 11 PageID: 377

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Blake Eldridge | April 19, 2018 |

Page 34

1  were parked?
2  A.  It is a parking lot cul-de-sac.
3  Q.  Cul-de-sac.  So there --
4  A.  There is a parking right in that area where
5  they were.
6  Q.  But it was part of the cul-de-sac; is that
7  right?
8  A.  Yes.
9  Q.  Was there, and this was more or less a
10 straight line walking away from the third base
11 dugout up to that area?
12 A.  Yes.
13 Q.  That's about 40 yards you think?
14 A.  Yes.
15 Q.  Thank you very much, Mr. Eldridge.  Those
16 are all the questions I have.
17      MR. MARSHALL-OTTO:  All set.
18      (The deposition was concluded at
19 12:44 p.m.)
20
21
22
23
24
25

Page 35

1      CERTIFICATE OF OFFICER
2
3      I, (CAROLYN J. MC CALLA), a Certified Court
4  Reporter and Notary Public, do hereby certify that
5  prior to the commencement of the examination,
6      BLAKE ELDRIDGE
7  was duly sworn by me to testify to the truth, the
8  whole truth and nothing but the truth.
9      I do further certify that the foregoing is
10 a true and accurate transcript of the stenographic
11 notes of testimony taken by me at the time place and
12 on the date hereinbefore set forth.
13     I do further certify that I am neither a
14 relative nor employee, nor attorney, nor counsel to
15 any parties to this action; and that I am neither
16 related a relative nor employee of any such attorney
17 or counsel, and that I am not financially interested
18 in this action.
19
20
21 *Carolyn McCalla* CCR, CRR, RPR, RMR
22 CAROLYN J. MC CALLA
23 Certificate No XI-0001219
24
25