# EXHIBIT C

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 2 of 14 PageID: 379

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
 2                CIVIL ACTION NO. 3:15-cv-02932-BRM-TJB
 3
    JOEL MARTINEZ,
 4
                    Plaintiff,
 5
            vs.
 6
    COLONEL JOSEPH R. FUENTES, SUPERINTENDENT;
 7  LT. COLONEL PATRICK CALLAHAN, DEPUTY
    SUPERINTENDENT OF OPERATIONS; MAJOR KEVIN
 8  DUNN, DEPUTY BRANCH COMMANDER, FIELD
    OPERATIONS SECTION; JOHN DOE 1, TROOP C
 9  COMMANDER; JOHN DOE 2, SUPERVISOR; TROOPER I
    JOSE G. RIVERA (#6010); ACTING MAJOR MARK
10  WONDRACK, OFFICE OF PROFESSIONAL STANDARDS;
    CAPTAIN SCOTT EBNER, BUREAU CHIEF, INTAKE
11  AND ADJUDICATION BUREAU, OFFICE OF
    ADJUDICATION BUREAU, OFFICE OF PROFESSIONAL
12  STANDARDS, and DSG ISMAEL E. VARGAS,
13                  Defendants.
14
                        ----------
15              THURSDAY, APRIL 19, 2018
                        ----------
16
17          Oral sworn deposition of MICHAEL S.
    GOLDENBERG, taken at the Lawrenceville Prep School,
18  2500 Main Street, Hogate Hall, Lawrenceville, New
    Jersey, before Carolyn J. McCalla, Certified Court
19  Reporter, on the above date, commencing at 10:10
    a.m., there being present:
20
21                    - - - - -
22
                       TATE & TATE
23               Certified Court Reporters
                 520 Stokes Road - Suite C-1
24                Medford, New Jersey 08055
              (856) 983-8484 - (800) 636-8283
25
```

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
|---|---|---|
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 2

```
 1   APPEARANCES CONTINUED:
 2
     LOUGHRY & LINDSAY, LLC
 3   330 Market Street
     Camden, New Jersey 18102
 4   BY: JUSTIN T. LOUGHRY, ESQUIRE
         Attorneys for Plaintiff
 5
 6   ATTORNEY GENERAL OF NEW JERSEY
     25 Market Street, PO Box 116
 7   Trenton, New Jersey 08648
     BY: KAI MARSHALL-OTTO, ESQUIRE
 8       Attorneys for Defendants Colonel
         Joseph Fuentes, et al.
 9
10   WINDELS, MARX, LANE & MITTENDORF, LLP
     120 Albany Street Plaza
11   New Brunswick, New Jersey 08901
     BY: WILLIAM C. CAGNEY, ESQUIRE
12       Attorneys for the witness
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1              I N D E X
 2
     WITNESS        EXAMINING ATTORNEY    PAGE
 3
     MICHAEL S. GOLDENBERG
 4
     Examination By Mr. Marshall-Otto      4
 5
     Examination By Mr. Loughry           18
 6
     Examination By Mr. Marshall-Otto     43
 7
     Examination By Mr. Loughry           43
 8
 9   ------------------------
10          E X H I B I T S
11   NUMBER   DESCRIPTION          MARKED
                                   FOR ID
12
     Goldenberg 1  Handwritten notes of   19
13               incident by Mr. Goldenberg,
                 4/26/13
14
15   - - - - - - -
```

### Page 4

```
 1        MICHAEL S. GOLDENBERG, having been first
 2   duly sworn, testified as follows:
 3   EXAMINATION BY MR. MARSHALL-OTTO:
 4   Q.   This is the matter captioned Martinez V
 5   Fuentes, et al., presently proceeding in the U.S.
 6   District Court District of New Jersey. My name is
 7   Kai Marshall-Otto. I am a Deputy Attorney General
 8   with the Office of the Attorney General. I
 9   represent defendant Trooper Jose Rivera with respect
10   to the civil lawsuit that Joel Martinez has brought
11   against him.
12        We're here today at the Lawrenceville
13   School in Lawrenceville, New Jersey to depose
14   Mr. Michael Goldenberg. Mr. Goldenberg, do you
15   understand that you are under oath?
16   A.   Yes.
17   Q.   Wonderful. This deposition shouldn't take
18   long today. I'm going to ask you a few questions
19   about some events that occurred back in April of
20   2013. Okay?
21   A.   Yes.
22   Q:   I'm just going to go over a few preliminary
23   rules before we get started.
24        Have you had your deposition taken before?
25   A.   Never.
```

### Page 5

```
 1   Q.   Never, okay.
 2   A.   You mean for this case?
 3   Q.   For any matter.
 4   A.   Yeah.
 5   Q.   You have not?
 6   A.   This is the first time.
 7   Q.   I'm going to just go over some instructions
 8   to make the process run smoothly.
 9        During the course of this deposition I'm
10   going to ask you a series of questions regarding the
11   events underlying this lawsuit. Please make sure to
12   answer each question to the best of your
13   recollection. That being said, if you don't know
14   the answer to any particular question I may ask, you
15   are free to inform me of such. You don't have to
16   make up an answer.
17   A.   Okay.
18   Q.   You can say you don't remember, you can say
19   you don't know or you can explain to me what you do
20   remember. I will try to avoid asking you questions
21   that ask for you to engage in speculation. With
22   that said, if I ask a question, that may require you
23   to speculate, you can do so and tell me that you are
24   simply speculating and that will be clear for the
25   record. However, you are not required to do that.
```

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 4 of 14 PageID: 381

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 6

1  Make sure to speak all your answers. The
2  court reporter can't take down a nod or the shake of
3  the head. Only verbal answers will do.
4  A.    I understand.
5  Q.    Please wait for me to finish speaking
6  before you start answering. That helps ensure that
7  we have a clear record for the court reporter. I
8  will try and do the same for you.
