# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

JOEL MARTINEZ,                    CIVIL ACTION NO.
                                  15-2932 (BRM-TJB)
        Plaintiff,
                                  CONFIDENTIAL
    vs.                           ORAL DEPOSITION OF:

COLONEL JOSEPH R. FUENTES,        THOMAS R. MURTHA
et al,
        Defendants.

---

\* \* \* \* \*
Tuesday, April 10, 2018
\* \* \* \* \*

        Transcript in the above matter taken at the offices of Richard J. Hughes Justice Complex, Office of the Attorney General, 25 Market Street, Trenton, New Jersey, commencing at 11:00 a.m.
A P P E A R A N C E S:
    GURBIR S. GREWAL
    ATTORNEY GENERAL OF NEW JERSEY
    BY: MICHAEL VOMACKA
    DISTRICT ATTORNEY GENERAL
    DIVISION OF LAW
    CORRECTIONS AND STATE POLICE SECTION
    RICHARD J. HUGHES JUSTICE COMPLEX
    25 MARKET STREET
    TRENTON, NEW JERSEY 08625
    (609) 633-8687
    E-MAIL: Michael.Vomacka@lps.state.nj.us
    ATTORNEY FOR THE DEFENDANT/THOMAS R. MURTHA


            MASTROIANNI & FORMAROLI, INC.
    Certified Court Reporting and Videoconferencing
            251 South White Horse Pike
            Audubon, New Jersey 08106
                (856) 546-1100

### Page 2

```
 1   APPEARANCES (CONTINUED):
 2       LOUGHRY & LINDSAY, LLC
         BY:  JUSTIN T. LOUGHRY, ESQUIRE
 3       330 MARKET STREET
         CAMDEN, NEW JERSEY 08102
 4       (856) 968-9201
         ATTORNEYS FOR THE DEFENDANT
 5
     ALSO PRESENT:
 6
         KAI MARSHALL-OTTO, DAG
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1                    EXHIBITS
 2   (EXHIBITS WERE NOT MARKED DURING THE DEPOSITION)
```

### Page 3

```
 1           WITNESS INDEX
 2   EXAMINATION OF SERGEANT MURTHA BY MR. LOUGHRY:
         PAGE 5
```

### Page 5

 1   (THOMAS R. MURTHA having been duly
 2   sworn, was examined and testified as follows:)
 3   (EXAMINATION OF SERGEANT MURTHA BY MR. LOUGHRY:)
 4       Q.  Thomas Murtha?
 5       A.  Yes.
 6       Q.  Are you still an official with the State
 7   Police?
 8       A.  Yes, I am.
 9       Q.  What is your title or your rank?
10       A.  I'm a staff sergeant.
11       Q.  And where are you presently assigned?
12       A.  Currently assigned to the Tuckerton
13   Station in West Creek, New Jersey, part of Troop C.
14       Q.  How long have you been there?
15       A.  I think this April will be coming up on
16   four years.
17       Q.  The event that brings us here, an event
18   or events really coalesce around April 26, 2013.
19   Where were you assigned then?
20       A.  April of 2013 I was assigned to the
21   Hamilton substation.
22       Q.  Is that the one on Negron?
23       A.  Yes.
24       Q.  And were you a sergeant at that time?
25       A.  Yes, I was.

Page 6

1  Q. Same rank you have now?
2  A. Same rank, staff sergeant.
3  Q. Did you have supervisory
4  responsibilities at that point?
5  A. Yes.
6  Q. What were those, a summary?
7  A. I was a squad leader for, I forget which
8  particular squad, if it was one, two, three or four.
9  But I was a squad leader. I was ultimately
10 responsible for the administration of the squad and
11 supervision, the same.
12 Q. And do you know Trooper Jose Rivera?
13 A. Yes.
14 Q. And did you know him back in those days?
15 A. Yes.
16 Q. Was he on that squad that you were in
17 charge of?
18 A. Yes, he was.
19 Q. Was there anybody else in
20 administration or supervision between you and him? I
21 am looking for a chain of command here. Was the
22 chain of command of him up to you or somewhere in
23 between?
24 A. At the squad level, I was the squad
25 leader. I did have control supervisors assigned to

Page 7

1  me at that time.
2  Q. Okay.
3  A. Which were, in my absence, responsible
4  for filling my duties, but day-to-day their main
5  focus was the actual on-the-road supervision.
6  Q. Who were your patrol supervisors, who
7  were they?
8  A. I don't recall at this time.
9  Q. Okay. Did you have responsibility for
10 doing performance evaluations for the squad members?
11 A. Yes.
12 Q. And did you do performance evaluations
13 for Trooper Rivera?
14 A. Yes, I did.
15 Q. I think I want to show you now, I'm
16 going to show you what we previously marked as Rivera
17 3 for identification. And I probably -- I gave my
18 extra copy to your colleague, Mr. Marshall-Otto.
19 That's the one that is marked.
20      MR. VOMACKA: I'll be happy to share.
21      MR. LOUGHRY: I am saying I normally
22 hand you my extra copy, but I've handed my
23 extra copy at the previous deposition.
24      MR. MARSHALL-OTTO: Here you go
25 (Handing).

