# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

JOEL MARTINEZ,                    CIVIL ACTION NO.
                                  15-2932 (BRM-TJB)
          Plaintiff,
                                      CONFIDENTIAL
     vs.
                                  ORAL DEPOSITION OF:
COLONEL JOSEPH R. FUENTES,          JOSE G. RIVERA
et al,
          Defendants.

---

               *   *   *   *   *
          Tuesday, April 10, 2018
               *   *   *   *   *

          Transcript in the above matter taken at
the offices of Richard J. Hughes Justice Complex,
Office of the Attorney General, 25 Market Street,
Trenton, New Jersey, commencing at 11:00 a.m.
A P P E A R A N C E S:
     GURBIR S. GREWAL
     ATTORNEY GENERAL OF NEW JERSEY
     BY:   KAI W. MARSHALL-OTTO
     DISTRICT ATTORNEY GENERAL
     DIVISION OF LAW
     CORRECTIONS AND STATE POLICE SECTION
     RICHARD J. HUGHES JUSTICE COMPLEX
     25 MARKET STREET
     TRENTON, NEW JERSEY 08625
     (609) 633-8687
     E-MAIL: kai.marshall-otto@lawnjaol.com
     ATTORNEY FOR THE DEFENDANT/JOSE G. RIVERA


          MASTROIANNI & FORMAROLI, INC.
     Certified Court Reporting and Videoconferencing
          251 South White Horse Pike
          Audubon, New Jersey 08106
             (856) 546-1100

Jose G. Rivera

April 10, 2018

Page 2

```
1      A P P E A R A N C E S  (CONTINUED):
2         LOUGHRY & LINDSAY, LLC
          BY:   JUSTIN T. LOUGHRY, ESQUIRE
3         330 MARKET STREET
          CAMDEN, NEW JERSEY 08102
4         (856) 968-9201
          ATTORNEYS FOR THE DEFENDANT
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            E X H I B I T S
2      (EXHIBITS ATTACHED TO THE END OF THIS TRANSCRIPT ARE
       CONFIDENTIAL)
3
4      EXHIBIT RIVERA 1:   CAD Abstract, CONFIDENTIAL NJSP
       PAGE 20        MARTINEZ 051 through 052
5      EXHIBIT RIVERA 2:   New Jersey State Police Daily
       PAGE 24        Activity Patrol Log,
6             CONFIDENTIAL, NJSP MARTINEZ 053
              through 054
7
       EXHIBIT RIVERA 3:   New Jersey State Police
8      PAGE 40        Performance Evaluation,
              CONFIDENTIAL, NJSP MARTINEZ 211
9             through 224
10     EXHIBIT RIVERA 4:   Two-page photocopy of maps
       PAGE 48
11
       EXHIBIT RIVERA 5:   Lawrenceville School Google Map,
12     PAGE 53        two pages
13     EXHIBIT RIVERA 6:   The Woods Drive East cul-de-sac
       PAGE 54        Google Map
14
       EXHIBIT RIVERA 7:   New Jersey State Police - Request
15     PAGE 66        to Engage in Outside Activity,
              CONFIDENTIAL, NJSP MARTINEZ 099
16            through 100
17     EXHIBIT RIVERA 8:   New Jersey State Police - Request
       PAGE 68        to Engage in Outside Activity,
18            CONFIDENTIAL, NJSP MARTINEZ 103
              through 105
19
       EXHIBIT RIVERA 9:   State of New Jersey vs Joel
20     PAGE 74        Martinez, CONFIDENTIAL, NJSP
              MARTINEZ 047 through 048
21
       EXHIBIT RIVERA 10:  New Jersey State Police
22     PAGE 82        Investigation Report,
              CONFIDENTIAL, NJSP MARTINEZ 040
23            and 041
24     EXHIBIT RIVERA 11:  Answers to Plaintiff's First Set
       PAGE 121       of Interrogatories on Behalf of
25            Trooper I. Jose G. Rivera
```

Page 3

```
1      W I T N E S S   I N D E X
2      EXAMINATION OF MR. RIVERA BY MR. LOUGHRY:
          PAGE 6
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1      EXHIBIT RIVERA 12:  Hand-drawn diagram
       PAGE 122
2
       EXHIBIT RIVERA 13:  New Jersey State Police Arrest
3      PAGE 123       Report, CONFIDENTIAL, NJSP
              MARTINEZ 042 through 043
4
       EXHIBIT RIVERA 14:  New Jersey State Police
5      PAGE 126       Supplemental Investigation
              Report, CONFIDENTIAL, NJSP
6             MARTINEZ 044 through 046
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Pages 2 to 5

Jose G. Rivera                                    April 10, 2018

Page 6

1   (J O S E  G.  R I V E R A, having been duly sworn,
2   was examined and testified as follows:)
3   (EXAMINATION OF TROOPER RIVERA BY MR. LOUGHRY:)
4        Q.    Is it Trooper Rivera?
5        A.    Yes, it's Trooper Rivera.
6        Q.    Are you still a member of the New Jersey
7   State Police?
8        A.    Yes.
9        Q.    I have a few brief instructions to give
10  you before we get started with the questions and
11  answers.
12       A.    All right.
13       Q.    As I introduced myself before we
14  started, my name is Justin Loughry.  I represent the
15  plaintiff in this case.  Today is the day for your
16  deposition.  I mean I'll pose some questions to
17  you which I concede to be relevant to the case, and
18  it's your task to the best of your ability to answer
19  those questions fully, completely, and truthfully.
20  Do you understand that?
21       A.    Absolutely.
22       Q.    You are represented by counsel here
23  today, is it Kai Marshall-Otto, do I have the full
24  name right?
25       MR. MARSHALL-OTTO:  You do.

Page 7

1   BY MR. LOUGHRY:
2        Q.    And he's apparently a member of the
3   staff of the Attorney General's Office of the State
4   of New Jersey; is that right?
5        A.    That's correct.
6        Q.    And he's representing you here today?
7        A.    That's correct.
8        Q.    Now, he has the right, if he concedes
9   that something requires it to lodge an objection to a
10  question, and the rules of evidence and discovery,
11  and so forth, place some limits on that process that
12  needn't concern you; but my point is, if he does make
13  an objection, your job is to stop talking even if you
14  are in mid-sentence.
15       A.    I understand.
16       Q.    And let Mr. Marshall-Otto, let he and I
17  work that out to the best of our ability before we
18  continue to finish up.  If you keep on talking,
19  experience tells us that this court reporter to your
20  right is going to have a hard time taking down more
21  than one person talking at the same time.  Although
22  I'm sure she is very experienced and talented, it's
23  still difficult.  Okay?
24       A.    I get it.
25       Q.    I try to ask questions that are

Page 8

1   understandable, that are short and to the point.
2   That's my goal so that every question I ask is a
3   question you understand.  But if I ask a question
4   that you don't understand, please tell me and I will
5   try to rephrase it so that you do understand.  Fair
6   enough?
7        A.    Fair enough, sure.
8        Q.    When you answer a question, we have a
9   record here of what's asked and what's answered, it
10  will be a verbatim record.  When you answer a
11  question, the reader naturally assumes that you
12  understood the question.
13       A.    Absolutely.
14       Q.    It's important to make your answers
15  verbal.  Feel free to make whatever gestures you
16  want, but we really do need a verbal response, not
17  just a shrug of the shoulder or a nod of the head.  I
18  can see you are somebody that nods your head a lot.
19  But say yes or no --
20       A.    Absolutely.  When it comes time to speak
21  up, I'll definitely speak up.
22       Q.    It's helpful and human nature being what
23  it is, we often err on this, but it's helpful if you
24  let me finish my question before you start your
25  answer.  And it's also helpful if I let you finish

Page 9

1   your answer before I ask my next question.  I will do
2   my best and I'll ask you to do your best as well.
3   Again, because the court reporter has a hard time
4   taking down two people speaking at the same time.
5        A.    Got it.
6        Q.    Now, this is going to be made into a
7   transcript, a booklet, which will be made available
8   to the parties for the appropriate price, I'm sure.
9   So it's a verbatim record, unless we go off the
10  record by agreement of counsel then the reporter will
11  stop taking things down.  We don't have a judge here
12  today, we don't have a jury here today, obviously,
13  but your testimony is taken under oath, and do you
14  understand that it's possible down the road in this
15  case that a jury or a judge may be asked to review
16  these questions and answer and rely on them or take
17  them into account as almost if they were said in
18  court.  Do you understand that?
19       A.    Right, yes.
20       Q.    So it's important to take the proceeding
21  seriously, to answer fully, truthfully, and
22  completely to the best of your ability.
23       A.    Fair enough.
24       Q.    If you need a break, I am not sure you
25  will, but if you need break, let us know, at least I

Jose G. Rivera                                                    April 10, 2018

## Page 10

1    am not, I don't know about your lawyer, but I'm not
2    trying to make this into an endurance test or
3    anything like that. We don't want to make anybody
4    physically uncomfortable.
5          Do you have any questions of me before
6    we start?
7       A.    Not at all.
8       Q.    How old are you?
9       A.    I'm forty-nine.
10      Q.    And your date of birth?
11      A.    ░░░░░░░░
12      Q.    And are you single or married at this
13   point?
14      A.    I am married.
15      Q.    Any children?
16      A.    Two.
17      Q.    How old are they?
18      A.    Seventeen and fifteen.
19      Q.    Okay. Now, are you assigned to a
20   particular station at this point?
21      A.    Not at this time. I am actually on
22   medical leave.
23      Q.    How long have you been on medical leave?
24      A.    It's been three years now.
25      Q.    Going back to 2015?

## Page 11

1       A.    Correct.
2       Q.    There's some mention in the records I
3    reviewed from your personnel file of you being on
4    medical leave perhaps in the year 2013?
5       A.    Correct.
6       Q.    What was the time period of that medical
7    leave?
8       A.    That medical leave, 2013, '12 into '13.
9       Q.    Can you remember the months?
10      A.    Month? March, '12, March of 2012, and
11   then into '13.
12      Q.    How far into '13?
13      A.    The full year, and then I was on and off
14   medical leave due to what I was, you know, medically
15   diagnosed with.
16      Q.    Now, was this a physical or a
17   psychological condition? I don't need to know all
18   the details.
19      A.    Physical.
20      Q.    But you were working on April the 26th,
21   20 --
22      A.    That's correct. That was the period
23   where I was on and off where I was coming on limited
24   duty, then I was going full duty, and then I
25   eventually was -- I was let out on a medical leave.

## Page 12

1       Q.    Can we agree, and I think I have the
2    date right, that the date of the incident we are here
3    to talk about today was the 26th of April --
4       A.    Yeah, I was on full duty, absolutely
5    without a doubt.
6       Q.    And earlier in 2013 you were on medical
7    leave?
8       A.    Correct.
9       Q.    Do you remember what day you came back
10   on full duty?
11      A.    No, I wouldn't be able to tell you that
12   off the top of my head.
13      Q.    Was it in April, that same month?
14      A.    No.
15      Q.    This was before?
16      A.    That was before. Because I was on --
17   when I came on, back to full duty, I was in the
18   station on limited duty. So . . . And the periods,
19   you'd have to contact medical, find out what that was
20   about, roundabout the dates.
21      Q.    Now, on April 26, 2013, were you what
22   was called patrol trooper?
23      A.    Road trooper, correct.
24      Q.    And now, did you have a certain patrol
25   loop that you were responsible for patrolling on

## Page 13

1    April the 26th, 2013?
2       A.    That's correct, yes, I did.
3       Q.    Was this loop having to do with Route 95
4    and 295?
5       A.    295 and the whole interstate. Correct.
6    Basically that was the area I was covering at the
7    time, but we, you know, we covered the whole
8    interstate from 95 down to the shore, if it all
9    happened to require us to head that far east.
10      Q.    Let's see. You weren't the only road
11   trooper --
12      A.    No.
13      Q.    Let me finish my question.
14      A.    I am sorry.
15      Q.    You weren't the only road trooper on the
16   road that day, were you, in your area?
17      A.    No, I was not.
18      Q.    What barracks were you out of?
19      A.    Hamilton Station.
20      Q.    Over on Negron Road?
21      A.    Negron Boulevard, correct.
22      Q.    If you can remember what's roughly the
23   geographic area that the troopers in that station
24   patrol?
25      A.    Well, the station, how would you call

Jose G. Rivera                                           April 10, 2018



Page 14

1   it, the highway, and then we had smaller residential
2   areas that we covered, like Upper Freehold, and what
3   else?  Upper Freehold.  I didn't even cover that area
4   for long.  I was only at the Hamilton Station for a
5   period of time.
6       Q.    Was the geographic extent of the area
7   you were supposed to control --
8       A.    Mine was highway.
9       Q.    Let me finish.
10      A.    Okay.
11      Q.    On or about April the 26th, 2013, what
12  was the geographic extent of the area you were
13  supposed to control?
14      A.    The highway and we cover anything off of
15  the highway we covered.  So, I mean, it's not just
16  the highway alone.  I mean, we cover, as troopers we
17  cover the areas that exit off of the interstates.
18      Q.    How far, for example, east from Hamilton
19  were you supposed to be covering?
20      A.    East?  Right up to the bridge at 95, the
21  crossing over to the Pennsylvania side.  Wait a
22  minute.  East is the shore.  Sorry.
23      Q.    I am trying to choose my words
24  carefully.  If you think about where your Hamilton
25  Station is, where is it roughly, off of Route 195 or

Page 15

1   295?
2       A.    It's 195.  Yeah, 195, Exit 8.
3       Q.    Was it within a mile of 195?
4       A.    A mile from 195?  Yeah, yeah.  The
5   station, yes.
6       Q.    So 195 goes east/west roughly speaking?
7       A.    Uh-hum.
8       Q.    I am asking how far on or about April
9   the 26th, 2013, how far east were you expected to be
10  covering or were you expected?
11      A.    Well, I wasn't stationed -- I wasn't
12  patrolling the east.  I was patrolling the west.
13      Q.    This is what I am trying to get at.
14      A.    I was patrolling the west.
15      Q.    Forgive me if I am not asking artfully
16  enough.  But let's go to the west from the station.
17  You were assigned to the highway portions that were
18  to the west of the station?
19      A.    West of the station.
20      Q.    Of Negron?
21      A.    West of the station, correct.
22      Q.    Did that include parts of 195?
23      A.    195?  Well, no, at that time, that
24  covered 295 and 95.
25      Q.    Okay.

Page 16

1       A.    Okay.
2       Q.    So to get to your assigned area then,
3   was your patrol shift starting at the station on
4   Negron?
5       A.    Okay.  If I could, because, I mean, it's
6   as if you're asking -- we have a general area.  We
7   have the Hamilton area that's as big as, I don't
8   know, perhaps a couple hundred square miles, but then
9   you have troopers that are designated areas.  It
10  doesn't necessarily mean that you are not, you know,
11  overlap each other, but that particular day, I was to
12  cover the west of our station area, we call it
13  station area, because that's what's known as.  This
14  is jargon that we know.  Station area is the complete
15  area we cover, not to say we can't jump off the
16  interstate and head into Trenton and Bordentown and
17  so forth and all.  We got a large area.  On that
18  particular day, April 26th, you are referencing an
19  area that I was found covering as part of my duty,
20  and that was 295, 95, which is the west part of our
21  station area.
22      Q.    Okay.  And were you the only road
23  trooper during your shift that was patrolling that
24  area or were there others?
25      A.    I may have.  Like I say, we overlap.  So

Page 17

1   if he was in my area, I wouldn't know, I mean, we go
2   from --
3       Q.    Who is he?
4       A.    Another trooper.
5       Q.    Okay.
6       A.    Another trooper.  I'm sorry.  With
7   regard to, I mean, you see us, you know, we're all
8   over.  So we are overlapping, we are doing that area.
9   I can go as far as, you know, the 195 area and come
10  back and do, I mean, over a period of 12 hours, you
11  can cover, you know, a few hundred miles of patrol.
12  So that particular area, if there was another
13  trooper, yeah, there was another trooper working in
14  my area.  Who, I don't know, you know.
15      Q.    Let me see if I understand the last
16  answer.  You were in sort of the area that the troop
17  station covers, you're not the only patrol --
18      A.    Correct.
19      Q.    -- trooper out there.  There are others
20  on the same shift?
21      A.    That's correct.
22      Q.    And as you sit here today, you don't
23  know who they were?
