# EXHIBIT H

Joel Martinez                                               April 26, 2018

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No. 15-2932 (BRM)(TJB)

- - - - - - - - - - - - - - -

JOEL MARTINEZ                          CONFIDENTIAL
        Plaintiff

        vs.                    ORAL DEPOSITION OF:
                                   JOEL MARTINEZ

COLONEL JOSEPH R. RUENTES,
SUPERINTENDENT, LT. COLONEL
PATRICK CALLAHAN, DEPUTY
SUPERINTENDENT OF OPERATIONS;
MAJOR KEVIN DUNN, DEPUTY
BRANCH COMMANDER, FIELD
OPERATIONS SECTION; JOHN
DOE 1, TROOP C COMMANDER;
JOHN DOE 2, SUPERVISOR,
TROOPER I JOSE G. RIVERA
(#6010), ACTING MAJOR MARK
WONDRACK, OFFICE OF
PROFESSIONAL STANDARDS;
CAPTAIN SCOTT EBNER, BUREAU
CHIEF, INTAKE AND ADJUDICATION
BUREAU, OFFICE OF PROFESSIONAL
STANDARDS, AND DSG ISMAEL
E. VARGAS,
        Defendants.

- - - - - - - - - - - - - - -


            *       *       *       *


        THURSDAY, APRIL 26, 2017


            *       *       *       *



        MASTROIANNI & FORMAROLI, INC.
    Certified Court Reporting & Videoconferencing
            251 South White Horse Pike
            Audubon, New Jersey 08106
                856-546-1100

Joel Martinez

April 26, 2018

---

Page 2

```
 1
 2
 3
 4
 5              Transcript of proceedings in the
 6      above matter taken stenographically by
 7      Theresa Mastroianni Kugler, Certified Court Reporter,
 8      license number 30X100085700, Notary Public of the
 9      State of New Jersey and the Commonwealth of
10      Pennsylvania at the law offices of Loughry & Lindsey,
11      LLC, 330 Market Street, Camden, New Jersey, 08102,
12      commencing at 10:16 AM.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1
 2                  W I T N E S S   I N D E X
 3
 4      EXAMINATION OF MR. JOEL MARTINEZ
 5
 6      By Mr. Marshall-Otto       Page 7
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1
        A P P E A R A N C E S :
 2
 3
 4      LOUGHRY and LINDSAY, LLC
        BY:  JUSTIN T. LOUGHRY, ESQUIRE
 5      330 MARKET STREET
        CAMDEN, NEW JERSEY  08102
 6      856-968-9201
        ATTORNEYS FOR THE PLAINTIFF,
 7      JOEL MARTINEZ
 8
 9      NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
        BY:  KAI MARSHALL-OTTO, ESQURIE
10      RICHARD J. HUGHES JUSTICE COMPLEX
        25 MARKET STREET
11      SECOND FLOOR
        TRENTON, NEW JERSEY  08611-2148
12      609-633-8687
        kai.marshall-otto@law.njoag.gov
13      ATTORNEYS FOR THE DEFENDANTS
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
 1          E X H I B I T S
 2
        EXHIBITS RETAINED BY COUNSEL - NOT ATTACHED
 3
 4      Exhibit Martinez 1, photographs
 5          Page 36
 6
        Exhibit Martinez 2, Responses and Objections of
 7      Plaintiff, Joel Martinez to defendants' Notice to
        Produce Documents
 8          Page 39
 9
        Exhibit Martinez 3, Responses and Objections to
10      Interrogatories
            Page 41
11
        Exhibit Martinez 4, Certification As To Accuracy And
12      Completeness Of Records Provided
            Page 47
13
14
        Exhibit Martinez 5, email transcription of text
15      messages between Raquel Rivera and Joel Martinez
            Page 47
16
17      Exhibit Martinez 6, 2012 tax returns
            Page 64
18
19      Exhibit Martinez 7, 2013 tax return
            Page 67
20
21      Exhibit Martinez 8, 2014 tax returns for Joel and
        Vicky Martinez
22          Page 67
23
        Exhibit Martinez 9, Schedule A Form 1040 tax return
24      for Joel Martinez
            Page 68
25
```

---

Pages 2 to 5

Joel Martinez                                                    April 26, 2018

## Page 6

```
1
2        Exhibit Martinez 10, 2016 tax return
3             Page 69
4
5
6
7
8
9              R E Q U E S T S
10
11        REQUEST......................Page  11
12
          REQUEST......................Page  13
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 7

```
1      (J O E L   M A R T I N E Z, having been duly sworn,
2    was examined and testified as follows:)
3      (EXAMINATION OF MR. MARTINEZ BY MR. MARSHALL-OTTO:)
4      Q.    Good morning, Mr. Martinez.  My name is
5    Kai Marshall-Otto.  I'm here in the matter captioned
6    Martinez versus Fuentes, et al, presently proceeding
7    in the U.S. District Court, District of New Jersey.
8          I'm a deputy attorney general with the
9    office of the Attorney General of New Jersey and I
10   represent Trooper Jose Rivera with respect to the
11   civil lawsuit you, Mr. Joel Martinez, have brought
12   against him.
13         We're here today at the Loughry and
14   Lindsay firm in Camden, New Jersey to depose you,
15   Mr. Joel Martinez.
16         Mr. Martinez, do you understand that
17   you're under oath and as such the same penalties for
18   perjury apply as if you were giving testimony in
19   court?
20     A.    I do.
21     Q.    Have you ever had your deposition taken
22   before?
23     A.    I have not.
24     Q.    Okay.  So I'm going to briefly go over
25   some instructions just to make sure that this process
```

## Page 8

```
1    runs smoothly.
2          During the course of your deposition,
3    I'm going to ask you a series of questions regarding
4    the events underlying this lawsuit.  Please make sure
5    you answer each question to the best of your
6    recollection.
7          I'm also going to be asking you some
8    background questions.  Some of it may not appear
9    directly relevant to you, but it's just general
10   standard background questions we ask.  If you don't
11   remember an answer to a question, you can simply say
12   that you don't remember.  That's okay.  But please
13   try to answer every question that I ask to the best
14   of your recollection.
15         If you don't know the answer to a
16   question, it's fine to say that you don't know.  I
17   will try to avoid asking questions that require you
18   to engage in speculation or simple guesses.  That
19   being said, if I ask a question and you choose to
20   guess, please just let me that you're making an
21   educated guess or something of that nature.
22         Make sure that you speak all of your
23   answers because the court reporter cannot take down a
24   nod or a shake of the head.  So rather than nods and
25   shakes, yeses and nos are preferred.
```

## Page 9