9         Are you on any medication or other
10 substances today that might impact your ability to
11 testify correctly or truthfully or impact your
12 memory?
13 A.    No.
14 Q.    Great.
15        Did you review any materials or other
16 documents in preparation for your deposition today?
17 A.    Yes, I did.
18 Q.    And what might those be?
19 A.    After the incident I went back to my office
20 and wrote down what I had seen.
21 Q.    And it's my understanding that you have a
22 copy to produce to us today?
23 A.    I have a copy with me. I have a copy with
24 me.
25 Q.    Great. Thank you.

### Page 7

1         And we're going to ask to take possession
2  of a copy of that and your attorney can facilitate
3  that, okay?
4  A.    Okay.
5  Q.    Thank you.
6         For the record, what is your full name?
7  A.    Michael Scott Goldenberg.
8  Q.    And your date of birth?
9  A.    [redacted]
10 Q.    Where do you presently reside?
11 A.    The Lawrenceville School.
12 Q.    The Lawrenceville?
13 A.    Faculty housing.
14 Q.    And where is that on the campus?
15 A.    It's right across from the baseball field.
16 Q.    It is.
17        Is that near where Vicky Martinez resides?
18 A.    Yes.
19 Q.    Does she still reside there?
20 A.    Yes.
21 Q.    And she resided there in April 2013, to the
22 best of your knowledge?
23 A.    Yes.
24 Q.    And you were living there in April of 2013
25 as well?

### Page 8

1  A.    Yes, I was.
2  Q.    Can you tell me a little bit about your
3  educational background, quickly. I don't want to go
4  into a ton of detail.
5  A.    I have a Bachelor's of Science in physical
6  education/athletic training from Plymouth State
7  University. From there I have a Master's of science
8  in exercise physiology/athletic training at the
9  University of Buffalo.
10 Q.    Are you currently employed with the
11 Lawrenceville School?
12 A.    Yes, I am.
13 Q.    How long have you been employed with the
14 Lawrenceville School?
15 A.    29 years.
16 Q.    After you received your higher education
17 degrees, did you immediately begin employment here
18 or have you worked elsewhere?
19 A.    No. Well, after I, after I got my
20 undergraduate degree, I worked for three years as an
21 athletic trainer at a private boarding school and
22 went to get my Master's and have been here ever
23 since.
24 Q.    What was that private school?
25 A.    Brewster Academy in Wolfeboro, New

### Page 9

1  Hampshire.
2  Q.    And can you list for me the positions you
3  have held at the Lawrenceville School in the past 29
4  years?
5  A.    I have been head athletic trainer. I have
6  been the associate AD/athletic trainer. I have been
7  the acting athletic director, I have been the
8  athletic director and now I'm back to being an
9  athletic trainer.
10 Q.    And can you tell me in April of 2013 what
11 position did you hold?
12 A.    I was the associate athletic director.
13 Q.    The associate athletic director.
14        And did you hold the athletic director
15 position subsequent to that or prior?
16 A.    I held it after.
17 Q.    And then in what year did you become an
18 athletic trainer?
19 A.    Again, three years ago, 2015 I guess.
20 Q.    What was the reason for that?
21 A.    I didn't like administration anymore. I
22 missed working with the students.
23 Q.    Are you happier now?
24 A.    Much happier.
25 Q.    That's great.

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 5 of 14 PageID: 382

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 10

1  A.   Doing what I was trained to do.
2  Q.   That's really all I have in the way of
3  background. I would like to dive right into the
4  incident in question.
5       Were you present on the grounds of the
6  Lawrenceville School on April 26th of 2013?
7  A.   Yes.
8  Q.   And can you tell me did you encounter or
9  come across an incident occurring between Trooper
10 Jose Rivera and one Joel Martinez?
11 A.   Yes.
12 Q.   What were you -- prior to coming across
13 that incident, what were you doing?
14 A.   I was, actually what I can remember is I
15 was probably feeding my dog and letting him out real
16 quick.
17 Q.   And at the time you were associate athletic
18 director, would that have brought you onto the
19 baseball field at that time? Were you attending the
20 practice -- I'm sorry. Strike that.
21      At the time when you were feeding your dog,
22 had you been at the baseball practice that day?
23 A.   I had passed it.
24 Q.   Would you regularly attend those practices?
25 A.   No.

### Page 11

1  Q.   Where did you come across Mr. Martinez and
2  Trooper Rivera?
3  A.   After I left my house, I saw them leaving
4  the -- they were by the corner of the baseball
5  field, or should I say inside the fence by the
6  dugout, and I could see that from my house. So I
7  wanted to say good-bye to the trooper and I was also
8  interested to see what his trooper car looked like
9  inside. I am a tech type of guy and I just wanted
10 to say good-bye and see what it looked like.
11      So I got in my golf cart, drove past and
12 stopped by his car waiting for them to completely
13 finish coming to his car.
14 Q.   So, so when you saw Trooper Rivera and
15 Mr. Martinez out the window at the baseball field,
16 did you discern at that time that there was a
17 confrontation going on between them or did you just
18 see them and think I'm going to -- excuse me. Did
19 you observe that there was a confrontation going on
20 at that time?
21 A.   Not at all.
22 Q.   So, did you simply think to yourself I'm
23 going to go say good-bye to Trooper Rivera?
24 A.   Correct.
25 Q.   When you saw that Trooper Rivera and

### Page 12

1  Mr. Martinez were there at the baseball field, did
2  you think that Trooper Rivera's presence there was
3  appropriate?
4  A.   Yes, because he is a volunteer couch.
5  Q.   And so his presence on the school grounds
6  would be expected?
7  A.   Yes.
8  Q.   Did you think anything of -- strike that.
9       Did you think that Mr. Martinez's presence
10 on the school grounds was appropriate?
11 A.   Yes.
12 Q.   And why would that be?
13 A.   He lives down -- he lives in the
14 neighborhood with his wife.