Page 8

1       MR. VOMACKA: Thank you.
2  BY MR. LOUGHRY:
3  Q. Have you had a chance to look at this
4  document?
5  A. I am looking at it now, yes.
6  Q. My first question is going to be did you
7  perform this Performance Evaluation, is this your
8  work?
9  A. Yes, it is.
10 Q. Is there anybody else that contributed
11 to it or is it solely you?
12 A. I am the author of the Performance
13 Evaluation.
14 Q. Okay. And that was a typical function
15 for you?
16 A. Yes.
17 Q. So let me direct your attention to Page
18 11 of 14.
19 A. Okay.
20 Q. At the bottom of that page, you know,
21 there's another identifying number, NJSP MARTINEZ
22 221, but right below that it says Page 11 of 14. Did
23 you find it?
24 A. Yes.
25 Q. Okay. There's a period here at the top

Page 9

1  right-hand corner, 4/20/2013 to 7/12/2013. That is
2  roughly a quarter of the year?
3  A. That's three months of the year. If you
4  were to say, yeah, twelve divided by four, this is a
5  partial periodic evaluation that was done for Trooper
6  Rivera from the period of 4/20/13 when he came under
7  my supervision until he was transferred to Kingwood
8  on July 12, 2013.
9  Q. All right. What I was getting at and
10 let me ask you this directly, were these typically
11 done every quarter?
12 A. Performance evaluations, the evaluation
13 system has changed through the years. Ones were
14 given for different reasons. We would have from the
15 time you first graduate the Academy, you had
16 probationary trooper evaluations which are done on a
17 90/180, every 90 days for three separate times. You
18 have the yearly evaluation, and you would have
19 quarterly appraisals which were done quarterly. The
20 purpose of this one here, from what I recall was for
21 Trooper Rivera was transferred from the Hamilton
22 station to Kingwood.
23 Q. Do you know why he was transferred?
24 A. No.
25 Q. Did you play any role in the decision to

Page 10

1 have him transferred?
2     A.    No.
3     Q.    Did someone come to you and say in
4 essence, in words and substance, you need to do an
5 eval because he's being transferred?
6     A.    Our evaluation system is prescribed by
7 our standard operating procedures, and they are
8 prescribed to be done at certain intervals and
9 certain events trigger that, such as a transfer, a
10 yearly -- again, the system has now changed and has
11 been revamped. Probationary evals were done, say, if
12 someone was promoted, they get one within one year of
13 their promotion, their probationary time. This one
14 was done specifically upon Trooper Rivera's transfer.
15    Q.    Okay. There's a commentary paragraph
16 here. Did you write that verbiage?
17    A.    On what page?
18    Q.    Page 11 of 14, the one I've been talking
19 about.
20    A.    Yes, I did.
21    Q.    I have some questions about some initial
22 acronyms, whatever, here.
23    A.    Uh-hum.
24    Q.    First it says during this rating period,
25 Trooper Rivera was Verbally Counseled. Those two

Page 11

1 words "Verbally Counseled", the first letter was
2 capitalized, is this a term of art, Verbally
3 Counseled?
4     A.    Within our internal evaluation systems,
5 we have a system called the, MAPPS, it's an acronym.
6 When you have to address something, there are ways
7 you can do that. You can verbally counsel somebody,
8 you can review an SOP with them, you can refer a
9 matter to our Internal Affairs System, you can
10 commend somebody for their actions. Verbal
11 counseling is, as you said, a term of art for a form
12 of intervention.
13    Q.    Is it a reprimand?
14    A.    These turn classified under
15 interventions. Verbally counseling, you know, my
16 understanding is, you noted something and you
17 addressed it.
18    Q.    When you say noted something, you mean
19 something negative?
20    A.    If you're counseling somebody, I could
21 see how realistically it would be a negative
22 connotation. It's just a corrective measure a
23 supervisor would take.
24    Q.    In other words, something happened that
25 you want to intervene about to correct in the future;