24      A.    At the time?  No.
25      Q.    Well, at the time would you know?

Pages 14 to 17

Jose G. Rivera                                          April 10, 2018

Page 18

1     A.   Oh, yeah, you're talking about my squad
2  mates. I don't know where they were specifically,
3  but, yeah, our squad was working, so, I mean, to say
4  where they were, if you're asking me specifically
5  where they were, we have a squad. We're usually
6  between five to eight troopers.
7     Q.   Does that mean five to eight cars?
8     A.   That would be five to eight other
9  vehicles, correct.
10    Q.   In other words, I don't want to make any
11 assumptions here, but one trooper to a car?
12    A.   No, not in -- daytime. No, they would
13 have been in single vehicles, one trooper per
14 vehicle.
15    Q.   One trooper per vehicle. All right.
16    A.   That's something we do safety-wise at
17 night, we will double up, yeah.
18    Q.   And we are talking today about daytime
19 hours, April 26, 2013.
20    A.   That's correct.
21    Q.   So there are somewhere between five and
22 eight other road troopers out on patrol in cars from
23 that station in your area?
24    A.   Yes.
25    Q.   You don't know who they were?

Page 19

1     A.   Where they were, I know my squad mates.
2  I can't tell you, this is years ago, who was actually
3  working that day, yeah.
4     Q.   At this time, back in April of 2013, did
5  you have a means of communication between your unit
6  and those units?
7     A.   Yes, a car radio.
8     Q.   You could call those units on your car
9  radio?
10    A.   Yes.
11    Q.   Did you have to go through Dispatch to
12 do that or could you call them directly?
13    A.   I could either call them through a
14 cellphone if I have to call them directly, just, I
15 just want to talk to, for instance, I wanted to speak
16 to you, I call you on the cellphone if it wasn't
17 related to work. If it was over the air, obviously
18 it's work-related.
19    Q.   I'm trying to understand what the means
20 of communications were. You had a personal
21 cellphone?
22    A.   I had my personal cellphone, correct.
23    Q.   And those other units, they had personal
24 cellphones?
25    A.   I would assume so. Not everybody.

Page 20

1     Q.   Typically did you have their phone
2  number?
3     A.   Yeah, absolutely.
4     Q.   Was there also some other kind of means
5  of communication in the car besides your cellphone
6  where you could call those other --
7     A.   Yes, our radio cars.
8     Q.   And the radio mechanisms in your car,
9  could you call dispatch?
10    A.   Call or go over the air, connect with,
11 yeah, like walkie-talkies, what we know as
12 walkie-talkies. Typical, you know, police radio
13 transmission equipment that are installed in our
14 vehicles, all vehicles.
15    Q.   That equipment, in other words, allowed
16 you both to call those other troopers directly and
17 also to call Dispatch; do I have that right?
18    A.   Everyone would hear. You wouldn't just
19 call to, you know, to your dispatcher. Everyone
20 would hear that you are reaching out to dispatcher or
21 reaching out to a particular trooper. Uh-hum.
22         MR. LOUGHRY: Let me have this marked as
23 Rivera 1.
24         (Exhibit Rivera 1, CAD Abstract, NJSP
25 MARTINEZ 051 through 052, is marked for

Page 21

1  identification.)
2  BY MR. LOUGHRY:
3     Q.   I'll show you what we marked as Rivera 1
4  for identification. I'll ask you to take a look at
5  that.
6         Trooper, have you had a chance to look
7  at what we've marked as Rivera 1 for identification?
8     A.   Yes.
9     Q.   Do you recognize the document?
10    A.   It's a report, an Abstract report.
11 Everything is reported through Dispatch.
12    Q.   It says CAD Abstract at the top. Does
13 that CAD stand for something like Computer Automated
14 Dispatch?
15    A.   Correct, uh-hum.
16    Q.   Is this the kind of report that is
17 frequently generated with respect to patrol
18 activities or incidents that happen on patrol?
19    A.   Anything that comes through the station,
20 correct.
21    Q.   All right. So in this case, this
22 appears to relate to the 26th of April. It's not a
23 report about the entire shift or the entire day, is
24 it?
25    A.   Nope. What it looks like, it's what

Pages 18 to 21

Jose G. Rivera                                        April 10, 2018

## Page 22

1  basically shows when -- basically when I communicated
2  to dispatch what had just happened. So, for
3  instance, the top part is just, you know, general
4  information that is obviously generated time, so
5  forth and so on. So when I contacted the station at
6  4/26 -- April 26 at 4:05, was basically that I had
7  one Hispanic male under arrest.
8      Q.   Okay. So you're looking at the first
9  page, Location History, Date and Time, 4/26/2013, and
10 there's a time in military time, 16:05:23.
11     A.   I said it in regular time.
12     Q.   That's 4:05 in the afternoon?
13     A.   That is correct.
14     Q.   And that's when you are contacting
15 dispatch to report that you've arrested a Hispanic
16 man?
17     A.   Yes.
18     Q.   That was the arrest of Joel Martinez?
19     A.   Correct.
20     Q.   Is that the first contact with Dispatch
21 from you that's reflected with respect to that
22 incident on this sheet?
23     A.   That's correct, uh-hum.
24     Q.   So there was no contact from you at --
25 let's see. Did you arrive at the location where you

## Page 23

1  ended up arresting Mr. Martinez some 30 minutes
2  before?
3      A.   Give or take, yeah.
4      Q.   There's no contact with Dispatch at that
5  time?
6      A.   No, correct.
7      Q.   And are you the person as far as you
8  know who supplied all of this information to Dispatch
9  that's reflected on here?
10     A.   Yes.
11     Q.   In the Location History section?
12     A.   Correct.
13     Q.   All right. There was no other officer
14 involved, in other words?
15     A.   No.
16     Q.   You didn't call out to any other officer
17 around the same time of 4:05:23?
18     A.   Nope.
19     Q.   You didn't seek the assistance or help
20 of any other officer?
21     A.   No.
22     Q.   From the time you arrived -- is this the
23 location of the Lawrenceville School?
24     A.   That's correct.
25     Q.   From the time you arrived there until

## Page 24

1  the time you actually made the arrest, you did not
2  call out to any other officer?
3      A.   No.
4      Q.   You didn't call the Headquarters or the
5  Station for any assistance?
6      A.   None at all.
7      Q.   Now, of course, this is not sort of a
8  summary of your entire patrol shift, is it?
9      A.   No, this is just one incident. This is
10 one incident, correct.
11     Q.   For any incident on your -- for any
12 incident on your shift that day, you would normally
13 have a CAD Abstract relating to each incident?
14     A.   Incidents is basically any stops, any
15 contacts or any work-related activity that I
16 contacted, you know, Dispatch in letting them know of
17 what I am doing.
18     Q.   Okay. And your first contact at
19 Dispatch about this incident was the 16 --
20     A.   05.
21     Q.   -- 05:23, 4:05 in the afternoon?
22     A.   That's correct.
23          MR. LOUGHRY: Rivera 2.
24          (Exhibit Rivera 2, New Jersey State
25 Police Daily Activity Patrol Log, NJSP MARTINEZ

## Page 25

1  053 through 054, is marked for identification.)
2  BY MR. LOUGHRY:
3      Q.   I am going to hand you now what we've
4  marked as Rivera 2 for identification. We may come
5  back to that one so I'll just keep that there.
6          Do you recognize the document we've
7  marked as Rivera 2?
8      A.   Yeah. It looks like my patrol chart.
9      Q.   Your patrol chart?
10     A.   Yes.
11     Q.   Up at the top on the first page --
12     A.   Uh-hum.
13     Q.   -- on the left-hand side, left-hand
14 column, at the top, New Jersey State Police Daily
15 Activity Patrol Log. Is that the formal name of this
16 document?
17     A.   Yes.
18     Q.   Is there such a Daily Activity Patrol
19 Log that's maintained for each of your work shifts?
20     A.   That's correct.
21     Q.   Do you have some responsibility to
22 making these entries into your report?
23     A.   As they generate, correct.
24     Q.   Do you dictate them in or type them in?
25     A.   No, you type them in basically. What is

Pages 22 to 25

Jose G. Rivera                                                    April 10, 2018

---

Page 26

1    generated as you go into, physically into the
2    computer system in your vehicle, uh-hum.
3         Q.    Was this a 12-hour shift that day?
4         A.    I believe -- all our shifts are 12
5    hours.
6         Q.    All right.  So the first time that
7    appears, I think, we can agree, 7:52 in the morning?
8         A.    Correct.
9         Q.    Is that about the time that your shift
10   started?
11        A.    Not necessarily.  No, we start at 7
12   o'clock.
13        Q.    7 o'clock?
14        A.    Usually 7 to 7, or 6 to 6, all depending
15   what you're working.  It's a 12 hour.
16        Q.    So 7 to 7?
17        A.    Probably 7 to 7, correct.
18        Q.    The last time reflected on here says
19   18:49 going off duty?
20        A.    Yeah, I mean, we don't, you know.
21        Q.    I'm not an outraged taxpayer here if you
22   got 11 free minutes.
23        A.    Yeah, it's when -- if you are in the
24   station, you don't necessarily, it's not, like you
25   said, not to the minute, correct.

---

Page 27

1         Q.    It looks like it was a 7 to 7?
2         A.    Correct.
3         Q.    So it's 7:53 next to the time, 7:53, the
4    word "arrived" appears.  What does that mean,
5    arrived?
6         A.    Arrived at -- all right.  So we do MVR
7    checks, we basically go over at the station level,
8    see, it indicates at the location post mile, Hamilton
9    Headquarters, basically doing our vehicle checks.
10   And arrive is how you show that you are at that
11   location to show where you conducted, in this case,
12   the MVR preop check.
13        Q.    And what does that stand for?
14        A.    The Motor Vehicle Recorder.
15        Q.    Motor Vehicle Recorder?
16        A.    Uh-hum.
17        Q.    Because you have a recording system in
18   your vehicle?
19        A.    Correct.
20        Q.    Is that audio and video?
21        A.    Audio and video.
22        Q.    How is that activated?
23        A.    In the case of when you turn on the
24   lights, it's automatically activated.
25        Q.    Do you have some type of transmitter on

---

Page 28

1    your belt?
2         A.    In our pockets or on our belts, inside
3    on our shirt pocket.
4         Q.    And does that also activate when the
5    headlights or sirens go on?
6         A.    Correct, yes, the overhead lights.
7         Q.    Is there any other way of activating
8    that system other than the overhead lights or the
9    sirens?  Is it the overhead lights that activate
10   them?
11        A.    Yes.
12        Q.    Is there any other way to activate it?
13        A.    You can manually, the audio, you can
14   also audio, activate manually, manually activate
15   both, the audio and video.
16        Q.    So if you were in a situation where for
17   one reason or another, either you didn't put your
18   overhead lights on or you couldn't put them on, you
19   still could activate the system?
20        A.    Correct.
21        Q.    Throughout the incident that we're
22   talking about here today, I want to focus on from the
23   moment you arrived at Lawrenceville School until the
24   time you arrested Mr. Martinez, did you ever activate
25   that system?

---

Page 29

1         A.    No.
2         Q.    Did you have the transmitter in your
3    pocket?
4         A.    More than likely I would have, yeah.
5         Q.    Is that normally part of the uniform?
6         A.    Yes, correct.  But it's important --
7    okay.
8         Q.    Just answer the questions.
9         A.    Okay.  Go ahead.
10        Q.    So you could manually activate it?
11        A.    Correct.
12        Q.    And is there some kind of a device or a
13   button on the transmitter that you have on your
14   person by which can manually activate it?
15        A.    Yes, correct.
16        Q.    There's also some switch in the car by
17   which you can manually activate it?
18        A.    Correct.
19        Q.    But you could do it whether you're in
20   the car or not?
21        A.    Yes.
22        Q.    But in this case you did not?
23        A.    Yes.
24        Q.    Just so I am clear, we are taking
25   discovery here, there's no recording that you know of

---

Pages 26 to 29

Jose G. Rivera                                                          April 10, 2018

Page 30

1    any of the interactions between you and anyone at the
2    Lawrenceville School during this time from the moment
3    you arrived until the moment you drove way with Mr.
4    Martinez in the car?
5        A.    That's correct.
6        Q.    And you didn't have it on in your car
7    when you were driving away, did you?
8        A.    No.
9        Q.    And that's both audio and video we're
10   talking about?
11       A.    That's audio and video.
12       Q.    Now, looking at this Daily Activity
13   Patrol Log for just a moment, it looks like you made
14   a note at 8:56 in the morning about there being some
15   debris in the roadway or waterway?
16       A.    Yes.
17       Q.    That was at a particular location, and
18   the location looks like it's a the right-most column?
19       A.    Uh-hum.
20       Q.    Where was that; can you interpret that?
21       A.    State Highway 29 northbound, mile post
22   point eight, so eight-tenth of a mile.
23       Q.    In Hamilton Township?
24       A.    Hamilton Township.
25       Q.    Is that directly off Route 195 or 295?

Page 31

1        A.    Off of 95.
2        Q.    Off of 95?
3        A.    Uh-hum.
4        Q.    And then you have an entry at 9:06 for a
5    motor vehicle stop. Did you make a motor vehicle
6    stop at around 9:06?
7        A.    It appears that -- let's see here if I
8    assisted or not. No enforcement. Yeah, I stopped
9    the vehicle, correct.
10       Q.    And this was on I295 northbound?
11       A.    Correct.
12       Q.    Someone was using their telephone?
13       A.    Yeah; some individuals do that, yeah.
14       Q.    That's what you stopped the car for?
15       A.    Yes, they have to use their hands-free
16   wireless phones, correct.
17       Q.    And there's another motor vehicle stop
18   at 9:16?
19       A.    Right.
20       Q.    But there's no entry here. Is there an
21   explanation why you stopped this other car? I am
22   trying to figure this out.
23       A.    That doesn't show why. I couldn't tell
24   you why.
25       Q.    Are you supposed to record a reason?

Page 32

1        A.    I don't necessarily -- I stop the
2    vehicle, and what we do, you stop the vehicle, you
3    call it in, and then you do an interim, give them the
4    status of the stop, whether you are okay, and then
5    you basically conduct -- you are going to let them
6    know you either are going to write a summons or not.
7    You don't let them know which, if it's enforcement or
8    no enforcement.
9        Q.    When you stop the car, stop the car on
10   the highway, and you say you communicate and let them
11   know where you are.
12       A.    Uh-hum.
13       Q.    Do you do that before you get out of
14   your car?
15       A.    That's correct.
16       Q.    And that is essentially for safety
17   reasons?
18       A.    That's all for safety reasons, that is
19   correct. And safety, if I could, it's so that they
20   know your exact location in the event something, you
21   know, goes south, and you need help, and they know
22   exactly where you are. So it's very important.
23       Q.    At 9:25, it looks like there's some kind
24   of a safety glass issue someplace. You arrived at
25   some location?

Page 33

1        A.    Yeah, I assisted somebody, I don't know
2    who, so someone that I am -- see, now, this is --
3    this is interesting. It shows assisted. I assisted,
4    so whoever made a stop, it wasn't necessarily my stop
5    perhaps, because it says an assist. So I would have
6    been there under someone else's job, and I was just
7    there basically backing them up or assisting them.
8        Q.    Okay.
9        A.    So it sort of would go back to that
10   first question you asked as to whether the stop,
11   whether I was actually the one stopping or assisting.
12       Q.    All right. Let's go to the second page
13   then.
14       A.    Uh-hum.
15       Q.    We may have to flip back to the first,
16   because I circled the word "assist" on that the 9/25
17   entry.
18       A.    Yeah.
19       Q.    But I see for your motor vehicle stop
20   there's a capital P in parentheses, at 9:06. Does
21   that reflect that's your stop, the capital P in
22   parentheses?
23       A.    You know, the system, I am not familiar
24   with the system as a whole. This is not our job, but
25   if I am correct and I would have to further look into

Pages 30 to 33

Jose G. Rivera                                                                  April 10, 2018

Page 34

1    this, because they may call that the primary,
2    meaning, that's my stop, my job.  If I assisted, that
3    would mean that was someone else's job.
4         Q.   Okay.  All right.  Well, look at the
5    top, the second page, 14:52 p.m., I guess that would
6    be 2:52 in the afternoon?
7         A.   Correct.
8         Q.   You have a motor vehicle stop with
9    capital P in parentheses right before that entry
10   again.
11        A.   Uh-hum.
12        Q.   Again, that appears to be a stop that
13   you made?
14        A.   Counsel, that is something that is new
15   to me.  We wouldn't typically look at our patrol
16   charts as detailed as you are indicating here.  So if
17   that's an issue, counsel, the P being whether it's
18   primary being that it's my job as opposed to someone
19   else's job, another trooper, another job and I am
20   assisting, that probably needs further looking into.