```
1          Please wait for me to finish speaking
2    before you start answering.  That helps ensure a
3    clear record and makes the court reporter's job a
4    little bit easier.  And I will try to extend you the
5    same courtesy and not interrupt you when you're
6    speaking.
7          Are you currently on any medications
8    today or other drugs that might prevent you from
9    answering questions to the best of your ability?
10     A.    No.
11     Q.    Nothing that would impact your memory?
12     A.    No.
13     Q.    Are you suffering from any physical or
14   mental condition which could prevent you from
15   answering questions?
16     A.    No.
17     Q.    Nothing that could impact your memory?
18     A.    No.
19     Q.    Did you review any materials, either
20   documents or photographs, in preparation for your
21   deposition today?
22     A.    I did.
23     Q.    And what were those?
24     A.    Just my own personal journal notes as
25   well as the documents that were sent to me.
```

schedules@mfreporting.com        Mastroianni & Formaroli, Inc.        856-546-1100
                                 Professionals Serving Professionals

Joel Martinez                                          April 26, 2018

## Page 10

1    MR. LOUGHRY: Right. So I think you
2  should just talk whatever you reviewed and not any
3  interactions that you had with counsel because that's
4  privileged.
5  BY MR. MARSHALL-OTTO:
6    Q.    I don't want any conversations that you
7  had with Mr. Loughry. I'm just interested in knowing
8  what documents you reviewed.
9         First, you mentioned some notes. Are
10  these handwritten notes?
11    **A.    No, they're typed.**
12    Q.    Typed notes?
13    **A.    Um-hum.**
14    Q.    Did you take them immediately after the
15  events that brought us here today?
16    **A.    Some did, some I did not. They're**
17  **all part of a journal. It's an app that I use that I**
18  **log not just the events that transpired between the**
19  **trooper and myself, but general notes.**
20    Q.    And to your knowledge, were those
21  produced in this case?
22    **A.    Were those produced in this case?**
23    Q.    Right. To me.
24    **A.    Were they delivered to you?**
25    Q.    Right.

## Page 11

1    **A.    No. These -- from these notes that**
2  **described the events that have taken place, the whole**
3  **history behind this case, I sourced them in my**
4  **communications with Justin.**
5         MR. MARSHALL-OTTO: (REQUEST) I'm going
6  to make a request for those and we can talk about it
7  later.
8         MR. LOUGHRY: While I see some issues
9  here, I will say that my thought process is that I
10  probably have been provided the material and that
11  it's gone into the interrogatory answers, but too
12  much surmise there on my part to say that. So let me
13  say that I'll review whatever Mr. Martinez can
14  provide to me and as long as it's relevant to this
15  case and not, you know, matters that don't have
16  anything to do with it, and that might be an issue in
17  an app like that, I want to clarify that right now.
18         MR. MARSHALL-OTTO: Right. I don't
19  necessarily need all the data.
20         MR. LOUGHRY: Right. You're looking
21  for the data that has anything to do with the events
22  of this case.
23         Similarly, we had something from Mr.
24  Goldenberg the other day that we got from him --
25         MR. MARSHALL-OTTO: Yeah. Right.

## Page 12

1    MR. LOUGHRY: -- at the beginning or
2  the end or the middle of the deposition, he produced
3  those typewritten notes.
4         So I'll see what's available and
5  certainly if it's relevant or could lead to the
6  discovery of admissible evidence, I think that's the
7  standard, then I'll make sure that you get it.
8         My impression is that you probably have
9  all the information right now.
10         MR. MARSHALL-OTTO: Right. Okay.
11  We'll deal with that.
12  BY MR. MARSHALL-OTTO:
13    Q.    So beyond those notes that were taken
14  in an app, what's the name of that app, by the way,
15  just for my knowledge?
16    **A.    Day One.**
17    Q.    Other than the notes that were taken in
18  that Day One app, did you take any other notes
19  handwritten or computer-typed regarding the incident?
20    **A.    Yes. Yes, I have some typewritten**
21  **notes that I prepared for my initial meeting with**
22  **Justin.**
23         MR. LOUGHRY: Yeah, I think those might
24  fall in the realm of privilege.
25         MR. MARSHALL-OTTO: Right. If they

## Page 13

1  were prepared for the meeting with counsel, I'm not
2  interested in them.
3  BY MR. MARSHALL-OTTO:
4    Q.    I'm going to put in a request for any
5  typed notes that he had regarding the incident. If
6  you can take a look at them and let me know if
7  they're privileged.
8         Understood?
9    **A.    Now, these notes that I did produce as**
10  **well on my personal app were for the same purpose.**
11    Q.    (REQUEST) Then you can have that
12  discussion with counsel. I'm putting in the request
13  for them and your counsel will assess whether they're
14  appropriate for disclosure to me.
15         MR. LOUGHRY: In other words, there may
16  be potential claims of privilege and then I'll have
17  an opportunity to review that.
18         MR. MARSHALL-OTTO: Or work product.
19  Okay.
20  BY MR. MARSHALL-OTTO:
21    Q.    So beyond those various notes, what
22  else did you review in preparation for your
23  deposition today?
24    **A.    I reviewed an audio of my**
25  **interrogat -- what is it called? Discussions with**

Joel Martinez

April 26, 2018



Page 14

1   Internal Affairs.
2      Q.   Okay.  Your interview with State Police
3   Internal Affairs?
4      A.   Correct.
5      Q.   Anything else?
6      A.   No.
7      Q.   Some background for the record.
8           Can you state your full name?
9      A.   Joel Martinez, J-O-E-L.  Last name,
10  M-A-R-T-I-N-E-Z.
11     Q.   No middle name?
12     A.   No middle name.
13     Q.   Your date of birth?
14     A.   ████████████
15     Q.   Where do you presently reside?
16     A.   In Princeton, New Jersey.
17     Q.   And your address?
18     A.   ████████
19     Q.   How long have you lived there now?
20     A.   How long have I lived there?
21     Q.   If you can give me the month and year
22  that you moved there, that could help.
23     A.   Sure.
24     Q.   You can approximate.
25     A.   Let's call it June, 2013.

Page 15

1           MR. LOUGHRY:  The record should reflect
2   that we had a pause because Mr. Martinez was looking
3   on his hand-held device, cell, whatever we call it
4   now, iPhone cell phone, to see if he could find
5   something that would jog his memory about the date.
6   But that's why there was a pause.  He was looking to
7   give a precise figure.  I don't know that he found
8   it.
9           THE WITNESS:  I did.  It was a picture
10  of the apartment close or on the date that I moved
11  in.  And I can give you the exact date if you'd like.
12  BY MR. MARSHALL-OTTO:
13     Q.   Around June of 2013 is fine.  Thank
14  you.
15          Do you own or rent that?
16     A.   I rent the unit.
17     Q.   Rent it.  Okay.
18          And in April of 2013, where were you
19  living?
20     A.   In April of 2013 I was rooming with a
21  friend over at an apartment complex called Avalon.
22  It's in West Windsor.
23     Q.   Avalon in West Windsor?  Okay.
24          And immediately after moving out of
25  there, you moved into where you now reside, is that

Page 16

1   right?
2      A.   That is correct.
3      Q.   Approximately what date did you move
4   into your friend's apartment in Avalon?
5      A.   Well, we both got the unit together.
6   We both moved in together.
7      Q.   So you had a lease agreement together?
8      A.   We did.  I can give you the date.
9      Q.   So would that have been around June of
10  2012, a June-to-June kind of lease?
11     A.   I'll have to check my iPhone for the
12  dates.  This is too bad, I don't want to take a
13  guess, but I was there for about a year.
14     Q.   About a year.
15          Just so you understand, the purpose of
16  this deposition is to probe your recollection and
17  your memory.  So for background questions like this,
18  it's okay to check on your phone, but when it comes
19  to really digging into the substance of this matter,
20  I'm going to be asking you questions based on your
21  memory.  It's not going to be about what, you know,
22  you can consult with, written documents like that.
23     A.   I was under the impression that I was
24  supposed to give exact dates.  Sorry.
25     Q.   Just to the best of your recollection.

Page 17

1   And I'm appreciative that you helped me out with
2   that.
3           Can you tell me a little bit about your
4   educational background?
5      A.   Sure.  I received my undergraduate
6   degree from the University of California at Berkley
7   in 1995.  I then went to Princeton University.  I
8   received my master's degree in 2000.
9      Q.   And what were your degrees in first
10  from Berkley, then from Princeton?
11     A.   In Princeton it was economic analysis
12  of development.  In Berkley it was political economy
13  of industrialized societies.  Bachelor's then a
14  masters.
15     Q.   Any further education?
16     A.   No.
17     Q.   Certificates?
18     A.   No.
19     Q.   Are you currently employed?
20     A.   I am.
21     Q.   Is that with BlackRock?
22     A.   That's correct.
23     Q.   How long have you been employed there?
24     A.   I've been there eight years.
25     Q.   Eight years?

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
Professionals Serving Professionals

Joel Martinez                                                  April 26, 2018

---

Page 18

1    A.   To this date.
2    Q.   To this date.
3         So it would have been in 2010 that you
4    began?
5    A.   Correct.  April 26th.
6    Q.   April 26th, of 2010.
7         And what position did you hold when you
8    first started at BlackRock?
9    A.   Investment management associate focused
10   on our offshore product range and dealing with our
11   offshore international financial advisors at Merrill
12   Lynch who are our clients.
13   Q.   And you no longer hold that position,
14   right?
15   A.   My role is no longer investment
16   management associate.  I'm a relationship manager
17   now.
18   Q.   And that's a promotion, right?
19   A.   It is.
20   Q.   How many promotions subsequent to the
21   initial position you held in 2010 have you had?
22   A.   One major promotion.
23   Q.   Any minor promotions?
24   A.   Change in title.  I went from
25   investment management associate to offshore product

---

Page 19

1    specialist.
2    Q.   In what year?
3    A.   This was, let's call it 2013, 2014.
4    Q.   And then subsequent to that, when was
5    the major promotion?
6    A.   Around the same time.  It was -- that
7    was a title promotion that went from investment
8    management associate to vice president.  So as an
9    offshore product specialist, I was still considered
10   an investment management associate.
11   Q.   Did you receive a promotion around
12   2015, by any chance, or would that have been in that
13   range?
14   A.   Yeah, it was around 2015 where I was
15   given the vice president, to my recollection, title.
16   Q.   2015 was the vice president title.
17        And have you received any promotions
18   subsequent to that?
19   A.   I have not.  But at the beginning of
20   this year, my group that was focused exclusively on
21   the Merrill Lynch channel, merged into the wider
22   wires, as we call it now, so I'm no longer referred
23   to as an offshore product specialist, but as a
24   relationship manager.
25   Q.   Understood.

---

Page 20

1         MR. LOUGHRY:  Just interrupt for one
2    moment.  Can we go off the record?
3         (Off-the-record discussion)
4         MR. MARSHALL-OTTO:  Back on the record.
5    BY MR. MARSHALL-OTTO:
6    Q.   So at this time I want to dig in a
7    little bit to the substance of the underlying
8    lawsuit.
9         Were you present on the grounds of the
10   Lawrenceville School on April 26 of 2013?
11   A.   I was.
12   Q.   And about what time did you arrive
13   there on that date?
14   A.   It was most definitely afternoon,
15   between 1 and 3:30.