15 Q.   So, you understood him to live at that
16 house at that time?
17 A.   Yes.
18 Q.   Once you came out of your house, what did
19 you observe?
20 A.   I just got in my golf cart and started to
21 drive around the corner. You have to see where I
22 live, but it's, I just drove over to his car and
23 waited for him and I witnessed them walking towards
24 me.
25 Q.   And you witnessed them walking towards you.

### Page 13

1  What did you see and what did you hear?
2  A.   They were shoulder to shoulder walking
3  toward me towards the police car. They were
4  speaking Spanish. So I really didn't know what they
5  were saying whatsoever and I saw -- do you want me
6  to continue?
7  Q.   No, that's okay.
8  A.   So, I saw them walking towards the police
9  car talking Spanish, shoulder to shoulder.
10 Q.   Did you notice anything about the tone of
11 voice in which Mr. Martinez was speaking?
12 A.   It was tough to say because, again, it was
13 quick. They were speaking Spanish. I didn't
14 understand what they were saying, but they were
15 having a conversation for sure.
16 Q.   Did Mr. Martinez or Trooper Rivera appear
17 to be agitated at that point?
18 A.   No.
19 Q.   Not to your observation?
20 A.   They were definitely eye to eye, speaking
21 you can see them definitely concentrating on each
22 other as they were speaking. I did not hear anybody
23 yell or scream.
24 Q.   What did you see next?
25 A.   Then what happened was that once they got

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 6 of 14 PageID: 383

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

Page 14

1  closer to the car, Joel came over to me and said
2  that Mr. Rivera, I will just say Jose was having an
3  affair with his wife. He shouldn't be here. He
4  threatened me and I'm going to get a restraining
5  order against him.
6  Q.  And how did you respond?
7  A.  Shocked. Originally I thought they were
8  kidding. I didn't -- I just was shocked. I didn't
9  really, again, I didn't realize there was an issue
10 until he came over to me.
11 Q.  Did you respond verbally to Mr. Martinez?
12 A.  Nothing.
13 Q.  Did you walk away or go back to your golf
14 cart?
15 A.  No, because he came over to me. After he
16 said that he started walking back over to his, Vicky
17 who was his wife at the time who was also at the
18 scene.
19 Q.  And did he begin verbally communicating
20 with Vicky?
21 A.  It looked like they were starting to talk,
22 yes.
23 Q.  A private conversation?
24 A.  Yes, I did not hear it.
25 Q.  Did it appear to be heated?

Page 15

1  A.  That I couldn't tell you. I can't speak on
2  that.
3  Q.  So, did it appear that Mr. Martinez was
4  agitated at the time he began to explain why he was
5  upset with Mr. -- with Trooper Rivera's presence?
6  A.  Yes. He was definitely upset when he was
7  talking to me.
8  Q.  And subsequent to when he went over to
9  Vicky Martinez and engaged her in conversation, what
10 happened?
11 A.  Jose came over towards me and then Vicky
12 said something, I did hear this, said "You are not
13 supposed to be here. Why are you here?"
14 Q.  To whom?
15 A.  To Joel.
16 Q.  So, Joel Martinez?
17 A.  Yes.
18 Q.  And do you recall if you heard
19 Mr. Martinez's response to that?
20 A.  I did not.
21 Q.  Did she say anything, and she being
22 Mrs. Martinez, Vicky Martinez, did Mrs. Martinez say
23 anything to Trooper Rivera regarding his presence
24 there?
25 A.  No, she did not.

Page 16

1  Q.  Can you explain to me what happened next?
2  A.  Trooper Rivera then said he's not supposed
3  to be here and repeated that and then went over to
4  him and said stand still and that's when -- and then
5  cuffed him.
6  Q.  Prior to his cuffing him, did you observe
7  Mr. Martinez make physical contact with Trooper
8  Rivera?
9  A.  No, I did not.
10 Q.  You did not?
11 A.  I don't remember.
12 Q.  Is it possible that you may have told
13 police investigators --
14     MR. CAGNEY: I'm going to object if it
15 is a possibility question.
16     MR. LOUGHRY: I will ask if you are
17 asking leading questions.
18 Q.  I will ask a different question. Do you
19 recall telling police investigators subsequent to
20 the incident that you had observed that?
21 A.  I don't recall.
22 Q.  After Mrs. Martinez indicated that
23 Mr. Martinez should not have been present on school
24 grounds --
25     MR. LOUGHRY: Objection. That was not

Page 17

1  the testimony. Objection to the form.
2  Q.  After Mrs. Martinez stated you should not
3  be here, did you perceive Mr. Martinez to be
4  trespassing?
5  A.  No.
6  Q.  Did you feel that the situation at that
7  point was under control insofar as everyone's safety
8  was concerned?
9  A.  Yes.
10 Q.  So you didn't feel like a police presence
11 was necessary?
12 A.  I don't understand the question.
13 Q.  When this, when the interchange was going
14 on, it appeared, did it appear heated?
15 A.  Which interchange?
16 Q.  Good question. Regarding whether
17 Mr. Martinez should have been present at the school?
18 A.  Well, he should not have been on the
19 baseball field inside the fence on the baseball
20 field. That wasn't his place to be, but other than
21 that as a faculty member you can go wherever, as a
22 faculty spouse or a faculty member, you can walk the
23 grounds wherever you would like.
24 Q.  Understood. Thank you.
25     Have you learned, I really don't have very

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 7 of 14 PageID: 384

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 18

1  much left. I'm curious, subsequent to the events
2  unfolding, have you had any conversations with
3  anyone other than your attorney, that have further
4  informed your understanding of the events that took
5  place?
6  A.  No.
7  Q.  I'm going to give Mr. Loughry a chance to
8  ask some questions before I ask anything further.
9  **EXAMINATION BY MR. LOUGHRY:**
10 Q.  Good morning, is it Mr. Goldenberg?
11 A.  Yes.
12 Q.  Mr. Goldenberg, my name is Justin Loughry.
13 We shook hands I think a few moments before this
14 deposition began. Do you remember that?