Page 12

1 is that what you're saying?
2     A.    You say something happened?
3     Q.    Well. . .
4     A.    Day-to-day basis, you're working, you
5 may note something. Hey, you know, I'd like you to
6 do it this way. Hey, that situation there, you could
7 have done it this way. There's different levels to
8 it. It's a -- it doesn't necessarily connote
9 negativity. But I could see where would one infer
10 from there.
11    Q.    Do you know what SOP C-22 is? It's
12 mentioned there?
13    A.    I would have to be, my recollection
14 would have to be refreshed by the actual SOP. Off
15 the top of my head. . .Usually, I don't recall what
16 SOP C-22 is termed off the top of my head.
17    Q.    Let's take a look at the rest of the
18 paragraph. Maybe we can draw some inferences.
19 There's mention in the next sentence of an incident
20 in which Trooper Rivera and I am quoting here, quote,
21 failed to document his location in the CAD. Do you
22 see that reference?
23    A.    Yes.
24    Q.    Is that some kind of issue that you
25 might note as a supervisor?

Page 13

1     A.    Yes.
2     Q.    And what's the concern there?
3     A.    Well, the SOP, again, off the top of my
4 head, I can't recollect what it is. Whether, I think
5 C7 is our evaluations, F19 may be patrol procedures.
6 I mean, there's all different acronyms. C7 -- C-22
7 may be something to do with radio procedures. Again,
8 during this time, I verbally counseled in regards to
9 whatever. He again, without the SOP or without the
10 verbal counseling, I wouldn't be able to speak to the
11 exact verbiage.
12         MR. LOUGHRY: I ask the reporter to note
13    in the document request, we had one before, in
14    the previous deposition, I'd like to have a
15    copy of that SOP C-22. Obviously, there's a
16    protective order, and I'll confirm in that a
17    letter to you or. . .
18         MR. MARSHALL-OTTO: You can include it
19    in a letter to me. That's fine.
20         MR. LOUGHRY: I don't believe it's
21    privileged. All right.
22 By MR. LOUGHRY:
23    Q.    So it doesn't appear in this photograph
24 as if you are commenting in a particular arrest for
25 this individual conduct, and harassment for any

Page 14

1  allegations made against Trooper Rivera, that's not
2  the subject of what you are writing about?
3      A.   No.
4      Q.   What you are writing about, Trooper
5  Rivera made an error in the basic control function.
6  What was the error?
7      A.   Excuse me?
8      Q.   What was his error?
9      A.   Again, I believe this pertains to radio
10 procedures, and again pertains to the other incident,
11 I believe at the time of the incident, his location
12 did not marry up with the CAD location, and I
13 believe, it was more like a safety thing, where, we
14 need to know where you're at.
15     Q.   This was marked as Rivera 1 at his
16 deposition. It was identified by him as a CAD
17 Report. And you just used the phrase, I think, CAD.
18 Is this what you are referring to? You would refer
19 to as the CAD Report?
20     A.   Yes, it is.
21     Q.   And what is, just for the record, what
22 is the function of that CAD Abstract or CAD report?
23     A.   The CAD is a computer system, it's the
24 computer aided dispatch system. It's a system
25 wherein, you know, anybody and everybody in the State

Page 15

1  Police that they logged into the system, you can
2  track where they are. And when things, incidents
3  occur, or motor vehicle stops, they generate what's
4  called a CAD incident number. So this is a record of
5  what occurred at this time at this date.
6      Q.   Now, did you have access to this, this
7  CAD report, in the process of you filling the
8  evaluation and writing the paragraph that's on page
9  -- the commentary that's on Page 11 of 14?
10     A.   I had access to all the State Police
11 systems that I would need to prepare this.
12     Q.   Did you look at the CAD Report in order
13 to write that?
14     A.   In conjunction as I wrote this, did I
15 specifically take this out? No. Do I have access to
16 it? Sure, I have access to anything.
17     Q.   How did you know that he had failed to
18 report a location?
19     A.   I was the supervisor on the date.
20     Q.   You remember the events on the date?
21     A.   On that date when this occurred, he was
22 in the computer aided dispatch system for a control
23 loop.
24     Q.   What does that mean, to be in the system
25 for a control loop? What does that mean?

Page 16

1      A.   During the day, when you come in in the
2  morning, you log onto the system, it puts a general
3  entry you're on duty. If you were to say SOP, it
4  says, which I believe, C-22 may be something with
5  radio procedures, you're supposed to keep the patrol
6  chart updated or keep the computer updated. A, just
7  for general supervision tracking purposes, for
8  safety, numerous different reasons. At the time of
9  this incident previous to that, he was signed out on
10 a patrol loop of 295. Our SOP dictates, my
11 understanding, that you update the CAD at least once
12 an hour, and then, you know, there is always
13 different verbiage in there, stuff that, things that
14 occur. You just, you document them, or things that
15 you are doing. And again, for various different
16 reasons, whether it's statistically to track stuff,
17 whether it's just basic safety, whether it's for just
18 general knowledge as a supervisor. You like to know
19 where your people are.
20     Q.   And did you make a determination at some
21 point that there was some period of time where you,
22 the supervisor, you know, the station, did not know
23 where he was?
24     A.   Yes.
25     Q.   Did you learn subsequently where he had