21             MR. MARSHALL-OTTO:  Let's go off the
22   record.
23             (Off-the-record discussion.)
24             MR. MARSHALL-OTTO:  Let's go back on the
25   record.

Page 35

1    BY MR. LOUGHRY:
2         Q.   Looking down, 15:24 the word "arrived"
3    appears.  That would be 3:24 in the afternoon, and
4    it's a patrol loop?
5         A.   Patrol loop, yeah.
6         Q.   Does that mean you returned to your
7    patrol loop?
8         A.   Patrol loop, it's just in the area, in
9    the area of 295.  Specifically it's on like a roll,
10   you're rolling, you're patrolling your roam.  So
11   that's in the area I was in at the time.
12        Q.   Okay.  Now, the next time entry is
13   16:05?
14        A.   Correct.
15        Q.   And it says arrived and there's a
16   trespass complaint.
17        A.   Uh-hum.
18        Q.   And your note here says one Hispanic
19   male, at 1 H M under Lawrenceville School varsity
20   baseball field ref trespass.
21        A.   Right.
22        Q.   Is that indicating that you arrived
23   there at 16:05 or is that when you actually made the
24   arrest?
25        A.   That's when I made the arrest.  That's

Page 36

1    when I went over the air and notified them that I had
2    a Hispanic male under arrest.
3         Q.   We can confirm that, I guess, Rivera 1,
4    16:05, Rivera 1 being the CAD Abstract, is when you
5    actually called in the arrest?
6         A.   Correct.
7         Q.   So you actually arrived at that scene
8    maybe 30 minutes before?
9         A.   Correct, uh-hum.
10        Q.   Is there any entry on your entry
11   activity log for arriving at that scene?
12        A.   It's patrolling.  You're not putting
13   yourself out.  It's sort of like, I was on foot, and
14   you see a New York City cop on beat walking the
15   streets, you don't stop, you know, on the corner, and
16   you say, I'm at this location for the next two
17   minutes, and I am going to take two steps east to the
18   next block.  So basically what I am saying is that
19   you're in the area.  And as what anyone would notice
20   when you see officers, well, just state highway
21   patrols or troopers on the road, they are one minute
22   in one area, and in another minute, they can be in
23   another.
24        Q.   All right.  But you did get out of your
25   car?

Page 37

1         A.   I did get out of my car, correct,
2    uh-hum.
3         Q.   Let's go to that for a minute.  You went
4    to the Lawrenceville School?
5         A.   Correct.
6         Q.   You parked near the baseball field?
7         A.   Correct.
8         Q.   And you got out of your car?
9         A.   Correct.
10        Q.   Now, at that point you weren't
11   investigating any kind of complaint, were you?
12        A.   Correct.
13        Q.   You weren't responding to any kind of
14   complaint?
15        A.   Correct.
16        Q.   You were interested in checking out the
17   baseball field?
18        A.   At the time, I was a volunteer baseball
19   coach at the Lawrenceville School which the State
20   Police is well aware of.  So on that day, I stopped
21   by to see my boys practice.
22        Q.   Did you have anybody's permission to do
23   that?
24        A.   My permission?  No.  As a patrol
25   trooper, we have the liberty of doing what would be

Jose G. Rivera                                              April 10, 2018

---

Page 38

1    community service, stopping just like we would stop
2    at grocery stores and supermarkets, just to say hello
3    and give a presence of who we are. This particular
4    day, I actually stopped by and see how my boys were
5    doing for practice.
6        Q.   Was this a break? Did you have a break
7    that you did this on?
8        A.   Break? While on patrol. Not
9    necessarily, it's not a specific break.
10       Q.   Do you get a lunch break?
11       A.   Yeah.
12       Q.   This wasn't your lunch break?
13       A.   It wasn't my lunch break, correct.
14       Q.   Do you get any other break, formal
15   breaks, under your contract?
16       A.   Lunch break? Coffee break. We can,
17   even on patrol, we're on 24/7. I mean, let's say,
18   for the 24/7 being that when we're off, we are still
19   on. And to clarify this, you know, if we're on
20   patrol and we want to stop at the Wawa, we want to
21   stop at the supermarket and grab something to eat,
22   there's no policy, no procedure that you have to say,
23   oh, I'm going to step out and get a cup of coffee, we
24   can turn on our radios, which we, you know, carry on
25   our person.

---

Page 39

1        Q.   Did you receive some kind of a verbal
2    admonition or some counseling from one of your
3    supervisors for your appearance that day at that
4    location?
5        A.   My appearance there?
6        Q.   Yes.
7        A.   Oh, well, they were surprised, they were
8    surprised, yeah. So I was, I was reprimanded,
9    correct.
10       Q.   What was -- who communicated that
11   reprimand to you?
12       A.   My staff sergeant.
13       Q.   Who was that?
14       A.   Thomas Murtha.
15       Q.   How did he do that?
16       A.   Well, he basically wrote it up. In the
17   beginning, it was told to me nothing would actually
18   come of it, and then I guess it was brought up to
19   higher rank, and they looked at it a little further,
20   but it was disposed of, unsubstantiated. Because as
21   troopers do, we patrol, we're doing our job, and that
22   day I was doing my job. I was just off the road in
23   an area that I am, you know, permitted to be in.
24   Though it was not on the highway, per se, but, like I
25   said, in the beginning, the exits and basically the

---

Page 40

1    State of New Jersey is our jurisdiction.
2            Does that answer your question, counsel?
3        Q.   I am thinking about your answer.
4        A.   Okay.
5        Q.   I have the right to do that.
6        A.   Because the question of why I was there
7    has been brought up, and like I said, it's been
8    looked into and disposed of by my superiors.
9            MR. LOUGHRY: All right. Let's have
10   this marked.
11           (Exhibit Rivera 3, New Jersey State
12   Police Performance Evaluation, CONFIDENTIAL,
13   NJSP MARTINEZ 211 through 224, is marked for
14   identification.)
15   BY MR. LOUGHRY:
16       Q.   I'll show you what was marked as Rivera
17   3 for identification. You're familiar with New
18   Jersey State Police Performance Evaluation forms, are
19   you?
20       A.   Yes, sir.
21       Q.   This is a periodic review by your
22   supervisors of your performance?
23       A.   That's correct.
24       Q.   And you probably saw a copy of this one
25   before, haven't you?

---

Page 41

1        A.   I've seen -- well, every quarterly or I
2    forget how many times, we are evaluated for our
3    performance, correct.
4        Q.   There's a period on the first page,
5    there's a period which relates to according to the
6    form, April 20, 2013 - July 12, 2013?
7        A.   Where do you see the dates?
8        Q.   Upper right-hand corner, right below
9    where it says New Jersey State Police.
10       A.   Oh, April 20th through July 12th,
11   correct.
12       Q.   So this covers the time period including
13   the date of April 26, 2013, right?
14       A.   Correct.
15       Q.   If you look at page 11 of 11 of 14?
16       A.   11?
17       Q.   It says it at the bottom, Page 11 of 14.
18       A.   Okay.
19       Q.   It looks like, first of all, on this
20   page, it looks like you got an unsatisfactory check
21   mark at the top?
22       A.   Yeah, yeah, yeah.
23       Q.   You generally were rated satisfactory in
24   your evaluations?
25       A.   Correct.

---

Pages 38 to 41

Jose G. Rivera                                                    April 10, 2018

Page 42

1        Q.    In this one, you were rated
2    unsatisfactory?
3        A.    For this particular one, this was
4    dealing with the issues of knowledge of rules.
5        Q.    Let's take a look at this commentary
6    here. It sounds like you were, quote, verbally
7    counseled?
8        A.    Correct.
9        Q.    And I may have to ask you a couple
10   questions about these initials because we don't know
11   what they mean, capital M, capital A, capital P,
12   capital P, capital S, MAPPS?
13       A.    MAPPS.
14       Q.    What is that?
15       A.    And I am going to give you the best
16   answer to that would be, sort of like a managerial
17   -- so application, where they carry and follow each
18   trooper's performance, and they write the report as
19   to what it is.
20       Q.    So it's some kind of a management
21   accountability type of situation?
22       A.    I would go with that.
23       Q.    And then there is a reference to SOP
24   C-22. What is that?
25       A.    The top of my head, that's standard

Page 43

1    order of operation, C-22. I don't know exactly what
2    it is. I don't know exactly what it is. C-22, I
3    don't know exactly.
4        Q.    Well, they talk about this incident,
5    right after the reference to SOP C-22. There is a
6    comment here, and I'm quoting, "This stemmed from an
7    incident in which Trooper Rivera failed to document
8    his location in the CAD."
9        A.    Correct, uh-hum.
10       Q.    Evidently, they were determining that
11   you had failed to document your location?
12       A.    That's correct.
13       Q.    And the location that you had failed to
14   document was your car and you being at the
15   Lawrenceville School?
16       A.    Correct.
17       Q.    And I am talking about the time period
18   prior to you calling in at 1605 and 23 seconds,
19   right?
20       A.    Well, I mean, now, the answer to that
21   would be, how far, then, that's where they then
22   evaluated the whole realm of where my location is in
23   relation to what I put in as patrol loop 295.
24   Because I was in the area, in the vicinity of 295,
25   which from the exit to the Lawrenceville School and

Page 44

1    where the baseball field is located, you're talking
2    maybe two miles, not even two miles. What am I
3    saying. I am talking about, I don't know, quarter of
4    a mile to be more exact. So that whole area vicinity
5    where they say, you know, I was not, and I had not
6    reported where I was to -- in relationship to my
7    patrol loop 295, they were, you know, sort of
8    looking, looking into that further.
9        Q.    They say here in the last sentence,
10   quote, without commenting on the specifics of the
11   allegation. Let me stop there for a second.
12   Apparently there's a reference here to the arrest for
13   disorderly conduct of Mr. Martinez.
14       A.    Correct.
15       Q.    Without commenting on that, I'll go back
16   to the quote. Quote, Trooper Rivera made an error in
17   a basic patrol function, which is unsatisfactory for
18   a trooper of his seniority.
19       A.    Right.
20       Q.    You see that.
21             Did they explain to you what the error
22   was that you made in the basic patrol function?
23       A.    Basically to be more specific. Just the
24   idea --
25       Q.    I am asking if they explained to you

Page 45

1    what your error in a basic patrol function was.
2        A.    I don't recall the conversation -- I
3    mean, the details. I know we had the conversation,
4    and, you know, you have to understand, the nature of
5    our job; and so that if someone, you are being
6    counseled, basically verbal counseled, basically like
7    you and I have a conversation, and they are telling
8    you, look, you know you weren't supposed to be there.
9    And I said, well, I mean, I'm in the area. So we
10   went over -- how close are you to the road. Well, a
11   quarter of a mile. Were you there for what reason?
12   Community service. I'm there letting them know that
13   I'm of a presence of law enforcement. We basically
14   had a little conversation, and that was it, a verbal
15   counsel. It doesn't go into exactly, you know, any
16   specific, you know, nature, of how you should do it,
17   when you should do it. Basically it was a
18   conversation, called verbal counsel, just to not, you
19   know, do that again.
20       Q.    And what you were not supposed to do
21   again, go over to a place like that without informing
22   Dispatch of your location --
23       A.    Absolutely.
24       Q.    Can I finish my question?
25       A.    Yes, I'm sorry.

Pages 42 to 45

Jose G. Rivera

April 10, 2018

Page 46

```
 1        Q.   What you're not supposed to do is go to
 2   a location such as that, which is off the roadway --
 3        A.   No, no, no.  Not necessarily.
 4             MR. MARSHALL-OTTO:  Let him finish the
 5   question.
 6   BY MR. LOUGHRY:
 7        Q.   -- and spend a half hour without
 8   informing Dispatch where you are and what you're
 9   doing.  Isn't that what they were telling you?
10        A.   No, no.  Basically that was -- do what
11   you do, Trooper.  I mean, we go off the roads all the
12   time.  We are to, we are to, you know, do community
13   service.  We are to, you know, do loops, stop on the
14   shoulder, make contacts with people.  Specifically,
15   this was more like, if you are going to be somewhere,
16   put yourself out on it.  That simple.
17        Q.   And where you were being if I heard you
18   correctly, you had a position, a volunteer position
19   working with the baseball squad.
20        A.   Correct.
21        Q.   And this was about, I guess, 3:30 in the
22   afternoon?
23        A.   Yes, that's correct.
24        Q.   That would be the end of the school day?
25        A.   That's correct.
```

Page 47

```
 1        Q.   That would be the beginning of practice?
 2        A.   Correct.
 3        Q.   And your goal was to go out and check
 4   out the practice?
 5        A.   Not necessarily, just to show up and see
 6   how they are doing, and we had a game just before,
 7   I'm in full uniform, not that I was going to engage
 8   in any practice.  I showed up, they had never seen --
 9   my players had never seen me in uniform, so I showed
10   up, and they -- between the time that I actually
11   showed up and I probably spent with them maybe ten,
12   fifteen minutes, because the head coach was actually
13   briefing them.  They were all sitting down in the
14   dugout when Mr. Martinez approached me at the field.
15        Q.   So for 10 or 15 minutes you stood around
16   sort of listening to the briefing, kind of being part
17   of that scene?
18        A.   Correct.
19        Q.   And it's ten or fifteen minutes you were
20   not out on the roadway patrolling; fair enough?
21        A.   But I have my radio on which I can hear
22   all the transmissions that were going over the air,
23   whether, you know, another trooper is in my area or
24   needed help or so forth and so on.
25        Q.   Okay.  Now, so this is not the first
```

Page 48

```
 1   time you had been to that baseball field, obviously,
 2   you had been there many times?
 3        A.   No, actually not in my uniform.
 4        Q.   I am not asking about your uniform.
 5        A.   Yes, I went to the school.
 6        Q.   Did you graduate from the school?
 7        A.   No, I did not.
 8        Q.   But you went -- you'd go there for
 9   practices?
10        A.   I practice -- every effort I could make,
11   I would be there, correct.
12        Q.   Is there some particular part of the
13   team you were responsible for?
14        A.   The outfielders.
15        Q.   Were you an outfielder?
16        A.   I was an outfielder.
17             MR. LOUGHRY:  Rivera 4.
18             (Exhibit Rivera 4, a two-page photocopy
19        of maps, is marked for identification.)
20   BY MR. LOUGHRY:
21        Q.   By the way, before I hand you this, in
22   my understanding or detecting that correctly, that
23   you thought your supervisor Murtha was wrong in his
24   determination and his wording here, that you had --
25   that you had made an error in basic patrol function?
```

Page 49

```
 1   Did you think he was wrong?
 2        A.   Not necessarily wrong.  I am not to say
 3   he was wrong, but obviously, in the conversation and
 4   working with Tommy Murtha, we know what we're talking
 5   about, whereas where we could go, where we can't go,
 6   so this then become a specific to where I was at the
 7   time.  It's sort of like, well, the interest of me
 8   being on campus or, you know, at a particular store,
 9   why would I necessarily be at -- why do you see
10   officers at a particular Wawa at a certain time.
11   Maybe breakfast, maybe it's a time where they meet
12   up.  It's like the water tank, or it's the Wawa for
13   coffee or whatever drinks, you know, you are
14   interested in.
15        Q.   You didn't go over to the Lawrenceville
16   School because you thought of it as a high crime
17   area?
18        A.   No, community service.
19        Q.   This is one of the most exclusive
20   expensive high schools in the United States?
21        A.   It's one of them, yes.
22        Q.   It's a whole campus, isn't it?
23        A.   That's correct.
24        Q.   I'm going to show you Rivera 4 --
25             MR. MARSHALL-OTTO:  Just one moment.
```

Pages 46 to 49

Jose G. Rivera

April 10, 2018

---

Page 50

1    Just a housekeeping issue before we move on. I
2    want to note that the last three documents that
3    were marked are marked CONFIDENTIAL and,
4    therefore, the testimony surrounding them
5    should be marked as confidential in the
6    transcript as well.
7        MR. LOUGHRY: We should probably take
8    care of that at the end of the deposition,
9    because a lot of these documents came in under
10   the protective --
11       MR. MARSHALL-OTTO: Right. Fair enough.
12       MR. LOUGHRY: But you don't need to keep
13   bringing it up. Just at the end of the
14   deposition. Let's do it that way.
15       MR. MARSHALL-OTTO: Sure. That works.
16       MR. LOUGHRY: This one is not one of
17   those documents.