16   Q.   And what was the reason for your
17   presence on the school grounds that day?
18   A.   I was going to catch a flight at
19   Philadelphia Airport to SanDiego where I was going to
20   pick up my mother who was elderly and fly her back
21   with me back to Philadelphia so she could stay with
22   me in Princeton.  So I went to the home, my home with
23   Vicky, to pick up my luggage which I needed an extra
24   piece to pack my things.
25   Q.   At this time, if you can remind me,

---

Page 21

1    were you still technically married to Vicky?
2    A.   I was.
3    Q.   But you no longer are, is that right?
4    A.   I no longer am.
5    Q.   On that date, did Vicky, your wife at
6    the time, know that you were coming to the house?
7    A.   No, she did not.
8    Q.   She did not.
9         Did your children know that you were
10   coming to the house?
11   A.   They did not.
12   Q.   Were either your children or Vicky
13   present there?
14   A.   They were not.
15   Q.   Was it common at that point in time for
16   you to come to the house unannounced?
17   A.   Vicky preferred that it would be
18   announced, but she had no problem with me coming over
19   unannounced to visit the kids which I did often.
20   Q.   Understood.
21        So would it be accurate to say that in
22   the context of where your relationship was with
23   Vicky, she would have preferred notice, but she
24   understood that in your role as a father you were
25   welcome there anytime essentially?

---

Pages 18 to 21

Joel Martinez                                           April 26, 2018

**Page 22**

1    A.   That's correct.
2    Q.   At some point while you were on the
3  Lawrenceville School Campus, did you confront New
4  Jersey State Trooper and volunteer baseball coach
5  Jose Rivera regarding a relationship that he had
6  previously had with your now ex-wife?
7    A.   Yes, I did.  I walked on to the
8  baseball field when I saw that it was Trooper Rivera
9  and wanted to get a good look to make sure it was
10 him.  So I walked over to have a discussion.
11   Q.   And I want to get this down because I
12 think it might help us with the timing issue, do you
13 recall about how long you had been on the
14 Lawrenceville School Campus before you saw Trooper
15 Rivera or who you believed to be Trooper Rivera?
16   A.   Well, as I was driving on to the
17 campus, I saw a police cruiser which made me think
18 perhaps this is Trooper Rivera because I know that he
19 was a New Jersey State Trooper.  I subsequently went
20 to the home.  It did not take me long to get my
21 luggage.  After I got my luggage, as I was leaving, I
22 parked in front of the trooper -- trooper's vehicle
23 to make sure that -- whether or not that was Trooper
24 Rivera on campus or not.
25        I saw from a distance a man in a police

**Page 23**

1  uniform and wanted to see if that was Trooper Rivera
2  or not.
3    Q.   Why did you park in front of his
4  vehicle rather than elsewhere?
5    A.   Because I was on my way out.  We live
6  on a cul-de-sac and the way you got on the cul-de-sac
7  as you're going towards my residence, as long as you
8  keep going, you circle the cul-de-sac to exit in that
9  same direction.  So because it was going to be a
10 quick look, I just parked in front of the cruiser.
11   Q.   How many feet away would you say your
12 original parking spot was from where you ended up
13 parked in front of the cruiser?
14   A.   Well, my original parking spot was in
15 the driveway of the home.  Then I got in and as I was
16 driving to leave campus, I parked in front of the
17 cruiser.
18        Does that answer your question?
19   Q.   No.  I'm looking for a distance.
20        So if you walked from where you ended
21 up in front of the cruiser back to the driveway where
22 the car was originally parked, how many steps or how
23 many feet approximately?  Your best estimation.
24   A.   Spatially?  If I crossed the little
25 island in the cul-de-sac.  75 feet.

**Page 24**

1    Q.   How about in terms of time, if you were
2  to walk from the driveway to that area, a minute or
3  30 seconds?
4    A.   If that.  It's a short distance.
5    Q.   At the time you parked there, and
6  correct me if I'm wrong, were you planning to
7  approach the baseball field or were you simply
8  looking to kind of drive by?
9    A.   I was planning -- well, it's part of my
10 routine to leave the premises.  My plan was to go to
11 the airport completely and absolutely.  I saw the
12 vehicle, I wanted to see if that was, in fact,
13 Trooper Rivera.
14        When I did see that it was Trooper
15 Rivera, that's when I decided that it was, in my
16 estimation, given what my children had gone through,
17 given the psychological trauma that his actions with
18 my then spouse had caused on them, the last thing I
19 wanted was for them to go through a relapse.  So it
20 was my intention to let the trooper know that it's
21 inappropriate for him to be so close to where my
22 children live and where they play after school.  And
23 I know that because it was, you know, well after
24 noon, that it was getting closer to after school, and
25 I just would not want them to reopen -- to have old

**Page 25**

1  wounds reopened from seeing the man that, you know,
2  they were afraid of and the man that they called the
3  H-Man.  His name is Jose Rivera, so they phonetically
4  take the beginning of his name as an H as opposed to
5  a J.  I was looking after their emotional welfare and
6  I just wanted to make sure that the trooper knew
7  that, because of my kids, it was inappropriate for
8  him to be there.
9    Q.   So your children resented him?
10   A.   Absolutely.
11   Q.   And you resented him?
12   A.   Well, resent is a strong word.
13        I was disappointed that given all that
14 had transpired and all that he had done in the past
15 that he was still so close to where my children were.
16 I was being, in my eyes, a good father protecting his
17 children.
18        Resent is a strong word.
19   Q.   When you talk about protecting your
20 children, isn't it true that your children were not
21 present at the home when you went there that day?
22   A.   That is true.  It's also true that it
23 was getting close to after-school time.  It's also
24 true that they were going to eventually come home and
25 I didn't know how long Trooper Rivera was going to be

Pages 22 to 25

Page 26

1 there. I was just trying to avoid an overlap where
2 they could cross paths.
3    Q.    Can you tell me a little bit more about
4 the confrontation with Trooper Rivera?
5         Is it accurate to say that you
6 initiated that confrontation?
7    A.    It is accurate.
8    Q.    And you made the choice to approach him
9 at the baseball field, is that correct?
10    A.    From a distance because there was a
11 fence that was separating us from a fairly wide
12 distance. So to approach from a distance, correct.
13    Q.    So describe for me the approach that
14 you made from your car that you parked in front of
15 Trooper Rivera's car to where you began verbally
16 communicating to him, let's say?
17    A.    Well, to describe the events, I would
18 say that as I started to walk towards the dugout and
19 I was on the outside of the dugout on the outside of
20 the field, I noticed at a distance that Trooper
21 Rivera was addressing some of the students in the
22 dugout, some of the student athletes. And from a
23 distance I saw that he could see me and I saw him get
24 on his cell phone. And oddly, Coach Eldridge
25 approached me, generally just to make small talk

Page 27

1 which I thought was a bit strange. We were always
2 polite to each other and friendly, but we had a very
3 short period of small talk. And after that small
4 talk, I continued to walk towards the dugout.
5    Q.    And had you made any kind of verbal
6 communications toward Trooper Rivera by that point or
7 did that come after?
8    A.    No, the first verbal communication came
9 when I arrived at the dugout. Again, I was on the
10 outside of the fence and he was at a fairly large
11 distance. That was the first interaction between
12 both of us. And I initiated it. And I asked him what are
13 you doing here.
14    Q.    How loudly?
15    A.    Loud enough for him to hear me because,
16 again, we were at a distance and we were outdoors.
17    Q.    Loud enough for everyone else around
18 the baseball field to hear?
19    A.    Yes.
20    Q.    And can you tell me what came next as
21 far as what you verbalized to him?
22    A.    Sure. I asked him a very direct and
23 firm question, what are you doing here? And his
24 response to me was in a very evasive and dismissive
25 manner, I don't know what you're talking about. And

Page 28

1 I was disappointed that that was his answer because
2 he was most definitely aware of all of the incidents
3 that had transpired in the past between he and my
4 wife and him and my family and between both of us.
5 So I was very direct again and I answered, well, what
6 I'm talking about is you coming here to campus to
7 hurt families. I'm talking about you coming here to
8 campus to hurt children. I'm talking about you
9 coming here to campus after having hurt your wife of
10 20 years who was recovering from throat cancer.
11         And he became very quiet. He became
12 very quiet.
13    Q.    Did you say anything else?
14    A.    No. At that point Trooper Rivera
15 started walking towards me and he escorted me away
16 from the dugout, away from the student athletes, away
17 from the coaches. And we silently walked away
18 together towards the backstop of the diamond, away
19 from the field of vision of everyone else.
20         That was when I saw my then spouse,
21 Vicky Martinez, arriving in her vehicle and getting
22 out of her vehicle and approaching us. And we were
23 both, the trooper and I, in silence.
24    Q.    And we'll get to that.
25         When you were expressing yourself to

Page 29

1 Trooper Rivera on the baseball field, can you give me
2 an estimate, rough estimate, as to how many student
3 athletes were around the field, on or around?
4    A.    Maybe 15, 16 student athletes.
5    Q.    So --
6    A.    And the coaches.
7    Q.    So you testified earlier that one of
8 the reasons, if not the main reason, for your
9 approaching Trooper Rivera was that you felt it was
10 inappropriate for him to be there considering the
11 exposure to your children that might occur and the
12 impact that might have.
13         Did you consider when you began to
14 verbalize your feelings toward him the impact that
15 might have on the children, the students who were on
16 the field at that time?
17    A.    No, because again, it was a verbal
18 communication between the trooper and I because we
19 were at a distance I spoke loud enough for him to
20 hear and firmly. So I'm not sure how that would
21 impact the students, disrupt them.
22    Q.    Do you not think that a loud verbal
23 communication regarding infidelity could negatively
24 impact a student?
25    A.    I'm sure it could definitely disrupt

Page 30

1  the practice. I'm sure it was out of place. I'm
2  sure that between 15 and 20 student athletes, the
3  last thing that they're expecting is a dialogue
4  between two adults that have nothing to do with
5  baseball would be out of place.
6      Q.    And, in fact, that dialogue was being
7  directed, or monologue initially, was being directed
8  at their coach?
9      A.    I didn't know he was the coach.
10     Q.    You didn't? When did you become aware
11  that he was the coach?
12     A.    Later. I knew that he was associated
13  with the school. I know that he had played baseball
14  as a youth for the school, and I know that he had
15  access to the field house and the baseball equipment
16  in the field house including the batting cages, and a
17  relationship with the Associate Dean of Athletics, I
18  believe Michael Goldberg. And that's what I knew.
19     Q.    Why did you think he had access to all
20  these various areas where baseball equipment was
21  stored and to individuals within the athletic
22  department if not for a coaching position?
23     A.    Because I've never seen him coach
24  students. In that baseball diamond it was always --
25  I'm sorry, in that batting cage within the field

Page 31

1  house, it was always him and Alejandra his son.
2      Q.    His son. Oh, okay.