15 A.  **You introduced yourself.**
16 Q.  But we haven't met before that moment, have
17 we, as far as you know?
18 A.  **Correct.**
19 Q.  And we haven't had any communications as
20 far as you know, have we?
21 A.  **Correct.**
22 Q.  You have made some mention here of some
23 notes that you made on the date in question. I
24 guess that would be back on April 26, 2013, about
25 what you saw and what you heard. Do you remember

### Page 19

1  making mention of that?
2  A.  Yes.
3  Q.  And do you have those notes with you here
4  today?
5  A.  Yes.
6  Q.  Could you please produce them for us so I
7  can take a look? Thank you. I'm going to ask the
8  court reporter to mark them please so can we call
9  them Goldenberg 1 to keep everything straight.
10        (Exhibit Goldenberg 1, Handwritten
11 notes of incident by Mr. Goldenberg, 4/26/13, was
12 marked for identification.)
13 Q.  Mr. Goldenberg, I'm placing in front of you
14 now something our court reporter has marked
15 Goldenberg 1 for identification. Is that the notes
16 that you and I just referred to in our question and
17 answer?
18 A.  Yes, sir.
19 Q.  These are notes that you made on April 26,
20 2013?
21 A.  Yes, sir.
22 Q.  Are they typed?
23 A.  Yes, sir.
24 Q.  Did you type them?
25 A.  Yes, I did.

### Page 20

1  Q.  In their original form. I don't know if
2  this instruction was given to you before, but if it
3  was, I apologize, if not, let me just say that I
4  have great respect for the court reporters from Tate
5  & Tate. I have known them for many years. They are
6  marvelous court reporters, but it is difficult for
7  them to take down two people speaking at the same
8  time. So if you could let me finish my question
9  before you begin your answer and I will try to do
10 you the same courtesy. I'm not perfect. So I don't
11 always follow my own rules, but it's just easier for
12 her. So let me just go back.
13       You typed those on the date in question?
14 A.  Yes, sir.
15 Q.  And did you make any handwritten notes
16 prior to typing them?
17 A.  No, sir.
18 Q.  So, you sat down at a computer and just
19 banged it out?
20 A.  Yes, sir.
21 Q.  Now, have you shown these notes to anyone
22 from the New Jersey State Police prior to today?
23 A.  **I don't recall.**
24 Q.  Have you given a copy of these notes to
25 anyone prior to today?

### Page 21

1  A.  Yes, sir.
2  Q.  To whom?
3  A.  **Our security, head of security and my**
4  **immediate supervisor at the time, the athletic**
5  **director.**
6  Q.  So, those are both employees of the
7  Lawrenceville School?
8  A.  Yes, sir.
9  Q.  Now, let me just ask to be clear, except
10 for employees of the Lawrenceville School here, the
11 school we are at today, have you given a copy of
12 these notes to anyone?
13 A.  No, sir.
14 Q.  And so be more specific, you haven't given
15 them to Mr. Kai Marshall-Otto up until this moment
16 perhaps, correct? Am I right?
17 A.  Correct.
18 Q.  And, of course, you haven't met me and you
19 haven't given them to me, have you?
20 A.  Correct.
21 Q.  And do you know whether your supervisors,
22 if you don't know I understand, do you know whether
23 these supervisors forwarded these notes to anyone
24 outside of the school?
25 A.  **I would not know.**

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 8 of 14 PageID: 385

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 22

```
 1   Q.   Who are the supervisors to whom you gave
 2   them?
 3   A.   John Simar.
 4   Q.   Can you spell that?
 5   A.   S-I-M-A-R.
 6   Q.   And that's John Simar?
 7   A.   Yes.
 8   Q.   And what's his position?
 9   A.   He is retired now.
10   Q.   Who else?
11   A.   He was the athletic director, Kevin
12   Reading.
13   Q.   Is he still around?
14   A.   Yes, sir.
15   Q.   R-E-D-D-I-N-G?
16   A.   R-E-A-D-I-N-G.
17   Q.   Like Reading, Pennsylvania.
18        What's his position here?
19   A.   Director of public safety.
20   Q.   May we see the notes please?
21        MR. MARSHALL-OTTO: Do you have a
22   second copy?
23        MR. CAGNEY: Yes.
24        MR. LOUGHRY: Is there a Xerox
25   machine?
```

### Page 23

```
 1        MR. CAGNEY: We will make copies of
 2   it.
 3        (At which time a break was taken.)
 4   Q.   So, Mr. Goldenberg, when you wrote down
 5   these comments, what we have now marked as
 6   Goldenberg 1, when you typed this down, you were
 7   doing your best to recount what you already saw?
 8   A.   Correct.
 9   Q.   And I notice in here, can you confirm that
10   you make no mention of Mr. Martinez making any
11   physical contact with Trooper Rivera prior to or
12   before Trooper Rivera took him into some kind of
13   control or custody; am I correct?
14   A.   Correct.
15   Q.   And you have told us here today that you
16   don't remember Mr. Martinez making any physical
17   contact with Trooper Rivera, do you remember that
18   answer?
19   A.   I cannot recall.
20   Q.   When you wrote this down, you were doing
21   the best you could to put down all the things that
22   you thought were important, when you wrote
23   Goldenberg 1?
24   A.   Correct.
25   Q.   If you had seen Mr. Martinez grab Trooper
```

### Page 24

```
 1   Rivera, for example, physically grab him, do you
 2   think you would have considered that important
 3   enough to note?
 4   A.   I would think so.
 5   Q.   Now, I want to go back over a couple of
 6   things that you told us about. You do recall it
 7   appears seeing Mr. Martinez and Trooper Rivera down
 8   by the dugout. I think that's the word you used,
 9   the dugout; is that correct?