Page 17

1  been?
2      A.   Yes.
3      Q.   Where was that?
4      A.   At the time this occurred, he was in
5  Lawrence Township at the Lawrenceville School.
6      Q.   And was that part of his patrol route?
7      A.   Trooper Rivera is a New Jersey State
8  Trooper assigned to the Hamilton Station. We have a
9  prescribed patrol area. 295 is in that area which
10 covers Lawrence, Lawrenceville School, the Lawrence
11 off the highway. That is in our area, yes.
12     Q.   When you say patrol loop, is that part
13 of the patrol loop?
14     A.   Again, you get into a semantic of the
15 roadway versus what is off. It's in the vicinity of
16 where he was. I don't know specifically where he was
17 but he was in the vicinity.
18     Q.   The dispatch call there, the first
19 contact with dispatch at what, 16:05?
20     A.   According to this, yes.
21     Q.   And that's the first time on that report
22 which treats this incident of arrest, right?
23     A.   On this report, yes.
24     Q.   And let's see. Here's Rivera 2, another
25 document I want to ask you about. Do you recognize

Page 18

1  this document or this type of document at least?
2     A.  Sure, patrol truck.
3     Q.  Who maintains that -- does that patrol
4  chart? Does the trooper do it, or someone at
5  headquarters do it?
6     A.  The patrol chart is maintained by the
7  trooper. He's responsible for making entries and
8  updating it. How it's actually entered into the
9  computer dispatch, it's, a trooper radios out,
10 dispatcher receives it, they can put the entry in.
11 With the new computer aided dispatch in the car, you
12 can actually update your location yourself. You can
13 --
14    Q.  I'm sorry. You mean you have a key
15 board or something in your computer and you can input
16 the information?
17    A.  You can import it yourself.
18    Q.  How about in 2013, was that the case?
19    A.  Yes.
20    Q.  This one, can you tell in looking at
21 this one, whether he was importing this stuff on his
22 computer or calling it in?
23    A.  This was inputted via the dispatcher.
24    Q.  We're talking about the next document.
25    A.  The computer-aided dispatch?

Page 19

1     Q.  Yes.
2     A.  Transcribes that into a different
3  program with generates a patrol log. They are two
4  systems intertwined.
5     Q.  Right.
6     A.  If you were to add up all the CAD
7  incidents from the day, it translates into your
8  patrol chart.
9     Q.  Fair enough.
10    A.  It aggregates everything into this.
11    Q.  It looks like there's a time period, I
12 have to get my copy out because I can't look across
13 the table, somewhere between 15:24 and 16:05?
14    A.  Yes.
15    Q.  There's sort of a gap of time of about
16 39 minutes, something like that?
17    A.  Uh-hum.
18    Q.  The last entry, prior to the 16:05
19 entry, is, he's out on 295?
20    A.  15:24 he enters the patrol loop or
21 somebody, whether him or dispatch, he signed out on
22 the patrol loop of 295.
23    Q.  He signed into or out of?
24    A.  Again, it is a mater of semantics. At
25 15:24 that was entered into the CAD that he was on

Page 20

1  patrol loop 295.
2     Q.  He was on patrol at 295.
3        MR. VOMACKA: You're asking in the
4  document?
5        MR. LOUGHRY: Yes, in the document. I
6  don't think this is official with him in the
7  car. Doesn't know. I am looking at the
8  document.
9        THE WITNESS: That's what was generated,
10 yes. Now, if he were to pull that, that CAD,
11 you could see if he inputted it or they
12 inputted. For me reviewing as a supervisor,
13 somehow, some way, he was on the loop of 295.
14 BY MR. LOUGHRY:
15    Q.  Well, can you put these two reports
16 together, and I want to make sure I get the exhibit
17 numbers right. Rivera 1 and Rivera 2, and looking at
18 the information on those reports, is that
19 information, the sum total of it, what leads you to
20 the commentary paragraph and the conclusion that the
21 trooper made an error in basic patrol function?
22    A.  If you are doing a patrol loop, there's
23 no patrol loop, it's -- take a look down the road,
24 take a look back, make sure no one is broken down, no
25 accidents. If you are in the vicinity of that and