18   BY MR. LOUGHRY:
19       Q.   Showing you what is marked now as Rivera
20   4 which is my best attempt to get a small map off of
21   Google Earth of this area. Do you recognize any sort
22   of vantage point, landmarks here, like a highway or a
23   roadway, Lawrence road, for example?
24       A.   Correct, uh-hum.
25       Q.   Now, I am going to give you a pen for a

---

Page 51

1    second and ask if you can circle a couple of things.
2        A.   Sure.
3        Q.   You see on this little map where Route
4    95 is located?
5        A.   95, correct.
6        Q.   Can you put a circle around 95?
7        A.   Sure. (Witness complies).
8        Q.   It looks like there's an Exit 7A off of
9    that highway?
10       A.   Yes.
11       Q.   That goes on to something called
12   Lawrence Road?
13       A.   Yes.
14       Q.   That's also known as Route 206?
15       A.   Correct.
16       Q.   That's the road that heads up to
17   Princeton?
18       A.   Correct.
19       Q.   Did you take that exit to leave I95 that
20   day to go up to the Lawrenceville School?
21       A.   Correct.
22       Q.   In which direction were you coming from,
23   from the west or from the east?
24       A.   From the east traveling west.
25       Q.   If you want to mark with a dotted line

---

Page 52

1    that direction you were traveling?
2        A.   Yeah. (Witness complies).
3        Q.   And so you took that exit, and did you
4    go up Lawrence Road?
5        A.   Lawrence Road, correct. I got off and
6    then middle exit there where it would be the
7    Lawrenceville, and then that first immediate right.
8        Q.   And what's that called?
9        A.   Would then become Franklin Corner Road.
10       Q.   All right. And so you went on to
11   Franklin Corner Road?
12       A.   Franklin Corner Road.
13       Q.   Did you have to make another left or
14   something?
15       A.   Yes, and then a quick left onto what is
16   Lewisville Road.
17       Q.   All right. And then how did you proceed
18   from there?
19       A.   And then I made a left onto the back
20   entrance. But this is not accurate because what this
21   would be, Woods Drive -- is it Woods Drive? Yeah.
22   Because Woods Drive, where's the baseball field on
23   this? This is not indicating where the baseball
24   field is.
25       Q.   I'll hand you a couple more.

---

Page 53

1        A.   Yeah, because this is not. . .
2        Q.   The baseball field is in the vicinity of
3    Woods Drive, is it?
4        A.   I would -- excuse me. See, when I went
5    there and to the day, I don't know what roads are. I
6    know through the back entrance it's Bakers Gate and
7    then your first right would take you to the varsity
8    field which you pass what is used for the soccer,
9    lacrosse and then in the back, obviously, the varsity
10   baseball field. So I would take it that it's -- the
11   baseball field is in this area what looks like Woods
12   Drive and this is, what I would think is the lake
13   (Indicating).
14       Q.   All right. So you made a mark on this
15   drawing where you think the baseball field is. Why
16   don't you put BB next to that.
17       A.   Somewhere in this area right here
18   (Indicating).
19       MR. LOUGHRY: Can you mark this as
20   Rivera 5?
21       (Exhibit Rivera 5, the Lawrenceville
22   School Google map, two pages, is marked for
23   identification.)
24       THE WITNESS: Because in this area --
25   well, this doesn't show but in this area there

---

Jose G. Rivera                                    April 10, 2018

Page 54

1    are homes off of Woods Drive that go all around
2    what looks like a cul-de-sac on this, on this
3    map.
4          MR. LOUGHRY:  We're going to stop for a
5    moment so the reporter can mark this.
6          THE WITNESS:  Okay.
7          (Exhibit Rivera 6, the Woods Drive East
8    cul-de-sac Google Map, is marked for
9    identification.)
10   BY MR. LOUGHRY:
11   Q.    Okay.  Now, let me show you what I've
12   marked 5 and 6, again, courtesy of Google.
13   A.    Yeah.
14   Q.    It's an aerial satellite photo.  Now, on
15   this Rivera 5, you recognize -- I'll represent to you
16   this came off the website of the school.  That's
17   where I'm getting it.
18         MR. MARSHALL-OTTO:  Sure.
19         MR. LOUGHRY:  Unfortunately, I didn't
20   have a color printer handy.
21   BY MR. LOUGHRY:
22   Q.    Do you recognize the baseball field
23   here?
24   A.    Yes.
25   Q.    It looks like there's some kind of a

Page 55

1    cul-de-sac?
2    A.    Correct.
3    Q.    Off to the right of it, so to speak?
4    A.    Yes.
5    Q.    And is this the baseball field that you
6    were visiting?
7    A.    That is correct, the varsity baseball
8    field.
9    Q.    All right.  And on R-6.
10   A.    R-6, okay.
11   Q.    This is a little bit of a larger view of
12   that cul-de-sac.
13   A.    Uh-hum.
14   Q.    The Woods Drive East cul-de-sac?
15   A.    Woods Drive East cul-de-sac, correct.
16   Q.    You mentioned a dugout, I think, where
17   the coaches were talking to the baseball squad?
18   A.    Yes.
19   Q.    Is that on the first baseline?
20   A.    There are two.
21   Q.    All right.
22   A.    There's one on the first base and then
23   there's another one on the third base.
24   Q.    Which dugout, do you remember, was he
25   talking about?

Page 56

1    A.    The third base.
2    Q.    On the third base?
3    A.    Correct.
4    Q.    All right.  And so you didn't park your
5    car next to that dugout, did you?
6    A.    No.  It's a grassy area.  I left it on
7    the cul-de-sac.  If I remember correctly, I was
8    facing what would be -- this is what, this is west/
9    east.  This would be north.  So that would be the
10   south.  So I was around the bend facing southbound
11   near the first baseline.
12   Q.    All right.  And you're marking that?
13   A.    Yes, the first baseline here.  Well, Let
14   me see here.  Yeah, this is third base.  This is
15   first base here, over here, first base (Indicating).
16   Okay.  And so I was parked, patrol car, P.C.
17   Q.    And that's the place you parked your
18   car?
19   A.    Yes.
20   Q.    You didn't move it until you left the
21   scene?
22   A.    That's correct.
23   Q.    You know Vicky Martinez, right?
24   A.    That's correct.
25   Q.    You had a relationship with her?

Page 57

1    A.    I did.
2    Q.    You've been in her house before?
3    A.    Yes.
4    Q.    Can you approximate on that drawing
5    there where her house was?
6    A.    Across the cul-de-sac.  I don't know,
7    something here, would be about three-quarters, well,
8    no, it's on the eastbound side of the cul-de-sac
9    halfway through, halfway up.
10   Q.    Let's take a look at R-5 for a moment
11   which is the aerial photograph, you can see it,
12   instead of houses or housing units that appear to be
13   arranged around at least part of the cul-de-sac, some
14   of them are off, one might say the third baseline,
15   and some of them are off --
16   A.    Right.
17   Q.    Do you remember the number of her house?
18   A.    No.
19   Q.    Do you remember how many houses from the
20   end of the row of houses was hers?
21   A.    It went closer to the start of the turn
22   of the cul-de-sac as you start exiting out.
23   Q.    All right.
24   A.    You go in and then around so it's closer
25   to the start of the bend.

Pages 54 to 57

Jose G. Rivera                                                      April 10, 2018

Page 58

1      Q.    All right.  So there's a row of houses
2  that you can see on this photograph, correct?
3      A.    **Correct.**
4      Q.    This is sort of the last house, if you
5  will, on the end?
6      A.    **Yes.**
7      Q.    That was not her house?
8      A.    **No.**
9      Q.    How many houses away from that was hers
10  approximately?
11      A.    **It's one of these three houses.  I think**
12  **it's one of these two houses to be exact.**
13      Q.    Circle the ones that you say was on
14  hers.  I understand there's no numbers on the house.
15      A.    **One of these two houses (Indicating).**
16      Q.    The record can reflect that the witness
17  has circled a couple of houses that are, they are
18  really the fifth or the sixth house from the end of
19  the row of houses.
20      A.    **Okay.**
21      Q.    And there was a softball field in that
22  area as well, right?
23      A.    **A softball field?  Oh, on the other**
24  **side.**
25      Q.    On the other side.  You probably don't

Page 59

1  see it in that photograph.
2      A.    **Yeah.**
3      Q.    On the other side of that row of houses?
4      A.    **Yes.**
5      Q.    And among her duties at the school, she
6  was a softball coach or assistant softball coach or
7  something like that?
8      A.    **I believe so, yes.  I believe so, yes.**
9      Q.    Now, prior to April the 26th, 2013, when
10  was the last time you had been in that house of Vicky
11  Martinez?
12      A.    **I don't know.  Oh, that was years, if I**
13  **remember correctly.  Because when this whole incident**
14  **happened, I hadn't spoken to her for a couple of**
15  **years.**
16      Q.    Okay.  Let me just -- I guess I want to
17  get to a sequence of events and ask you about the
18  State Police and coaching job.  I am not trying to
19  drive you crazy.  I just want to double back on some
20  things.  Let's talk about this for a minute since you
21  brought this up.
22      A.    **I brought it up?**
23      Q.    What do you mean?
24      A.    **I brought it up, and you responded.**
25      Q.    You had an affair with Vicky?

Page 60

1      A.    **I did.**
2      Q.    Was that back in 2011?
3      A.    **Correct.**
4      Q.    Around Christmastime?
5      A.    **Correct.**
6      Q.    And how long did this affair last?
7      A.    **Exactly?  I don't know exactly.  A few**
8  **months.**
9      Q.    It wasn't like three days?
10      A.    **No, no, no.**
11      Q.    Some of it was around Christmastime
12  2011?
13      A.    **Correct.**
14      Q.    You got to know her children?
15      A.    **Yes.**
16      Q.    You spent some time with them?
17      A.    **No, never spent any time with the**
18  **children.**
19      Q.    She never brought them over to your
20  place?
21      A.    **Oh, in that sense, yes, she did, yes, in**
22  **the beginning.**
23      Q.    In the beginning.
24      A.    **And we were friends then.  We were not**
25  **involved when we had kids meet my kids.**

Page 61

1      Q.    You had her kids meet your kids?
2      A.    **Correct.  They were just friends.  We**
3  **knew each other from the school.  She was a teacher**
4  **-- well, an admissions officer, and I was, you know,**
5  **alumni, and also I volunteered at the school.**
6      Q.    But there was a time when you were
7  actually, I'm going to use the euthymism here, you
8  were being intimate with her, right?
9      A.    **Yeah.**
10      Q.    Physically intimate, right?
11      A.    **Right.**
12      Q.    And that was at least Christmastime
13  2011?
14      A.    **It's safe to say, yes.**
15      Q.    And some months after that?
16      A.    **Correct.**
17      Q.    How many months?
18      A.    **Two or three months.**
19      Q.    And after that, you had no further --
20      A.    **That's correct.**
21      Q.    No further intimacy?
22      A.    **Correct.**
23      Q.    And no further contact with her?
24      A.    **No, I had contact with her.  Phone**
25  **conversations of that nature.**

Pages 58 to 61

Jose G. Rivera                                                         April 10, 2018

## Page 62

1    Q.    After the several months of having an
2    affair?
3    A.    Correct.
4    Q.    So you had contact with her during the
5    year 2012?
6    A.    Yes.
7    Q.    And you had some physical intimacy with
8    her, the year 2012?
9    A.    I may have, correct.
10   Q.    But when that stopped, you maintained
11   contact with her?
12   A.    Yes.
13   Q.    And why were you maintaining contact
14   with her?
15   A.    I think we -- we felt a connection with
16   regards to what she was doing as an admissions
17   officer, also, her interest in educating kids, my
18   thing is, it's important, and also being an alumni, I
19   just thought, you know, keeping a mutual relationship
20   was okay. We're, you know, adults.
21   Q.    And you are telling me then it wasn't a
22   personal relationship anymore, more of a professional
23   relationship?
24   A.    Yeah. I mean, we realized what we were
25   doing, and we felt that it was not something we

## Page 63

1    should continue.
2    Q.    And if we take the date of April 26,
3    2013, if you look back in time, when was the last
4    time you had spoken to her prior to that?
5    A.    Actually, that was 2011/12. Like I
6    said, probably a couple years in between that lapsed
7    since the last time I saw her and the day of the
8    incident when she showed up.
9    Q.    A couple years went by between the last
10   time you saw her and August -- April 26, 2013?
11   A.    No. Seeing her, I had spoken to her on
12   and off, what have you, but we had broken it off. So
13   we were no longer intimate.
14   Q.    All right. Sounds like you are telling
15   me that certainly then in the year 2013, you were not
16   physically intimate?
17   A.    Correct.
18   Q.    And well back into 2012, many months
19   back in 2012, you were not physically intimate?
20   A.    2012? I saw her in '11 and '12. It was
21   few months.
22   Q.    When was the last time you had spoken
23   with her prior to April 26, 2013?
24   A.    April 26, '13?
25   Q.    The day you were there at the school and

## Page 64

1    you had the incident with Mr. Martinez, I want you to
2    look back in time and say when was the last time you
3    had spoken to her.
4    A.    At least a year or more. Safe to say it
5    was a good period of time. Exactly, because, I just,
6    I hadn't spoken to her whatsoever.
7    Q.    Okay. Now, so I am just doing the math.
8    We're going back, if we could say a year, it would
9    have been the last time you had spoken to her at all
10   was around April of 2012, a year over?
11   A.    Roughly.
12   Q.    Now, you had made a mention about the
13   State Police were well aware of your activity as an
14   assistant coach --
15   A.    That's correct.
16   Q.    -- of the baseball team?
17   A.    That's correct.
18   Q.    And is that because you had filed some
19   kind of request for permission to serve in that
20   capacity?
21   A.    Yes, sir.
22   Q.    And does the State Police have a
23   procedure for you filing for, I guess for want of a
24   better word, outside employment?
25   A.    That's exactly the word.

## Page 65

1    Q.    Let me show you a couple of things here.
2    I have documents. As you recall it, were you clear
3    that this was a volunteer position?
4    A.    Yes. It was approved, to be exact. I
5    had submitted paperwork that I had an interest in
6    serving under the assistant baseball coach at the
7    Lawrenceville School.
8    Q.    As you recall in making your request,
9    you specifically identified that it would be as
10   baseball coach on that baseball team?
11   A.    Yes.
12   Q.    The varsity baseball team?
13   A.    Yes.
14   Q.    This was varsity baseball team?
15   A.    Varsity baseball team.
16   Q.    Even though you weren't going to be --
17   it's a volunteer position, right?
18   A.    Correct.
19   Q.    You were not going to be compensated?
20   A.    Not at all.
21   Q.    You still needed do that, make the
22   request?
23   A.    Yes.
24   Q.    And you did make the request?
25   A.    Yes.

Jose G. Rivera

April 10, 2018

Page 66

1    Q.   And it was approved?
2    A.   Yes.
3         MR. LOUGHRY:  Okay.  Let me a have a
4    couple more documents marked.
5         (Exhibit Rivera 7, New Jersey State
6    Police - Request to Engage in Outside Activity,
7    CONFIDENTIAL, NJSP MARTINEZ 099 through 100, is
8    marked for identification.)
9    BY MR. LOUGHRY:
10   Q.   I'll show you what's been marked Rivera
11   7.  I am going to clear this away.  I'll leave this
12   here in case you have a question.
13   A.   Sure.  You want me to keep any in front
14   of me?
15   Q.   Right here is good.  This is Rivera 7.
16   This is one of those confidential documents, I'm
17   pretty sure.  Now, this is -- do you recognize this
18   form, Prospective Employment Information form?
19   A.   Okay.  No, this is another.
20   Q.   I understand.  I just want to get the
21   form straight.
22   A.   Yup.
23   Q.   At the top, it says, can we agree,
24   Request to Engage in Outside Activity?
25   A.   Right.

Page 67

1    Q.   Actually, at the top at least it doesn't
2    actually imply strictly speaking to employment?
3    A.   Right.
4    Q.   But it does talk about outside activity.
5    A.   Correct, uh-hum.
6    Q.   And by that you understood it to mean
7    some commitment you are going to make to some kind of
8    regular job or work that's not State Police work; is
9    that right?
10   A.   Yeah.
11   Q.   So in this instance, this looks like it
12   comes from the year 2010, and it has something to do
13   with importing cigars from Puerto Vallarta, Mexico.
14   A.   Yes.
15   Q.   And this was a request you made to be
16   allowed to work in that capacity being an employee?