3          And you used the word associated with
4  the school or the program, is that right?
5      A.    Um-hum.
6      Q.    So you knew him to have an association.
7          But nevertheless, you testified that
8  you didn't think he should be on school grounds, is
9  that right?
10     MR. LOUGHRY: Objection.
11     THE WITNESS: No.
12     MR. LOUGHRY: Objection just to form.
13  He can answer.
14  BY MR. MARSHALL-OTTO:
15     Q.    Correct me.
16     A.    Sure.
17          You're making it seem that it's -- that
18  he's not supposed to be there legally or as a private
19  citizen he had no right to be on campus. And I never
20  made that assertion. I've always said that it was
21  inappropriate for him to be there. He had every
22  single legal right to be there. Like I said earlier,
23  I graduated from Berkley, I received my masters from
24  Princeton, I'm a pretty smart guy. Of course I
25  understand his legal rights. I would never make that

Page 32

1  claim.
2      Q.    Well, and I understand what you're
3  saying, but I'm not really talking about legal rights
4  either.
5          What I'm talking about are his moral
6  rights, I guess. In spite of the fact that he had
7  had an affair, and I understand with your wife, there
8  was that difficulty. As someone who was an alumnus
9  of the school and who had a relationship with the
10  athletics department, how is it inappropriate or was
11  it inappropriate for him to be on the school grounds?
12     MR. LOUGHRY: I object to the form.
13     Go ahead. You can answer.
14     THE WITNESS: In no way was it
15  inappropriate for Trooper Rivera to be there on the
16  baseball diamond with the students. What was
17  inappropriate was the probability of him running into
18  my children who might be playing outside during a
19  period that was close to after school and my children
20  seeing him and reopening up wounds. I wanted to get
21  that across to him hoping that I could appeal to his
22  sensibilities and maybe have him think about that and
23  leave the baseball field. But in no way did I ever
24  challenge his -- or think that it was inappropriate
25  for him to be there.

Page 33

1  BY MR. MARSHALL-OTTO:
2      Q.    Understood. Thank you.
3          Let's move on to what happened after
4  you and Trooper Rivera left the field and went
5  towards your cars.
6      A.    Um-hum.
7      Q.    How did it happen that the two of you
8  left the baseball field?
9      A.    When I got to the point of my series of
10  questions, those three questions that I described
11  earlier, the last one being about his wife who was
12  recovering from throat cancer who he was unfaithful
13  to, I noticed that he became a little bit concerned
14  and started to walk over towards me and said come on,
15  walk with me. This was coming from a man in a
16  uniform. And, again, I'm a pretty bright guy, I'm
17  not dumb. I completely complied. And as we were
18  walking away, I said nothing else to him until Vicky
19  arrived on the scene.
20     Q.    So from the baseball field to the cars,
21  essentially was it just a quiet walk?
22     A.    Correct.
23     Q.    Nothing was spoken?
24     A.    Nothing was spoken.
25     Q.    By either of you?

Joel Martinez                                                    April 26, 2018

Page 34

1    A.    By either of us.
2    Q.    Okay.
3    A.    There was something spoken between
4    myself and Vicky as Vicky approached us when she
5    arrived on the scene --
6    Q.    Between yourself and Vicky?
7    A.    -- as we were walking back towards the
8    backstop and away from the dugout.
9    Q.    And can you tell me what was said
10   between the two of you?
11   A.    Yes. Vicky, as she was walking towards
12   us, I said -- I started speaking to her in Spanish.
13   I said is this what you left us for? Is this what
14   you hurt our marriage for? Was this what was worth
15   it? And her reply to me was what are you doing here.
16   You're not supposed to be here.
17        And I was disappointed with that being
18   her first words. And I said in disbelief, given all
19   the pain that Trooper Rivera had caused our children,
20   what am I supposed to be doing here? I live here. I
21   live here. And I turned to Trooper Rivera and I said
22   he's not supposed to be here. And Trooper Rivera
23   looked at me, chest out, and he said I have every
24   right to be here, I'm an alumnus of this school,
25   which my understanding was that he never graduated.

Page 35

1    So I replied, I said no, you're not, you're a fraud,
2    you're a failure. I know that you didn't graduate.
3    I know that you didn't make it here academically.
4    And I saw Trooper Rivera stunned. He said absolutely
5    nothing to me. And me realizing that it was getting
6    late and for me to have to hit the road to pick up my
7    mom to fly out of Philadelphia Airport, I started
8    walking towards my car because I was right next to my
9    car. I was on my way out. And as I was walking
10   towards the car, I hear "that's it" in a very strong
11   angry tone. And the trooper proceeded to arrest me
12   right on the hood of my car as I was leaving the
13   scene. And he put the handcuffs on me very tight.
14   It was very painful. It was very traumatic. And I
15   was shocked that this was happening.
16   Q.    So when he arrested you, you were
17   walking away?
18   A.    Correct.
19   Q.    So did he approach you from a distance
20   or could you not see because --
21   A.    I could not see him as I was walking
22   towards my car. I did not see him approach me.
23   Q.    So all you know is that you were
24   walking away one moment and the next moment you were
25   being placed against the hood, essentially?

Page 36

1    A.    Correct.
2    Q.    And the cuffs were being placed around
3    your wrists?
4    A.    Correct.
5    Q.    So I want to ask you, with respect to
6    the arrest and the entire date April 26, 2013, did
7    Trooper Rivera assault or cause you physical injury?
8    A.    Other than --
9    Q.    Or any injury, in fact?
10   A.    Other than placing the handcuffs
11   excessively tight on me leaving marks, no.
12   Q.    Okay.
13   A.    We were at a distance, there was no
14   room for that.
15        (Exhibit is Martinez 1, photographs,
16   marked for identification)
17   BY MR. MARSHALL-OTTO:
18   Q.    So, Mr. Martinez, you're now looking at
19   what's been marked as Martinez 1. And for the
20   record, these documents are Bates labeled P-36
21   through P-40.
22        And what we're looking at is five color
23   photographs.
24        Can you describe what these are for me?
25   A.    Yes. These are the markings left from

Page 37

1    the handcuffs that Trooper Rivera placed on me which
2    I had in anguish and out loud asked him to loosen,
3    they were too strong and they were hurting me. And
4    he scoffed that they're not supposed to feel good.
5    And when I was released from the detention center and
6    given my phone back, I took pictures in the holding
7    cell of these markings. And when I returned home, in
8    the bathroom I took some more shots of the markings
9    left by the handcuffs.
10   Q.    So it would be correct to characterize
11   what we're looking at here are the injuries caused by
12   the handcuffs, is that correct?
13   A.    That's correct.
14   Q.    And specifically it would be the
15   redness that we're looking at that reflects those
16   injuries, correct?
17   A.    After the time I had spent in the
18   holding cell and after I was released and returned my
19   phone, yes. These were not as soon as I arrived in
20   the holding cell and moments after the handcuffs were
21   taken off. This was a while after the handcuffs were
22   taken off.
23   Q.    About how many hours? Your best
24   estimate.
25   A.    Less than two.

Joel Martinez                                    April 26, 2018



Page 38

1     Q.     Less than two.
2            Were the marks worse immediately after
3     the cuffs were taken off?
4     A.     Yes, they were.
5     Q.     So they resolved quickly?
6     A.     They were not -- I mean they were more
7     noticeable as soon as the cuffs were taken off.  This
8     is less than two hours later when I was released.
9     Q.     Do you, today, bear any signs of those
10    cuff marks?
11    A.     I do not.
12    Q.     And how long did it take for that to
13    completely resolve?
14    A.     I do not recall.  Days perhaps.
15    Q.     Days perhaps.
16           Did you see a doctor about it?
17    A.     I did not.
18    Q.     You did not.
19           How long did you feel pain from it, if
20    at all?
21    A.     By the next day I did not feel any
22    pain.
23    Q.     Did you take any Advil or Tylenol or
24    anything?
25    A.     Perhaps.

Page 39

1     Q.     Do you recall if it helped?
2     A.     I do not recall.
3            (Exhibit Martinez 2, Responses and
4     Objections of Plaintiff Joel Martinez to defendants'
5     Notice to Produce Documents, is marked for
6     identification)
7     BY MR. MARSHALL-OTTO:
8     Q.     Mr. Martinez, I've handed you what has
9     been marked as Martinez 2 which is entitled:
10    Responses and Objections of Plaintiff Joel Martinez
11    to Defendants' Notice to Produce Documents.
12           I'm just going to ask you very quickly
13    with as much time as you need to flip through this
14    document and take a look at these responses and
15    objections.
16           Do you recall, and answer this question
17    when you're ready, do you recall having taken a look
18    at these?
19           MR. LOUGHRY:  Taken a look at them
20    when?
21    BY MR. MARSHALL-OTTO:
22    Q.     At the time they were propounded on
23    your counsel, did he ask you to take a look at these
24    when --
25           MR. LOUGHRY:  Now I object on the terms

Page 40

1     of work product and attorney-client privilege.  I can
2     see that my signature appears on the last page.
3            MR. MARSHALL-OTTO:  Your signature does
4     appear there, yes.
5            MR. LOUGHRY:  But I don't think any
6     dialogue between Mr. Martinez and counsel is -- I
7     don't think that's fairly discoverable.
8            MR. MARSHALL-OTTO:  No, I think you're
9     right.
10           MR. LOUGHRY:  The interrogatories are
11    something different.
12           MR. MARSHALL-OTTO:  Yes.
13           MR. LOUGHRY:  They have to be verified.
14    BY MR. MARSHALL-OTTO:
15    Q.     What I'm trying to get at, and I'll try
16    to do it in a more artful way, is your efforts at
17    producing or locating the documents that are sought
18    through these document requests.  So if you could
19    take a quick look through these requests and tell me
20    whether you engaged in efforts to retrieve any of the
21    documents in these categories?
22    A.     I made ever effort to retrieve the
23    documents that Justin and his paralegal, Pat?
24           MR. LOUGHRY:  Patricia Good.
25           THE WITNESS:  Patricia, had requested

Page 41

1     of me.  I have been very responsive and thorough in
2     retrieving that information.
3     BY MR. MARSHALL-OTTO:
4     Q.     Fine.  You can put that aside.  Thank
5     you.
6            (Exhibit Martinez 3, Responses and
7     Objections to Interrogatories, is marked for
8     identification)
9     BY MR. MARSHALL-OTTO:
10    Q.     Mr. Martinez, I've handed you what has
11    been marked as Martinez 3 which is entitled:
12    Responses and Objections to Interrogatories.
13           Would you take a look through this
14    document and let me know when you're done?
15    A.     Sure.
16    Q.     Specifically when you've arrived at the
17    last page.
18    A.     I have arrived at the last page.
19    Q.     Is that your signature that appears on
20    the last page?
21    A.     Yes, it is.
22    Q.     And did you review these interrogatory
23    responses before you signed?
24    A.     Yes, I did.  These, I believe, were
25    mailed to me.

Pages 38 to 41

Page 42

1    Q.    So everything in here is true to the
2  best of your knowledge, is that right?
3    A.    That's correct.
4    Q.    I've got a quick question for you. Not
5  a lot on this, but one question.
6          I want to bring your attention to
7  interrogatory number three and your response thereto.
8    A.    Yes.