10   A.   Correct.
11   Q.   Now, this is the baseball field, the
12   varsity baseball field at Lawrenceville School that
13   we are talking about?
14   A.   Correct.
15   Q.   Is it called the Waugh, W-A-U-G-H, baseball
16   field?
17   A.   Yes, sir.
18   Q.   I take it there is a regulation baseball
19   diamond there and probably an outfield and fence
20   showing the limits of the baseball field on the
21   outside, the outfield, the wall?
22   A.   Yes.
23   Q.   And there is also a backstop and a chain
24   link fence around sort of the foul territory that is
25   around the infield?
```

### Page 25

```
 1   A.   Correct.
 2   Q.   And the dugout, of course, is along one of
 3   the baselines?
 4   A.   Correct.
 5   Q.   Is this the third baseline?
 6   A.   Yes.
 7   Q.   Now, there is some kind of a distance I
 8   guess between the dugout or the edge of the dugout
 9   and someplace where cars could pull up and stop and
10   even park; is that right?
11   A.   Correct.
12   Q.   And Trooper Rivera had parked his car,
13   which you actually focused a little bit on the fact
14   that there was a trooper car there, didn't you?
15   A.   Correct.
16   Q.   You were interested or curious about maybe
17   getting a look at the trooper car?
18   A.   Correct.
19   Q.   And that was parked in the roadway?
20   A.   Yes.
21   Q.   And what's the name of that road?
22   A.   Woods Drive.
23   Q.   That's the road that you live on?
24   A.   Right.
25   Q.   The same road that Vicky Martinez and the
```

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 9 of 14 PageID: 386

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 26

1  Martinez's lived on?
2  A.  Yes.
3  Q.  There is a row of homes there and if you
4  think about the end of the row of homes, this is
5  sort of a long part of a cul-de-sac, isn't it?
6  A.  Yes.
7  Q.  And so these are units that are more or
8  less of uniform appearance, dimension and so forth?
9  A.  Yes.
10  Q.  Townhouses, that sort of thing?
11  A.  Yes.
12  Q.  If you count in from the last townhouse to
13  where yours is, how many, if you can think in your
14  mind's eye for a moment, how many units in is your
15  unit from the end?
16  A.  **Well, my number is 16 and the last unit is**
17  **22.**
18  Q.  And how about the Martinez's unit?
19  A.  **I do not know their number off the top of**
20  **my head.**
21  Q.  So, was their unit closer to the end of the
22  row or was it on the other side, if you follow me?
23  A.  **Their house is, actually in the side of the**
24  **cul-de-sac they are further from the baseball field**
25  **if that makes sense.**

### Page 27

1  Q.  In any event, when you came over with your
2  golf cart, you came over more or less by where the
3  trooper's car was parked?
4  A.  Yes.
5  Q.  And Vicky Martinez was there in her car?
6  A.  Yes.
7  Q.  Vicky Martinez got out of the car, right?
8  A.  Yes.
9  Q.  And you were in your cart?
10  A.  **Golf cart.**
11  Q.  You didn't get out of your golf cart?
12  A.  **No.**
13  Q.  And if I heard you correctly, you watched
14  as Mr. Martinez and Trooper Rivera were walking away
15  from the dugout up towards where the cars were
16  parked; is that right?
17  A.  **Correct.**
18  Q.  And that's more or less a grassy lawn type
19  area with some shrubs?
20  A.  **Correct.**
21  Q.  And you would walk across the grassy area,
22  maybe through a little bit of shrubbery and then up
23  to the road, is that the way it works?
24  A.  **It's open.**
25  Q.  You can see, you have a clear view?

### Page 28

1  A.  **Clear view.**
2  Q.  And you obviously could hear as well?
3  A.  **Yes.**
4  Q.  And you heard them speaking to one another
5  as they traversed or as they crossed the distance
6  between the dugout and where the cars were parked;
7  is that correct?
8  A.  **Correct.**
9  Q.  But what you heard was spoken in Spanish,
10  not in English, did I get that right?
11  A.  **Correct.**
12  Q.  And you don't speak Spanish?
13  A.  **Not at all.**
14  Q.  And they were having a conversation, is
15  that the word you used?
16  A.  **Yes.**
17  Q.  So, this was not someone or two people
18  screaming at each other at that point, was it?
19  A.  **No.**
20  Q.  It was -- you didn't know whether they were
21  having a conflict or not?
22  A.  **Correct.**
23  Q.  And certainly, as you heard the voices
24  going back and forth, well, you didn't hear any
25  profanity coming from anyone, did you?

### Page 29

1  A.  **I don't speak Spanish so I couldn't tell**
2  **you if they were doing that or not.**
3  Q.  Let me just use, with apologies for the
4  decorum of this institution, let me just use one
5  particular word which is not a Spanish word, the
6  word fuck, F-U-C-K, you didn't hear that word, did
7  you?
8  A.  **No, I did not.**
9  Q.  In all the time that you listened to the
10  conversation or interchange between Mr. Martinez and
11  Trooper Rivera, you did not hear that word being
12  used, did you?
13  A.  **Not that I recall.**
14  Q.  And you can confirm there is nothing in
15  Goldenberg 1 about anyone using that word, is there?
16  A.  **Correct.**
17  Q.  Of course, you heard some of the
18  interchange, some of the conversation between
19  Martinez, Rivera and maybe Mrs. Martinez up at the
20  car? You heard some or most of that or all of it?
21  A.  **I heard.**
22  Q.  Now, I believe you told us that your, did
23  you say a golf cart, is that what you were driving?
24  A.  **Yes.**
25  Q.  You are obviously ambulatory, we just

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 10 of 14 PageID: 387

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

### Page 30

1  watched you go through the conference room doors and
2  go out, you walk just fine, right?
3  A.   Yes.
4  Q.   That was true on that day, correct?
5  A.   Yes.
6  Q.   But this was the way you got around the
7  campus, you used the little golf cart?