Page 21

1  you stop off at the Dunkin Donuts to get a cup of
2  coffee, you wouldn't necessarily say, hey, I am at
3  Dunkin Donuts. But if he was out at the Lawrence
4  School for a patrol-related function, community
5  policing, such as target hardening, doing a critical
6  infrastructure check, I would assume he would have
7  updated his location, which he did not.
8     Q.  How about if he's out there to visit the
9  baseball field where he's a volunteer baseball coach
10 and hang out with the kids for a while in the middle
11 of his shift? How about that?
12    A.  Again, in this day and age of soft
13 targets, community policing, when you say hang out,
14 if you are doing it in a semi-official capacity, I
15 would assume that he would sign out there.
16    Q.  There should be an entry?
17    A.  As a supervisor, I would have liked to
18 have known where he was.
19    Q.  If he was just taking a break, it has
20 nothing to do with his police work, you wouldn't
21 necessarily want to know where he was? I am asking.
22    A.  You're trying to take an art and make it
23 into a science.
24    Q.  Okay.
25    A.  The freedom that the trooper has and the

Page 22

1   discretion that the trooper has of where he goes and
2   when he goes absent direction, as long as he's on
3   patrol and doing somewhat of a patrol-related
4   function, I don't care if they run radar at the
5   Scudder Falls Bridge, or if they look for expired
6   inspections on 29 and 129, they have the freedom to
7   go, as long as they are within that area. Again,
8   just for documentation purposes, for credit purposes,
9   productivity and statistical purposes, if somebody is
10  doing a property check, somebody is out in a
11  community policing detail, or if somebody is out on a
12  meal, you want to know. However, you do make
13  allowances. If somebody stops for a necessity, call
14  of nature, someone wants to grab a bottle of water.
15  But specifically related to this, A, I would like to
16  have known he was there, and for, B, the safety
17  aspect, and for him to get the credit, if he's doing
18  something positive for the community in somewhat of
19  an official capacity as the State Police.
20      Q.   Did you ever discuss this event with
21  Trooper Rivera after the event occurred, that is,
22  after the arrest occurred?
23      A.   Yes.
24      Q.   And when did you discuss it?
25      A.   In conjunction with him coming back to

Page 23

1   the station. You know, when he was -- my
2   recollection, when he said he had one under arrest, I
3   looked at the computer, and he's on the patrol loop.
4   Usually there's some precipitating event, such as a
5   motor vehicle stop, a pedestrian contact, which, hey,
6   if he's out on a motor vehicle stop and he says I
7   have one under arrest, generally, A, maybe it's a CDS
8   arrest or maybe it's a DWI, maybe it's some other
9   sort of arrest. When someone says patrol loop and
10  then they say they want an arrest, I want to know
11  what's going on.
12      Q.   Sure.
13      A.   We got back to the station. We spoke as
14  to what occurred.
15      Q.   What did he tell you?
16      A.   He said he was out in Lawrence School,
17  your client had encountered him, there was some
18  tumultuous behavior by your client, and your client
19  grabbed him by the arm at which place he placed him
20  under arrest.
21      Q.   Did he tell you anything about the
22  person he arrested?
23      A.   Your client made it known who he was in
24  relation to Trooper Rivera.
25      Q.   I am asking whether Trooper Rivera told

Page 24

1   you about the client?
2       A.   Yes.
3       Q.   What did tell you?
4       A.   That he had a relationship with the
5   client's wife previous to this occasion, and, you
6   know, where he was and what he was doing.
7       Q.   This is the defendant's wife, the
8   arrestee's wife?
9       A.   Yes.
10      Q.   You used the word client. He wasn't
11  your client?
12      A.   No, no.
13      Q.   Okay. All right. Did you review the
14  reports that Trooper Rivera wrote on this incident
15  report, I should say?
16      A.   I would have to see the report to see if
17  I did or not.
18          MR. MARSHALL-OTTO: It's R-13.
19          MR. LOUGHRY: I'm getting there.
20  Actually, it's R-10.
21          THE WITNESS: R-10 is the arrest report.
22  R-10 is the Investigation Report.
23  BY MR. LOUGHRY:
24      Q.   Have you had a chance to look at it?
25      A.   I'm looking at it now.

Page 25

1       Q.   Okay.
2            There's a couple places for, I guess,
3   detectives or somebody to approve here for other
4   troopers, but your name does not appear here.
5       A.   No, I did not approve this report.
6       Q.   Who is Trooper Green?
7       A.   Timothy Green, I believe, would have
8   been an acting sergeant at that time, one of my
9   patrol supervisors.
10      Q.   What about DSG Koenig?
11      A.   He was, I believe, would have been the
12  detective sergeant and assigned to Hamilton at that
13  time.
14      Q.   And is it unusual to have a couple
15  signatures of approval?
16      A.   No.
17      Q.   Did either of these folks, Green or
18  Koenig, discuss this report with you?
19      A.   I don't recall speaking with them
20  directly about this report.
21      Q.   In any of your conversations with Rivera
22  did the question come up as to whether he was going
23  to include in his report some mention of the
24  relationship as it were between Mr. Martinez and Mrs.
25  Martinez and Trooper Rivera, that being there was an