17   A.   So this is one of two requests.  This
18   was my outside employer, my, I was actually doing
19   what this indicates, but I also indicated -- I also
20   submitted and got approved for being an assistant
21   baseball coach. So what you are presenting to me,
22   yes, correct.
23   Q.   This was another?
24   A.   This was another.  I actually ventured
25   into the importation of cigars.

Page 68

1    Q.   Did you actually do that?
2    A.   Yes, I do.
3    Q.   You still do?
4    A.   I do, correct.  Well, actually, I've
5    actually just recently stopped because of the high
6    taxes, we are being killed with the taxes.  It's not
7    worth importing cigars.
8    Q.   But you did it for some period of time?
9    A.   Absolutely, and I had a lot of fun.
10   Q.   Okay.
11   A.   Success, too.
12        MR. LOUGHRY:  Let me get another
13   document marked.
14        Rivera 8.
15        (Exhibit Rivera 8, New Jersey State
16   Police, Request to Engage in Outside Activity,
17   CONFIDENTIAL, NJSP MARTINEZ 103 through 105, is
18   marked for identification.)
19   BY MR. LOUGHRY:
20   Q.   Just a couple other questions I wanted
21   to ask generally.
22   A.   By the way, I still have plenty for
23   sale, so they are great cigars.
24        MR. LOUGHRY:  Off the record.
25        (Off-the-record discussion.)

Page 69

1    BY MR. LOUGHRY:
2    Q.   So if I understood correctly, your goal
3    in doing the cigar business, it sounds like you were
4    kind of interested in cigars?
5    A.   Yeah, I mean, I've been for years.
6    Q.   But you wanted to make some money?
7    A.   As a business, absolutely.  You know,
8    it's a business.  Your goal is to -- my goal was to
9    supply a product that everyone would enjoy, and with
10   the means -- with the idea of that, you know, revenue
11   would be a plus.
12   Q.   Right.  So you would hope to get some
13   compensation?
14   A.   Yeah, absolutely.  Absolutely.
15   Q.   But in terms of the baseball coach
16   stuff, that was something without compensation?
17   A.   Correct, yeah, uh-huh.  That was my
18   giving back for the love of the game.
19   Q.   Okay.  Let me show you what's Rivera 8.
20   Now, this seems like another request to engage in
21   outside activity for another business you formed,
22   Young People in Training, LLC?
23   A.   Yes, that's correct.
24   Q.   This was a business where you were going
25   to provide some personal training services, you have

Jose G. Rivera                                          April 10, 2018

## Page 70

1  brochures, websites, pamphlets offering information
2  on healthy living.
3      A.  Yup.
4      Q.  Was this some kind of a contradiction
5  with getting people to smoke cigars?
6      A.  No, this was two totally different --
7  myself, I enjoy a good solid, you know, road cigar,
8  and that was something that I had ventured for years,
9  and I found an opportunity, so I started that. In
10  fact, I started the Young People in Training before
11  the cigars.
12      Q.  Before the cigars.
13      A.  And this was official because of the
14  time period but prior to this, I had been smoking
15  cigars when I was in college.
16      Q.  This Young People in Training, this was
17  another business idea that you had?
18      A.  That was correct.
19      Q.  And this was approved as well?
20      A.  I did.
21      Q.  Did you do some business as Young People
22  in Training, LLC?
23      A.  I did.
24      Q.  And it does say -- most of the way down
25  the page on the first page, this is an application

## Page 71

1  form, it says will you be compensated, you checked
2  the block yes?
3      A.  Uh-hum.
4      Q.  Did you get some compensation for it?
5      A.  Very little.
6      Q.  But you had some paying customers?
7      A.  How would I?  I mean, some people --
8  basically where it turned out they would give me,
9  because I didn't find myself, you know, accepting,
10  because it was something that just came easy to me.
11  In fact, I utilized the Lawrenceville School Field
12  House for the area where I trained, I trained the
13  kids.  So there were family members that would offer,
14  and I would say, you know, don't worry about it.  And
15  they would say, well, please, you know, if I can
16  contribute, and basically, I would say, you know
17  what, I will take it and buy some more equipment that
18  I would use for the kids.
19      Q.  What kind of equipment?  Weights?
20      A.  No not necessarily weights.  More like,
21  because my focus was, you know, speed and agility.
22  So like I would buy the bands, the resistance bands,
23  medicine balls, lightweight medicine balls, sort of
24  the -- let's see what else, the parachute, the
25  resistant parachute.  So they learn plyometrics,

## Page 72

1  flexibility, and agility.
2      Q.  And those are various tools of the
3  trade, so to speak?
4      A.  Absolutely and then some.
5      Q.  I've gone through from your personnel
6  file and I will represent to you those are the two
7  requests I could find for permission to engage in
8  outside employment, and I haven't found one for being
9  an assistant baseball coach.  Do you recall one?
10      A.  Absolutely.
11      Q.  And you got approval?
12      A.  I got approval.
13      Q.  Do you have copies?
14      A.  I more than likely would have a copy.
15  If my memory serves me correct, I probably have a
16  copy.
17      Q.  (REQUEST)  All right.  So I am making a
18  request on the record of your counsel that I be given
19  a copy.  I had an extensive personnel file given to
20  me, and unless my eyesight is failing me or my
21  diligence, I could not find that application.
22      A.  Oh, absolutely.
23      Q.  Nor an approval for that.
24      MR. MARSHALL-OTTO:  We'll take a look
25  for that.  Could you follow up with a letter?

## Page 73

1      MR. LOUGHRY:  Sure.
2      MR. MARSHALL-OTTO:  Thank you.
3      THE WITNESS:  You know, in fact,
4  everyone knew that I had gone to Lawrenceville
5  School and I was a baseball coach there.  So it
6  was not, you know, a surprise, by no means.
7  BY MR. LOUGHRY:
8      Q.  Now, I want to go back to the CAD report
9  for a moment.  The caption on Rivera I said this was
10  a Trespass Complaint?
11      A.  Correct.
12      Q.  Did you ever file a complaint against
13  Mr. Martinez for trespass?
14      A.  No.  Well, no, I think we did.  We did.
15  Trespassing, resisting arrest, and disorderly
16  persons, I think it was, if I remember correctly.
17      Q.  Okay.  Let me see what I can find here.
18  Just give me a moment.
19      A.  And if I could, counsel, when we brought
20  him back, when I arrived at the Hamilton Station and
21  placed him in the holding cell, Mr. Martinez clearly
22  was, you know, beyond disorderly.
23      MR. MARSHALL-OTTO:  I don't know if
24  there's a question pending.  You have to answer
25  the questions that he's asking.

Jose G. Rivera

April 10, 2018

Page 74

1    THE WITNESS: All right. Thank you.
2    (Exhibit Rivera 9, the State of New
3    Jersey vs. Joel Martinez, CONFIDENTIAL, NJSP
4    MARTINEZ 047 through 048, is marked for
5    identification.)
6    MR. LOUGHRY: This is Rivera 9. I
7    represent to you, Kai, that this came out of, I
8    believe this came out of the discovery file
9    from the municipal court. And my perception
10   is, these are essentially the same document,
11   but I can see that there was a cross-out on
12   one, so I have both. But I think it's the same
13   document. It's a little hard to read the
14   summons numbers at the top 387, you see that.
15   MR. MARSHALL-OTTO: Yup. This looks
16   like the one we produced to you, bates NJSP
17   Martinez 047.
18   MR. LOUGHRY: You're right. The thing
19   is I have them both together. I am not trying
20   to mislead anybody. I see on the second page,
21   there's a slightly different date entries, and
22   I think the substance of the document is the
23   same. In other words, I don't think they are
24   two separate summonses. I think it's the same
25   summons. Can we go off the record?

Page 75

1    MR. MARSHALL-OTTO: Yes, let's.
2    (Off-the-record discussion.)
3    MR. LOUGHRY: Back on the record.
4    BY MR. LOUGHRY:
5    Q.   Trooper, I presented to you with Rivera
6    9, which was produced to me as copy of the summons
7    that was issued against Mr. Martinez. It's the only
8    one I know about anyway. I explained to your counsel
9    there's two pages, it looks like the same charge, but
10   there's a slight alteration in some dates on the
11   second page in the Certification or Date to Appear
12   area.
13   A.   All right.
14   Q.   On the second page. I've compared the
15   wording, the actual charge, and it looks like it's
16   identical.
17   A.   Okay.
18   Q.   Take a look for yourself.
19   A.   Yeah. I've actually read both, both
20   pages, and they are written, what looks to be exactly
21   the same.
22   Q.   So this sheet reflects two charges,
23   doesn't it, one summons, but there are two charges on
24   it.
25   A.   Right.

Page 76

1    Q.   One of them is for petty disorderly
2    persons offense for 2C:33-2B, that's the harassment
3    statute, correct?
4    A.   I believe so. I'm not actually sure if
5    it's exactly that, but yeah.
6    Q.   Well, it's not the resisting arrest
7    statute. Isn't that 2C:29?
8    A.   Again, that may be correct.
9    Q.   And you also have a petty disorderly
10   persons offense. There's two petty disorderly
11   persons offense. The first is 33-2B; the second, it
12   looks like it's -- does say harass, subject another
13   to offensive touching by placing his hands on Trooper
14   Rivera, and that's 2C:33-4B petty disorderly. Do you
15   see that?
16   A.   Uh-hum, correct.
17   Q.   Now, there's no charge on here for
18   trespassing?
19   A.   Correct.
20   Q.   And no charge on here for resisting
21   arrest?
22   A.   No.
23   Q.   There's no charge here for anything but
24   these two, whatever that 33-2B and 33-4B are?
25   A.   Correct.

Page 77

1    Q.   Do you know of any other charges that
2    you actually filed against Mr. Martinez?
3    A.   Actually, I did not -- this is where --
4    when the Detective Bureau jumped in and wrote up the
5    charges against Mr. Martinez based on what I told
6    them had happened.
7    Q.   So it does say -- the Certification
8    says, Signed: Trooper Rivera, Jr.?
9    A.   Correct.
10   Q.   That's not your signature, it's typed?
11   A.   That is typed, correct.
12   Q.   Did you ever sign these?
13   A.   No.
14   Q.   Did anyone ask you to sign them?
15   A.   No, it's in the system as you being part
16   -- well, as the primary trooper, that which is then
17   generated automatically in the system. So you don't
18   sign the charges. It comes up under your name and it
19   types it out as if your signature is in the system.
20   Q.   Did you certify to the accuracy of these
21   charges?
22   A.   Did I certify?
23   Q.   Yes.
24   A.   Yeah, I mean, I told them what happened,
25   and these are the charges that were going to come

Jose G. Rivera

April 10, 2018

Page 78

1    down on him for what had happened.
2        Q.    Let's look at the Certification box on
3    the first page of this document.
4        A.    Uh-hum.
5        Q.    Quote, I certify that the foregoing
6    statements made by me are true?
7        A.    Correct.
8        Q.    That's in reference to the information
9    above --
10        A.    Right.
11        Q.    -- that sets out what the alleged
12    allegations are?
13        A.    Correct.
14        Q.    And then your name appears, although not
15    a signature, right?
16        A.    Uh-hum.
17        Q.    And there's no other name certifying
18    this?
19        A.    That's correct.
20        Q.    Did you certify to the accuracy of these
21    charges?
22        A.    In that case, no.  I -- we discussed
23    with the Detective Bureau what those charges were,
24    they went into the system, and me being the trooper
25    handling the case, that's how, I guess, that's how

Page 79

1    the system is created.
2        Q.    Do you know if anybody else who provided
3    the information to those who typed up this form
4    besides yourself?
5        A.    Well, who actually wrote it up was a
6    detective.
7        Q.    Do you know anybody -- well, the
8    detective was not there when these things happened,
9    was he?
10        A.    What happened?
11        Q.    Whatever happened out at the
12    Lawrenceville School at the baseball field between
13    you and Mr. Martinez, the detective wasn't there?
14        A.    No, correct.
15        Q.    The only person there that gave
16    information to the detective was you?
17        A.    Correct.
18        Q.    As far as you know, the detective did
19    not go out and interview anybody else on the 23rd of
20    April, did he?
21        A.    No.
22        Q.    Am I correct?
23        A.    Correct.
24        Q.    Whatever information appears here, it's
25    a fair conclusion that it had to have come from you?

Page 80

1        A.    Correct.
2        Q.    It says at the bottom of this summons,
3    not at the bottom, underneath the certification, the
4    complaining witness is a law enforcement officer,
5    that would be you?
6        A.    Correct.
7        Q.    And a judicial probable cause
8    determination is not required prior to issuance of
9    this complaint summons.  Do you see that?
10        A.    Yes.
11        Q.    Does that strike you as accurate, that
12    there was no judicial probable cause determination
13    made here?
14        A.    No, there was probable --
15            MR. MARSHALL-OTTO:  Objection to form.
16            MR. LOUGHRY:  Okay.  Let me try it
17    again.
18    BY MR. LOUGHRY:
19        Q.    Would you agree with me that the
20    suggestion here is that a judicial probable cause
21    determination is not required prior to the issuance
22    of this complaint summons?
23        A.    Right.  Judicial being a judge?
24        Q.    Yes.
25        A.    Correct.

Page 81

1        Q.    Have you ever in your experience as a
2    trooper called a Municipal Court judge, for example?
3        A.    Uh-hum.
4        Q.    To ask him to authorize, let's say, the
5    issuance of an arrest warrant?
6        A.    Absolutely, yes.
7        Q.    Have you called the municipal court or
8    superior court judge to ask for the issuance of an
9    arrest warrant?
10        A.    Yes.
11        Q.    And in those conversations you would
12    have to satisfy to the judge or the official that
13    there's probable cause?
14        A.    That's correct.
15        Q.    Now, that sort of conversation, if I'm
16    understanding correctly, did not happen with respect
17    to this charge; am I right?
18        A.    That's correct.
19        Q.    As far as you know, there's no judicial
20    officer, whether it's a municipal court clerk or a
21    municipal court judge or a Superior Court judge that
22    had anything to do with the issuance of this charge?
23        A.    That's correct.
24        Q.    Did you ever go to a probable cause
25    hearing on this?

Pages 78 to 81

Jose G. Rivera

April 10, 2018

Page 82

1    A.    Probable cause, no.
2    Q.    Now, when this case --
3    A.    Actually, let me go back, because this
4    is at the criminal level, this is at the municipal
5    court in Lawrence. We have a meeting. A
6    probable cause hearing? I don't recall, but
7    something that maybe the prosecutor, the municipal
8    court prosecutor may have had with the judge.
9    Q.    You weren't there for it?
10   A.    No, I was not.
11   Q.    You couldn't say one way or the other?
12   A.    One way or the other, no.
13   Q.    This case was dismissed in the municipal
14   court, wasn't it?
15   A.    That's correct. And the reason being?
16   Q.    There's no question pending.
17   A.    Okay.
18         MR. MARSHALL-OTTO:  Off the record.
19         (Off-the-record discussion.)
20         (Exhibit Rivera 10, New Jersey State
21   Police Investigation Report, NJSP MARTINEZ 040
22   and 041, CONFIDENTIAL, is marked for
23   identification. )
24   By MR. LOUGHRY:
25   Q.    So when you arrived at the field, let's

Page 83

1    go back to when you went over to the baseball field,
2    you parked your car, you went down to the field, the
3    players were in the dugout area?
4    A.    In the dugout, correct.
5    Q.    On the third base side?
6    A.    On the third base side, yes.
7    Q.    And the coaches were speaking with them?
8    A.    Correct.
9    Q.    And did you go and sit with the players?
10   A.    No.
11   Q.    Or were you more standing with the
12   coaches?
13   A.    I was outside standing by the coach. I
14   was standing exactly next to assistant coach Blake
15   Eldridge.
16   Q.    Now, at some point you became aware of
17   Mr. Martinez being nearby, I guess on the other side
18   of the fence or something?
19   A.    Yes.
20   Q.    And he was shouting?
21   A.    Correct.
22   Q.    And you knew Mr. Martinez?
23   A.    Yes, I caught sight of him. In fact,
24   what would be, when he came into my view was, he was,
25   what would be the equivalent of behind the backstop

Page 84

1    screaming and hollering. Well, more than that,
2    but. . .
3    Q.    He was screaming and hollering at you?
4    A.    Yes, cursing, profanity, basically
5    saying, you know, this son of a bitch, he has no
6    business being here, and he had an affair with my
7    wife, and as he's getting closer, I turned to the
8    head coach -- well, prior to that, Blake Eldridge
9    says:  You know who that is?  And I say yeah, I know
10   who that is, that's Mr. Martinez, that's Vicky's
11   husband. And he proceeds to walk over to the fence,
12   the fence line and makes his way closer to where we
13   were. And actually stopped and along the side of the
14   dugout, which is, you know, cement-like wall, and
15   he's, you know, screaming and hollering, bent over,
16   and such, calling out to the players, you know:  Your
17   fucking coach, you know, had an affair with my wife.