9    Q.    Give it a quick read-through and when
10 you're done, I want to bring your attention to the
11 fourth paragraph.
12         MR. LOUGHRY:  They're not numbered
13 paragraphs, just counting down.
14         MR. MARSHALL-OTTO:  Not numbered.
15         THE WITNESS:  Okay.
16 BY MR. MARSHALL-OTTO:
17   Q.    Specifically I want to bring your
18 attention to two lines that state:  After the affair
19 was exposed, Trooper Rivera threatened my family. My
20 wife and children were frightened by his threats.
21   A.    Correct.
22   Q.    I believe you did testify with respect
23 to these threats that were made against your family.
24   A.    Correct.
25   Q.    Can you describe the nature of those

Page 43

1  threats?
2    A.    Sure. When the affair was exposed late
3  in 2011, I would say December, there was a lot of
4  back and forth between Trooper Rivera and Vicky. The
5  person who disclosed the affair to me was Trooper
6  Rivera's wife, Raquel Rivera. She came knocking on
7  my door late one night. I forget what time it was,
8  it was very late, I was fast asleep. And she told me
9  that Vicky and Trooper Rivera were involved and that
10 they were planning on leaving us and starting a new
11 family together.
12         Shortly after that, Raquel had kicked
13 out of the home Trooper Rivera. Rivera -- Trooper
14 Rivera then ended up being with or living at, I
15 believe, a cousin's house. And I get this
16 information from Vicky who told me that he was
17 staying at a cousin's house. And during this period,
18 Vicky and the trooper were in constant, incessant
19 communications, texts. And I was very much
20 disappointed in Vicky. I had never in a million
21 years thought that she would do something like that,
22 have an affair and hurt our family in the way that it
23 did. But I was -- I was also shocked that she and
24 Trooper Rivera were texting incessantly.
25         And one day Trooper Rivera called her,

Page 44

1  he called the house number. I picked up and I told
2  Trooper Rivera to stop texting, to stop talking, to
3  leave my wife alone, to give us the opportunity to
4  heal, to give us the opportunity to find out what's
5  wrong, that we have a family. And I said that he had
6  no honor, that what he did to hurt my kids and my
7  marriage, he had no code. And he became angry and he
8  said that, you know, then I guess I'm going to have
9  to come over there and do what I have to do to you.
10 And Vicky was on the other phone, she was listening
11 to this conversation. That was the first threat.
12         The second threat came when Vicky had
13 disclosed to me that she had -- she had unprotected
14 sex with the trooper. They had both lied to -- Vicky
15 lied to me, the trooper, according to Vicky's words,
16 gave his wife, Raquel Rivera, something called the
17 trooper's promise that there was no sex in the
18 relationship. And when I informed Raquel, because I
19 felt that it was my moral obligation to take care of
20 her given that she has children, for her to get
21 checked, I received a call from Vicky when I was
22 driving, I was in my car away from the home. And
23 Vicky calls me very concerned and very -- in an
24 altered state telling me that Trooper Rivera had
25 called her, was furious about the conversation that

Page 45

1  had transpired between Raquel and myself, and
2  threatened her and my family by saying don't ever
3  call my house again. If you ever call me or my wife
4  again, I will crush you, I will crush your careers.
5  I am a New Jersey State Trooper. Upon which Vicky,
6  afraid, told me please come home, I'm very scared.
7  That was another threat.
8          And another really scary incident was
9  when Trooper Rivera, his wife took him back, there
10 were texts going back and forth between Vicky and
11 Trooper Rivera. And within these texts I saw on
12 Vicky's phone that Trooper Rivera had written, you
13 know, you're so -- something to the extent of I can't
14 believe you told your husband what we shared. You
15 know you're so vindictive. And why don't you, these
16 were Trooper Rivera's words, not mine, why don't you
17 fuck off.
18         There was ample personal animus that
19 the trooper had towards me and towards my wife and my
20 children and all of the drama were over hearing
21 everything that was going on. It was a very chaotic
22 moment.
23         Another point that I'd like to
24 highlight is, again, when I'm asking Trooper Rivera
25 to, you know -- whenever I would hear Vicky and



Joel Martinez                                                            April 26, 2018

---

**Page 46**

1   Trooper Rivera speaking on the phone, separate
2   incident, Vicky had locked herself into a room to
3   speak to Trooper Rivera, and I would say please let
4   us heal, please let us heal.  And I could clearly
5   hear him in a very loud voice egging Vicky on,
6   telling her to kick his ass out, just kick his ass
7   out, you're so close, you're so close, just kick his
8   ass out.
9           His comportment was very aggressive.
10  It was scary given his threats, given his position of
11  power.  And it was a very difficult moment for us and
12  it still is.
13      Q.    With respect to the threats that
14  occurred over telephone, do you have recordings of
15  any of those?
16      A.    I do not, but Vicky was on those calls.
17      Q.    Do you know if she made recordings of
18  them?
19      A.    I do not know.
20      Q.    And the text messages, I guess the
21  answer is probably the same, they went to her phone?
22      A.    Yes.  If you subpoena them, you will
23  see them.
24      Q.    Did she ever give you copies of them?
25      A.    No, I did see them.

---

**Page 47**

1      Q.    You saw them visually?
2      A.    Um-hum.  Yes.
3      Q.    A couple more exhibits and then I think
4   we'll be done.
5           You can put aside those answers to
6   interrogatories.
7           (Exhibit Martinez 4, Certification As
8   To Accuracy And Completeness Of Records Provided, is
9   marked for identification)
10          (Exhibit Martinez 5, email
11  transcription of text messages between Raquel Rivera
12  and Joel Martinez, is marked for identification)
13  BY MR. MARSHALL-OTTO:
14      Q.    We're going to get back to what was
15  marked Exhibit 4, but we'll talk about Exhibit 5
16  first.
17          Here is a copy in front of you here.
18          Mr. Martinez, just for the record, I
19  was just handed a few minutes ago a document that's
20  now been marked Martinez 5.  It appears to be an
21  email transcription of text messages between Raquel
22  Rivera and Joel Martinez, is that correct?
23      A.    That is correct.
24          MR. LOUGHRY:  Can I just note for the
25  record before you go on, this appears on an email

---

**Page 48**

1   with the name Denise Marrin, a secretary in my law
2   office at the top.  And the only reason I'm making
3   this comment is because certain questions that
4   counsel asked a few minutes ago before we went off
5   the record were about texts between Vicky Martinez --
6   or maybe more than Vicky Martinez, whether Mr.
7   Martinez had those.  And the answer was no, and from
8   what I understand appropriately.  But it's triggered
9   some concern because in his phone he had to save what
10  he'll probably explain here, but what I understand to
11  be an exchange not with Vicky or Jose Rivera, but
12  actually between himself and Raquel Rivera.  So
13  that's on his phone where he saved it.  Now, the only
14  reason I'm saying all this is because I was trying to
15  figure out a way that we could generate -- it's not a
16  document we've produced before.  I was trying to
17  figure out a way we could generate this quickly to
18  give it to counsel so he would have it as soon as I
19  learned about it.  And the only way we could come up
20  with was to have it forwarded to my -- by Mr.
21  Martinez from his email port to my email port.  That
22  could look like an attorney-client communication.  It
23  was not intended to be that way.  This was a
24  technological resort that we chose in order so I
25  could get something that I could give over to Mr.

---

**Page 49**

1   Marshall-Otto, to counsel.
2           So I don't want this to stand ever for
3   any kind of a waiver of attorney-client privilege
4   just because opposing counsel now has an email that
5   says Joel Martinez to Justin Loughry.  That's not
6   what we intended here.  It's simply technological
7   feasibility or convenience to give him the material.
8           We're going to try to retrieve the
9   original of this which apparently has some Spanish in
10  it that's been translated.  We'll try to get that to
11  Mr. Marshall-Otto as well.  I don't have the ability
12  to do that today.  It's on some device that's not
13  here.
14          MR. MARSHALL-OTTO:  Fair enough.
15          MR. LOUGHRY:  But I just want to make
16  that clear.
17          You agree with me that there has been
18  no waiver of attorney-client privilege here?
19          MR. MARSHALL-OTTO:  Right.  We won't
20  construe this as a waiver of the attorney-client
21  privilege.  No chance.
22          MR. LOUGHRY:  Thank you.
23          MR. MARSHALL-OTTO:  Okay.
24  BY MR. MARSHALL-OTTO:
25      Q.    So I'm looking at this document marked

---

Pages 46 to 49

## Page 50

1   as Martinez 5.  And it begins with -- strike that.
2        A couple background questions.
3        This text message exchange, J.M., that
4   stands for Joel Martinez, is that correct?
5        A.    That's correct.
6        Q.    And RR is Raquel Rivera, is that
7   correct?
8        A.    Correct.
9        Q.    So it appears this exchange is from
10  December 29th of 2011, is that correct?
11       A.    That is correct.
12       Q.    Was this around the time when the
13  relationship between Jose Rivera and Vicky Martinez
14  was uncovered?
15       A.    Yes, it was around that time.
16       Q.    Do you have any idea of how many days
17  or weeks or months after you found out about it this
18  was?
19       A.    Let's put it this way, on Christmas
20  Eve, Vicky and Jose Rivera had spent it together.
21  And Jose was not at his home.  He was kicked out by
22  Raquel Rivera.  So to put that -- that was Christmas
23  Eve.  By the 29th, which I labeled these texts when
24  these texts from Raquel and myself were exchanged,
25  she had brought Jose back to the home.

## Page 51

1        Q.    Do you recall, though, what date you
2   found out about the relationship, what date it was
3   where in the middle of the night Raquel Rivera came
4   to your house and said that Jose and Vicky were
5   having an affair?
6        A.    It was in December of 2011.
7        Q.    So it was that same month at some
8   point.
9        And then around Christmas, from what I
10  understand --
11       A.    Correct.
12       Q.    -- both Vicky and Jose had left their
13  respective homes and spent it together elsewhere
14  or --
15       A.    No.  Jose had not left his home.  He
16  was kicked out of his home by Raquel Rivera.  And
17  Vicky was spending the nights with Jose during this
18  time frame.  She had expressed to me that they were
19  spending the night together at a relative or a cousin
20  of Jose who has -- in any case, in some building
21  where he was sleeping on a sofa.  That was the
22  explanation that was given to me by Vicky.
23       Then afterwards Raquel had taken Jose
24  back into the marriage.  And do I have to explain the
25  part about why I reached out to Raquel?

## Page 52

1        MR. LOUGHRY:  You should respond to the
2   questions that are asked, if you're asked about it.
3   BY MR. MARSHALL-OTTO:
4        Q.    I'm going to ask about that shortly.
5        So I want to talk about the text
6   messages.
7        So the first message says:  I need to
8   share something very painful and serious with you
9   that is vitally important and that came out during
10  our counseling session.
11       It's in the interest of our children
12  that we speak briefly.  Text me and I will call you
13  again.
14       Have I read that correctly?
15       A.    That is correct.
16       Q.    And what was it that you wanted to
17  speak with her about?
18       A.    This is very difficult and very
19  personal.
20       Vicky had promised me that there had
21  not been any unprotected sex, any sex for that