8  A.   Yes.
9  Q.   So, as you were making your observations
10 that day, can you tell us where your golf cart was
11 situated with respect to the trooper's car?
12 A.   **Towards the trunk end, pretty close to it.**
13 Q.   On the driver's side or on the passenger
14 side?
15 A.   **Driver's side.**
16 Q.   When you were -- so you are telling us that
17 Mr. Martinez came over to you to say something about
18 Trooper Rivera having had an affair with his wife?
19 A.   **I can't say that. I don't know. He could**
20 **have been going around the car to get in the car**
21 **because I was on the driver's side.**
22 Q.   I'm talking about Mr. Martinez now, maybe I
23 misspoke. Did Mr. Martinez come over to you?
24 A.   Yes.
25 Q.   To speak to you directly?

### Page 31

1  A.   **Yes, so he came around the car.**
2  Q.   And then he went back and talked?
3  A.   **To Vicky.**
4  Q.   And at that point Trooper Rivera was where
5  in relation to your cart?
6  A.   **That I couldn't tell you because**
7  **Mr. Martinez was right in front of me.**
8  Q.   So, Rivera was not closer to you than
9  Mr. Martinez?
10 A.   **No.**
11 Q.   He was farther away.
12      But you had your eye on Mr. Martinez?
13 A.   **He was in my face.**
14 Q.   And then he turned and walked away from
15 you?
16 A.   **Correct.**
17 Q.   And where did he walk to at that point?
18 A.   **Toward the front of the car where Vicky**
19 **was.**
20 Q.   Was she on the driver's side or passenger
21 side?
22 A.   **I can't recall. It was just the front of**
23 **the car. Yeah, she was by the hood, probably**
24 **more -- she was in front of the car.**
25 Q.   And is that where Rivera was, Trooper

### Page 32

1  Rivera?
2  A.   **I did not see him there.**
3  Q.   Where did you see him?
4  A.   **When I saw him next, he was at the tail end**
5  **of the car, the trunk of the car.**
6  Q.   Whose car?
7  A.   **His car.**
8  Q.   So, Vicky was --
9  A.   **Vicky was in front -- Vicky was at the hood**
10 **of the car, the engine of the car.**
11 Q.   Of the trooper car?
12 A.   **Of the trooper car and Jose, when I saw him**
13 **next was at the trunk end.**
14 Q.   And Mr. Martinez was down by where Vicky
15 was?
16 A.   **Was walking toward her, yes.**
17 Q.   Was it at that point that you remember
18 Vicky saying something to Mr. Martinez about you are
19 not supposed to be here?
20 A.   **Correct.**
21 Q.   And that's when I think what you told us
22 was that Mr. -- Trooper Rivera said something
23 similar, oh, you are not supposed to be here,
24 something like that?
25 A.   **Correct.**

### Page 33

1  Q.   And then he walked towards Mr. Martinez and
2  said stand still?
3  A.   **Correct.**
4  Q.   So, you heard and saw Trooper Rivera do
5  that?
6  A.   **Correct.**
7  Q.   Did he say stand still as he was walking
8  towards him?
9  A.   **That I couldn't tell you.**
10 Q.   Then did you see what Trooper Rivera did
11 physically?
12 A.   **He just cuffed him.**
13 Q.   How did he do that, do you remember?
14 A.   **I remember Joel being flexed and I'm**
15 **trying, I can't remember if he was on the hood of**
16 **the car.**
17 Q.   When you say flexed, we don't have a
18 videotape rolling now so I will try to describe what
19 you did. You took the upper part of your body and
20 you moved it toward --
21 A.   **Yes.**
22 Q.   When you said that you remember Joel being
23 flexed. Is that, do you mean that the top part of
24 his body, the trunk of his body was bent forward?
25 A.   **Yes.**

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 11 of 14 PageID: 388

USDC, District of NJ                    Martinez v. Fuentes, et al.                          Thursday
No. 3:15-cv-02932-BRM-TJB         Deposition of Michael S. Goldenberg              April 19, 2018

### Page 34

1   Q.  And as you recall it, it was that Trooper
2 Rivera was putting him down on the hood of the car?
3   A.  Yes.
4   Q.  In these moments around the cars, as you
5 were listening to whatever was being said, it
6 appeared to you that Joel Martinez seemed upset?
7   A.  Yes.
8   Q.  But he did not seem aggressive at that
9 point, just upset, am I right?
10   A.  Yes.
11   Q.  So, he did not seem out of control to you,
12 did he?
13   A.  **When he was with me, no.**
14   Q.  Although he was upset, you were talking
15 about emotional upset; is that right?
16   A.  Yes.
17   Q.  You didn't hear him threaten anybody, did
18 you?
19   A.  **I did not.**
20   Q.  And you didn't see him make any threatening
21 gestures to anybody, did you?
22   A.  **I did not.**
23   Q.  And he wasn't screaming at that point, was
24 he, Joel?
25   A.  **When he was with me, I would not say**

### Page 35

1 **screaming, but he was talking loudly.**
2   Q.  A little louder than what we're talking
3 now?
4   A.  **Yes, correct.**
5   Q.  So, his tone was a bit elevated?
6   A.  Yes.
7   Q.  He was saying to you something about the
8 trooper having had an affair with his wife, wasn't
9 he?
10   A.  **Correct.**
11   Q.  So, that wasn't terribly surprising to you
12 that his tone might be a bit elevated given the
13 content of what he was saying? Was that surprising
14 to you?
15   A.  **I guess I have no opinion on that.**
16   Q.  Are you married?
17   A.  **Yes, I am.**
18   Q.  If someone had an affair with your wife and
19 you ran into that person, do you imagine you might
20 have a bit of an elevated tone in addressing that
21 person?
22   A.  **With that person, yes.**
23   Q.  So, it wouldn't be surprising if
24 Mr. Martinez was actually stating this proposition?
25   A.  **Correct.**

### Page 36

1   Q.  That this man had an affair with his wife,
2 you wouldn't find that surprising that his tone was
3 elevated, would you?