Page 26

1  adulteress affair between Rivera and Martinez?
2      A.   I don't recall speaking to Trooper
3  Rivera about the substance of the report. The way
4  the Investigation Report goes, the trooper writes
5  them, the sergeant will approve it. Usually a
6  criminal investigation office will do the second
7  level of approval. And again, dates, that was
8  submitted, you know, he may have typed it up on the
9  day I wasn't working, and it had been approved on a
10 day I was not working.
11     Q.   Was it appropriate to write this report
12 in your view knowing what you know after the fact,
13 you know, was it appropriate for him to write this
14 report without making any mention of the background
15 between the relationship, Vicky Martinez, Jose
16 Rivera, and Joel Martinez?
17     A.   Appropriateness?
18     Q.   Yes. Was it appropriate, was it
19 correct?
20     A.   He's a trooper, an incident occurred, he
21 placed somebody under arrest, he's mandated to write
22 an Investigation Report.
23     Q.   Was it appropriate without explaining
24 the reason, at least his perceived reason for the
25 purported upset and tumultuous behavior of Mr.

Page 27

1  Martinez?
2      A.   I don't have an issue with him not
3  mentioning it.
4      Q.   Why is that?
5      A.   Is it material to his arrest? Is it
6  material as towards your client's behavior? You
7  know, at the end of the day, the behavior that he
8  described to me which your client acknowledged to me
9  and was written here, you know, using profanity in
10 front of juveniles, being loud and aggressive toward
11 a police officer in uniform and place his hands on
12 him, this seems wholly inappropriate to me.
13     Q.   Did you have a discussion with Mr.
14 Martinez?
15     A.   Yes, I did.
16     Q.   What did he tell you?
17     A.   In substance, both accounts of the
18 events matched up.
19     Q.   And so he told you he had used all this
20 profanity?
21     A.   I spoke to him. In substance, yes.
22     Q.   Well --
23     A.   We didn't get into specific stuff, but
24 his somewhat tumultuous behavior in front of people,
25 you know, he would acknowledge, he did acknowledge

Page 28

1  that, you know, it wasn't appropriate, or, yeah, I
2  was wrong, something to that.
3      Q.   I will ask you a specific question. Did
4  he tell you that he used the F word a dozen times or
5  20 times or something like that? Did he admit that
6  to you?
7      A.   He admitted to behavior in front of the
8  juveniles that matches Trooper Rivera's account.
9      Q.   Well, did you give him Trooper Rivera's
10 account and ask him to review?
11     A.   We spoke because your client was very
12 upset. Your client wished to speak to somebody in
13 the supervisory capacity. Your client did not, when
14 I spoke to him, it was my understanding of the
15 events, your client agreed, acknowledged, did not
16 dispute the events that occurred and expressed
17 remorse.
18     Q.   I asked you a specific question. The
19 specific question was did you show Mr. Martinez the
20 written report that you have in front of you so he
21 could express agreement or disagreement with what was
22 written?
23     A.   No.
24     Q.   Oh, okay. It didn't exist at that
25 point, did it?

Page 29

1      A.   No.
2      Q.   So how is it that he became aware, if he
3  did become aware, of what Rivera was saying?
4      A.   From the moment he walked in the
5  station, he was yelling, he wanted to speak to
6  somebody in a supervisory capacity, and he went so
7  far as saying he wanted to speak to the Attorney
8  General. As a shift supervisor, I saw what was going
9  on. This is somewhat not in the, you know, usual
10 course of business, something like this is occurring.
11 Prisoners come in all the time and they are quiet,
12 whatever. He was in an agitated state. I spoke to
13 him, identified myself as a supervisor. He has some
14 objections, that he's been arrested, which he said he
15 was arrested for no reason. I said that I would
16 speak to him; however, some of the nuts and bolts of
17 processing kind of had to start and he needed to
18 allow that to occur.
19     Q.   Where did you speak to him?
20     A.   In the cells.
21     Q.   You went into the holding cells?
22     A.   Yes.
23     Q.   And you sat down with him?
24     A.   I don't know if I sat down, but I spoke
25 to him within the cells.