18   He has no business being here, so forth and so on.
19   And I looked at Coach Champ Atlee, and I said:
20   Coach, I'll take care of this, you know.
21   Q.    Let me stop you there. So is there some
22   kind of gate that lets you on to the actual surface
23   of the field?
24   A.    Correct.
25   Q.    Did he come inside the gate?

Page 85

1    A.    No.
2    Q.    So he's outside the gate?
3    A.    He's outside.
4    Q.    And he was yelling, did you say he was
5    bent over and leaned into the dugout? Did I get that
6    right?
7    A.    Yeah. The fence line, it butts up to
8    the dugout, he's bent over and screaming towards the
9    kids, profanity about myself and what had happened.
10   Q.    All right. So, you had had an affair
11   with his wife?
12   A.    That's correct.
13   Q.    Apparently he knew about it?
14   A.    He was divorced by then or in the
15   proceeding.
16   Q.    How did you know that?
17   A.    I had spoken to her.
18   Q.    Vicky Martinez?
19   A.    Yes, they were in the process of getting
20   divorced.
21   Q.    Okay. So he was using profanity using
22   the F word?
23   A.    F word, everything under the sun as far
24   as --
25   Q.    Well, let's stop there for a minute.

Pages 82 to 85

Jose G. Rivera                                   April 10, 2018

Page 86

1    A.    Yes, sir.
2    Q.    You heard the F word?
3    A.    Yes.
4    Q.    You heard it loud and clear?
5    A.    Heard it loud and clear.
6    Q.    When he was yelling at you and you were
7    out there with the coaches?
8    A.    Yes, and he's pointing at me as he's
9    speaking to the players and loud, saying, what had
10   happened.
11   Q.    And you heard that word repeatedly, the
12   F word?
13   A.    Including the F word.
14   Q.    It wasn't just the F word.  He was
15   saying certain things?
16   A.    Yes.
17   Q.    He was saying things such as I am going
18   to use that word so we have the reality here from
19   your standpoint.
20   A.    Yes, sir.
21   Q.    What the fuck are you doing here?
22   A.    Yes, sir.
23   Q.    That's something he said?
24   A.    Yes, sir.
25   Q.    And he was pointing at you?

Page 87

1    A.    Yes, sir.
2    Q.    And he said:  Do you know what the fuck
3    your coach did, something like that?
4    A.    That's correct.  Not only did he -- that
5    he had an affair with my wife?
6    Q.    Well, that was true, right?
7    A.    Correct.
8    Q.    He wasn't saying anything that was not
9    correct?
10   A.    That is correct.
11   Q.    Did he say to you that you had no,
12   quote, fucking business on campus?
13   A.    Yes.
14   Q.    All right.  And I guess you're making, I
15   don't want to use the word assumption, but you're
16   making the inference that because you could hear all
17   of this language, including the profanities, that the
18   coaches could also hear?
19   A.    Absolutely.
20   Q.    And the players could hear?
21   A.    Without a doubt.
22   Q.    And did hear it?
23   A.    Well, I have to, as far as I know, yes,
24   it was loud and clear.  He positioned himself so that
25   the kids would -- what I got from what he was doing,

Page 88

1    was sort of discredit me, you know, put me in a bad
2    light as to, you know, what can -- you know, what I
3    am doing there when, in fact, happened with his wife.
4    And so, he just went on.  And I said:  Enough.
5    Q.    So you would fairly characterize him, I
6    guess, accurately, as he was upset emotionally at
7    this point?
8    A.    No, he was out of control.
9    Q.    Out of control?
10   A.    Out of control.
11   Q.    That's even more than upset emotionally?
12   A.    Absolutely.  In fact, beyond out of
13   control.  He was out of place given the institution
14   where he placed himself.  And besides out of control,
15   disorderly.  Quite honestly, I don't know if there's
16   anything, you know, mentally wrong with him, because
17   he just went out in a rage, to come and discredit, I
18   guess, me as to what had happened years prior.
19   Q.    Well, actually we were talking about
20   Christmas of 2011, right?
21   A.    Yeah.
22   Q.    And we were talking about you having an
23   affair with Vicky Martinez through several months of
24   2012?
25   A.    Some months, yes.

Page 89

1    Q.    So it wasn't years, it was maybe 12
2    months earlier?
3    A.    Okay.
4    Q.    Is that right?
5    A.    Okay.
6    Q.    Now, he didn't have an affair with your
7    wife?
8    A.    No.
9    Q.    So you weren't angry with him for having
10   an affair with your wife?
11   A.    No.
12   Q.    Do you think a man would not be angry
13   with a fellow who had an affair with his wife?
14   A.    Oh, I mean, but his behavior --
15   Q.    I am asking you a question.  Would you
16   assume that a man might be angry --
17   A.    Oh, yeah.
18   Q.    -- about someone having an affair --
19   A.    Sure.
20   Q.    -- with his wife?
21   A.    Absolutely.  But they were no longer
22   together and the fact --
23   Q.    Wait a minute.  Were they together when
24   you had the affair?
25   A.    They were together when we had the

Pages 86 to 89

Jose G. Rivera                                                                April 10, 2018

## Page 90

1   affair.
2       Q.   Okay. Let's go to that time.
3       A.   Okay.
4       Q.   When a man has an affair with another
5   man's wife while there still is a marriage intact,
6   wouldn't you expect that to create some anger?
7       A.   Absolutely. Absolutely. But there
8   was -- there are two parties involved.
9       Q.   All right. Now, Mr. Martinez, he had no
10  weapon on him that day as far as you know?
11      A.   That's correct, no.
12      Q.   He never threatened you physically?
13      A.   Threatened me physically? Well, he
14  placed his hands on me.
15      Q.   But he never uttered a threat to you
16  physically?
17      A.   No.
18      Q.   In your earshot he never threatened
19  anybody else, did he?
20      A.   Threatened?
21      Q.   Did he threaten to hurt anybody?
22      A.   No.
23      Q.   Did he even yell at anybody else?
24      A.   Well, he was yelling continuously.
25      Q.   He was yelling at you?

## Page 91

1       A.   Yes.
2       Q.   He wasn't yelling at the kids?
3       A.   Well, he was engaged -- engaging the
4   kids, in what I would imagine, a frightful situation.
5   I mean, as you describe, Lawrenceville is a very
6   calm, safe environment where you have someone in his
7   mental state, it's pretty threatening. Did they feel
8   threatened for their lives? I think they felt
9   comfortable that I was there.
10      Q.   But, of course, if you hadn't been
11  there, there wouldn't have been any yelling?
12      A.   That is correct.
13      Q.   Because as far as you were concerned, he
14  was yelling at you because of that affair?
15      A.   Well, he came over to where I was where
16  I had not gotten -- I did not engage him. But to
17  answer your question, he came over because he saw my
18  troop car parked and knew where I worked, and so he
19  took it upon himself to, you know, confront me,
20  because he had never confronted me.
21      Q.   He had never confronted you?
22      A.   No.
23      Q.   He never loaned you any money, did he?
24      A.   No.
25      Q.   So it wasn't like you owed him money?

## Page 92

1       A.   That's correct.
2       Q.   You had no business or personal disputes
3   with this man?
4       A.   No.
5       Q.   The only thing between you, so to speak,
6   was the fact that you had an affair with his wife?
7       A.   Correct.
8       Q.   So you must have concluded in hearing
9   what he was saying, which you claim he was saying,
10  that the reason for his upset and his anger was this
11  affair, right?
12      A.   That would be safe to say.
13      Q.   The reason that he was engaging in loud
14  and maybe insulting, embarrassing communications to
15  you, in front of you and in front of others, because
16  he was angry and communicated his anger because of
17  the affair?
18      A.   Right.
19      Q.   Now, you wrote a report about this
20  incident, didn't you?
21      A.   Correct.
22      Q.   And this is marked as Rivera 10.
23      A.   Okay.
24      Q.   I am showing you what we marked as
25  Rivera 10. Is this the report that you wrote about

## Page 93

1   this incident?
2       A.   This is what appears to be mine, yes,
3   correct.
4       Q.   Is that your signature down there, under
5   Trooper JJG Rivera, Badge number 6010?
6       A.   Trooper 1, JG Rivera.
7       Q.   Okay. And could you and I agree that
8   there is nowhere in this report that you mention that
9   you had an affair with this man's wife and that was
10  the source of his anger?
11      A.   That was not what the reason for me to
12  engage with him.
13      Q.   I'm asking you a question, though.
14          MR. MARSHALL OTTO: Answer the question.
15          THE WITNESS: I'm sorry.
16  BY MR. LOUGHRY:
17      Q.   Do you make any mention, one syllable,
18  one word in this report about Mr. Martinez being
19  angry at you because of affair you had with his wife?
20      A.   No, no, that doesn't.
21      Q.   That doesn't touch this report?
22      A.   No.
23      Q.   Not a word, not a syllable, right?
24      A.   No, it doesn't.
25      Q.   You were charging him among other things

Pages 90 to 93

Jose G. Rivera

April 10, 2018

## Page 94

1  with make harassing communications?
2      A.   Correct.
3      Q.   You had some legal training, haven't
4  you?
5      A.   Yes.
6      Q.   You had a class to understand what the
7  statutes are?
8      A.   Correct.
9      Q.   You are aware that, aren't you, I am not
10  asking you as a lawyer, I am asking you as a sworn
11  law enforcement officer, there's a requirement to
12  prove guilt of harassment if it's a verbal
13  communication, that the person had a conscious object
14  and desire, a purpose to harass; you heard that
15  before, haven't you?
16      A.   Correct.
17      Q.   And you've also heard of cases where
18  people are angry with another, but they had a purpose
19  in communicating, a legitimate purpose, right?
20      A.   Right.
21      Q.   And if it's a legitimate purpose, then
22  you don't have the specific intent to harass, do you?
23      A.   Right.
24      Q.   So in other words, for example, if
25  somebody starts making phone calls in the middle of

## Page 95

1  the night, two or three in the morning, yelling into
2  the phone, what's the purpose, just to annoy
3  somebody?
4      A.   Right.
5      Q.   To harass them?
6      A.   Right.
7      Q.   But if somebody is angry and they have a
8  reason for being angry and the reason happens to be
9  that someone was having an adulteress affair with
10  their wife, they have a purpose in communicating,
11  don't they?
12      A.   I suppose so.
13      Q.   All right.
14      A.   Everyone has their way of handling
15  things.
16      Q.   And in a society where there's actually
17  been a crime committed, that is a criminal offense of
18  harassment, one has to make an evaluation of whether
19  someone had or did not have a legitimate purpose in
20  making that communication, don't they?
21      A.   That sounds about right.
22      Q.   Wouldn't it be important to put in your
23  report the reason why somebody was acting in the way
24  that you describe and expressing themselves in the
25  way you describe, wouldn't it be important to note

## Page 96

1  the reason?  I am just asking a question.
2      A.   Yes, I mean, that would be to show why
3  he was upset?  I mean, I don't seem to quite
4  understand the question, but, I mean, to show his
5  purpose as to why he was behaving the way he was
6  behaving, I understood.  If he had come towards me
7  one-on-one, but then he put the whole -- he took the
8  stage and put everyone in alert.  I took it upon
9  myself then to say, hey, look, cut it out, it's
10  enough.  And I expressed myself to him, I said:  This
11  is old, let it go.  And I said:  Look, you are going
12  to have to leave.  And he's like, basically it went
13  back:  I don't know where the fuck you think you are,
14  you have no business being here, so forth and so on.
15  You don't know whether or not I'm supposed to be
16  here.  I know I am supposed to be here.  So you know
17  what, do yourself a favor and leave.  That's when I
18  opened up the gate than approached him, I said:
19  Joel, do yourself a favor, just leave.
20      Q.   At this point, you knew Vicky Martinez's
21  house was really across the baseball field?
22      A.   Right.
23      Q.   And you say that you -- were they
24  divorced at that point?
25      A.   Separated or in the process.

## Page 97

1      Q.   You knew he was still the father of her
2  children?
3      A.   Correct.
4      Q.   You knew he still saw those children?
5      A.   Correct.
6      Q.   You knew he spent time at that house,
7  didn't you?
8      A.   Not to that extent, no.  Because whether
9  he -- no, because he was living off-campus.  In fact,
10  that was an issue.  When I finally got him to the
11  roadside where my car was parked, and I believe where
12  his car was, Vicky Martinez shows up and says:  Joel,
13  what are you doing here?
14      Q.   There was no restraining order in place?
15      A.   I don't know.  I actually don't know.
16      Q.   No one showed you a restraining order?
17      A.   I mean, didn't show me at the time.  I
18  didn't ask.  I didn't see it was any relevance.  But
19  when she made that comment, it sort of got my
20  attention as to, you know, why he was there.
21      Q.   We'll get to that in a minute.
22      A.   Okay.
23      Q.   We'll get to that conversation.
24      A.   All right.
25      Q.   You went over to Mr. Martinez and you

Pages 94 to 97

Mastroianni & Formaroli, Inc.
Professionals Serving Professionals

856-546-1100

Jose G. Rivera                                    April 10, 2018

Page 98

1  told him you've got to leave?
2      A.  Yes.
3      Q.  And didn't you walk him back to his car?
4      A.  Well, it wasn't easy.  I tried to calm
5  him down, first of all.  I actually tried, you know,
6  to lower his voice and watch his language because of
7  the children present.  And so I just kept on
8  insisting that he calm down, and that, you know,
9  listen.
10     Q.  Are you standing with him at that point?
11     A.  I am standing, yeah, right in front of
12  him.  In the beginning, the initial was at the fence
13  line.
14     Q.  Okay.  He's still outside the field?
15     A.  Oh, yeah, he's outside the field,
16  correct.  He never actually entered the field.
17     Q.  And you're inside the field?
18     A.  I am inside the field.
19     Q.  But then you went out to be next to him,
20  didn't you?
21     A.  Correct.
22     Q.  Did you escort him back to his car?
23     A.  I tried to calm him down.  As he's
24  walking, and I said:  Look, why don't you just walk
25  towards your car and make your way out of here.  And

Page 99

1  we're continuing walking towards --
2      Q.  When you said that to him, he was
3  standing, right?
4      A.  Yes, he was standing, correct.
5      Q.  You asked him if he would walk back to
6  his car?
7      A.  Yes.
8      Q.  And he did that?
9      A.  Not immediately, no.  Absolutely not.
10     Q.  But he did do it?
11     A.  Eventually, after, after minutes,
12  minutes of asking him to first calm down, quiet it
13  up, and to, you know, make his way out of here, to
14  leave.
15     Q.  Did you walk him back in his car?
16     A.  Yes, after, perhaps, I'll say, at least
17  ten minutes, between five and ten minutes.
18     Q.  Did you physically have to escort him,
19  did you physically put your hands on him to do it?
20     A.  I told him, let's walk this way.  You
21  know, I gave him, sort of, I placed, not my hands on
22  him, you know, sort of guided him.
23     Q.  You put your hand on his back?
24     A.  I don't recall putting my hand on his
25  back.

Page 100

1      Q.  Did you physically touch his body, his
2  clothing?
3      A.  I may have touched his clothing, I made
4  contact with him, but I didn't push him in any way.
5      Q.  He walked back with you?
6      A.  After making --
7      Q.  I understand there was a little bit of
8  time it took you to convince him, but then you walked
9  back?
10     A.  He paused a couple times, and again,
11  made a scene, and I am like Joel, really, and I use
12  discretion.  This is a discretion.  Here I am a sworn
13  officer and I'm trying to, you know, talk to him,
14  say, hey, look, just leave.
15     Q.  And he walked out with you to the car?
16     A.  We did.
17     Q.  That was 50 yards away?
18     A.  Approximately.
19     Q.  Did you continue to speak with him?
20     A.  Yes, as he -- well, yes, but basically
21  not speaking to him, but just to calm down.
22     Q.  Did he continue to be loud and abrasive?
23     A.  Yes, absolutely.
24     Q.  While you walked?
25     A.  Yes.

Page 101

1      Q.  And did he continue to use this
2  profanity?
3      A.  Absolutely.
4      Q.  And so give us some examples of the
5  things that he was saying and yelling as you walked
6  back to the car with him?