22  matter, between Jose and herself, that it was
23  emotional.  And she had told me that Jose had told
24  Raquel the same thing.  And again having issued a
25  trooper's promise that nothing had -- sexual had

## Page 53

1   transpired.
2        Then around December 29th, maybe that
3   day or earlier, I felt urination when I was peeing.
4   And I thought it was odd.  And I told Vicky, I said
5   this is weird, it burns when I'm peeing.  She said
6   it's in your head.  I don't know why you're feeling
7   that.  And it was -- it didn't go away.
8        And she had a conversation with me, she
9   took me to the bottom of the stairs and she
10  immediately started to tear up and she said I have
11  something to tell you.  I lied that there was nothing
12  sexual between Jose and myself and we actually
13  engaged in unprotected sex.  And I agreed because
14  Raquel and Jose -- Raquel -- either Raquel had Jose
15  get a vasectomy and she couldn't get pregnant and she
16  thought it was okay.
17       So it was very painful for me.  Vicky
18  promised that she would get it fixed and she was able
19  to see her physician and get a prescription of
20  antibiotics which we both later took.  But during
21  that frame it was -- I never cheated on Vicky ever in
22  our 13 years of marriage and here I am with a
23  venereal disease.  Burning, can't pee.  And I thought
24  what else is this guy -- Vicky tells me that Jose had
25  given his trooper promise that nothing had -- sexual

Joel Martinez

April 26, 2018



## Page 54

1    had transpired, that Raquel might be in danger. And
2    Raquel needs to know and she needs to get tested.
3        Q.    Okay.
4        A.    So I texted her and I needed to speak
5    to her about something that I thought was between
6    life and death that she absolutely needed to get
7    checked. And it was after this communication that I
8    received the phone call from Vicky telling me that
9    Trooper Rivera, in anger, had called her and
10   threatened her and intimidated her, saying if you or
11   your husband ever call me or my wife again, I will
12   smash you, I will smash your careers. I am a New
13   Jersey State Trooper. Vicky called me to tell me
14   this and that she was afraid and begged me to come
15   home because I was driving away from the house that
16   day.
17       Q.    I want to bring your attention to the
18   fifth text in this exchange which is a text from
19   Raquel Rivera. And the translation says: Vicky
20   contacted me last night via text. Supposedly because
21   you obligated her to. According to what she later
22   told Jose. She said that you obligated her and that
23   accidently the girl erased it. Are you aware of
24   this?
25            I'm a little bit confused as to what

## Page 55

1    she's saying here. Are you aware of what she's
2    getting across?
3        A.    Yes.
4        Q.    Can you explain it to me?
5        A.    That was a separate communication
6    between Vicky and Raquel, separate from the one
7    you're looking at now which was between myself and
8    Raquel.
9            The email exchange between Vicky and
10   Raquel was that Vicky felt very disappointed that
11   when Jose returned to his wife, that Vicky was
12   painted as the sole bad person in the relationship.
13   In fact, Raquel had told me that it was a hundred
14   percent Vicky's fault when she came to visit me that
15   night. I remember telling Vicky, I guess -- or
16   Raquel that night, doesn't it take two to Tango?
17   Weren't both willing participants? And she said yes,
18   you're right. So Vicky had sent a text message to
19   Raquel to explain everything that had happened so
20   that Raquel would be aware that it was not just
21   Vicky's fault. This part about me obligating her to
22   and the girl had accidently erased it, that's a
23   fabrication. That was -- if I had to speculate, that
24   was something that Jose had told Raquel.
25       Q.    Do you know what she's trying to say,

## Page 56

1    erased what?
2        A.    I think not the entire text that Vicky
3    had intended to send was texted. A portion of it had
4    been deleted by my daughter, I believe. I don't know
5    if it's the youngest one or the middle one.
6        Q.    Is it possible that when it says the
7    girl here, that in Spanish that might make more sense
8    as to who was being referred to?
9        A.    My daughter, one of my daughters. So
10   this is showing you the communication between myself
11   and Raquel, between Vicky and Raquel, which sparked
12   Jose's physical threats and intimidation phone call
13   to Vicky.
14       Q.    This exchange and the events that
15   underlie it clearly were emotionally troubling to
16   you, is that right?
17       A.    Of course.
18       Q.    And still are, right?
19       A.    Someone's life was at risk. No, they
20   longer are. You're just making me relive it right
21   now.
22       Q.    Understood.
23            You described feelings of fear, is that
24   right?
25       A.    That's correct.

## Page 57

1        Q.    How about anger?
2        A.    No anger. No anger.
3        Q.    How about disgust?
4        A.    Disgust towards Vicky, disgust towards
5    him, disgust towards --
6        Q.    Towards Jose, Trooper Rivera, right?
7        A.    It was blatant -- I don't know if the
8    proper term is moral turpitude.
9        Q.    This is a man that --
10           MR. LOUGHRY:  Let him finish his
11   answer.
12           THE WITNESS:  For me to know that he
13   knew that I have three very young children, was in a
14   long-term relationship, that he was in a 20-year
15   relationship with two young children of his own with
16   his wife after 20 years, and was suffering and just
17   recovering from throat cancer, for him to do what he
18   did, it disgusted me.
19   BY MR. MARSHALL-OTTO:
20       Q.    Because this man took your wife from
21   you and took your family from you, is that right?
22       A.    This man hurt my children. This man --
23   to this day my children still talk about the H-Man.
24   That's the whole point of me having approached the
25   trooper on that baseball field that day, to say

Joel Martinez

April 26, 2018

Page 58

1    listen, please don't be here. You're hurting my
2    kids. And his initial response was, what are you
3    talking about in such a dismissive and evasive way.
4    There was just no consideration for what my family
5    and my kids had gone through. It was sadness.
6        Q.    Is this lawsuit about what he did to
7    you and your family?
8        A.    No. This lawsuit is one hundred
9    percent to clear up a blatant wrong from a man who
10   supposedly has the public trust in his power and
11   abused that public trust to win an argument, to exact
12   a grudge because he might have felt slighted that I
13   said that he was a fraud and a failure, to protect
14   his ego, to act out on his previous threats.
15   Whatever the case may be, he arrested me and
16   fabricated charges against me. And I'm someone who
17   is very educated and I'm someone who has ample
18   resources and I'm someone who is very intelligent,
19   I'm someone who can defend myself. So if he went and
20   felt brash enough to fabricate and to arrest an
21   innocent person and cause slander against a pillar of
22   the community, then what must he be doing when the
23   kid in Trenton or the kid in Camden slights him who
24   has nothing, no resources, no intelligence? That
25   type of abuse can't go unchecked.

Page 59

1        Do you understand?
2        Q.    Do you recall receiving a call prior to
3    the later recorded interview you had with the State
4    Police from a Lieutenant Smith on or around June 4th
5    of 2013 regarding the incident in question?
6        A.    Can you restate that?
7        Q.    Sure.
8        Do you recall receiving a call from a
9    Lieutenant Smith on June 4th of 2013 regarding the
10   incident in question?
11       A.    On June 4th, 2013, a phone call from
12   Lieutenant Smith. I do not recall.
13       Q.    Do you recall receiving any phone calls
14   from individuals with the State Police trying to get
15   information regarding the complaint that you filed
16   with respect to the events underlying this suit?
17       A.    Yes. There was a Lieutenant Vargas
18   that reached out to me and I believe he's with the
19   Internal Affairs Division. He wanted to take my
20   testimony. He wanted me to come into the office in
21   Princeton and take my statement and ask questions. I
22   believe that occurred about a year after the
23   incident.
24       Q.    So Lieutenant Vargas took your
25   statement ultimately, performed an interview of you,

Page 60

1    correct?
2        A.    There were two people. Lieutenant
3    Vargas and another sergeant.
4        Q.    Do you recall, prior to the phone calls
5    you got from Lieutenant Vargas, an individual who I
6    will represent to you is Lieutenant Smith but who you
7    may not remember the name of, calling you to get
8    preliminary information about the complaint you had
9    filed?
10       A.    By preliminary information, what
11   information are you talking about? Maybe that could
12   jog my memory.
13       Q.    So I'll represent to you that my
14   understanding is that when you were at the station
15   you made a complaint about what had happened to you?
16       A.    That's correct.
17       Q.    Subsequently an investigation was
18   opened and --
19       A.    That very same day.
20       Q.    Right. Right.
21       A.    That gentleman took out a piece of
22   paper and wrote things down.
23       Q.    Right. So thereafter, the State Police
24   began an investigation and continued it.
25       Do you recall getting a phone call by

Page 61

1    an individual whose name you may not recall saying
2    I'm trying to get information about this complaint
3    that you filed, what is the reason for your
4    complaint?
5        A.    It could have happened. I don't
6    recall.
7        Q.    Do you recall telling anyone over the
8    phone in response to a question about the nature of
9    your complaint, quote, my complaint is that Trooper
10   Rivera is having an affair with my wife, Vicky?
11       A.    No. That's preposterous.
12       Q.    Okay.
13       A.    And if I did disclose that type of
14   information, it would have been to stipulate and to
15   prove that the arrest was not happenchance, it wasn't
16   random, it wasn't as portrayed on the trooper's
17   narrative which showed me as some lunatic coming out
18   of left field to, for some reason, question a
19   trooper's authority. It was to set the context that
20   the arrest was biased, that prejudice had existed,
21   that there was nothing objective about it. If I said
22   that. I don't remember -- I don't remember saying
23   that. That was -- what you just read is what I
24   recall now saying to Michael Goldenberg when Trooper
25   Rivera had slapped the handcuffs on me. I was in

Pages 58 to 61

## Page 62

1  such a state of disbelief that for that purpose that
2  I stipulated a couple of seconds ago, to prove this
3  is wrong, this is biased.  There is prior animus here
4  and this is it.
5       Q.    Wasn't the animus from you towards
6  Trooper Rivera?
7       A.    No.
8       Q.    Isn't that why you approached the field
9  in the first place?
10      A.    Absolutely not.
11            I have been crystal clear explaining to
12  you why I approached the field.  It was one hundred
13  to protect my children.  It was one hundred percent
14  to not have them cross paths.  I had not seen him in
15  years since the event.  If I had been angry at him or
16  had any sort of ill feelings, I would have maybe
17  taken action, I don't know.  Something, don't you
18  think, would have transpired since then?  I just
19  wanted to work on healing the family.  That's where
20  my focus was on.  No hate.  If anything...
21      Q.    Okay.
22            Very briefly for the record, I'm going
23  to introduce a number of tax returns.  I'm just going
24  to ask you essentially to identify them and confirm
25  one piece of information on them.

## Page 63

1       A.    Yes.
2            MR. LOUGHRY:  Can I just ask if you're
3  going to put these in the record, I think we probably