4   A.  **Correct.**
5   Q.  With respect to that baseball field, it is
6 your recollection that you saw Mr. Martinez actually
7 go inside the gate onto the field?
8   A.  **I did not see him go inside the gate. He**
9 **was already inside the gate when I came out.**
10   Q.  And Rivera was on the field, wasn't he?
11   A.  **Correct.**
12   Q.  And how far was Martinez inside the gate,
13 do you remember?
14   A.  **I do not.**
15   Q.  There is no sign down there in that fence
16 saying no trespassing, is there?
17   A.  **There is not.**
18   Q.  And it sounds like what you observed at
19 least is Mr. Martinez and Trooper Rivera walking
20 away together from the point when you first saw them
21 walking away from the field and coming out to the
22 cars, do I have that right?
23   A.  **Yes, they were shoulder to shoulder.**
24   Q.  And no one was pulling or pushing anyone;
25 is that right?

### Page 37

1   A.  **I can't recall.**
2   Q.  Well, shoulder to shoulder, did you see
3 anybody's hands on anybody else?
4   A.  **I can't remember.**
5   Q.  Nonetheless, did it seem like a struggle
6 was going on at that point?
7   A.  **Define struggle.**
8   Q.  Well, I think you have already told me you
9 don't remember whether one person was dragging
10 another, or anything like that?
11   A.  **No, they were not dragging.**
12   Q.  But you didn't see any physical struggle
13 going on, did you?
14   A.  **No.**
15   Q.  Had you heard Trooper Rivera ask or tell
16 Mr. Rivera to walk away from the field?
17   A.  **I did not.**
18   Q.  But, in any event, you saw Mr. Martinez
19 walking away from the field, fair enough?
20   A.  **With the two of them together, yes.**
21   Q.  Now, I just wanted to ask you to listen for
22 about 30 seconds to a few voices, all right. I will
23 be asking you a question. The question I will be
24 asking you is whether you hear and recognize your
25 voice in what I will play you, all right?

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 12 of 14 PageID: 389

| USDC, District of NJ | Martinez v. Fuentes, et al. | Thursday |
| No. 3:15-cv-02932-BRM-TJB | Deposition of Michael S. Goldenberg | April 19, 2018 |

Page 38

1  MR. CAGNEY: Are we going to mark
2  something first?
3  MR. LOUGHRY: I can't mark it. It is
4  on my computer.
5  MR. CAGNEY: Can you identify it?
6  MR. LOUGHRY: Well, I will ask the
7  witness if he can identify it. Do you want me to
8  stop?
9  MR. CAGNEY: Yes, I do want you to
10 stop. Do we know what this is?
11 MR. MARSHALL-OTTO: No, I don't but
12 I'm comfortable if he wants to make a representation
13 about it and have him attempt to identify it we can
14 get a copy later, that's okay with me.
15 MR. LOUGHRY: This is a tape recording
16 of a conversation between the state police internal
17 affairs officer and purportedly Mr. Goldenberg that
18 was produced to me in discovery from the state
19 police.
20 A.   May I ask a question?
21     (Discussion off the record.)
22     (At which time a break was taken.)
23 Q.   So, what I will do is play maybe the first
24 30 seconds or something.
25     Counsel, the reporter is going to attempt

Page 39

1  to take down what's played and I have asked her to
2  do that so the transcript is clear.
3     (At which time the following is an excerpt
4  of an interview.)
5     ("Good morning. Today is May 7th of 2014
6  Wednesday. It looks like the time is now 10:10 a.m.
7  We're currently located at the Lawrenceville Prep
8  High School located on 2500 Main Street in
9  Lawrenceville, New Jersey in Mercer County. This is
10 the digitally recorded statement of Mr. Michael
11 Goldenberg, a witness regarding general
12 investigation 20130216. I am Detective Sergeant
13 Vargas badge 6764 of the New Jersey State Police
14 currently assigned to the Office of Professional
15 Standards Federal Investigation Bureau,
16 investigation central.
17    Mr. Goldenberg, I am currently
18 investigating an allegation of false arrest against
19 Trooper I Jose Gabrielle Rivera, 6010, with the
20 state police. I request that you provide me with a
21 formal statement concerning any information you know
22 pertaining to this incident. The statement will
23 consist of a question and answer dialogue. Your
24 statement is being digitally recorded and the
25 information provided may be very important. Please

Page 40

1  speak loud, slow and clear, if necessary, I suggest
2  that if you wait a minute to compose your thoughts
3  prior to answering any questions. It is also my
4  duty to inform you that your statement will be
5  considered part of an official police report and
6  will be relied upon in furtherance of an official
7  police investigation. In that regard, you have a
8  legal obligation to provide truthful statements and
9  responses. Should it be discovered that you have
10 intentionally provided false information you are
11 subject to criminal persecution. Do you understand
12 all the information I've explained to you?
13    Yes, I do.
14    Okay, thank you. Will you now voluntarily
15 provide me with a statement concerning your
16 knowledge of the incident under investigation?
17    Yes.
18    And do you have any questions before we
19 begin?
20    No.
21    Okay, sir, if you would please for the
22 record full name and address?
23    Michael Goldenberg, 2500 Main Street,
24 Lawrenceville, New Jersey.
25    Okay, and your phone number please.

Page 41

1  609-895-2105.
2     And your age and date of birth please?
3     7/7/62 and I will be 52 -- 51 right now
4  will be 52 in a few months.
5     All right, sir."
6  Q.   Mr. Goldenberg, have you had the
7  opportunity to listen to the first couple of minutes
8  of this tape recording that I have played you?
9  A.   Yes.
10 Q.   Is that your voice that you hear?
11 A.   Yes.
12 Q.   Do you remember giving a statement to this
13 state police trooper Investigator Vargas on occasion
14 before today?