Page 30

1  Q. Did you go inside the cells with him or?
2  A. I am sure I was in the cell room. The
3  physical layout, whether he was behind the bars,
4  whether I was in the doorway.
5  Q. Was he still handcuffed?
6  A. I don't know.
7  Q. He was upset?
8  A. Oh, sure.
9  Q. And he told that you this guy had an
10 affair with his wife?
11 A. Yes.
12 Q. Now, what I am specifically asking, did
13 you make any notes about that?
14 A. I did a report for him and forwarded
15 that to Internal Affairs, because his objection was
16 that he had been arrested for no reason.
17 Q. Uh-hum.
18 A. The details of that relationship, I
19 don't know if -- I don't recall making specific note.
20 However, you know, he acknowledged a relationship,
21 Trooper Rivera acknowledged the relationship, and I
22 conveyed, you know, that to my superiors, also.
23 Q. So did you write a report writing down
24 what it is he told you?
25 A. No, I did not.

Page 31

1  Q. Did you -- you didn't write down any
2  report that attributed to any particular quotes to
3  him when he was out there on the field or talking to
4  Rivera there at scene?
5  A. Not that I recall.
6  Q. I mean, did he admit to you that he used
7  the F word, the fuck word, you know, 15 or 20 times?
8  A. As a direct admission, I don't recall.
9  Q. Okay. And did he tell you, did he admit
10 to you that he had grabbed Trooper Rivera?
11 A. Yes, he did.
12 Q. How did he say that he did that?
13 A. He grabbed him by the arm. Or he
14 acknowledged when I conveyed the set of circumstances
15 to him, something -- he agreed with it. He was even
16 apologetic.
17 Q. Did you write that down?
18 A. No.
19 Q. You didn't make a record of that?
20 A. No.
21 Q. Were you ever called to attend court in
22 this case when this case came up in municipal court?
23 A. No.
24 Q. No one came, we need you because this
25 guy made some kind of admissions to you?

Page 32

1  A. No.
2  Q. That never got communicated to you? No?
3  A. I was never subpoenaed as far as I am
4  aware of.
5  Q. You knew the case was dismissed, don't
6  you? Do you know that?
7  A. I am aware after the fact of that, yes,
8  I was.
9  Q. In terms of the Internal Affairs
10 investigation, were you interviewed?
11 A. I don't believe I was.
12 Q. Do you know the fellow Vargas?
13 A. I know the name. I don't know if I'm
14 personally acquainted with him.
15 Q. Do you know that he was trying to figure
16 out what happened out there as far as at the field
17 between Rivera and Martinez?
18 A. If you say so. Was he the investigator
19 assigned to the case?
20 Q. Yes.
21 A. Okay.
22 Q. You never had any contact with him to
23 tell him about the extremely valuable information
24 that Mr. Martinez gave you from what you're telling
25 me?

Page 33

1  A. I don't believe that I was interviewed.
2  I don't believe.
3  Q. What's an SP 525?
4  A. I believe that's the Report of Incident
5  form.
6  Q. Your badge is 6110?
7  A. 6110, correct.
8  Q. What's the function of that report,
9  SP 525? What's the function of that report?
10 A. It's report of incident form. I guess
11 when allegation has been made or some substantial
12 breaking of a rule or law, it comes to my attention,
13 I fill it out and forward it to Internal Affairs.
14 Q. You mean when a member of the public
15 brings an allegation against a police officer, for
16 example?
17 A. It could be public, could be internally,
18 sure.
19 Q. It could be another police officer
20 making an allegation against another police officer?
21 A. Yes.
22 Q. So you report the substance of the
23 allegation?
24 A. Yes.
25 Q. Is it a function of that form to put

**Page 34**

1  down memorialized statements that people have made
2  about it or is it simply to report the allegation?
3       A.    It's to report the allegation and to
4  forward it on to Internal Affairs to investigate.
5       Q.    So that's the report you filled out?
6       A.    As I recall, yes.
7       Q.    So the allegation was not Rivera's
8  allegation against Martinez, but it was Martinez's
9  allegation about the so-called improper conduct by
10 Rivera?
11      A.    Your client felt he was arrested without
12 cause.
13      Q.    Okay.
14      A.    And was in fear. I said to him, well,
15 what is your complaint? And we spoke about what
16 incident occurred. And he did not dispute what had
17 occurred. So I said if you're -- I explained to him,
18 my understanding, I explained to him disorderly
19 conduct, harassment, and again, he acquiesced,
20 agreed, did not dispute what occurred, and even
21 expressed regret as to his actions and behavior.
22      Q.    But did he allege or say to you that he
23 was arrested without reason?
24      A.    Yes.
25      Q.    And that was an entry in his complaint

**Page 35**

1  or was it something else?
2       A.    Yes and no. I do recall, and I said,
3  well, looking at this incident today and the set of
4  circumstances, which he did not dispute to me,
5  factually as I understood them, with the arrest, I
6  said: Then what is your compliant? And he intimated
7  that he was in fear of further reprisals. That in
8  regard to the initial arrest and his concerns, that's
9  what were put in there and sent to. . .
10      Q.    But you do recall he thought he was
11 arrested without reason?
12      A.    Well, that was, I mean, he was very
13 agitated when he came in. He made a lot of
14 statements.
15      Q.    Was that one of the statements?
16      A.    Yes, he was arrested for no reason, yes.
17      Q.    Okay.
18      A.    And when I explained to him why he was
19 arrested, he seemed to agree or understand. So that
20 then somewhat became secondary to his concern of
21 future reprisals. Or I don't even know how I termed
22 it, but. . .
23      Q.    I'm curious, did you administer Miranda
24 warnings to have that conversation with him? I'm
25 just curious.