7      A.  Examples?  What the fuck, Jose.  You
8  don't belong here.  You know, you're a piece of shit.
9  I mean, it was things that I don't even recall.
10     Q.  Let me stop you there.
11     A.  Sure.
12     Q.  So he was saying the same things that he
13  had said while yelling at you while you were out in
14  the middle of the field?
15     A.  Yes.
16     Q.  And he is using the same verbiage?
17     A.  Yes.
18     Q.  All right.  And it was loud enough in
19  your view that maybe the people on the field could
20  still hear it?
21     A.  Oh, absolutely.
22     Q.  And a direct quote, you know, what the
23  fuck are you doing here, right?
24     A.  Right.
25     Q.  And so you were concerned that the

Jose G. Rivera

April 10, 2018

## Page 102

1  students would still hear all of this?
2      A.   **Right, plus, it started escalating.**
3      Q.   This is all the way back to the car?
4      A.   **Correct.**
5      Q.   And this was all in English, right?
6      A.   **Correct.**
7      Q.   This was not a Spanish conversation
8  between the two of you, was it?
9      A.   **No, I probably said his name in Spanish,**
10  **Jose.**
11      Q.   Jose, because we don't pronounce the J,
12  Jose?
13      A.   **Right, uh-hum.**
14      Q.   This was all in English?
15      A.   **Yes.**
16      Q.   And just as surely as the kids and the
17  coaches could hear when he was standing over there
18  near the dugout, your assumption was, at least, that
19  they would hear this thing as you walked all the way
20  back to the car?
21      A.   **Correct.**
22      Q.   Okay.  Now, when you got back up to
23  where the cars were, there came a point where Vicky
24  Martinez appeared?
25      A.   **She drove up, yeah, and surprised by**

## Page 103

1  **finding him there.**
2      Q.   And she never told you that she had a
3  restraining order against him, did she?
4      A.   **No.**
5      Q.   She just said:  What are you doing here?
6      A.   **She basically said:  Jose, what are you**
7  **doing here?**
8      Q.   And Jose was saying that to you, too,
9  wasn't he?
10      A.   **What am I doing?  Oh, yeah.**
11      Q.   And you were saying it to him, weren't
12  you?
13      A.   **Was I saying it to him?  I didn't say**
14  **anything to him.**
15      Q.   You didn't say anything to him?
16      A.   **Why he was there?  No, for him to be**
17  **there, whether he was supposed to be there or not,**
18  **but when she came --**
19      Q.   Wait.  He was yelling at you, but you
20  weren't yelling at him?
21      A.   **No.**
22      Q.   Not even up by the car?
23      A.   **Not even by the car.**
24      Q.   So this was -- all of the emotion, all
25  of the noise and everything was coming from Jose

## Page 104

1  Martinez and not you?
2      A.   **Yeah, absolutely.**
3      Q.   If anybody said anything to the
4  contrary, they are just wrong?
5      A.   **Well, to my -- I remember basically**
6  **telling him to calm down.**
7      Q.   Okay.
8      A.   **And then at the car when trying to calm**
9  **him down, and Vicky shows up, and she gets involved,**
10  **and I am, like, Vicky, you know, don't get involved.**
11  **You know, he was over there acting, you know, like a**
12  **fool, cursing, put the kids in, you know, you know, a**
13  **real compromising, you know, position, and so she**
14  **basically asked, you know, like, sort of surprised,**
15  **like, what are you -- what are you doing here?  Sort**
16  **of like, I don't know.**
17      Q.   Okay.  So you are over by your car or
18  his car?
19      A.   **Right in front of my troop car, the**
20  **driver side.**
21      Q.   And did Vicky come up and stand next to
22  you?
23      A.   **She actually, no, she jumped out of her**
24  **car, she drove up.  The cars are facing, faced**
25  **head-to-head and she jumps out of the car and**

## Page 105

1  **hysterically says:  What are you doing, Jose?  What**
2  **are you doing here?  And sees me involved and trying**
3  **to calm him down, and she's, she's asking, like, calm**
4  **down.  You're going to have to leave.  What are you**
5  **doing?**
6      Q.   Did she ever ask you to leave?
7      A.   **She never asked me to leave, no.**
8      Q.   Did she suggest you should leave?
9      A.   **No.**
10      Q.   Did she ever suggest you calm down?
11      A.   **No.**
12      Q.   Now, somebody named Goldenberg?
13      A.   **Yes, the athletic director.**
14      Q.   Did he come up at some point?
15      A.   **Yes.**
16      Q.   Did Vicky get there first?
17      A.   **Yes, if I remember correctly, she drove**
18  **up and Goldenberg appeared.  I didn't have a clear**
19  **view where he was.**
20      Q.   Okay.  He wasn't standing right next to
21  you?
22      A.   **No, no.**
23      Q.   Vicky was?
24      A.   **Vicky was.**
25      Q.   And Jose?

Jose G. Rivera

April 10, 2018

Page 106

1    A.   I had Jose on the front bumper, you
2  know, trying to calm him down.  Trying to say:  Look,
3  why don't you jump in the car and get out of here.
4  Vicky's like:  What are you doing here?  You're not
5  supposed to be here.  And so I'm talking, I said:
6  Jose, you're going to have to leave.  And my -- what
7  I'm telling myself at this point, now he's disobeying
8  a direct order.  And if he didn't leave, he was going
9  -- was going to be placed under arrest.
10   Q.   Did you charge him with disobeying an
11 order of the police?
12   A.   At that time, no.
13   Q.   At any time did you charge him?
14   A.   No, I did not.
15   Q.   Did you charge him with trespassing?
16   A.   I did not.
17   Q.   Okay.  So I want to get the location of
18 the people.  You are in front of your car, near the
19 front bumper?
20   A.   On the side.
21   Q.   On the passenger side or driver?
22   A.   Driver side.
23   Q.   Driver side?
24   A.   Driver.
25   Q.   Where is Jose?

Page 107

1    A.   He's between me and the bumper.  No,
2  between me and, between you -- yeah, me and the
3  bumper.  He's between both of us.  So he's facing me,
4  sort of sitting or close to the bumper.
5    Q.   I am going to ask you to draw a little
6  picture.  It's pretty hard to follow what you're
7  saying from my standpoint.  Your counsel may be
8  brighter than me --
9    A.   No.  There's a troop car, you know, the
10 bumper.
11   Q.   Is that the front that you are talking
12 about?
13   A.   This is the side, the door, the bumper
14 (Indicating).
15   MR. MARSHALL-OTTO:  Draw the whole car.
16   MR. LOUGHRY:  I am still not making any
17 sense out of this.  Sorry.
18   THE WITNESS:  Okay.  So this is, I would
19 say, the door, the bumper, front end on the
20 driver's side.  I am not an artist at all.
21 Driver's side.  So he's against the bumper,
22 this is Jose, Jose Martinez, me, and Vicky was
23 over here (Indicating).
24 BY MR. LOUGHRY:
25   Q.   And how many feet away from you was

Page 108

1  Vicky?
2    A.   Oh, a good seven, eight feet.
3    Q.   Seven, eight feet.  Okay.  But she's on
4  the same side of the car?
5    A.   Yes.  Her car is here (Indicating).
6    Q.   Do you know where Goldenberg was?
7    A.   I don't know.  I don't know.  I know he
8  was in the area.  I don't know if he was moving, but
9  I didn't have my -- my eyes were on Joel.
10   Q.   Okay.
11   A.   Yeah, yeah.
12   Q.   And so you said at some point he put his
13 hand on your arm or he grabbed your arm?
14   A.   I am telling Joel, you know, do us all a
15 favor.  You know, in my mind, I'm using all my
16 authority and discretion, look, you know, look, I see
17 what you did there, you know, being disorderly, look,
18 I get it, you're upset.
19   Q.   Are you talking to him in the same tone
20 of voice you are using here, your regular
21 conversational tone?
22   A.   Yeah, regular, regular conversation.
23   Q.   You're not interrupting him or talking
24 over him or being louder than him or anything like
25 that; am I right?

Page 109

1    A.   Yes.  I am actually trying to talk to
2  him down, because he was so upset, and then I see
3  where he was going, sort of like, first of all, now
4  disregarding the authority.  I'm not here as Jose.
5  Though he saw Jose, he disrespected the uniform, he
6  was disrespecting the uniform.  And I told him.
7  Jose, I mean, you're out of place.  You're out of
8  line.  Whatever I said, I actually tried to walk him
9  off the ledge, and tried to calm him down so he can
10 leave because the matter was not that big.  It was
11 what he imagined in his head, you know, being
12 revisited, because I had shown up on the field where
13 he believed I wasn't supposed to be.
14   Q.   Let me stop you for a minute.  Where was
15 his car?
16   A.   I don't know.  Quite honestly, I don't
17 know where he parked his car.
18   Q.   Where was Vicky's car?
19   A.   Well, right facing my car as I was
20 parked.  I don't know what he was driving that day.
21   Q.   All right.  And you were on the
22 cul-de-sac?
23   A.   Correct.
24   Q.   Now, I recognize you didn't do this, but
25 was there anything stopping you from, if you decided,

Pages 106 to 109

Jose G. Rivera                                                                April 10, 2018

## Page 110

1   you know, I'm going to leave, get in your car and
2   drive away?
3        A.    Could I have done that?
4        Q.    Yes.
5        A.    No, well, no, I'm basically, how would I
6   say?  Failure to act.
7        Q.    All right.  I think you misunderstood my
8   question.  Nobody was stopping you from getting in
9   your car, were they?
10       A.    No.
11       Q.    Okay.  And nobody had blocked you in
12  with their car or anything like that; am I correct?
13       A.    Sure.
14       Q.    So at any point here you could have
15  said, you know what, I'm out of here, you could have
16  gotten in my car and left.
17       A.    No.
18            MR. MARSHALL-OTTO:  Objection to form.
19            MR. LOUGHRY:  Physically.  Let me just
20  clarify.
21  BY MR. LOUGHRY:
22       Q.    Physically you could have gotten in your
23  car and left?
24       A.    As a civilian.
25       Q.    I'm just asking you if you could have

## Page 111

1   physically done that.
2        A.    Yes, but that takes, you're asking, I'm
3   in the -- I'm working, I'm working.  In the capacity
4   I'm --
5        Q.    I think you're answering my question.
6   You're saying professionally, you felt duty bound not
7   to do that, not to leave?
8        A.    Not to leave.
9        Q.    But there was nothing physically
10  stopping you?
11       A.    Not physically, absolutely not.
12       Q.    That was the only question I was asking,
13  Trooper.
14       A.    Okay.  All right.
15       Q.    We'll get through this a lot faster if
16  you answer the questions I ask.  I am sorry, I didn't
17  mean to chastise you.
18       A.    No.
19       Q.    At some point when you're up there at
20  the front of the car, he grabbed your arm?
21       A.    Yes.
22       Q.    With one hand or two?
23       A.    He grabbed with one hand, and that's
24  when I swept and turned him.  Because at that moment,
25  as you can imagine, he's heated, he's really upset,

## Page 112

1   he's not obeying my order to leave, and so I'm
2   basically telling him, well, what are you going to
3   do.  So he sort of like grabbed my arm, and I sweep
4   his arm and turn him around and place him under
5   arrest.
6        Q.    So he placed his hand on your arm?
7        A.    Yes.
8        Q.    Did he inflict any pain?
9        A.    He did not inflict any pain.
10       Q.    Did he try to make your arm do anything
11  in particular?
12       A.    No.
13       Q.    He just put his hand on your arm?
14       A.    Correct.
15       Q.    And you swept him?
16       A.    Yes, it's a sweep as, you know, in my
17  training, it's that you, you are to be unarmed.  And
18  so I am talking to him, I know where I am, as far as,
19  you know, the situation.  I'm in uniform.  I'm, you
20  know, I am sworn to carry out the law.  At that
21  moment, I act, my initial, my immediate reaction was
22  just to grab him and put him down, not knowing what
23  he was thinking.
24       Q.    So which arm did he touch?
25       A.    This arm (Indicating).

## Page 113

1        Q.    Your left arm?
2        A.    He reached from the right.
3        Q.    The record is not going to reflect
4   unless I say this, that he put his hand on your left
5   arm?
6        A.    Right, which would be his right arm onto
7   my left.
8        Q.    Okay.  And you immediately swept him?
9        A.    Yes, I swept, you know, it's sort of,
10  you know, be the equivalent of having his arm, you
11  know, go under and turning him around and placing him
12  under arrest.
13       Q.    In your training is it a violation of
14  the law for a citizen to touch you?
15       A.    Is it a violation of the law?
16       Q.    Of the law for a citizen to touch you?
17       A.    If you feel threatened, yes.
18       Q.    Mr. Martinez hadn't threatened you with
19  any harm at that point, had he?
20       A.    Not towards me -- well, his presence and
21  the fact that he failed to abide by my order, your
22  tendency is to sort of worry and heighten your safety
23  for your own protection.
24       Q.    I am asking a different question.  He
25  had not uttered any words, saying, I am going to hurt

Jose G. Rivera                                                          April 10, 2018

## Page 114

1    you, I'm going to hit you, I am going to do anything
2    like that, I am going to take you down, nothing like
3    that?
4         A.    No.
5         Q.    And he hadn't said anything to Mr.
6    Goldenberg along those lines, had he?
7         A.    I don't think so.
8         Q.    And you didn't hear him say anything
9    like that to Vicky, did you?
10        A.    No.
11        Q.    And, in fact, he didn't say anything
12   like that to anybody, had he?
13        A.    No.
14        Q.    Okay. Am I right?
15        A.    Yes.
16        Q.    So when he put his hand on your left
17   arm, you swept his arm and grabbed it and what, you
18   put him where, on the hood of the car?
19        A.    On the hood of the car.
20        Q.    My question is is it a violation of the
21   law for someone to touch a police officer?
22        A.    When there is a situation that you feel
23   that he's sort of a broken -- well, a law? For our
24   safety and our training, we are part of, you know,
25   our equipment. If he were to go for my weapon, he

## Page 115

1    goes for my person, that's a physical contact. We
2    are not to be touched in any way.
3         Q.    Is there a law that says that?
4         A.    I don't know. Is it law?
5         Q.    I mean, it would be a law, for example,
6    if someone inflicted some pain on you, right,
7    aggravated assault?
8         A.    Well, the idea -- I understand that
9    you're saying, counsel, but the idea was that, you
10   know, we are trained in a manner you're in a
11   situation, you feel that your safety can be
12   compromised, your reaction is to subdue and take
13   control.
14        Q.    So in your training, were you trained if
15   a citizen makes any contact with your body
16   whatsoever, you are to take action and put them down,
17   so to speak?
18        A.    In a situation where you feel there's
19   aggression, absolutely.
20        Q.    So what was the aggression other than
21   his saying things that were embarrassing to you?
22        A.    His behavior, I mean, I don't know his
23   state of mind. I am not a psychologist, but he was
24   in a very threatening manner. He was at a very
25   heightened aggressive state of mind.

## Page 116

1         Q.    When he was yelling at you, how close
2    were you to him?
3         A.    Probably the distance away you are now.
4    So it's about two, four, five feet.
5         Q.    Four, five feet?
6         A.    Uh-hum.
7         Q.    So it's not as though he was
8    nose-to-nose with you?
9         A.    No.
10        Q.    You are a baseball man, aren't you?
11        A.    Yes, sir.
12        Q.    Let's talk about the major leagues for a
13   minute. You probably seen it when a manager gets
14   upset at a call and comes out at the field to argue
15   with the umpire?
16        A.    Yes.
17        Q.    You've probably seen someone like
18   Charlie Manuel or somebody like that get nose-to-nose
19   with an umpire?
20        A.    Sure.
21        Q.    And you probably notice the manager is
22   really careful not to make any physical contact with
23   the umpire?
24        A.    Yes.
25        Q.    It's a rule in the baseball rule book?

## Page 117

1         A.    Against the umpire.
2         Q.    If you even brush the umpire's uniform,
3    you're out of the game?
4         A.    You're correct.
5         Q.    And is there such a rule in the code, in
6    the criminal code in New Jersey?
7              MR. MARSHALL-OTTO: Objection to the
8         form.
9              THE WITNESS: It brings us to the
10        point -- I'm sorry.
11   BY MR. LOUGHRY:
12        Q.    Do you know of any law in the criminal
13   code in the State of New Jersey that has that kind of
14   provision, if you touch the police officer, you
15   committed an offense? That's all I'm asking.