4  tried to block out personal identifiers, but I wonder
5  if --
6            MR. MARSHALL-OTTO:  They don't need to
7  be attached to the transcript.
8            MR. LOUGHRY:  I don't want them to
9  circulate.  There are a lot of personal identifiers
10  there.
11            MR. MARSHALL-OTTO:  That's fine with
12  me.  Why don't we say starting at Exhibit 6, nothing
13  will be attached to the transcript because after that
14  I'm going to -- oh, we can probably say for Exhibit
15  4, too.  These are his mental health records.  So we
16  should say that for Exhibit 4.
17            MR. LOUGHRY:  Right.
18            MR. MARSHALL-OTTO:  We can just not do
19  any attachments --
20            MR. LOUGHRY:  I think we have a
21  protective order for confidential information and I
22  believe you and I discussed this, counsel, that
23  financial information or health information has to be
24  considered.
25            MR. MARSHALL-OTTO:  Yes.

## Page 64

1            MR. LOUGHRY:  Just like if you gave me
2  SOPs, personnel records from Mr. Rivera, you know,
3  they're under the protective order.
4            MR. MARSHALL-OTTO:  Yes.  We agree.  So
5  just to be safe, why don't we just have none of the
6  exhibits attached to the transcript and we'll deal
7  with that later.
8            MR. LOUGHRY:  And I think in that
9  sense, since you're going to go into these things,
10  that portion of the transcript should be sealed.
11  We talked about this with Trooper Rivera as well.  For
12  now maybe we should just consider the whole
13  transcript, unless you want to segment out part of
14  it, I think that's what we did with Trooper Rivera.
15            MR. MARSHALL-OTTO:  Yeah.  That's fine.
16            (Exhibit Martinez 6, 2012 tax returns,
17  is marked for identification)
18  BY MR. MARSHALL-OTTO:
19      Q.    So these are tax returns from 2012 that
20  I've marked as Martinez 6.  These appear to be tax
21  returns for Joel Martinez and Vicky Martinez?
22      A.    That's correct.
23      Q.    These are correctly identified?
24      A.    Yes.
25      Q.    It looks like these were prepared by an

## Page 65

1  Orlando E. Silva at Ideal Associates in Union City,
2  is that right?
3       A.    That is correct.
4       Q.    Is that your accounting firm that you
5  use?
6       A.    That I used years ago.
7       Q.    Okay.
8       A.    I believe I stopped using them in two
9  thousand -- you'll see the last one there.
10      Q.    I just want to go to one number and
11  it's on page P-105 of the marking.  Line 18, enter
12  your earned income, 107,782 dollars, is that correct?
13      A.    107,782 is correct.
14      Q.    Thank you.  Very good.
15      A.    I mean are you asking me to identify
16  that number or is the calculation correct?
17      Q.    Is that correct as the earned income to
18  the best of your knowledge for 2012?
19      A.    I trust my accountant if that is what
20  he came up with and my answer is yes, I did not do
21  the math or did not double check his work.
22      Q.    You didn't review it before you filed
23  it?
24      A.    I gave him all of my information, my
25  W-2 forms and we worked in conjunction with it and it

Joel Martinez                                            April 26, 2018

## Page 66

1   seemed very fair and accurate.
2       Q.   Okay. Fair enough.
3           Is that number 107 thousand 782 dollars
4   your gross income in 2012, to the best of your
5   knowledge, or does that approximate your gross income
6   in 2012?
7           (Off-the-record discussion)
8   BY MR. MARSHALL-OTTO:
9       Q.   So we're looking at, just to get us
10  back on track, we're looking at line 18 on page 105
11  of the 2012 tax returns.
12          And when I say P-105, I'm referring to
13  the Bates label not the tax return page, per se. And
14  just for clarity of the record, can you confirm that
15  line 18, your earned income states that you earned
16  107 thousand 782 dollars in 2012?
17      A.   That sounds right. I also forwarded
18  you my W-2s. That would give you the exact dollar
19  amount. I would prefer you to use that, but yes,
20  this seems right.
21      Q.   I'm going to put in front of you what
22  was previously marked as Exhibit 3, interrogatories,
23  and in answer to interrogatory number 15 --
24      A.   These match up.
25      Q.   And that's going to be my question, do

## Page 67

1   those match up?
2       A.   Yes, they do.
3       Q.   Great. You can put that document
4   aside.
5           (Exhibit Martinez 7, 2013 tax return,
6   is marked for identification)
7   BY MR. MARSHALL-OTTO:
8       Q.   I'm handing you Exhibit 7 and these are
9   2013 returns and I'm going to ask that you go to
10  P-126 and again look at line 18.
11      A.   126.
12      Q.   And that was going to be my question.
13  So the sum of 120 thousand 661 dollars is the earned
14  income indicated in your 2013 tax return, correct?
15      A.   That's correct.
16      Q.   And now I'm going to ask you to tell me
17  if that matches up with what you indicated on your --
18      A.   That does match up.
19      Q.   It does indeed. Thank you.
20          (Exhibit Martinez 8, 2014 tax returns
21  for Joel and Vicky Martinez, is marked for
22  identification)
23  BY MR. MARSHALL-OTTO:
24      Q.   Next I'm going to hand you what is
25  being marked as Exhibit 8. Exhibit 8 is tax returns

## Page 68

1   for Joel and Vicky Martinez for the year 2014.
2       Q.   Does that appear to be correct?
3       A.   It does.
4       Q.   I'm going to ask you to take a look at
5   P-158?
6       A.   Line 18?
7       Q.   Line 18, correct.
8           Can you read the earned income number
9   there?
10      A.   137 thousand 634 dollars.
11      Q.   I'm handing you again what's been
12  marked Exhibit 3 which is your answers to
13  interrogatories and can you tell me if --
14      A.   They match up.
15      Q.   -- 2014 matches up with line 18 on your
16  2014 tax returns?
17      A.   Correct.
18      Q.   Okay. You can put that aside.
19          (Exhibit Martinez 9, Schedule A Form
20  1040 tax return for Joel Martinez, is marked for
21  identification)
22  BY MR. MARSHALL-OTTO:
23      Q.   I'm handing you what has been marked as
24  Martinez 9. I'm going to ask you to look at P-58.
25          Can you confirm for me that this

## Page 69

1   document appears to be a Schedule A form 1040 tax
2   return for, I believe, yourself only?
3       A.   Correct.
4       Q.   Joel Martinez. So this is an
5   individual tax return document?
6       A.   Yes.
7       Q.   And can you look for me at P-58 line
8   seven. Because this is an individual return, we're
9   just going to look at the income wages and salaries.
10      A.   Um-hum.
11      Q.   And that indicates your wages of
12  101,894 dollars, is that correct?
13      A.   Can I see if that marches up to --
14      Q.   Well, yeah, I'm going to put that in
15  front of you. But it does. I'm going to ask you
16  that now.
17      A.   It does match up.
18      Q.   And that's what line seven of P-58
19  indicates, right?
20      A.   Correct.
21      Q.   Okay. Very good. You can put that
22  aside.
23          Next I'm handing you what will be
24  marked as Exhibit Martinez 10.
25          (Exhibit Martinez 10, 2016 tax return,

Joel Martinez                                                      April 26, 2018



Page 70

1  is marked for identification)
2  BY MR. MARSHALL-OTTO:
3      Q.    And this appears to be your individual
4  tax returns for the year 2016.
5      A.    Um-hum.
6      Q.    Is that correct?
7      A.    Yes.
8      Q.    I'm going to ask you to look on the
9  front page here, P-78, at line seven which by my
10 reading indicates wages, salaries and tips of 151
11 thousand 265 dollars, is that right?
12     A.    That's correct.
13     Q.    And does that comport with what your
14 answers to interrogatories state?
15     A.    It does match.
16     Q.    And you can put that aside.
17          To the best of your recollection, do
18 these numbers that we've gone over comport with your
19 salaries for those years?
20     A.    They do.
21          MR. LOUGHRY:  When you say these
22 numbers, you mean the ones in the interrogatories or
23 the ones on the tax returns?
24          MR. MARSHALL-OTTO:  Well, we've
25 established that they all match up, so.

Page 71

1          MR. LOUGHRY:  Okay.
2          THE WITNESS:  Yes, they match up.
3  BY MR. MARSHALL-OTTO:
4      Q.    That's all I need to ask about that.
5          Actually, excuse me, I have one
6  follow-up question.
7          Is there anything missing from these or
8  from your tax returns as far as any bonuses that you
9  didn't report or anything like that?
10     A.    No. Nothing.
11     Q.    Let me go to what was previously marked
12 as Martinez 4.
13          So I'm going to represent to you that
14 the first two pages of these documents are a
15 certificate as to accuracy and completeness of
16 records provided which we received from the custodian
17 of records at Aroga Behavioral Health Center and
18 thereafter the next 80 pages or so, maybe 79 pages,
19 are your mental health records from Aroga Behavioral
20 Health Center?
21     A.    Um-hum.
22     Q.    Have you seen these records before?
23     A.    I have.
24     Q.    Have you read through them in detail?
25     A.    Not in detail, but I have read through

Page 72

1  them.
2      Q.    I'm just going to ask you a few
3  questions and I'll bring your attention to the
4  particular page number that I'm interested in and
5  you'll see at the bottom of the pages they're marked
6  NJSP Martinez followed by a numerical number here,
7  numerical value.
8      A.    Yes.
9      Q.    AND so I'll indicate which value I'm
10 looking at.
11          I want to start at NJSP Martinez 314.
12          This record indicates that patient Joel
13 Martinez, is that right?
14     A.    That's correct.
15     Q.    It indicates a patient with a long
16 history of anxiety and low self esteem since
17 childhood. Reports being diagnosed with OCD in the
18 past, has a very strong family history of anxiety.
19 Reports recent episode of severe anxiety at work.
20          Is that accurate that you've had a
21 history of anxiety and anxiety attacks?
22     A.    When it comes to public speaking, that
23 is correct. When it comes to feelings of me being
24 one of the very few Latinos in high finance, for lack
25 of a better term, and feeling that I need to perform

Page 73

1  very well in front of my colleagues, it does create
2  anxiety.
3      Q.    But in general, you're proud of your
4  accomplishments?
5      A.    I am.
6      Q.    As you should be. Okay.
7      A.    If you take out the public speaking
8  events, then I do not.
9      Q.    So on the same page it indicates that
10 you were, at least at the time, paranoid that other
11 people talk about him.
12          What people were you worried would talk
13 about you?
14     A.    I had just joined the asset management
15 industry for the very first time after having spent
16 13 years on the sell side in investment banking. My
17 position in investment banking was, at the very end
18 of it, a difficult one. We tried to launch a sales
19 desk because of the crisis, it did not work out. I
20 was downsized, I was let go. As a result of that, I
21 switched careers to the asset management side and at
22 the very beginning it was a very strong adjustment
23 period because I had to learn a brand new language
24 and I came in with very high accolades at the
25 director level on -- during my previous position on

Pages 70 to 73

Joel Martinez                                                                April 26, 2018

## Page 74

1   Wall Street. And here I am placed in a new role with
2   people speaking a language that -- or terminology
3   that I was not familiar with and I felt that at the
4   time, wow, having lost a job is a pretty -- it's a
5   pretty impactful event in one's life. I'm not up to
6   speed with the language that everyone else is
7   speaking, therefore, is this going to hurt me and is
8   there a probability that I'm going to be laid off.
9   That created anxiety for me.
10      Q.   Understood. Understood.
11      I want you to flip the page to NJSP
12   Martinez 315.
13          There is a note here that indicates
14   that you were bullied as a child. I imagine you