15 A.   Yes.
16 Q.   Now, I might, what I might do is I just
17 might hit two other places in the tape randomly just
18 to confirm that it continues to be your voice and so
19 I will just, I'm not going to any particular time.
20    (Discussion off the record.)
21    "And that I remember, I mean I --
22    Sure.
23    That you remember.
24    There is nothing obvious where somebody,
25 you know, took two hands and punished him, I would

Case 3:15-cv-02932-BRM-TJB   Document 64-5   Filed 05/22/19   Page 13 of 14 PageID: 390

USDC, District of NJ  
No. 3:15-cv-02932-BRM-TJB

Martinez v. Fuentes, et al.  
Deposition of Michael S. Goldenberg

Thursday  
April 19, 2018

### Page 42

1  have remembered that."
2  Q. Is that your voice?
3  A. Yes.
4  Q. That is time signature around 11:56. I
5  will go down towards the end of the tape.
6      "You would have remembered some sort of
7  physical --
8  Q. I'm at time stage 39:50. I hope that's not
9  too far.
10     "Sort of safeguarding the confidentiality,
11 they go in hand in hand. Everyone's interview is
12 just that, it's confidential, it's not shared with
13 anyone.
14     No, but does he know that you guys are
15 investigating him?"
16 Q. Again, that is your voice?
17 A. Yes.
18 Q. That was at time signature 39:55 to about
19 40 minutes, that's essentially the end of the tape.
20     MR. MARSHALL-OTTO: Are you all set,
21 Justin?
22     MR. LOUGHRY: Let me check my notes.
23 Those are the questions I have. Thank you very
24 much, Mr. Goldenberg.
25     MR. MARSHALL-OTTO: I have one

### Page 43

1  follow-up question.
2  EXAMINATION BY MR. MARSHALL-OTTO:
3  Q. Mr. Goldenberg, you testified that you
4  observed Trooper Rivera place Mr. Martinez under
5  arrest, correct?
6  A. Correct.
7  Q. Did you also observe him place him in his
8  trooper car?
9  A. I did not.
10 Q. You did not. With respect to what you did
11 observe, did you at any time observe Trooper Rivera
12 attack, assault or otherwise cause bodily harm to
13 Mr. Martinez?
14 A. I did not.
15 Q. That's all I have.
16 **EXAMINATION BY MR. LOUGHRY:**
17 Q. Based on that, Mr. Goldenberg, you
18 mentioned I think that Trooper Rivera cuffed
19 Mr. Martinez?
20 A. Correct.
21 Q. You meant handcuffed?
22 A. Correct.
23 Q. Do you remember Mr. Martinez expressing any
24 kind of concern about the handcuffing?
25 A. I do not recall.

### Page 44

1  Q. Any kind of discomfort or pain?
2  A. I do not recall.
3  Q. Did he make any reaction at the time that
4  he was handcuffed?
5  A. **Yes, he actually just said to me that he**
6  **shouldn't be there and he doesn't want Trooper**
7  **Rivera with his kids.**
8  Q. Like around his kids?
9  A. **Around his kids, yes.**
10 Q. Thank you very much, Mr. Goldenberg.
11     (The deposition was concluded at
12 11:02 a.m.)

### Page 45

1  CERTIFICATE OF OFFICER
2
3      I, (CAROLYN J. MC CALLA), a Certified Court
4  Reporter and Notary Public, do hereby certify that
5  prior to the commencement of the examination,
6      MICHAEL S. GOLDENBERG
7  was duly sworn by me to testify to the truth, the
8  whole truth and nothing but the truth.
9      I do further certify that the foregoing is
10 a true and accurate transcript of the stenographic
11 notes of testimony taken by me at the time place and
12 on the date hereinbefore set forth.
13     I do further certify that I am neither a
14 relative nor employee, nor attorney, nor counsel to
15 any parties to this action; and that I am neither
16 related a relative nor employee of any such attorney
17 or counsel, and that I am not financially interested
18 in this action.
19
20
21  _Carolyn McCalla_, CCR, CRR, RPR, RMR
22  CAROLYN J. MC CALLA
23  Certificate No XI-0001219

What I witnessed on 4/26/13
4:15pm-ish

Jose's police car was parked by the baseball field on the side of the port-a-pot. I saw him start to leave the baseball field walking to his car and I was just coming out of my house and figured I would meet him at his car to say good-bye and to look into the vehicle to see what the technology looks like now a days in a police car. As I drove my golf cart over from my house to where he was parked, there was a black car at the front end of the police car and a white car at the trunk end. Approximately five minutes earlier when I was going into my house from the third base side of the baseball field, I saw the white car coming towards me and as it passed in front of Jim Jordan's house, it turn right towards the port-a-pot and where the police car was.

When I came over to the police car in my golf cart, I saw Vickie Martinez was in the drivers seat of the black car and as I pulled up to the police car to see where Jose was, I saw he and Mr. Martinez walking over towards the cars speaking in Spanish. Mr. Martinez came over to me and said "his wife was having an affair with Jose and Jose was threatening me and that Jose should not be here and he was getting a restraining order on him." I thought he was kidding at first because I did know about Vickie's family situation. Mr. Martinez walked towards the front end of the police car where Vickie was standing. Jose was walking by me at the end of the police car and Vicky said to Mr Martinez, "what are you doing here? You are not supposed to here." Jose repeated "he is not supposed to be here" and then told him not to move and cuffed him. Mr. Martinez said something to me like he did not want Jose by his kids and he should not be here. Vickie said "please don't arrest him because of his job."

I then left the scene realizing that this was a serious private situation. A few minutes later Vickie called me to explain the situation, so I went back to her house and sat on the front steps. She told me that she is getting divorced and that her husband left her a month ago. I told her I did not know that and I was sorry to hear about her situation. I told her that I would not say anything to anyone because it was not anyone's business except hers.



EXHIBIT
Goldenberg 1
4-19-18