**Page 36**

1       A.    I don't recall.
2       Q.    If you did administer Miranda warnings,
3  you would have a card or form that you sign, have
4  them sign, have the defendant sign?
5       A.    There is a Miranda card that
6  acknowledges the time and date you've read somebody
7  their Miranda.
8       Q.    It's a little line on the bottom?
9       A.    There are times people do read the
10 Miranda rights such as on the side of the road, you
11 know. It's possible. If I had read him his rights
12 again in there before I took it, it's possible that I
13 wouldn't have filled one out. But I did fill one
14 out, it should be in the case file somewhere, it
15 should have been scanned in or part of it.
16      Q.    And the SP 525 form should be available?
17      A.    That's an administrative form. It's not
18 an investigatory form per se, and I wasn't asking him
19 any incriminating questions, so I wouldn't have read
20 him as a matter of course before.
21      Q.    I understand. So it's not the function
22 of that form, you're saying, because there are people
23 statements or anything like that?
24      A.    Correct.
25      Q.    But it is the function of the form to

**Page 37**

1  pass on, a complaint, so to speak, that would require
2  them some, for example, in this case, Internal
3  Affairs' work?
4            MR. VOMACKA: It's just compound. Are
5       you asking the function of the form or --
6            MR. LOUGHRY: Yeah, the function of the
7       form.
8            THE WITNESS: It's a reportable
9       incident. It's to notify, and then you have to
10      pull out the SOP for internal investigations to
11      get the verbiage and the term.
12 BY MR. LOUGHRY:
13      Q.    But a reportable incident could be
14 someone speeding on a highway, right?
15      A.    A reportable incident, people can come
16 in and say they didn't like the trooper's attitude
17 and demeanor.
18      Q.    Okay.
19      A.    They can come in and say they were
20 issued a summons without probable cause.
21      Q.    Okay.
22      A.    They can come in and say they were
23 racially profiled.
24      Q.    So it's basically a complaint about the
25 trooper's conduct?

Page 38

1  A.  Yes, it's a general form if something
2  arises to where, you know, if we may need to address
3  it. As a supervisor I am mandated to fill out and
4  forward it on.
5  Q.  Did he say anything about any pain or
6  injury that you suffered?
7  A.  I don't recall.
8  Q.  Did he show you any part of his body?
9  A.  It's been five years. I don't recall.
10 Q.  Okay. Those are the questions, I have.
11 Thank you.
12     (Witness excused.)
13     (Testimony concluded.)

Page 39

1           CERTIFICATE
2  I, Theresa DiStephano, a Certified Court
3  Reporter of the State of New Jersey, do hereby
4  certify that prior to the commencement of the
5  examination,
6       THOMAS R. MURTHA
7  was duly sworn by me to testify to the truth,
8  the whole truth and nothing but the truth.
9       I do further certify that the foregoing is
10 a true and accurate transcript of the testimony
11 as taken stenographically by and before me at
12 the time, place and on the date hereinbefore
13 set forth.
14      I do further certify that I am neither a
15 relative nor employee nor attorney nor counsel
16 of any of the parties to this action, and that
17 I am neither a relative nor employee of such
18 attorney or counsel and that I am not
19 financially interested in this action.
20
21 _____
   THERESA DiSTEPHANO, C.C.R.
22 CERTIFICATE NO. X101115
23
24
25

```
 1                C E R T I F I C A T E
 2         I, Theresa DiStephano, a Certified Court
 3    Reporter of the State of New Jersey, do hereby
 4    certify that the foregoing is a true and
 5    accurate transcript of the testimony as taken
 6    stenographically by and before me at the time,
 7    place and on the date hereinbefore set forth.
 8         I do further certify that I am neither a
 9    relative nor employee nor attorney nor counsel
10    of any of the parties to this action, and that
11    I am neither a relative nor employee of such
12    attorney or counsel and that I am not
13    financially interested in this action.
14
15    _____
      Theresa DiStephano, C.C.R.
16    Certificate No. X101115
17
18
19
20
21
22
23
24
```