16        A.    Not that I know of. Criminal? No.
17        Q.    Now, back in 2011 around Christmastime
18   and then the weeks and months that followed, do you
19   remember either Mrs. Martinez or Mr. Martinez making
20   contact with your wife to discuss the affair that you
21   had or were having with Mrs. Martinez? Did that
22   ever happen?
23        A.    Did my wife make any contact?
24        Q.    Yes.
25        A.    My wife made contact with her husband,

Jose G. Rivera

April 10, 2018

## Page 118

1  Joel Martinez.
2      Q.   In fact, she went over to the Martinez
3  house, correct?
4      A.   Yes.
5      Q.   Is she the one that told them, hey, my
6  husband is having an affair with Mrs. Martinez?
7      A.   Well, I don't know exactly what was
8  said, but that's when they learned -- he learned that
9  what was going on.
10     Q.   You knew that she went over there?
11     A.   She had told me later on.
12     Q.   She told you that she went over there?
13     A.   Correct.
14     Q.   She was going to tell the Martinezes
15 what was going on?
16     A.   She had told what was -- what she
17 believed, something may have been going on between
18 his wife and myself.
19     Q.   And she was right, wasn't she?
20     A.   Yes, sir.
21     Q.   And there was some follow-up contact
22 between one of the Martinezes and your wife, wasn't
23 there?
24     A.   I don't know.
25     Q.   Well, wasn't it the case that Joel made

## Page 119

1  contact with your wife to say, they had unprotected
2  sex, you might want to get yourself checked?
3      A.   I don't know.
4      Q.   That never came to your attention?
5      A.   That's not something I -- no.  No.
6      Q.   In the course of this encounter, do you
7  recall Mr. Martinez questioning whether you were an
8  alumnus of the school, the Lawrenceville School?
9      A.   Correct.
10     Q.   And you had told him that you had a
11 right to be where you were among other reasons
12 because you were an alumnus, correct?
13     A.   Yes.
14     Q.   He said, you're not an alumnus, you are
15 a failure, you didn't graduate?
16     A.   Correct.
17     Q.   You didn't graduate?
18     A.   I didn't graduate from Lawrenceville
19 School.
20     Q.   You went somewhere else and graduated,
21 right?
22     A.   Yes.
23     Q.   That got under your skin, didn't it?
24     A.   No.
25     Q.   Well, it got under your skin when he was

## Page 120

1  saying you had an affair with his wife, didn't it?
2      A.   No.  Got under my skin?  No.
3      Q.   Didn't that upset you?
4      A.   I mean, I mean, I realized what had
5  happened, but it didn't get under my skin where I
6  felt. . .
7      Q.   Let me put it this way, the fact that he
8  was publicly and loudly accusing you in front of
9  other people, like, your students and baseball
10 players, the coaches, that you had an affair with his
11 wife, that's not something that you had told those
12 coaches prior to that day, right?
13     A.   Yes.
14     Q.   That was a secret of yours?
15     A.   Secret of mine to them?  Well, they did
16 not know.  I didn't tell them.
17     Q.   So Mr. Martinez was revealing something
18 that was intensely personal about your life, wasn't
19 it?
20     A.   He revealed it, correct.
21     Q.   It was very embarrassing to you,
22 correct?
23     A.   It was embarrassing -- well, yeah, I
24 mean, it was revealing something that I didn't need
25 everyone to know about.  I was dealing with my own

## Page 121

1  issues, so embarrassed, I was just, you know, yeah,
2  I'd say embarrassed.
3      Q.   This place where you were, you said it
4  was about a quarter of a mile from the highway?
5      A.   Yes, sir.
6      Q.   You couldn't see the highway from the
7  baseball field?
8      A.   Not with the greenery.  On a day like
9  today, you could see the highway and traffic.
10     Q.   Is that so?  From Route 95, you could
11 see that baseball field today?
12     A.   The entrance?  You could see where --
13 you could see a lot more.  You don't exactly see the
14 highway, correct.
15     Q.   That baseball field is across some other
16 road, isn't it?
17     A.   Correct.
18     Q.   All right.  If you look at the map.
19     A.   Yes.
20     Q.   Okay.
21          MR. LOUGHRY:  Let's have this marked.
22          (Exhibit Rivera 11, Answers to
23 Plaintiff's First Set of Interrogatories on
24 Behalf of Trooper I. Jose G. Rivera, is marked
25 for identification.  )

Pages 118 to 121

Jose G. Rivera

April 10, 2018

Page 122

1          (Exhibit Rivera 12, hand-drawn diagram,
2     is marked for identification.)
3     BY MR. LOUGHRY:
4          Q.    Rivera 12, this is a piece of paper, the
5     lined piece of notebook paper that you did a short
6     drawing on of where the parties were basically
7     located; is that right?
8          A.    That's correct, yeah.
9          Q.    And we have on the driver's side of your
10    car, the police car?
11         A.    Correct.
12         Q.    We have you and Mr. Martinez and Vicky
13    Martinez on that same side a bit off to the side, you
14    said, six, seven feet?
15         A.    Yes, roughly.
16         Q.    And I think you used VM for Vicky
17    Martinez, UM or VM, and then you got JM, and then we
18    got ME, M-E, meaning you.
19         A.    That's correct.
20         Q.    Now, we know what that is.  Now, 11, I
21    am going to show you what's marked 11.  I want you to
22    take a quick look.  I probably am not going to have
23    any specific questions.  I just want to confirm what
24    it is we have here.  Can you identify this as a set
25    of Interrogatory Answers that you reviewed and then

Page 123

1     signed on the last page under a paragraph that is
2     entitled Certification?
3          A.    Yes. Yes.
4          Q.    My question is, is that your signature
5     on the last page?  That's what I'm looking for.
6          A.    Oh, okay.  Yeah, that's mine.  That's my
7     signature.
8          Q.    Okay.  And that's dated 8/30/17?
9          A.    Yes.
10         Q.    Did you sign that?
11         A.    Yes, I did.
12         Q.    So in order to -- this is a
13    Certification saying these answers are my answers,
14    they are accurate and correct and so forth?
15         A.    To the best of my ability, yes.
16         Q.    All right.  In other words, you reviewed
17    the questions and answers before you signed the
18    Certification?
19         A.    Yes.
20         Q.    And you made the Certification?
21         A.    That's right.
22         Q.    And then you signed it?
23         A.    That's correct.
24              MR. LOUGHRY:  Let's mark this.
25              (Exhibit Rivera 13, New Jersey State

Page 124

1     Police Arrest Report, CONFIDENTIAL, NJSP
2     MARTINEZ 042 through 043, is marked for
3     identification.)
4     BY MR. LOUGHRY:
5          Q.    Trooper, take a look at what we marked
6     Rivera 13.  I'll have a couple questions.
7              Do you recognize this as the Arrest
8     Report and signed by you on Mr. Martinez's arrest?
9          A.    That's correct.
10         Q.    Now, this form, is this the form that
11    you actually fill out yourself?
12         A.    It's generated in the system, the
13    computer system.
14         Q.    Well, how does that happen, do you sit
15    at a keyboard and --
16         A.    Yes.
17         Q.    You're not typing it in a sense, but you
18    are inputting, a laptop or personal computer?
19         A.    The station computers.
20         Q.    So you are the one that enters all the
21    information?
22         A.    Correct, uh-hum.
23         Q.    And let's see.  There's a box, halfway,
24    well, a third of the way down.  It talks about the
25    crime and it says harassment, 33-4.  That's an entry

Page 125

1     that you made, not someone else?
2          A.    I imagine I put that in there, correct.
3          Q.    And arrest type, and a little farther,
4     three, four boxes down, there's a box, Arrest Type?
5          A.    Right.
6          Q.    And there's something checked there that
7     says P-R-A.  Do you know what that stands for?
8          A.    Patrol related.
9          Q.    There's a box down here towards the
10    bottom, the next-to-the-last section, Final
11    Disposition.  Did you make those entries at all?
12         A.    No.  Well, no, we don't, no, this is --
13    well, this is tentative.  Put in where the court is,
14    where the court matter is going to be heard and so
15    forth and so on.  The sentence is pending.  Basically
16    where the court is going to be, when the matter is
17    going to be heard.
18         Q.    There is a municipal court in
19    Lawrenceville, correct?
20         A.    That's correct.
21         Q.    Do they have a police department in
22    Lawrenceville?
23         A.    Yes, sir.
24         Q.    They have local patrol officers?
25         A.    Local patrol, uh-hum.

Pages 122 to 125

Mastroianni & Formaroli, Inc.
Professionals Serving Professionals

856-546-1100

Jose G. Rivera

April 10, 2018

Page 126

1    Q.   I see down here, there's a narrative box
2  at the very bottom where it says, Disorderly Persons
3  Offense, and there's a -- is that the summons number
4  there?
5    A.   2000 -- I mean, 201, correct.
6    Q.   And those last three digits are 387.
7  And that's the 387 that we saw on the summons?
8    A.   Did that correlate?  I think it was.
9    Q.   Okay.  And you got a sergeant Murtha
10 here whose name appears halfway down?
11   A.   Staff sergeant, yes, sir.
12   Q.   He was a supervisor there at the
13 facility?
14   A.   At the station, our station, correct.
15 Our station?
16   Q.   The Negron Station?
17   A.   Yes.
18        (Exhibit Rivera 14, N.J. State Police
19   Supplemental Investigation Report,
20   CONFIDENTIAL, NJSP MARTINEZ 044 through 046, is
21   marked for identification.)
22 BY MR. LOUGHRY:
23   Q.   So this is now Rivera 14.  Take a look
24 at that.  At the top it says New Jersey State Police
25 Supplemental Investigation Report?

Page 127

1    A.   Yes.
2    Q.   Now, this report looks like it was dated
3  October 10, 2013; do you see that?
4    A.   Yes.
5    Q.   So this is several months after the
6  incident.  Did someone ask you to write this report?
7    A.   No.  Hold on a second.  Let me look at
8  this.
9    Q.   I mean, it's your signature?
10   A.   Yes, October 10th.  No.  Okay.  I
11 was. . .okay.  No.  No, my signature is not on here.
12 At the end of the report?
13   Q.   Oh, I'm sorry.
14   A.   This is a follow-up, someone accused
15 Martinez, I was contacted -- I contacted this person
16 who was Detective Fitzgerald, with regards to the
17 investigation.  Same requested a supplemental report
18 be typed detailing the persons present when Joel
19 Martinez acted in a disorderly fashion.  So, yeah,
20 okay.
21   Q.   This Detective Fitzgerald, is he
22 somebody who was at the station you were operating
23 out of?
24   A.   Yes, correct.
25   Q.   At that point were you on medical leave?

Page 128

1    A.   October, safe to say that, yeah.
2    Q.   And so this was --
3    A.   Or was I?
4    Q.   I don't know.  I am asking you.
5    A.   You know, I am just thinking, because I
6  may have been transferred to another station,
7  Kingwood Station.  So I am not actually sure whether
8  I was on medical leave or up in Kingwood Station.
9    Q.   Where was that?
10   A.   Kingwood, Hunterdon County.
11   Q.   Did you ask to be transferred up there?
12   A.   No, you know, we get transferred all
13 over the place.  Basically it's a manpower issue.
14   Q.   Was that a patrol assignment?
15   A.   Yes, and I've been there to that station
16 before.  That was my first tour.
17   Q.   The report has the name of four
18 witnesses:  Vicky Martinez, Michael Goldenberg, Champ
19 Atless?
20   A.   Atlee.
21   Q.   And Blake Eldridge?
22   A.   That's correct.
23   Q.   And those are names you supplied to the
24 detective?
25   A.   Yes.

Page 129

1    Q.   And you believe they would be witnesses?
2    A.   Yes.
3    Q.   Other than this report and the other
4  report we've had marked Rivera 10, the Investigation
5  Report you wrote on the date of the incident, other
6  than these two reports, did you write any other
7  reports?
8    A.   No.
9    Q.   Well, actually, the Supplemental was
10 written by --
11   A.   Detective Fitzgerald.
12   Q.   You didn't even write the Supplemental.
13 You just wrote the one report?
14   A.   That's correct.
15   Q.   All right.
16   Q.   Is there any reason why when you called
17 in to the CAD, the Dispatch, you called this in as a
18 trespass complaint?  Is there any reason why you
19 didn't call it in as harassment complaint?
20   A.   It would have been a slew -- basically,
21 you enter one, and then you then figure out what
22 other charges at the time.  At the time it was a
23 trespass.  Because what I was learning, what I had
24 asked him to do when he is not supposed to be there,
25 because, in fact, he was on private property.  That's

Jose G. Rivera

April 10, 2018

## Page 130

1  private property. So when I asked him to leave, he
2  was disobeying a direct order to leave private
3  property. He wasn't on, you know, a parking lot of a
4  supermarket, he could say, I can do whatever. It was
5  private property.
6  Q.    Did any of these coaches, for example,
7  did they complain about trespass? Did they sign a
8  complaint or anything like that?
9  A.    Not that I know of, no, no.
10  Q.    Is there any kind of signage anywhere
11  that said, you know, no entry to this field or
12  anything like that? Did you see any sign?
13  A.    Well, I don't know of any, you know, in
14  view?
15  Q.    Yes.
16  A.    Of saying that it is private property?
17  Q.    Yes, yes.
18  A.    Not that I know of.
19  Q.    Okay.
20  A.    Not that I know of.
21  Q.    And that house that Vicky Martinez was
22  living in and the Martinezes lived in, that was on
23  school grounds, wasn't it?
24  A.    Correct.
25  Q.    Do you know whether that was school

## Page 131

1  property, the school owned it?
2  A.    Yes.
3  Q.    Or did the Martinezes own it?
4  A.    No, they are, I guess, from what I
5  understand, it's sort of like dorms for the family
6  faculty.
7  MR. LOUGHRY:  That's all the questions I
8  have. Thank you.
9  THE WITNESS:  Okay.
10  MR. LOUGHRY:  We have logistics to do
11  here. My guess is that the easiest thing for
12  the present purposes, to mark the deposition as
13  CONFIDENTIAL.
14  MR. MARSHALL-OTTO:  Yes.
15  MR. LOUGHRY:  There were one or two
16  documents that weren't. Why don't we mark it
17  for now at least CONFIDENTIAL, and the exhibits
18  as CONFIDENTIAL as well. Obviously, we have
19  some terms of the order we have to live with in
20  terms of publications that delve outside the
21  confines of the litigation. I mean, an expert
22  can look at it, you know, our staff can look at
23  them. Obviously, if we have a public trial,
24  then if it we're going to be out in public.
25  But for the present purposes, would that

## Page 132

1  suffice, identified under a protective order?
2  MR. MARSHALL-OTTO:  Yes, we can talk
3  about potentially if there's a trial when we
4  get there and how the Court might, you know,
5  crack a solution for that, but that's a problem
6  for another day.
7  MR. LOUGHRY:  That's another issue.
8  Neither one of us has committed ourselves as
9  far as I can see on that issue. Obviously, we
10  have a constitution, we have public trials, you
11  know, these are not national security secrets.
12  At least last I checked. Okay. So I guess we
13  can close the record on that. Thank you very
14  much.
15  (Witness excused.)
16  (Testimony concluded.)

## Page 133

1  CERTIFICATE.
2  I, Theresa DiStephano, a Certified Court
3  Reporter of the State of New Jersey, do hereby
4  certify that the foregoing is a true and accurate
5  transcript of the testimony as taken stenographically
6  by and before me at the time, place and on the date
7  hereinbefore set forth.
8  I do further certify that I am neither a
9  relative nor employee nor attorney nor counsel of any
10  of the parties to this action, and that I am neither
11  a relative nor employee of such attorney or counsel
12  and that I am not financially interested in this
13  action.
14
15
   THERESA DISTEPHANO, C.C.R.
16  CERTIFICATE NO. X101115

Pages 130 to 133

schedules@mfreporting.com    Mastroianni & Formaroli, Inc.    856-546-1100
Professionals Serving Professionals

```
 1                    C E R T I F I C A T E
 2          I, Theresa DiStephano, a Certified Court
 3    Reporter of the State of New Jersey, do hereby
 4    certify that the foregoing is a true and
 5    accurate transcript of the testimony as taken
 6    stenographically by and before me at the time,
 7    place and on the date hereinbefore set forth.
 8          I do further certify that I am neither a
 9    relative nor employee nor attorney nor counsel
10    of any of the parties to this action, and that
11    I am neither a relative nor employee of such
12    attorney or counsel and that I am not
13    financially interested in this action.
14
15    _____
      Theresa DiStephano, C.C.R.
16    Certificate No. X101115
17
18
19
20
21
22
23
24
```