15   mentioned that to your therapist for a reason. Does
16   that have any lasting impact on you today?
17      A.   I don't remember me offering that
18   information. Perhaps it was part of a general Q&A,
19   how was your upbringing. Perhaps that's how it came
20   out.
21      Q.   Okay. Your records from Aroga, and I'm
22   talking a little bit more generally now, indicate
23   various medications, Prozac and Zoloft, Xanax and
24   Ambien.
25          Do you take any of those now?

## Page 75

1      A.   I do not take Ambien. I do not take
2   Zoloft or what is the other one?
3      Q.   Prozac.
4      A.   Prozac, I don't remember the last time
5   that I've taken those medications. What I do take,
6   and this is prior to a public event or a public
7   speaking event is a very small portion of Xanax and
8   propranolol as prescribed by my physician.
9      Q.   Did you take that today?
10      A.   I did.
11      Q.   Do you take Seroquel now?
12      A.   I do not.
13      Q.   You do not?
14      A.   I do have a prescription for it for
15   sleep, but I do not take it.
16      Q.   And with respect to these medications
17   we were talking about, Prozac, Zoloft, Xanax,
18   Ambien and also -- excuse me. Prozac, Zoloft, Xanax,
19   Ambien propranolol and Seroquel, were you taking any
20   of those on April 26 of 2013?
21      A.   I doubt it because it was a day where I
22   was going to travel and I was not going to be in a
23   public speaking role.
24          Just to reiterate, these are for
25   periods in which I am giving a presentation to a

## Page 76

1   large group of people which is a normal part of my
2   business activity.
3      Q.   Sure.
4      A.   I think it says here at the bottom of
5   your exhibit, may discontinue propranolol and Ambien.
6   I'm not taking Ambien, Zoloft, and what was the other
7   one? Prozac.
8      Q.   Right. Okay.
9      A.   And this was 2010.
10      Q.   I'd like to turn your attention to NJSP
11   Martinez 329.
12      A.   Um-hum.
13      Q.   The chief complaint section of this
14   page mentions that you and your wife were working out
15   your relationship after she cheated on you?
16      A.   Correct.
17      Q.   Near the bottom of that little
18   paragraph, the chief complaint paragraph, it says
19   feels that the meds helped him cope with the marital
20   crisis. So is it true that those medications had a
21   purpose beyond just helping you at work?
22      A.   Yeah. Again, what was Seroquel for?
23   It was for sleep. I was having a difficult time
24   sleeping during that period of my marriage and the
25   Seroquel helped give me a good night's rest.

## Page 77

1      Q.   But with respect to coping with the
2   marital crisis, let's say the ante-anxiety medication
3   Xanax, that wasn't for coping with the marital
4   crisis?
5      A.   No, that was for public speaking to
6   relax me. The Seroquel was for me to be -- finally
7   be able to sleep. I was going through a very
8   difficult period, I was having difficulty falling
9   sleep at night and Seroquel helped with that.
10          You might want to also consider the
11   dosage that's prescribed. It could be the bare
12   minimum.
13      Q.   I can't do that, I'm not a doctor.
14      A.   It could be the half of a bare minimum.
15      Q.   Understood.
16          MR. LOUGHRY: It could be.
17          THE WITNESS: I'm implying that it is.
18   Reports sleeping well on Seroquel.
19   BY MR. MARSHALL-OTTO:
20      Q.   I want to bring your attention to NJSP
21   Martinez 342. Actually, 341 to 342.
22      A.   Okay.
23      Q.   Beginning at the very bottom, 341.
24          It says: Patient with history of
25   anxiety who reported with loss of follow-up who

Pages 74 to 77

Joel Martinez                                                    April 26, 2018

Page 78

1   reported with episode of severe anxiety after, this
2   appears to be a typo, he but it says the, T-H-E, ran
3   out of the Seroquel. Patient reported he with the
4   inability to lower his heart rate. Patient reported
5   with severe anxiety. Patient reported with frequent
6   awakening. Patient reported with good response to
7   Xanax.
8          This report discusses frequent
9   awakening, severe anxiety and inability to lower
10  heart rate, right?
11      A.    Consistent with what I had expressed
12  earlier, that is correct, having difficulty falling
13  asleep.
14      Q.    Right. And it appears that the notes
15  record a good response to Xanax with respect to those
16  issues.
17      A.    By good response, what do you mean?
18  Can you elaborate?
19      Q.    Well, I can't elaborate. That's what
20  the notes say. I would assume that a good response
21  would mean that it helped to address the issues noted
22  here such as frequent awakening and severe anxiety,
23  but I have no more than what's available before me.
24          MR. LOUGHRY: Is there a question?
25  BY MR. MARSHALL-OTTO:

Page 79

1       Q.    Well, I asked him, is it accurate to
2   say that there was a good response to the Xanax,
3   i.e., that it helped address the problems mentioned?
4       A.    I mean I can tell you one thing, that
5   the -- I did have a much different form of anxiety
6   because of what had transpired and the conflicts in
7   our marriage were very bad, and I was having more
8   difficulty sleeping at night. So yes, the Seroquel
9   was helpful. I don't know about the Xanax because
10  the Xanax was more for public speaking.
11          And yes, I see here I was going through
12  a bout of depression at that time.
13      Q.    I'm going to make a couple
14  representations to you and then follow up with a
15  question.
16          I'm going to represent to you that the
17  health records that I have before me are in
18  chronological order and I'm going to represent to you
19  that the first health record in here that comes after
20  the date of April 26th, 2013 is the record beginning
21  on NJSP Martinez 341 dated July 23rd, of 2013.
22      A.    The one that describes an uptick in
23  anxiety and depression?
24      Q.    The one that describes your anxiety and
25  treating with Xanax, et cetera.

Page 80

1       I want to ask you -- I want to make one
2   more representation.
3          I represent to you that there is no
4   discussion or no note of the incident with Trooper
5   Rivera in this particular record and I'm wondering,
6   wouldn't that be something that you would have
7   mentioned to your mental health professional?
8       A.    During every session. During every
9   session you can directly call Dr. Negron and ask if
10  this situation with the trooper is discussed or not.
11      Q.    Well, that's my point. Because I can
12  also represent to you that in the entries that
13  follow, July 23rd 2013, there are notations regarding
14  the affair and the apparent issues that it caused
15  you. I'm wondering why the soonest in time after the
16  event had no mention of that affair?
17          Is that a simple failure of your
18  psychiatrist to note anything or do you think it
19  wasn't discussed yet at that time.
20          MR. LOUGHRY: Just note my objection to
21  form. You can go ahead.
22          THE WITNESS: Repeat your question,
23  please.
24  BY MR. MARSHALL-OTTO:
25      Q.    Sure. Maybe I can phrase it a little

Page 81

1   better.
2          Do you have a specific recollection of
3   mentioning the incident with Trooper Rivera at your
4   session on July 23rd of 2013?
5       A.    I mentioned that event in one shape or
6   another during every session that I've had with this
7   mental healthcare professional. In fact, I was
8   concerned for my safety after the event and I
9   actually had this conversation with my primary care
10  physician as well as my parish priest as well as my
11  mom. I was afraid.
12      Q.    So the fact that anything with respect
13  to the incident and the problems it was causing you
14  can't be found in the July 23rd, 2013 entry is not
15  something you can speak to?
16      A.    You'd have to ask the doctor.
17      Q.    Fair enough.
18          I want to bring your attention to NJSP
19  Martinez 351.
20          This is about, I'll represent to you,
21  date noted on this entry is April 21st of 2015 which
22  is about two years after the incident with Trooper
23  Rivera. The notes indicate, quote, patient reported
24  also with a civil case against a State Police. The
25  police was having an affair with his wife and that's

Joel Martinez                                              April 26, 2018



Page 82

1    all it says about the lawsuit.
2            Isn't it true that the civil suit is
3    about the affair that Trooper Rivera was having with
4    your wife at the time?
5        A.    Say that again.
6        Q.    These health records note a civil case
7    against the State Police, period.
8        A.    Where? Which part?
9        Q.    The middle of the second paragraph.
10   Quote --
11       A.    On 351?
12       Q.    On 351.
13           Quote, patient reported also with a
14   civil case against the State Police.
15           Actually that's comma. The police was
16   having an affair with his wife.
17       A.    Okay.
18       Q.    It appears reading this that the two
19   are very intimately connected, that this is a civil
20   case against someone who is having an affair with
21   your wife. There is no mention of him having caused
22   you a wrongful arrest and perpetrating any other harm
23   like excessive force against you.
24           Did you tell your therapist or whomever
25   you were speaking to that you had a civil case

Page 83

1    against the State Police because the police was
2    having an affair with your wife, as it states here?
3        A.    How and in which way the healthcare
4    professional puts down his notes to jog his memory is
5    an issue you'll have to take up with him. I have
6    been extremely transparent with my therapist and he
7    knows the story from cradle to grave.
8            Again, I am in no way in this fight for
9    justice and wrongdoing and abuse of public trust
10   because of an affair with my wife. I've moved on. I
11   have divorced her. I have achieved an annulment. I
12   am in communication with other females. This has
13   nothing to do with the affair. If anything, Vicky
14   was responsible along with the trooper for their
15   affair. I am in this legal process for wrongful
16   arrest and lies made against my character and
17   fabrication of charges that never took place so that
18   this cannot happen to another person going forward.
19           I thought I made that specifically
20   clear and I'm sorry that syntax that is short and one
21   sentence or two from a mental healthcare professional
22   could lead you to make that conclusion.
23       Q.    And I'm simply reading what's on the
24   paper. And we're going to move on.
25           In fact, I may be done.

Page 84

1        MR. MARSHALL-OTTO: I'm finished.
2        MR. LOUGHRY: Okay. Thank.
3    (Witness excused)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 85

1            C E R T I F I C A T E
2
3        I, Theresa Mastroianni Kugler, a Notary Public
4    and Certified Shorthand Reporter of the State of New
5    Jersey, do hereby certify that prior to the
6    commencement of the examination,
7            J O E L   M A R T I N E Z,
8    was duly sworn by me to testify the truth, the whole
9    truth, and nothing but the truth.
10       I DO FURTHER CERTIFY that the foregoing is a
11   true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place, and on the date hereinbefore set forth, to the
14   best of my ability.
15       I DO FURTHER CERTIFY that I am neither a
16   relative nor employee nor attorney nor counsel of any
17   of the parties to this action, and that I am neither
18   a relative nor employee of such attorney or counsel,
19   and that I am not financially interested in the
20   action.
21
22
23       _____
         Theresa Mastroianni Kugler, C.S.R.
24       Notary Public, State of New Jersey
         My Commission Expires May 5, 2021
25       Certificate No. XIO857

Pages 82 to 85

# C E R T I F I C A T E

I, Theresa Mastroianni Kugler, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.


Theresa Mastroianni Kugler, C.C.R.
Notary Public, State of New Jersey
My Commission Expires July 15, 2021
Certificate No. XI0857